UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 26-mj-03259-LFL
Case No. 26-mj-03260-LFL

IN THE MATTER OF EXTRADITION OF
TRISTAN TATE
_______________________________/

IN THE MATTER OF EXTRADITION OF
EMORY ANDREW TATE
_______________________________/

**EMORY ANDREW TATE'S AND TRISTAN TATE'S REPLY IN SUPPORT OF THEIR MOTION FOR RELEASE PENDING EXTRADITION PROCEEDINGS**

For all of its 38 pages, the government does not deny the material facts supporting the Tates' motion for release.

The government does not deny the numbers: 1,193 days of supervised conduct, thirty-four departures and thirty-four returns, and zero failures to appear.

It does not deny that each of the 34 times that the Tates traveled internationally, they returned to Romania to check in with the judicial authorities as ordered.

It does not deny that the brothers fully complied with their obligation to appear whenever summoned.

It does not deny that every Romanian judicial officer who has considered whether to detain the Tates since their initial arrest has declined to do so.

It does not deny that Romania has a standing surrender order requiring the Tates to be turned over to the U.K. after the Romanian proceedings conclude.

And it does not deny that the brothers were arrested at a publicly advertised boxing match in downtown Miami, just four days after posting information about the event to their millions of followers.

Yet, the government asks this Court to keep the brothers detained in the Special Housing Unit ("SHU") at FDC-Miami for an undefined period of time. In support of its request, the government relies only on: (1) years-old social media posts *from a satirical account that does not belong to Andrew Tate*; (2) "recent Romanian charges" of alleged witness interference based on conduct that the Romanian authorities have known about for years; and (3) the strong presumption against bail in extradition proceedings.

In short, the government offers speculation. By contrast, the Tate brothers offer a documented record of compliance. Every fact the Tates rely on is sworn, certified, or issued by a judicial officer.

Consequently, Andrew and Tristan Tate have more than met their burden to show that the Court should release them on the conditions proposed in their Motion for Release Pending Extradition Proceedings (the "Motion").[1]

## ARGUMENT

### I. The Tates are Not a Danger to the Community.

For the first time in this proceeding, the government reports that DIICOT (the Romanian law enforcement agency) brought charges against Andrew and Tristan Tate in July 2026 for "influencing witness statements." DE#37, p. 7. According to a July 27, 2026 letter submitted by the Romanians, the alleged conduct occurred between January 2023 and July 2024, while the Tates were in pretrial detention and under judicial supervision. DE#37-3, p. 5. The government contends that this alleged

[1] As set forth in their Motion, the Tates maintain that the Court should adopt the preponderance of the evidence standard in determining whether they meet the criteria for bail, but they also meet the higher clear and convincing standard.

conduct demonstrates the Tates pose a danger because the conduct constituted new criminal conduct while on pretrial release. DE#37, p. 17. The record does not support this conclusion.

*a. The Romanian Authorities did not Detain the Tates as a Danger to the Community Despite Knowing about these Allegations.*

The influencing charges are based on allegations the Romanian authorities have known about since they began investigating the Tates. *See, e.g.,* March 7, 2026 Ordinances as to T. Tate and A. Tate, attached as **Exhibits 1 and 2**; March 27, 2026 Ordinance, attached as **Exhibit 3**. The March 2026 ordinances demonstrate that an extension of the criminal prosecution for influencing statements was ordered as early as February 2023. The Romanian authorities knew about these allegations every time they considered whether to detain the Tates.

In August 2024, DIICOT asked the Bucharest Tribunal to detain the Tate brothers. The Tribunal rejected the request, imposing house arrest on Andrew and judicial control on Tristan. Ex. 1, p. 7. DIICOT appealed and lost again. The Bucharest Court of Appeal rejected the appeal and maintained the preventive measures ordered by the Tribunal. *Id*.

Only a few months later, in February 2025, the Romanian authorities removed the Tates' travel restrictions based on their excellent record of compliance and lack of risk of flight. *See* DE#30-6, p. 7; DE#30-5. The Tates' judicial supervision, with no limitations on travel, continued for more than a year, until the brothers were arrested in the United States in July 2026.

The point is not that the Romanian authorities found the allegations meritless, but that the Romanian authorities knew about the allegations and still allowed the Tates to remain on conditions of release. This point directly undermines the government's claim that these allegations now require detention in the United States.

*b. There are No Allegations of Threats or Violence.*

Unproven witness tampering allegations do not establish dangerousness, and there are no allegations that the Tates threatened or harmed any witness.

The so-called "witnesses" that the Tates allegedly bribed are women who knew the Tates and wanted to speak on the brothers' behalf, but could not afford to travel to Bucharest to give statements to the authorities. The Tates helped coordinate their travel so that the women could speak with the authorities or hired legal counsel to represent them. *See, e.g.,* Ex. 1, pp. 9-10 (summarizing the influencing allegations against Tristan); Ex. 2, pp. 11, 17 (summarizing the influencing allegations against Andrew). The Romanians also characterized bringing a defamation suit against the accusers in the United States as "acts of a manifestly intimidating effect." Ex. 2, p. 17. This conduct is not "witness tampering" or "coercion."

The government has identified no evidence that the Tates personally threatened any witness, directed anyone to threaten a witness, or engaged in violence against a witness. Nor has it identified a witness who was actually intimidated by either Andrew or Tristan. At most, the government relies on allegations that third parties sent threatening messages online, but it offers no evidence of those messages.

The U.K. likewise asserts the complainants in the U.K. "fear" intimidation because of "the resources available to Andrew and Tristan Tate, and…their propensity to intimidate vulnerable complainants." DE#37, p. 12. But fear of what the Tates might do is not evidence of what they have done. There are no allegations of actual intimidation or even contact with the complainants in the U.K. Indeed, Andrew and Tristan have not been told the identities of the complainants in the U.K.

*c. The Use of Legal Process is Not Intimidation.*

The government also suggests the Tates' use of legal process to discover the identity of their accusers is intimidation. It is not.

The Tates have hired counsel, rather than resorting to self-help, to seek disclosure of the complainants' identities in the High Court of Justice. *See* R (Tate) v. Dir. of Pub. Prosecutions [2026] EWHC (Admin) 1600 (Eng.); Mot., p. 20; DE#30-8, ¶ 12. Since March 2024, the Tates' English solicitors have dealt directly with Bedfordshire Police and with the Crown Prosecution Service. The Tates have not attempted to identify the complainants through their followers or otherwise outside the legal process. Additionally, a confidentiality order has been in place in the civil case in the U.K. since its inception in December, 2024, and there have been no allegations that Andrew has violated that order. A copy of the Order is attached as **Exhibit 4**.

Nor was the offer of 40,000 pounds as "security" in exchange for the complainants' names intimidation. U.K. counsel Andrew Ford proposed the offer to protect the complainants' identities by imposing a financial consequence for any breach of confidentiality. DE#30-8, p. 54. Mr. Ford explained to the CPS that the purpose of the offer was to "strike[] a proportionate and practical balance between the interests of justice, including our clients' right to a fair trial under Article 6, and the legitimate concern to safeguard the identities of the complainants," and to enforce the confidentiality obligations against the Tates with a "tangible financial consequence in the event of non-compliance." *Id*. This is litigation, not intimidation.

Similarly, bringing a civil defamation action against a Romanian accuser in Florida is an appropriate use of legal process, not evidence of dangerousness. *See* DE#37-1, p. 12. On July 11, 2023, the Tates filed suit in the Fifteenth Judicial Circuit, Palm Beach County, Florida, against a Florida resident who had accused both men of sexual assault and human trafficking. *Tate v. Doe*, No. 50-2023-CA-011904-XXXX-MB.

Along these lines, the government suggests the Tates' counsel intimidated the accuser by speaking negatively about her on a podcast. In fact, the Palm Beach

Circuit Court Judge presiding over the litigation (the Honorable G. Joseph Curley, Jr.) expressly recognized counsel had a First Amendment right to comment on the litigation and denied the defendants' motion for a protective order precluding the Tates' lawyer from issuing prejudicial extrajudicial statements about the accuser. Judge Curley held: "Plaintiffs are not prohibited from commenting on the litigation in general based primarily on their First Amendment freedoms that allow them to make certain statements." *See* August 2, 2024 Order Denying Defendants' Joint Motion for Protective Order, *Tate v. Doe*, Case No. 2023-CA-011904-XXXXMB, attached as **Exhibit 5**.

Further, on October 23, 2025, Judge Curley dismissed the accuser's counterclaim against the Tates for trafficking. *See* October 23, 2025 Order, *Tate v. Doe*, Case No. 2023-CA-011904-XXXXMB, attached as **Exhibit 6**. Judge Curley ruled the counterclaim "fails to sufficiently allege that Plaintiffs used force, fraud, or coercion to cause or to attempt to cause Jane Doe to engage in a commercial sex act," and that it "sets forth allegations of a romantic relationship, travel and business offers and lacks the specificity of fraud, force or coercion." *Id*. Judge Curley found no criminal enterprise, no pattern of criminal activity, and "at most emotional damages." *Id*. He dismissed six of the seven counterclaims. *Id*.

In the letter from the UK, Senior Specialist Prosecutor Southam cites to a *New Yorker* article and claims the Tates' counsel "published [the accuser's] name, birth date, and passport number, along with her parents' address." DE#37-1, p. 12. But this disclosure occurred because personal information was inadvertently filed on the docket. This error was immediately rectified, and the confidential information was swiftly removed.

d. *The Social Media Post Offering a Reward for Identification is Unrelated to these Proceedings.*

The government relies on a September 16, 2025 post on X by Andrew offering a $10,000 reward for the identification of a man. DE#37, p. 12. The U.K. characterizes the post as evidence that the Tates would attempt to identify and intimidate witnesses if released. DE#37-1, p. 13. But the post had nothing to do with these proceedings.

The unidentified man pictured in the tweet had posted a comment, two days after Charlie Kirk's assassination, that Andrew needed "a dose of what Charlie got." *See* September 16, 2025 post by @CobraTate, attached as **Exhibit 7.** Andrew asked his followers to identify the perpetrator of the threatening tweet so Andrew could report him to law enforcement. *Id*. The government is mischaracterizing a post designed to identify the perpetrator as evidence that Andrew would intimidate a witness.

e. *The Allegations, Standing Alone, Cannot Establish Dangerousness.*

The government's dangerousness argument ultimately rests on the unproven U.K. and Romanian charges. Neither Andrew nor Tristan has ever been convicted of an offense in the United States, the U.K., Romania, or elsewhere.

More importantly, the Romanian authorities have already evaluated the Tates' conduct and record and repeatedly determined that detention was unnecessary. As recently as July 23, 2026, Romania certified the Tates "have fully complied with the obligations imposed upon them," appeared for all summonses, and complied with every measure ordered. DE#37-2, p. 7. The government has no persuasive retort to this finding.

Instead, it relies on *In the Matter of the Extradition of Bell,* where Judge Matthewman found Bell failed to establish he was not dangerous while facing an allegation of forcible rape. 2021 WL 1616127, at *7 (S.D. Fla. Apr. 26, 2021). Bell

left the United Kingdom on a flight to Miami less than one month after the offense was reported, and then refused to return, which the court read as "the avoidance of prosecution." *Id*.

This case is different. The Tates have no criminal record, have demonstrated years of compliance with judicial supervision, and are not "refusing" to return to the U.K. The Tates' compliance record is clear and convincing evidence they are not a danger to the community and will comply with conditions this Court imposes.

## II. The Tates are Not a Flight Risk

The government has provided the court with dozens of "posts" on social media to support its assertion that the Tates pose a risk of flight because (1) they have "multiple identities" that they use to "evade law enforcement;" and (2) they have "excessive wealth and influence." DE#37, pp. 9-14.

Almost every single one of these posts is from an account named @OfWudan. *This account does not belong to Andrew Tate, and he did not generate these posts.* Moreover, the posts are from 2019 to 2021, years before the Tates were ever arrested in any country.

Andrew's social media account is @CobraTate, a business account where he often posts promotional content. Other users who work for and with Andrew have access to the account; members of his team have continued to post from the account while he has been in custody.

The government is asking this Court to treat posts that are obvious satire, hyperbole, and promotion—and *that were not even written by Andrew*—as evidence of risk of flight. They are not.

### *a. The Tates Have **Never** Fled from a Criminal Investigation.*

Between January 2023 and October 2025, Andrew and Tristan were under investigation in four different jurisdictions in the United States: a sealed federal grand jury investigation in the Southern District of New York, a border action by the

Department of Homeland Security, a criminal referral in Los Angeles County, and a criminal investigation by the Florida Office of Statewide Prosecution. *See* August 20, 2026 declaration of attorney Joseph McBride, attached as **Exhibit 8**. While subject to these investigations, the brothers retained counsel, remained accessible, and cooperated with authorities. *No charges were ever filed.*

*The Southern District of New York Investigation:*

On January 17, 2023, under a sealed nondisclosure order entered pursuant to 18 U.S.C. § 2705(b), a grand jury in the Southern District of New York issued a subpoena to Google for Andrew Tate's account records dating back to January 1, 2018. McBride Dec., ¶ 6. Andrew and undersigned counsel McBride learned of the subpoena in January 2025. *Id*. On January 30, 2025, McBride obtained a copy of the subpoena. *Id*., ¶ 7. McBride attempted repeatedly to contact the Assistant United States Attorney handling the investigation. *Id*., ¶ 8. Between January and April 2025, McBride placed numerous calls to the S.D.N.Y. U.S. Attorney's Office. *Id*. McBride last spoke with Jacqueline Kelly of that office on April 7, 2025. *Id*. During those communications, and after Andrew entered the United States in February of 2025, McBride offered to take Andrew to the U.S. Attorney's Office for a proffer. *Id*., ¶ 9. The offer was not accepted and no interview was ever scheduled. *Id*. The government never disclosed the nature of the investigation, and *no charges were ever brought. Id*., ¶ 10.

*The Homeland Security Investigation:*

Two days after Romania lifted the travel restriction on February 25, 2025, the Tates returned to the United States. *Id*., ¶ 11. Upon entry on February 27, 2025, the Department of Homeland Security (DHS) seized their electronic devices. *Id*. McBride contacted DHS about the seizure and received a letter from DHS counsel on March 10, 2025, asserting border search authority for the seizure. *Id*., ¶ 12. McBride pressed by telephone for additional information but received no further

response. *Id*., ¶ 13. To this day, there has been no explanation as to why the devices were seized. *Id*. The government has held the contents of both brothers' telephones *but has never charged either brother. Id.*

*The Los Angeles County Investigation:*

In 2025, the Family Violence Division of the Los Angeles County District Attorney's Office reviewed a criminal referral arising from an accusation against Andrew. *Id*., ¶ 14. On June 27, 2025, the Division issued a declination letter explaining that the office would not file charges. *Id*., ¶ 15. Andrew did not evade the investigation while it was pending. Instead, McBride, retained Jason Koch, Esq., as California counsel for Andrew Tate. Mr. Koch's declaration addresses the particulars of the California proceedings and is attached as **Exhibit 9**. No criminal charge was ever filed against Andrew Tate arising from that Los Angeles County referral. McBride Dec., ¶ 16.

After the District Attorney's Office declined to prosecute, the accuser filed a civil suit against Andrew in California state court, and Andrew filed a cross-complaint for defamation. Koch Dec., ¶¶ 5-6. The accuser filed a special motion to strike the cross-complaint, which was granted in part and denied in part. *Id*. Following the Court's ruling, the accuser did not file an answer or other responsive pleading addressing the portions of Tate's cross-complaint that remained operative, and on April 21, 2026, the clerk of the court entered the accuser's default on Andrew's cross-complaint. *Id*., ¶¶ 8-9. The accuser's complaint against Andrew is still pending and Andrew continues to defend against the claims asserted in that complaint. *Id*., ¶ 14.

*The Florida Attorney General's Office Investigation:*

In April 2025, the Florida Office of Statewide Prosecution opened a criminal investigation into Andrew and Tristan. McBride Dec., ¶ 17. The Attorney General's

civil attorneys also sought to intervene in the Tates' pending Palm Beach County civil action in order to obtain access to sealed materials. *Id*.

On May 2, 2025, Special Counsel Rita Pavan Peters wrote to counsel that she appreciated our willingness to cooperate, had a duty to review potential exculpatory information, and would conduct a complete review before deciding. *Id*., ¶ 18. On May 8, 2025, McBride and Special Counsel Peters agreed to stay the Palm Beach civil action for sixty days to allow time for the investigation. *Id*. On June 13, 2025, McBride provided the documents requested by the AG's Office without requiring a subpoena. *Id*., ¶ 19. Between May and October 2025, counsel for the Tates communicated with Ms. Peters concerning the investigation and Assistant Attorney General James Waczewski and other civil attorneys concerning the proposed intervention. *Id*., ¶ 20. McBride supplied information and records in response to those communications without requiring compulsory process. *Id*.

On September 25, 2025, Ms. Peters informed McBride and undersigned counsel Maniotis via telephone that the investigation had concluded. *Id*. ¶ 21. McBride requested a declination letter and confirmed with Ms. Peters that he would inform Judge Curley of the decision to close the investigation. *Id*. Ms. Peters indicated that a declination letter could follow a final review and did not object to McBride representing to Judge Curley that the investigation had closed. *Id*.

A few weeks later, on October 17, 2025, Ms. Peters clarified in writing that law enforcement had several items pending and she could not yet close the case. *Id*. ¶ 22. In the same email, Ms. Peters wrote: "I also appreciate you and your clients being cooperative with us and providing us information to consider in this investigation." *Id*., ¶ 23. Ms. Peters also wrote that she did not suspect charges were imminent, that the AG's Office did not then intend to intervene in the civil case, that she could not confirm a final charging decision, that FDLE's investigation remained pending, and that she would provide a declination letter "if and when that is the final

resolution." *Id*. McBride heard nothing further from the agency. *Id*., ¶ 25. Although no formal declination letter was provided, no charges were filed against Andrew or Tristan. *Id*.

While the investigation was pending, Andrew and Tristan traveled to Florida on three separate occasions, despite knowing that they were the subjects of an active criminal investigation. *Id*. ¶ 26. They have never attempted to evade, obstruct, or otherwise avoid the authorities conducting the investigation.

*b. The Tates Do Not Use Fake Identities to Evade Law Enforcement.*

The social media posts regarding passports are plainly satirical. Although they appear as though Andrew posted them, he did not.

A review shows the number of passports and licenses Andrew supposedly possesses changes from post to post. In one of the first tweets the government cites (posted in 2019), "Andrew" claims to have a Romanian passport:




Andrew is not a Romanian citizen, and he has never had a Romanian passport. Further, the phrases "HARD TO KILL" and "ABOVE THE LAW" are titles of movies by Steven Seagal, with whom the brothers are socially acquainted. Andrew and his fan base use them as catchphrases.

The video in which Andrew claimed to possess passports from Estonia, Nigeria, Poland, the U.K., and the U.S. was a joke, complete with Andrew portraying a false Nigerian accent. DE#37, p. 10.

The August 12, 2020 post by @OfWudan shows a picture of Andrew on a train, purportedly escaping the German border, because "French and German police are after me." The Tates are not aware of any charges pending against Andrew in France or Germany, ever. DE#37, p. 10. This same parody account, not Andrew, posted the 2021 tweets criticizing Spanish authorities.

The so-called Mexican "passport" bearing the name "Vladimir Scorpius" was a cardboard prop Tristan used for a Halloween costume. The fact that Tristan used this name as a joke explains why the U.K. found "evidence corroborating" Tristan's connection to the name, including an online video where Tristan says "I'm Captain Vladimir Scorpius" while standing on a ship, and Tristan's registration as a director of a U.K. company called "Scorpius Ltd." DE#37, p. 10.

The running joke also explains why Mexican officials were unable to find a record of ever having issued a passport in the name of Vladimir Scorpius. *Id.*

A die-hard 007 fanatic would immediately recognize the name Vladimir Scorpius as a fictional character from the 1988 eponymous James Bond novel. *See* DE#37, fn. 7. A Google search of the name would have revealed the same. *See* https://en.wikipedia.org/wiki/Scorpius_(novel). No one can seriously suggest that Tristan adopted a covert identity, with the purpose of evading international law enforcement, under the name of a famous fictional supervillain.

Andrew and Tristan are social media personalities. Their business model depends on online attention. The outrageousness of the posts by them and about them is the point. The more hyperbolic and outlandish the post, the more likely it will generate views and likes, which in turn generates income. In short, *they are playing a role.*

During a 2026 deposition, Andrew explained his made-for-social-media character "Top G", testifying that: "Top G is a character" and "that character, you know, hyperbolically will say what he believes to be true and perhaps sometimes

he'll exaggerate for comedic effect." *See* April 23, 2026 deposition of Andrew Tate, at p. 9, attached as **Exhibit 10.** He added, "Top G takes stories and he makes them as entertaining as possible. I think everybody who watches my content understands that a lot of it is hyperbolic. I don't think there's a single episode of anything I've ever made where people cannot tell that I am being deliberately sarcastic or hyperbolic." *Id.*, p. 68. Andrew also admitted that his self-description as a "trillionaire" on his website is "a hyperbolic exaggeration for comedic effect." He stated: "I don't think anybody believes I'm a trillionaire, just like nobody believes I was a pimp. It's called playing a character. It's hyperbolic for comedic effect. No one believes I'm a trillionaire. I also said I was an astronaut, but I've never been to the moon." *Id.*, p. 84. In the same deposition, Andrew testified that he did not recognize the handle @OfWudan and that it was an account impersonating him. *Id.* at pp. 274-75.

Similarly, Tristan testified these posts are "clearly a joke." *See* April 21-22, 2026 deposition of Tristan Tate, at p. 373, attached as **Exhibit 11.** He also testified: "My brother brags that he's a trillionaire and the world's first trillionaire, and I back up his claims all the time. Of course that's a lie." *Id.*, p. 372. Tristan also stated that certain claims he made on a podcast were "a gratuitous attempt at self-promotion, and nothing I say in this podcast should be taken seriously. It sounded cool at the time." *Id.* at 374.

Andrew's posts on his own account, @CobraTate, are designed to sell this character. For example, Andrew has claimed:

> "[I] can send anything to 9 figures with a single tweet." *See* https://x.com/Cobratate/status/1849486763540025703 .
>
> "In mortal kombat, I would destroy a singular wolf. Decimation. I am one of the most powerful humans on the planet." https://x.com/Cobratate/status/1647951704942313472 .

"Sooner or later I will be the British PM and we will destroy these lying scum." https://x.com/Cobratate/status/1877511513553932449 .

"My podcasts are the most viewed on the planet because I do not waste the viewers' time."

https://x.com/Cobratate/status/1838633329526214926 .

All of these posts are hyperbole.

The government offers no evidence that the Tates' social media persona corresponds to actual false identities, much less that either Tate has ever used a false identity to evade law enforcement.

Other than the @OfWudan tweets from 2019 to 2021 and self-promoting social media videos, the government has no evidence that the Tates have used false identities. And neither the government nor the U.K. identifies any instance in which either Tate used a false passport to evade authorities.

Instead, the government's own evidence establishes only that the U.K. has been unable to trace some of the Tates' travel. DE#37, p. 10. This deficit likely arises because, although the Tates have U.K. and U.S. passports, they travel with their U.S. passports almost exclusively.[2] Undersigned has submitted a FOIA request to Customs and Border Protection for a history of their travel as associated with their U.S. passports to demonstrate the Tates are traveling with valid travel documents and will provide the Court with these documents as soon as they become available.

Finally, only Andrew has a Vanuatu passport.

Counsel has physical custody of all five passports (U.S. and U.K. passports for both brothers, and a Vanuatu passport for Andrew) and will surrender them to Pretrial Services should the Court set a bond.

---

[2] Tristan uses his U.K. passport when he travels to Dubai, because his residency card is linked to his U.K. passport. Otherwise, he uses his U.S. passport.

*a. The Tates Do Not Have "Excessive Wealth and Influence," and Any Wealth Does Not Establish a Flight Risk.*

Whatever resources the Tates possess, they have not used those resources to flee. They have traveled openly to Dubai and the United States (both places where they could be extradited by the U.K.), and they have repeatedly returned to Romania as required. Their actual conduct is far more probative than their social media activity.

The government alleges that the Tates are a risk of flight based on their social media claims that they are "self-proclaimed *billionaires"* who own "high-end vehicles, private jets, and a custom $50-million-dollar superyacht and have unrestricted access to traditional funds, cryptocurrency, and bitcoin." DE#37, p. 11. To support this, the government points to the theatrical social media where the Tates boast about owning luxury goods. *Id*. But the government has not established these grandiose claims are true. Once again, the government provides speculation, but offers no evidence of ownership, only videos, podcast boasts, and a market-capitalization figure for a meme coin. DE#37, p. 12-14.

A promotional video filmed aboard a yacht is not evidence of title to the yacht. DE#11, p. 24. As set forth in the Motion, the "superyacht" does not belong to the Tates. They received payment to promote the ship on social media.

Further, the Tates are engaged in several businesses "teaching" men how to earn money. It is in their interest to portray themselves on social media as uber-wealthy. For example, the $2.1 million Aston Martin and $5 and $7 million Bugattis featured in Tristan's videos were rented. The valuation of Andrew's watch collection is based on a third-party enthusiast publication. DE#37, p. 13. As to the government's assertion about Andrew's meme coin, the valuation does not equal Andrew's actual holdings. The government's meme-coin figure is a market capitalization; it is the aggregate value of all of the meme coins in existence, held by

everyone in the world. Andrew did not create DADDY. He holds a quantity of the coin the way a shareholder holds stock, and he only owns approximately 1% of the total coins, worth approximately $70,000.

The government claims that the Tates have "influence over foreign authorities," [DE#37, p. 9], but there is no evidence presented to the Court to support this claim.

Regardless of the extent of their wealth, the Tates cannot access the majority of their assets because the Romanian authorities seized or restrained them. *See* Ex. 10, p. 308. (Q. You don't own any property? A. (by Andrew) It's all been seized.); Ex. 11, p. 59 (by Tristan: The Romanian justice system was very happy to attack me because they seized almost $20 million of money from me, which I have never seen again and never got back. They've stolen almost all of my assets.").

*b. The Tates are Not "Unwilling" to Return to the U.K.*

The government claims that the Tates have refused to return to the U.K. willingly. DE#37, pp. 2-3; DE#37-1, p. 6. This is inaccurate.

The Tates have not returned to the U.K. because doing so would violate the Romanian proceedings governing their release. The extradition order postpones their surrender until the criminal case is resolved in Romania. See DE#30-1; 30-2. In his declaration, U.K. counsel Andrew Ford states: "The Tates fully intend to participate with U.K. proceedings but, as ordered by the Court, only once Romanian proceedings have concluded." Mot., p. 36; DE#30-8, ¶ 17.

Prior to their arrest in Romania, the Tates frequently traveled to the U.K., even while the U.K. was actively investigating them. They never hid from the U.K. authorities. In fact, in December 2022, before they were arrested in Romania, Andrew traveled to London and appeared on a television program.

The Tates have also attempted to participate in the court proceedings in the U.K. U.K. counsel Ford has offered to make the Tates available for interview in

Bucharest, but the Crown Prosecution Service refused. DE#30-8, ¶ 15. Additionally, Andrew inquired in correspondence with the CPS whether it would be possible for the warrant issued in January 2024 to be suspended to allow him to return to the U.K. to participate in the High Court proceedings without being taken into custody, but again, the CPS refused. DE#37-1, p. 6.

It is difficult to characterize the Tates as "stridently unwilling to voluntarily return to face prosecution," DE#37, p. 2, when they offered to make themselves available to law enforcement and were refused.

*c. The Tates' Public Profiles Make Flight Unlikely.*

Without any evidence, the government speculates the Tates could enlist their "millions of dedicated followers" to help them disappear. DE#37, p. 20. In fact, their extraordinary public profiles would make successful flight particularly difficult. As an example, the U.S. Marshals located the Tates in Miami through their social media posts. DE#3, ¶¶ 7(g), 9.

Finally, the circumstances have not "changed," as the government claims. The government argues that the Tates must be detained because they "could stop posting about their locations at any time," and the calculation of flight risk "changed" after the Tates were informed that "the U.K. has dozens of charges against them that carry a possible penalty of twenty years to life imprisonment." DE#37, fn. 11. In support, the government cites this Court's Order in *Duarte*, where the Court concluded that "the circumstances have changed with his arrest, and the absence of evidence of earlier flight are not sufficient to meet his burden to show that he is not a risk of flight *now*." *Matter of Extradition of Duarte Jacquez*, No. 20-mc-022829, DE#24, at 8 (S.D. Fla. Sept. 14, 2020) (emphasis in original).

But this is simply not a change in circumstance. Charges have been pending against the Tates in the U.K. since 2024, and in Romania since 2022. And the Tates know that at the conclusion of the Romanian case (where they also face a potential

lengthy sentence) they will be surrendered to the U.K., regardless of what happens in this extradition proceeding. Accordingly, unlike Duarte, the Tates' documented record of compliance and their dedication to publicly posting their location are "sufficient to meet [their] burden to show that [they are] not a risk of flight *now.*" *Id.*

For all of its argument, the government identifies no actual instance of evasion or non-compliance. The record instead shows the opposite: years of appearances, compliance, voluntary returns to Romania, and public disclosure of their whereabouts. Speculation about what the Tates might do should not outweigh what they have actually done.

## III. <u>There are Special Circumstances Warranting Release.</u>

### *a. The Tates' Years-Long Record of Compliance is Itself a Special Circumstance.*

Contrary to the government's response, Romania knew of the witness-influencing allegations and nevertheless released the Tates and ultimately removed their travel restrictions. DE#37-2; DE#30-6, p. 7; DE#30-5. The Tates traveled to 12 different countries with at least 34 different international flights, and every trip abroad ended in a return to Romania. Those 34 flights represent 34 returns to judicial supervision. Additionally, the Tates cooperated fully with the four investigations in the United States and continued to visit the U.S. even while investigations were pending. This documented record of compliance outweighs any speculative prediction about future non-compliance.

### *b. The Government Misunderstands the Tates' Position on the Romanian Surrender Order.*

The surrender order eliminates the diplomatic concern underlying the presumption against bail. Romania already has a standing surrender order requiring the Tates to be turned over to the U.K. after the Romanian proceedings conclude. The Tates have lived openly under that order for more than two years. *See Wright v.*

*Henkel*, 190 U.S. 40, 62 (1903). There is therefore no diplomatic necessity to detain the Tates merely to ensure that the United States can honor its treaty obligations.

For the same reason, the Court should consider the delay in this case and the availability of bond in the U.K. as a special circumstance. The Tates are not arguing, at least at this point, that the delay in seeking their extradition "should factor into the extradition decision," a question the government notes is left to the Secretary of State. DE#37, p. 23. The point is narrower: while courts do not treat ordinary litigation delay as a special circumstance, the delay here is not ordinary because the U.K. has had a surrender order for more than two years.

The U.K. already has the mechanism it needs to obtain the Tates after the Romanian proceedings conclude. For unknown reasons, the U.K. is now trying to get the Tates into custody another way. This unexplained delay, coupled with the availability of bond in the U.K., undermines the diplomatic necessity for detention. The United States will be able to honor its treaty obligations without detaining the brothers for months.

*c. The Lack of Urgency in Obtaining the Tates' Arrest is a Special Circumstance Supporting Release.*

Although the urgency underlying a provisional arrest warrant may not itself be "subject to judicial review," *Matter of Extradition of Correa*, No. 17-mc-14059, 2017 WL 8780154, at *2 (S.D. Fla. May 8, 2017), it is the precise interest underpinning detention. "The rationale for provisional arrest is to prevent flight in advance of the formal request." *United States v. Messina*, 566 F. Supp. 740, 743 (E.D.N.Y. 1983). Thus, the Court should consider it in determining whether to permit release on conditions.

In fact, the *Messina* Court noted that "the question of urgency goes to the question of whether there are 'legitimate reasons' for detaining a person with a presumption against bail," and "there may be an eighth amendment question when

American citizens are held without bail in advance of a formal extradition request and without a showing of exigent circumstances." 566 F. Supp. at 743. Thus, the Tates' contention that there was no "urgent situation" justifying the brothers' provisional arrest should be a consideration for the Court in determining whether their continued detention is required.

Here, the absence of urgency is particularly significant given the conditions of the Tates' confinement, the Tates' years of compliance, and the existence of Romania's standing surrender order. These circumstances weigh strongly against continued detention.

*d. The Tates' Conditions of Confinement Require the Tates' Release.*

The Tates are being held in administrative segregation on a provisional arrest. The U.K. has still not submitted a formal extradition request, and its deadline to do so is September 16, 2026. Thus, the Tates face several more weeks, most likely months, under administrative segregation, under harsh conditions of confinement.

*Matter of Extradition of Toledo Manrique* is squarely on point: the Tates have not yet been convicted of *any crime*, and yet remain subject to this severe restraint on their liberty. 2019 WL 5168587, at *1 (N.D. Cal. Oct. 10, 2019). According to a supervisory attorney at the Bureau of Prisons, Andrew and Tristan are segregated from general population subject to the following conditions while detained in the SHU:

1. Only five hours per week of recreation (less than one hour per day);
2. Only one phone call per month (rather than the routine access to a phone and 300 minutes per month allocated to inmates in general population);
3. Limited commissary items with access only once every two weeks;
4. No radio; and
5. No television.

These conditions are strikingly similar to those in *Toledo Manrique,* where, as the government acknowledged, Toledo was held in "'a small cell for all but an hour of every two days,' about which a staff psychiatrist at the jail opined had created a decline in the fugitive's mental health." DE#37, p. 28; 2019 WL 5168587, at *2. Toledo had been held in solitary confinement for nearly three months at the Santa Rita Jail due to his status as a former head of state and his request for protective custody. *Id.* He was confined "to a small cell for all but an hour of every two days," and the staff psychiatrist opined that detention under those conditions had "already initiated a marked decline in Toledo's mental health." *Id.* And, like the Tates, "Toledo's detention [was] likely to continue unabated for many months, if not years, in light of the anticipated length of extradition proceedings." *Id.*

The government made the same argument in *Toledo* that "jail administrators are 'accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order'" and therefore "if the government's entitlement to detain a person is not at issue, a court cannot order release to remedy unlawful conditions of confinement outside of narrowly cabined circumstances." *Id*.

But the court was not "question[ing] the Santa Rita Jail's decision to place Toledo in administrative segregation." *Id*. Instead, the court was considering whether to continue "detention in solitary confinement or release on bail." *Id*. In granting bail, the *Toledo* court concluded: "in this context the hardship of detention is one factor among many that can justify release … indeed *Bell* (which is the primary authority on which the government relies) referred to bail hearings as a safeguard that can mitigate restrictive conditions of pretrial detention." *Id*. (citing *Hu Yau-Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981); *United States v. Taitz,* 130 F.R.D. 442, 446 (S.D. Cal. 1990); and *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).

The government has made the same argument to this Court. DE#37, p. 27 (citing *Bell*, 441 U.S. at 547). The *Toledo* court rejected it, and this Court should do the same.

It is antithetical to our justice system for United States citizens with no criminal history, accused of committing crimes based on ambiguous statements by alleged victims, to sit in administrative segregation while they fight the unfounded charges against them, of which they are presumed innocent under our Constitution. They have not been convicted of any crime, here or abroad, nor have they received a single disciplinary infraction, and yet they are subject to some of the most restrictive conditions of confinement in this country.

In fact, the Tates have been subjected to the chemical effects of "pepper spray" in their unit. On August 9, 2026, correctional officers deployed oleoresin capsicum spray (commonly known as pepper spray) against another detainee in the SHU. Andrew and Tristan had no involvement in the incident that prompted its use, yet the spray entered the shared air of the unit and traveled into the cells where the brothers were locked. It burned their eyes, their throats, and their airways. No officer decontaminated them. No medical staff examined them. The brothers wrapped wet T-shirts around their faces and waited for the air to clear.

Approximately two hours after the incident, undersigned counsel Maniotis arrived at FDC-Miami for a legal visit and was brought to the SHU to meet with the Tates. However, the OC spray had not dissipated and Maniotis developed eye pain and had difficulty breathing. He was forced to terminate the visit and seek treatment that evening at Baptist Health's urgent care facility in Miami. Maniotis was diagnosed with acute toxic conjunctivitis and burning sensation of the eye. His eyes were irrigated with ophthalmic solution, and he was discharged with medication and instructions to proceed to the emergency room if his symptoms persisted or worsened. His medical records are attached as **Exhibit 12**.

Every applicable standard runs against what happened in the SHU on August 9, 2026. The Department of Justice's National Institute of Corrections states that OC spray causes complete closure of the eyelids, swelling of the throat that reduces the airway, temporary paralysis of the larynx, and uncontrollable choking, and that the first aid for exposure is "fresh air, copious amounts of cool water and soap." *See* Nat'l Inst. of Corr., Chemical Agent Instructor's Manual, attached as **Exhibit 13**, at p. 3. Law enforcement policy in this district requires that deployment be avoided where OC may affect innocent bystanders, that decontamination begin immediately, that exposed persons be monitored continuously and not left alone, and that "[a]ssistance shall be offered to any individuals accidentally exposed" to the agent. *See, e.g.,* North Miami Police Dep't, Response to Resistance, pp. 18-20, attached as **Exhibit 14;** March 23, 2022 Report Describing the Miami-Dade Police Department's Practices, Policies, and Procedures Related to Arrests, Custody, Physical Restraint, and Use of Force - Directive 20109, pp. 22, 31-32, attached as **Exhibit 15**. The same policy recognizes that air normally reduces the chemical effects of OC within 20 to 30 minutes. Ex. 14, p. 19. The Bureau of Prisons regulations authorize chemical agents only in narrow circumstances, 28 C.F.R. § 552.25, and command that after any use of force, the inmate against whom it was used "shall be examined by qualified health personnel, and any injuries noted, immediately treated." 28 C.F.R. § 552.26(b); *see also* Ex. 15, p. 32 ("When a chemical agent has been applied, first aid shall be administered as soon as practicable."). Under BOP regulations, medical examination is mandatory for the man the spray is aimed at, yet Andrew and Tristan, who were not intended recipients of the spray, received no medical care.

As set forth in the Motion, a pretrial detainee "may not be punished at all," *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), "much less maliciously and sadistically." *Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015); *see also* 4 W. Blackstone,

Commentaries *300 ("[I]f the offence be not bailable, or the party cannot find bail, he is to be committed to the county [jail] ... [b]ut ... only for safe custody, and not for punishment"). Here, the offense is bailable, as the Tates have more than demonstrated the special circumstances required under *Wright v. Henkel,* 190 U.S. 40 (1903).

Even in extradition cases, courts have tolerated restrictive housing only where it was demonstrably temporary. *Cf. Matter of Extradition of Carr*, 2020 WL 4816052, at *6 (N.D. Ill. Aug. 18, 2020) (although two-week solitary confinement for COVID quarantine was not a special circumstance, holding was limited because the conditions were temporary: "there is no reason to expect that the MCC will seek to keep Carr in segregation once he has successfully completed his two-week quarantine."). Here, the conditions of the SHU only magnify the special circumstances and strengthen the case for release. Nothing about this placement is temporary. FDC-Miami has denied undersigned counsel's written request for non-SHU housing for the brothers. The United Kingdom's formal papers are not due until September 16, 2026. The brothers face months more of confinement under extremely restrictive conditions.

Whatever the merits of the underlying allegations, detention in these circumstances should not be presumed necessary where reasonable conditions of release can adequately address the government's concerns. The Tates' conditions of confinement, combined with the lack of diplomatic necessity and their long-standing record of compliance with court orders, constitute special circumstances requiring their release.

*e. The Tates Have a Strong Interest in the Civil Litigation in Palm Beach County*

Andrew and Tristan Tate are the plaintiffs in the Palm Beach County action against a Florida resident who had accused both men of sexual assault and human

trafficking. *Tate v. Doe*, No. 50-2023-CA-011904-XXXX-MB. In *In re Mitchell*, Judge Learned Hand held that an extraditee's participation in a civil proceeding underway at the time of his arrest was a special circumstance warranting bail under *Wright v. Henkel,* because his "whole fortune" depended on the litigation. 171 F. 289, 290 (S.D.N.Y. 1909).

Here, more than money is on the line. The Tates' reputation depends on this litigation. The accuser's claims are directly related to the charges in Romania. The Palm Beach action is the only forum in which these accusations have actually been adversarially tested, and Judge Curley has dismissed six of the seven counterclaims. *See* Ex. 6. Judge Curley found no criminal enterprise, no pattern of criminal activity, and "at most emotional damages." *Id*.

In *In re Extradition of Bowey*, a court held that there was a special circumstance where "releasing Mr. Bowey on bail would allow him to participate in the divorce proceedings in Cobb County Superior Court" that were "directly related to the reasons for his extradition and the resolution of the issues in that matter could directly affect the prosecution of the charges he faces in France." 147 F. Supp. 2d 1365, 1368 (N.D. Ga. 2001); *see also Matter of Extradition of Vladimir Blasko to the Slovak Republi*c, 2018 WL 3691859, at *10 (E.D. Cal. Aug. 1, 2018) ("Blasko's pending asylum case and the imminent merits hearing on his application for asylum constitutes a special circumstance weighing in favor of the setting of bail in this action" where "Blasko's preparation for and participation in the merits hearing [was] 'immediately necessary.'").

The fact that the Tates have spent years on this litigation to clear their name is clear and convincing evidence they are unlikely to flee and abandon their pending civil claims in the United States.

*f. Due Process Requires Release.*

Finally, the Tates submit the Court should not place the burden of proving special circumstances on them at all. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). This reasoning should not disappear solely because the Tates are facing extradition rather than trial.

## IV. Proposed Conditions of Release

The government claims the Tates "declin[ed] to propose a bail package." DE#37, fn.12. This contention is inaccurate.

The Motion proposed a bond, surrender of all travel documents, GPS monitoring, and authority for Pretrial Services to enter the residence at any time. Mot., pp. 39-40. The brothers will submit to any additional conditions this Court finds appropriate.

## CONCLUSION

The government does not dispute the facts that matter most: the Tates have complied with Romanian court orders for years; they have appeared whenever required; Romanian courts have repeatedly declined to detain them; Romania has a standing surrender order for the U.K.; and the Tates were arrested openly in Miami after publicly announcing where they would be.

What remains is speculation, driven by years-old social media bravado that was not even posted by Andrew or Tristan. The government's case for detention is not based on what the Tates have done: it is based on what the government speculates *they might do.*

Speculation cannot outweigh a documented record of 1,193 days of compliance, 34 international departures, 34 returns, and zero failures to appear.

The Tates' demonstrated record of compliance is clear and convincing evidence they are not a danger to the community and do not pose a flight risk. It is also a special circumstance warranting release.

For the foregoing reasons, Andrew and Tristan Tate respectfully request that the Court release them on the conditions proposed in their motion for release.

Respectfully submitted,

*/s/ Thomas Maniotis*
**THOMAS MANIOTIS**
Florida Bar No. 122414
EQUITY LEGAL, PLLC
5201 Blue Lagoon Drive, Floor 8
Miami, Florida 33126
(305) 407-1005
tamaniotis@equitylegalfirm.com

*/s/ Joseph D. McBride*
**JOSEPH D. MCBRIDE**
New York Bar No. 5445879
THE MCBRIDE LAW FIRM, PLLC
305 Broadway, Suite 700
New York, New York 10007
(917) 757-9537
jmcbride@mcbridelawnyc.com
Admitted Pro Hac Vice
Co-Counsel for Defendants

/s/ *Howard Srebnick*
*/s/ Alexa Klein*
**HOWARD SREBNICK** (FBN 919063)
**JACKIE PERCZEK** (FBN 042201)
**ALEXA KLEIN** (FBN 1002299)
**JAKE GOLDMAN** (FBN 1074657)
BLACK SREBNICK
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131 / (305) 371-6421
HSrebnick@RoyBlack.com
JPerczek@RoyBlack.com
AKlein@RoyBlack.com
JGoldman@RoyBlack.com

/s/ *Stephen James Binhak*
**STEPHEN JAMES BINHAK**
Florida Bar Number 736491
LAW OFFICES OF STEPHEN JAMES BINHAK
One Southeast Third Avenue, Suite 1800
Miami, Florida 33131
(305) 361-5500
binhaks@binhaklaw.com