# Memorandum

MIAMI-DADE COUNTY

**Date:** March 23, 2022

**To:** Honorable Chairman Jose "Pepe" Diaz
and Members, Board of County Commissioners

**From:** Daniella Levine Cava
Mayor

Daniella Levine Cava

**Subject:** Report Describing the Miami-Dade Police Department's Practices, Policies, and Procedures Related to Arrests, Custody, Physical Restraint, and Use of Force - Directive 201092

---

The following information is provided in response to Resolution No. R-591-20, sponsored by Commissioner Barbara Jordan, and adopted by the Board of County Commissioners on June 16, 2020, directing the County Mayor or County Mayor's designee to prepare a report that includes the Miami-Dade Police Department's practices, policies, and procedures related to arrests, custody, physical restraint, and use of force. As part of my operation to catch up on the backlog of items, we are bringing you reports that were pending from the previous administration.

The Miami-Dade Police Department, Departmental Manual articulates the policies which govern our law enforcement mission and contains procedures to provide direction for employee conduct and action. Attached are **CHAPTER 18 - PART 2 - PRISONER RELATED ACTIVITIES**, as it pertains to arrests and custody; and **CHAPTER 31 - PART 1 - USE OF FORCE AND WEAPONS**, as it pertains to physical restraint and use of force.

Per Ordinance 14-65, this report will be placed on the next available Board meeting agenda. Should you require additional information, please contact Interim Director George A. Perez, Miami-Dade Police Department, at 305-471-3272.

Attachments (2)
1. Chapter 18 - Part 2 - Prisoner Related Activities
2. Chapter 31 - Part 1 - Use Of Force And Weapons

c: Geri Bonzon-Keenan, County Attorney
Gerald K. Sanchez, First Assistant County Attorney
Jess M. McCarty, Executive Assistant County Attorney
Office of the Mayor Senior Staff
George A. Perez, Interim Director, Miami-Dade Police Department
Jennifer Moon, Chief, Office of Policy and Budgetary Affairs
Adeyinka Majekodunmi, Commission Auditor
Basia Pruna, Clerk of the Board
Eugene Love, Agenda Coordinator

**I. GENERAL:**

**II. POLICY:**

**III. PROCEDURES:**

- **A.** Admonition of Rights: [CALEA 1.2.3b,c]
- **B.** Alert Messages – Arrested Subjects:
- **C.** Safeguarding Against False Arrest:
- **D.** Persons in Custody:
- **E.** Immunity from Arrest: [CALEA 1.1.4]
- **F.** Handcuffing Prisoners: [CALEA 70.2.1]
- **G.** Searching Prisoners: [CALEA 70.1.1; 71.3.1.b]
- **H.** Temporary Detention:
- **I.** Firearms: [CALEA 71.3.3a; 70.1.6a]
- **J.** Prisoners' Property:
- **K.** Safeguarding Persons and Property In Custody:
- **L.** Custody of Prisoners:
- **M.** Sick or Injured Prisoners: [CALEA 70.3.1]
- **N.** First-Aid Kits: [CALEA 72.6.2]
- **O.** Escaped Prisoners: [CALEA 72.4.10]
- **P.** Security of Prisoners at Other Than Ward D: [CALEA 70.3.2]
- **Q.** Prisoner Transportation:
- **R.** Forms:
- **S.** Miami-Dade County Department of Corrections and Rehabilitation:
- **T.** Delivery to Detention Facilities:
- **U.** Removal from Detention Facilities:
- **V.** Fingerprinting: [CALEA 1.2.5b]
- **W.** Release of Prisoners: [CALEA 72.5.7]
- **X.** Bail:
- **Y.** Fines:
- **Z.** Intoxicated Persons: [CALEA 72.5.4]
- **AA.** Combative Prisoners:

**ANNEXES**

A. Strip Search Authorization

# CHAPTER 18 - PART 02 - PRISONER RELATED ACTIVITIES

## I. GENERAL:

Prisoner processing, a fundamental responsibility of all sworn officers, is a multi-step process which requires consistent application of appropriate sanctions to preclude jeopardizing a defendant's criminal prosecution. Criminal investigations may require the temporary removal of prisoners from detention facilities and procedures concerning prisoner removal, security, and custody are essential. The Miami-Dade Police Department (MDPD) has the responsibility of ensuring that prisoners who escape from Miami-Dade County confinement facilities or from MDPD police officers are expeditiously returned to custody.

## II. POLICY:

MDPD policy is to comply with the highest standards of legal and professional conduct when processing persons who are arrested and in custody. MDPD officers will treat prisoners with all due concern for their safety and well-being and remain constantly mindful of the rights and protection afforded all persons by the United States Constitution. No person may be deprived of constitutional rights because the person is suspected of having committed a crime. The task of determining constitutionality of a statute lies with a court of proper jurisdiction.

An officer who lawfully acts within the scope of authority does not deprive persons of their civil liberties. Officers may make reasonable inquiries, conduct investigations, and arrest on probable cause; however, when officers exceed their authority by unreasonable conduct, they violate the sanctity of the law which they swore to uphold. Additionally, the MDPD is committed to a policy of zero tolerance towards any form of sexual abuse or sexual harassment in accordance with the Federal Prison Rape Elimination Act (PREA), and is committed to investigate all reported complaints fairly and impartially to determine whether the allegations are founded.

## III. PROCEDURES:

### A. Admonition of Rights: [CALEA 1.2.3b,c]

A subject in police custody must be advised of pertinent constitutional rights prior to interrogation. Subjects shall be advised of their right to counsel and right to remain silent. In every instance, the full warning shall be read from a prepared text to preclude inadmissibility of any statements due to insufficient warning.

### B. Alert Messages – Arrested Subjects:

In order to avoid arresting individuals on charges that are listed for subjects with similar personal identifiers, it is imperative that all personnel carefully and thoroughly review the information contained in the Criminal Justice Information System (CJIS) when performing subject inquiries. Particular attention must be paid to the information contained in the wanted person segment of CJIS.

When performing or requesting the performance of local wanted subject information, special attention is to be paid to the Alert Messages in the CJIS that state, "**Make Positive ID by Fingerprints before Making Arrest. Not the same as. . . .**" These messages are reflected in the Wants Check by Personal Identifiers or Wants Check by Numerical Identifiers in CJIS. By following the information contained in this segment of the CJIS, the number of subjects wrongfully arrested on warrants that belong to another individual will be reduced.

### C. Safeguarding Against False Arrest:

Probable cause to arrest must exist before a subject can be taken into custody. In any case where a subject is arrested, and newly acquired evidence reveals that there is no longer probable cause to arrest the subject, the correct procedure is to release that person. The concerned officer shall notify his or her supervisor of the circumstances regarding the arrest. The released person should be given an explanation and returned to the location where he or she was originally arrested. This includes making arrangements to retrieve any vehicle or property that had been impounded and/or towed. A detailed Offense-Incident Report shall be prepared for the benefit of the officer and the Department.

Officers shall utilize every source of information available to ensure correct identification of a person arrested or confined. All efforts will be made to confirm identity, so that the decision to arrest is not based solely on the similarity of names or information received from other law enforcement agencies. A suspect whose identity is doubtful may be detained, but not booked, until identity is confirmed. Should a suspect detained as a result of a warrant arrest claim mistaken identity, the officer will notify the Warrants Bureau and delay booking the suspect until positive identification is established. Claims of mistaken identity shall be recorded on the Complaint/Arrest Affidavit.

**D. Persons in Custody:**

The Department maintains custody of arrested persons until they are transferred to the Miami-Dade Corrections and Rehabilitation Department; released from custody on fixed bail, recognizance, or without being charged; or released to another law enforcement agency, if the arrest was effected by that agency.

The Department's intent is to minimize the time which an arrested person spends in its custody. In addition, officers shall not:

1. Take any action, outside of required police procedures, which will delay arraignment of prisoners.

2. Make statements or take any action which might prejudice a fair trial.

3. Employ coercion or threats, either real or implied, to obtain confessions or admissions.

4. Engage in any behavior towards an arrestee that constitutes any form of sexual abuse or sexual harassment.

    a. The Professional Compliance Bureau is responsible for classifying and investigating all reported PREA complaints of sexual or sexual harassment arising from the time period when an arrestee was held in departmental custody

**E. Immunity from Arrest: [CALEA 1.1.4]**

Career consular officers of foreign nations are immune from arrest for criminal and traffic offenses unless ordered by a federal magistrate. Once identified, consular officers will not be detained unnecessarily. Consular immunity does not normally extend to consular officers' families or employees.

Diplomatic agents may not be arrested or detained; however, reasonable restraints may be applied in emergency circumstances involving self-defense, public safety, or the prevention of serious criminal acts.

United States Legislators are in all cases, except for Treason, felonies, and Breach of the Peace, privileged from arrest during their attendance and travel to and from the session of their respective Houses. [CALEA 61.1.3c]

Honorary consular officers are not issued United States Department of State identification cards and are not immune from arrest or detention. However, archives and documents of a consular post headed by an honorary consul are inviolable provided the records are maintained separately from records of a private or commercial nature.

The Communications Bureau will be notified regarding the arrest, detainment, or significant incidents involving consular personnel or foreign nationals.

Even though Diplomatic Officers, Consular Officers, and United States Legislators are immune from arrest under certain conditions, officers shall report details of the incident on appropriate departmental forms. Specific guidelines are included in the Florida Law Enforcement Handbook. Questions regarding immunity shall be directed to the Police Legal Bureau.

**F. Handcuffing Prisoners: [CALEA 70.2.1]**

1. Except when health, physical condition, or circumstances of arrest dictate otherwise, all arrested persons shall be handcuffed behind the back with departmentally-approved handcuffs. Handcuffs shall always be double-locked. Officers shall use due care when placing handcuffs on prisoners.

   a. To prevent restricting blood flow to the hands, handcuffs shall not be applied too tightly. A finger's-width of room should exist between the inside of handcuffs and the prisoner's wrists.

   b. Handcuffs shall not remain on prisoners for unreasonable periods of time, i.e., when prisoners may otherwise be properly secured.

   c. Prompt attention shall be given to complaints that handcuffs are too tight and adjustments shall be made, if warranted.

2. In multiple arrest situations, when custody of the prisoner will change a number of times prior to booking or incarceration, or in other exceptional circumstances, disposable or flexible restraints may be used. Officers utilizing these restraints must take all necessary precautions to safeguard themselves as these restraints are much less secure than departmentally-approved handcuffs.

**G. Searching Prisoners: [CALEA 70.1.1; 71.3.1b]**

Officers shall thoroughly search prisoners who are taken or given into their custody to ensure the safety of themselves as well as others. Any contraband, evidence, and fruits or instrumentality of a crime, unrelated to the arrest but discovered incidental to a body search, shall be seized and appropriate charges filed.

1. Except in emergency or other exigent situations, prisoners shall be searched only by officers of the same sex as the prisoner. Officers shall be discreet in the search of prisoners of the opposite sex so as to avoid claims of impropriety.

2. Strip Searches:

   a. A strip search requires an arrested person to remove or arrange some or all clothing to permit a visual or manual inspection of the genitals, buttocks, anus, breasts in the case of a female, or undergarments of such person.

   b. Strip searches cannot be conducted on persons arrested for traffic or misdemeanor offenses except when the crime is violent in nature, involves a weapon or a controlled substance, or there is probable cause to believe the arrestee is concealing a weapon, a controlled substance or stolen property. A strip search must be performed by a person of the same gender as the arrestee. Any observers of the strip search must also be of the same gender as the arrestee, have a legal and compelling reason to be present, and are limited to the number legally required or necessary to safely conduct the strip search. Further, the strip search shall be conducted in an area where the search cannot be observed by persons not conducting or observing the search pursuant to statute. [CALEA 1.2.8b] Officers cannot order a strip search without first obtaining the written authorization of their supervisors or the supervisor in charge of the facility where the strip search is to be conducted. [CALEA 1.2.8a]

   c. Blanket written authorization may be given in advance for an operation likely to result in numerous arrests. The operation must be a preplanned contained activity such as a reverse sting, a series of buy-busts as part of a one day operation, or a roundup of subjects for a group of warrants. Blanket authorization only applies to prisoners with felony narcotics charges and must be approved by use of the Strip Search Authorization form (Annex A).

   d. Other felony and misdemeanor arrests require individual supervisory approval and completion of the Strip Search Authorization form (Annex A). This form must be completed prior to strip searches and will become part of the arresting officer's case file. [CALEA 1.2.8c]

e. All strip searches will be conducted pursuant to the guidelines enumerated in Florida Statutes 901.211, which does not require that the officer obtain a search warrant prior to a strip search. [CALEA 1.2.8a]

**H. Temporary Detention:**

1. General:

a. Investigators and police officers are held accountable for prisoners and detainees in their custody, and are authorized to use interview rooms for processing, questioning, and testing, e.g., drug, alcohol, etc. Supervisors have the responsibility of training investigators and police officers in the use of interview rooms/temporary detention areas when initially assigned, and refresher training every three years. Training will include a review of procedures described in this section. [CALEA 71.2.1]

b. Prisoners and detainees will be under the continuous supervision of the assigned investigator and will not be left in an interview room/temporary detention area at any time without some form of continuous monitoring. [CFA 22.05 A, B]

c. The interview room/temporary detention area will typically be equipped with a table and a chair. [CALEA 42.2.10e]

d. If the interview room/temporary detention area has an immovable object designed to secure prisoners, prisoners may be secured to such an object. Prisoners/detainees may remain handcuffed if necessary. [CALEA 42.2.10b; 71.3.1c,d; 71.3.2]

e. Male, female, and juvenile prisoners/detainees will not occupy the same interview room/temporary detention area simultaneously without supervisory approval. If simultaneous interviews of a male, female, or juvenile prisoner/detainee are necessary, the prisoners/detainees will not be left in the interview room without an investigator being present or continuous visual monitoring. [CFA 16.03 E]

2. Interview Rooms and Temporary Detention Areas:

a. Interview Rooms and temporary detention areas will be kept sanitary. [CALEA 71.4.1]

b. Prisoners shall be provided access to bathrooms, drinking fountains, and meals upon request. These breaks will be documented in the officer's/investigator's report. [CALEA 42.2.10f; 71.4.1]

c. Fire prevention and evacuation routes for interview rooms/temporary detention areas are included in the fire prevention and evacuation routes for the MDPD facility in which the interview room/temporary detention area is located. Evacuation routes are posted in a conspicuous area near the interview rooms/temporary detention areas. [CALEA 71.4.2]

3 Processing Prisoners at Warrants Bureau and Identification Section:

Officers transporting prisoners to the Headquarters Building for processing at the Warrants Bureau or Identification Section are authorized to use temporary detention areas for the purpose of verifying warrants and fingerprinting prisoners. [CALEA 71.1.1; 71.3.3c] The arresting officer/and or transporting officer shall maintain supervision and accountability during temporary detention of prisoners within the facility. [CALEA 71.3.1b] The following procedures must be followed when processing prisoners:

a. The offense, date, and time of processing at Warrants Bureau or Identification Section must be noted on the Daily Activity Report. [CALEA 71.3.1a]

b. No prisoner will be left unattended. Video monitoring is permissible if the detention area is equipped with a monitor. [CALEA 71.3.3e,f]

c. To ensure the separation of male and female prisoners, officers transporting prisoners will remain outside the temporary detention area if a prisoner of the opposite sex is being processed. Officers transporting juveniles will remain outside the temporary detention area when an adult is being processed. [CALEA 71.3.1e; CFA 16.03 E]

d. If a prisoner becomes unruly, the officer can request assistance via the police radio or utilize the emergency button on the police radio to call for assistance. [CALEA 71.3.3b] Prisoners transported to the Forensic Services Bureau, Fingerprint Identification Section, for the purpose of establishing positive identification shall not be fingerprinted if the prisoner becomes uncooperative or combative. Refer to AA. Combative Prisoners for specific instructions and procedures.

e. Officers will be cognizant of safety issues whenever holding a prisoner in temporary detention to ensure against possible escape. [CALEA 71.3.3d]

4. Security and Escape Prevention:

a. Investigators will be cognizant of safety issues whenever interviewing prisoners and will be accompanied by a second investigator, if necessary, precluding the need for a panic or duress alarm. [CALEA 42.2.10d]

b. Firearms will not be brought into interview rooms/temporary detention areas except in emergencies. Firearms will be stored in a designated storage area. [CALEA 42.2.10a]

c. Only assigned investigators and those investigators that are specifically authorized by the assigned investigator may gain access to an occupied interview room to interact with the prisoner/detainee. The number of personnel should be limited to six unless authorized by a supervisor. [CALEA 42.2.10c]

d. All prisoners should be searched for weapons and contraband prior to being detained in an interview room/temporary detention area. [CALEA 42.2.10a]

e. Interview rooms and designated areas used for temporary detention will be inspected for secure locks (if installed) and cleanliness during Level I and Level II inspections performed by the Professional Compliance Bureau's Staff Inspection Section every three years. The inspection will include an administrative review of the temporary detention areas to ensure compliance with relevant policies and procedures that govern their use. [CALEA 71.4.3] Personnel from the Warrants Bureau and Identification Section will also inspect the temporary detention areas during semiannual facility line inspections to ensure that the area is secure and sanitary. The Facility Inspection Data Form, Section B. Interior Conditions, holding cells category, will be used to signify the condition of the temporary detention area with regard to cleanliness, neatness, lighting, ventilation and security. Investigators/officers will also inspect interview rooms for weapons and contraband before and after prisoners are held.

**I. Firearms and Other Weapons: [CALEA 71.3.3a;70.1.6a]**

Firearms or other weapons, including less lethal weapons, will not be taken into secure holding facilities, processing areas, temporary detention areas or security perimeters, except in emergencies. Weapons must be secured in a police vehicle or in designated storage areas. In accordance with **CHAPTER 31 - PART 01 - USE OF FORCE AND WEAPONS,** firearms will not be stored in an unattended vehicle overnight or for an extended period of time.

**J. Prisoners' Property:**

Personal property shall be surrendered at the station, confinement facility, or as otherwise directed by a supervisor. A receipt (refer to **CHAPTER 27 - PART 01 - REPORT WRITING** for Prisoner Property Receipt) for all personal items surrendered will be presented to the prisoner. Personal property consisting of small items that can be easily stored at the detention facility, e.g., women's purse, men's pouch, camera or transistor radio, shall be transported with the prisoner when the prisoner is moved to a detention facility. Bulk property will not be accepted at the detention facility. Items of this nature will be impounded at the district station. A prisoner's personal property shall not be stored at the Property and Evidence Section, unless it is of evidentiary value in a pending criminal court action. Prisoners will not be taken inside the Property and Evidence Section building or the adjacent fenced-in area.

**K. Safeguarding Persons and Property In Custody:**

An officer is responsible for safeguarding prisoners and property in the prisoners' immediate possession.

**L. Custody of Prisoners:**

Only restraints necessary to ensure safe custody of a prisoner, afford safety to the officer, or prevent damage to County property shall be utilized. No item shall be given to or received from a prisoner without the expressed consent of the concerned officer. An officer shall not lose sight of a prisoner until custody is relinquished to the proper authority. [CALEA 70.1.4]

**M. Sick or Injured Prisoners: [CALEA 70.3.1]**

Miami-Dade Fire Rescue shall be requested for any prisoner who displays evidence of, or complains of, an injury or illness. The arresting officer shall request the Fire Department Alarm number and write the number in the narrative of the Offense-Incident Report. The prisoner shall be transported to Jackson Memorial Hospital (JMH) for examination and treatment unless fire rescue deems it necessary to transport the prisoner to another medical facility for emergency treatment. The transporting officer is responsible for custody of the prisoner until relieved or when Miami-Dade Corrections and Rehabilitation Department takes custody.

Circumstances surrounding the injury or illness will be reported immediately to the custodial officer's immediate supervisor and documented on the appropriate departmental form. When possible, names and addresses of witnesses will be obtained.

The use of handcuffs and/or other restraining devices on sick or injured persons may be waived if approved by a supervisor; if the prisoner is not an escape risk; and there is no danger of injury to the prisoner, officer, or medical personnel. [CALEA 71.2.1]

**N. First-Aid Kits [CALEA 72.6.2]**

MDPD locations with prisoner holding facilities will ensure that a standard first-aid kit is available. The kit will be subjected to a documented weekly inspection, using the MDPD Holding Cell Inspection Log, and will be replenished as necessary. (Refer to **CHAPTER 06 - PART 03 - BUILDINGS MANAGEMENT** for mandatory items in this kit.)

**O. Escaped Prisoners: [CALEA 72.4.10]**

1. The Communications Bureau Shift Commander will, upon notification of an escape, immediately issue a BOLO via radio and a message via computer; dispatch a uniform unit to the scene; and notify the Public Information Section.

2. The officer first aware of a prisoner escape shall take the following actions:

   a. Notify the officer's immediate supervisor and/or duty platoon commander as soon as possible. [CALEA 70.1.7a]

   b. Notify the Communications Bureau Shift Commander. [CALEA 70.1.7a]

c. Request appropriate assistance; i.e., helicopter, canine, crime scene, and uniformed units.

d. Request a General Investigations Unit detective who will initiate follow-up investigation. [CALEA 70.1.7a]

e. Establish a perimeter if applicable.

f. Ensure the broadcasting of an alert via the facility's public address system.

g. Cancel the alert after the prisoner is returned to custody.

h. Prepare an Offense-Incident Report. [CALEA 70.1.7b]

i. Initiate entry in the appropriate Daily Incident Log.

3. When a prisoner escapes from the custody of an MDPD officer outside of Miami-Dade County, the MDPD officer will:

a. Immediately notify the agency which has jurisdiction in the area where the prisoner escaped and take appropriate action to capture the prisoner, considering mutual aid agreements and law enforcement authority in that jurisdiction.

b. Provide information and request the agency issue a BOLO.

c. As soon as possible, notify the Communications Bureau Shift Commander and, if the prisoner is being extradited, the Warrants Bureau Operations Desk.

d. Cancel the alert when the prisoner is returned to custody.

4. The Corrections and Rehabilitation Department and the affected bureau or district will be responsible for the filing of escape charges and obtaining warrants for escapees from their respective custody. [CALEA 70.1.7c]

**P. Security of Prisoners at Other Than Ward D: [CALEA 70.3.2]**

A person who is arrested and is in need of immediate medical attention will be taken to the nearest hospital. If the prisoner must be admitted for stabilizing treatment or emergency surgery, appropriate security measures for prisoner custody are the responsibility of the police district initiating the arrest. In the event the arresting officer is assigned to an entity other than Police Services, security measures for prisoner custody are the responsibility of the police district in which the admitting hospital is located. If the hospital is within a municipality, the responsibility is that of the nearest departmental district.

The lead investigator is responsible for liaison with the affected district major/commander or on-duty platoon commander who will initiate prisoner security measures. The officer who effects the arrest is responsible for security of the prisoner until properly relieved. Security requirements will continue until the prisoner is transferred to a confinement facility. The decision as to when the prisoner may be transferred is that of hospital medical staff members and not the Department. Upon determination that a prisoner is medically able to be transferred to Ward D, JMH, from another hospital emergency room or inpatient care facility, contact will be made with the Ward D head nurse or on-call JMH administrator to arrange for transfer of the prisoner and medical records.

**Q. Prisoner Transportation:**

1. Persons under arrest will be thoroughly searched prior to being transported. [CALEA 70.1.1] This requirement is applicable to each subsequent transporting officer.

2. One-man units shall not transport a prisoner unless the vehicle is equipped with a protective divider or supervisory approval is obtained. [CALEA 70.1.3]

3. When a two-man unit not equipped with a protective divider is utilized, one officer and not more than two prisoners will occupy the rear seat with the second officer in a position behind the driver. [CALEA 70.1.3]

4. When a two-man unit equipped with a protective divider is utilized, both officers shall occupy the front seat. [CALEA 70.1.3] The second officer shall maintain continuous surveillance of the prisoners.

5. Not more than three prisoners will be transported simultaneously, except in a van. [CALEA 70.1.3]

6. When transporting prisoners, the dispatcher shall be advised of the location and mileage reading upon departure for, and arrival at, the place of booking or confinement. This includes any change of location such as meeting a supervisor to sign the Complaint/Arrest Affidavit or changing location to complete paperwork, etc.

7. Prisoners shall be transported to a detention facility without unnecessary delay. Delays will only be taken to render emergency assistance. [CALEA 70.1.4] Should a delay occur, the dispatcher shall be advised immediately.

8. A prisoner who causes damage to the transporting vehicle shall be charged with the appropriate offense.

9. The transporting vehicle will be inspected for contraband prior to and after transporting a prisoner. [CALEA 70.1.2]

10. Prisoners shall not be permitted to smoke while being transported.

11. A prisoner of the opposite sex shall be transported by two officers or, with supervisory approval, by one officer.

12. Female and male prisoners shall not occupy the same vehicle without supervisory approval, unless arrested as a result of the same incident.

13. A female police officer shall accompany any female prisoner being transported beyond the boundaries of Miami-Dade County.

14. Except in emergency situations, a child shall not be placed into or transported in any police car or similar vehicle which at the same time contains an adult under arrest, unless the adult is alleged or believed to be involved in the same offense or transaction as the child. [CFA 16.03 E]

15. When transporting a handicapped prisoner, officers shall use due care placing the prisoner in a vehicle. The prisoner's wheelchair, crutches, or prosthetic appliance shall be secured by the transporting officer and taken with the prisoner to the holding facility. Physically or mentally handicapped prisoners who cannot be transported by police vehicle will be transported by ambulance. The prisoner shall be properly restrained and the officer, if in a one-man unit, shall follow the ambulance to the receiving facility. With a two-man unit, one officer shall ride in the ambulance with the prisoner. [CALEA 70.2.1; 70.3.1]

16. Officers transporting a prisoner to court or another agency, who is considered a security hazard, must notify the judge of the court or the agency prior to arriving at the destination. [CALEA 70.1.8]

17. The prisoner's right to communicate with attorneys and others will not be exercised during the period that the prisoner is being transported. [CALEA 70.1.5]

18. Prisoners shall not be handcuffed to any part of the vehicle during transport.

19. If a meal is required during transport of a prisoner, the following procedures shall apply: [CALEA 70.1.4]

    a. The location of the meal shall be chosen randomly and must provide a safe and secure environment for the prisoner, transporting officers, and restaurant patrons.

    b. The prisoner shall be seated in such a manner as to maintain his or her security.

    c. Restraining devices will not be removed for the meal. [CALEA 70.2.1]

    d. Prisoners will only be allowed to use utensils that are safe and unlikely to be used as a weapon. Plastic utensils should be used when possible.

    e. All expenditures for meals will comply with departmental policies.

20. When transporting mentally disturbed prisoners, the safety of the officer and of the mentally disturbed individual is paramount. After requesting an ambulance service to transport, the mentally disturbed prisoner will be secured to a stretcher and the officer, if a one-man unit, shall follow the ambulance to the final destination. In a two-man unit, one officer shall ride in the ambulance with the prisoner. The types of restraints used shall be documented on the Offense-Incident Report. [CALEA 70.3.1]

21. Responsibility for establishing positive identification of prisoners when they are transported between detention facilities lies solely with the transporting officers. Prisoners delivered to the custody of other authorities from a police facility shall be positively identified by a picture on a driver's license or passport. If no photographic identification is available, a verbal confirmation from the prisoner, supported by the Complaint/Arrest Affidavit description, will provide the transporting officer with positive identification. Prior to departure from the transferring detention facility, transporting officers shall obtain the following: [CALEA 70.5.1b]

    a. Positive identification of prisoner to be moved; e.g., visual verification by arresting officer or by matching the physical description on arrest/booking forms, driver's license, or other formal documents to the prisoner. [CALEA 70.5.1a]

    b. Confirmation of receiving detention facility.

    c. Jail number.

    d. Documents of prisoner's personal property.

    e. Prisoner medical records and escape/suicide potential. [CALEA 70.5.1c]

22. The Miami-Dade Corrections and Rehabilitation Department is responsible for intrastate prisoner transportation. When deemed appropriate by the chain of command due to exigent circumstances, MDPD can provide intrastate transportation of prisoners. Interstate extradition, performed by the Warrants Bureau, requires possession of a properly executed waiver or properly executed governor's warrant and positive identification of the prisoner. [CALEA 70.5.1b]

23. Transporting officers shall remain alert for any potential security problems that a prisoner may pose during transport. Officers shall note on the Complaint/Arrest Affidavit any potential for escape or suicide and unusual illnesses demonstrated by the prisoner. Transporting officers shall ensure that receiving detention facility personnel are made aware of any such potential. [CALEA 70.5.1c; 70.3.2; 70.1.6d]

24. Vehicles used primarily for transporting prisoners (80 percent or more of their use) will have the driver separated from the prisoner by a safety barrier of wire mesh or heavy gauge plastic. [CALEA 70.4.1] Door lock releases will be operated either automatically from driver's position, if the vehicle is so equipped, or manually from outside the vehicle. Interior door handles, lock actuators, and window cranks shall be removed from the rear doors of the vehicle. [CALEA 70.4.2]

25. Officers transporting prisoners to the MDPD Headquarters Building shall park on the west side of the building in a parking space designated for prisoner parking. Prisoners will be brought into the Headquarters Building via the west door. A call box has been installed to enable communications with the Headquarters Security Unit. The Unit will monitor the doorway through a video camera. The cargo elevators on the west side of the building will be used when a prisoner is taken to the second or third floor.

26. Upon request, the transportation of a prisoner arrested by Organized Crimes Bureau, Narcotics Section personnel to a Miami-Dade County detention facility shall be the responsibility of the district in which the arrest is made. If the arrest is written within a municipality, responsibility for transportation will be that of the nearest departmental district. This procedure does not include other special operations.

**R. Forms:**

Officers shall complete an Offense-Incident Report and/or Complaint/Arrest Affidavit, as well as other necessary forms, for all persons arrested. [CALEA 1.2.5] Refer to **CHAPTER 27 - PART 01 - REPORT WRITING** for specific instructions and procedures.

**S. Miami-Dade County Department of Corrections and Rehabilitation:**

A correctional facility is defined as all buildings, grounds outside perimeters, and other areas, including both secure and public areas for which Miami-Dade County Department of Corrections and Rehabilitation has responsibility. Certain specific crimes and incidents within these facilities shall be recorded by correction officers on MDPD police reports, under the guidance of MDPD.

1. MDPD retains the responsibility for documentation and investigation of the following incidents and crimes.

   a. Death Investigations:

      (1) Homicide

      (2) Suicide

      (3) Accidental death

      (4) Occurrences requiring hospitalization and/or where death is likely to occur

   b. Sexual Battery

   c. Arson

   d. Narcotic investigations with an identified subject

   e. Escape

   f. Immediate on scene arrest of subjects not already in Corrections and Rehabilitation custody

2. Miami-Dade County Department of Corrections and Rehabilitation retains the responsibility for documentation and investigation of all other incidents and crimes occurring in a Miami-Dade County correctional facility.

   a. Reports prepared by Miami-Dade County Department of Corrections and Rehabilitation shall be processed by MDPD like MDPD original reports. All follow-up investigations shall be conducted by MDPD.

   b. Miami-Dade County Department of Corrections and Rehabilitation is authorized to obtain MDPD report case numbers from MDPD Communications Bureau.

   c. Miami-Dade County Department of Corrections and Rehabilitation personnel shall complete all MDPD reports in accordance with report writing guidelines as established in **CHAPTER 27 - PART 01 - REPORT WRITING.**

3. If there are no officers available at a given time within the Miami-Dade County Department of Corrections and Rehabilitation Department who are certified as law enforcement officers, the arrest within a detention facility and initiation of the criminal judicial proceedings by completion of an arrest affidavit must be accomplished by officers of the MDPD. (This function could also be performed by municipal police officers if the facility is located within a municipality).

4. Correctional facilities shall be assigned, jurisdictionally for the purpose of report processing and guidelines, to the MDPD district station whose boundaries it is located in.

5. Miami-Dade County Department of Corrections and Rehabilitation reserves the right to request MDPD to conduct investigations and complete requisite reports as special circumstances dictate.

**T. Delivery to Detention Facilities:**

1. Firearms, ammunition, or other weapons will not be taken into a detention facility. All firearms, ammunition, and other weapons will be secured in the trunk of a police vehicle or in designated storage areas in accordance with III. I. [CALEA 70.1.6a]

2. Officers will not remove restraints until the prisoner is within a secure area or as directed by facility personnel. [CALEA 70.1.6b]

3. Officers will turn in all required paperwork and the prisoner's property, with a Property Receipt, to booking personnel. [CALEA 70.1.6c]

4. Booking personnel will affix a jail number to the Complaint/Arrest Affidavit and return the appropriate copies to MDPD for processing. The goldenrod copy will be given to the prisoner. [CALEA 70.1.6e]

5. In the case of extremely violent prisoners, officers will advise detention personnel prior to arrival.

**U. Removal from Detention Facilities:**

Prisoners may be removed from detention facilities by the assigned investigators when approved by the concerned operations commander. These provisions do not apply to extradition, routine return of prisoners from jurisdictions outside Miami-Dade County, and special circumstances that require trustees be assigned to MDPD.

1. Prisoners may be temporarily removed from detention facilities for the following:

a. Continuation of the incident investigation of which the prisoner, as a subject, was charged and subsequently arrested; e.g., crime scene reenactment, location of evidence, identification of other subjects, and court-related activities.

b. Interview in a departmental facility regarding an ongoing investigation of which the prisoner may be knowledgeable.

c. Utilization as a lineup stand-in.

d. Other legitimate purposes which are considered by the concerned operations divisions chief, bureau, district, section, or unit commander to be in the best interest of the Department.

2. Restriction: Prisoners shall not be removed for personal reasons or to act as an agent of MDPD; e.g., undercover narcotics purchases or visits with suspects involved in other criminal investigations.

3. Federal Hold Order: Authorization of the U.S. Marshals Office is required to remove prisoners held under federal order.

4. Juveniles: Approval of the assigned Assistant State Attorney is required to remove a juvenile.

5. Custody: Temporary custody of a prisoner should not exceed eight hours. If circumstances mandate a longer period, the investigator having custody will advise his or her supervisor and the appropriate section of the respective detention facility.

6. Security:

a. Prisoners will be handcuffed unless extenuating circumstances dictate otherwise.

b. Prisoners removed for purposes which are conducted within a departmental facility will be accompanied by a sufficient number of sworn employees to ensure prisoner security.

c. Prisoners removed for crime scene reenactment or field investigative purposes shall be accompanied by two or more sworn employees as circumstances may require.

7. Prisoners Health and Welfare: While in departmental custody, prisoners will be provided with meals as appropriate and be permitted personal hygienic necessities. Prisoners shall not be permitted to consume alcoholic beverages.

**V. Fingerprinting: [CALEA 1.2.5b]**

Fingerprinting is a method of positively identifying persons arrested and booked for crimes. In addition, fingerprints are compared with latent prints taken from crime scenes and may ultimately lead to the arrest of perpetrators. Authority for fingerprinting persons who are arrested for crimes is contained in Florida Statutes. Further, a decision by the Florida Third District Court of Appeals provides that fingerprints may be taken without the defendant's permission at any time following his or her lawful arrest prior to release and without defendant's counsel being present. Officers shall secure their firearms in a locked cabinet or drawer prior to fingerprinting prisoners. When transporting subjects/arrestees to the Forensic Services Bureau, Fingerprint Identification Section (FIS), officers shall report and enter the Section as a two-officer team. The FIS personnel shall ensure that officers from other law enforcement agencies wishing to gain entrance to the FIS with a subject/arrestee for fingerprinting are only permitted entrance as a two-officer team.

1. Federal Bureau of Investigation (FBI) Fingerprint and Palmprint Cards will be utilized for fingerprinting all persons.

2. Persons arrested and booked for any felony or misdemeanor will be fingerprinted and photographed prior to bonding out or release. [CALEA 1.2.5b,c]

3. Persons booked on fugitive warrants and National Crime Information Center (NCIC) and Florida Crime Information Center (FCIC) "hit" information will be fingerprinted and photographed and the charge shall be reflected on the jail booking record.

4. Officers of other police agencies who request fingerprinting will be required to furnish the FBI Fingerprint Card when booking prisoners into a Miami-Dade County facility.

5. The Fingerprint Card, Palmprint Card, photograph, and affidavit/arrest form(s) will be forwarded to MDPD Central Records Bureau.

6. Juveniles will be fingerprinted and photographed at the Juvenile Service Department. [CFA 16.03 C, E]

7. Persons booked into any MDPD or Corrections facility will be fingerprinted except for the following violations which require only the thumb print on the Jail Booking Record:

    a. Traffic violators (except fugitive warrants).

    b. Hold for United States Marshal (safeguarding).

    c. Hold for United States Immigration and Naturalization Service (safeguarding).

    d. Hold for other agencies (safeguarding).

    e. Material witness.

    f. Local ordinance violators when the violation has no Florida Statute counterpart.

    g. Writs; e.g., Writ of Attachment, Habeas Corpus.

**W. Release of Prisoners: [CALEA 72.5.7]**

Prisoners released on recognizance from a police facility shall be positively identified by a driver's license, government-issued identification with photograph, or a passport photograph.

**X. Bail:**

Conditions of release may be discussed with a prisoner, but officers shall not discuss the procedures or monetary amounts of bonds.

**Y. Fines:**

Officers shall not discuss the amount of fines with a person except as may be preprinted on citations or other official publications.

**Z. Intoxicated Persons: [CALEA 72.5.4]**

An individual taken into custody because of intoxication will be protected and sent or transported to the appropriate treatment facility within the County health care system. If the inebriate becomes disorderly prior to acceptance at a health care center or transfer station, the officer may take appropriate enforcement action.

**AA. Combative Prisoners:**

1. Combative prisoners shall be restrained by use of the leg restraint strap and placed in a sitting position while being transported in a police vehicle. The placing of a knee or other body part on the neck of a prone prisoner, once the prisoner is secured, e.g., handcuffed and/or leg restraint strap applied, in an attempt to control combativeness, shall be avoided if possible. Leg restraint straps shall be used only by trained officers who annually demonstrate proficiency in their use.

2. Under no circumstances shall prisoners be "hogtied" and placed in a prone position in the back of a police vehicle.

3. Prisoners in an excited delirium state, also referred to as cocaine psychosis, shall be transported by two officers with one officer constantly monitoring the prisoner.

4. Combative prisoners will be transported directly to a County jail facility. If the combative prisoner complains of pain or injury or has an obvious injury requiring medical attention beyond the capability afforded by training and issued first-aid items, officers shall request a fire-rescue unit be dispatched to the scene. If fire rescue clears the prisoner for transport, the prisoner will be transported to JMH. [CALEA 72.5.4] Once a combative prisoner has been placed into a vehicle for transportation, he or she shall not be transferred to another vehicle without supervisory approval.

5. Prisoners transported to the Forensic Services Bureau, Fingerprint Identification Section, for the purpose of establishing positive identification shall not be fingerprinted if the prisoner becomes uncooperative or combative. Fingerprint Identification Section personnel will instead direct the officer to transport the prisoner directly to a County jail facility and immediately notify the Miami-Dade Corrections and Rehabilitation Department, Intake and Release Bureau Shift Commander, at 786-263-5305 to inform the Shift Commander that the uncooperative/combative prisoner is en route to their facility.

**ANNEXES**

**A. Strip Search Authorization**

**SECTION 1 - GENERAL**

**I. BASIS FOR USE OF FORCE:**

**II. NECESSITY THAT OFFICERS BE ARMED:**

**SECTION 2 - USE OF FORCE [CALEA 1.3.2 – 1.3.13; 26.1.1]**

**I. GENERAL:**

- **A.** Definitions:
- **B.** Use of Force:
- **C.** Reasonable Force:
- **D.** Use of Deadly Force:
- **E.** General Prohibitions Regarding the Use of Deadly Force:
- **F.** Prohibitions Regarding the Use of Deadly Force at or from Motor Vehicles:
- **G.** Animal Shootings:

**II. USE OF FORCE REPORTING: [CALEA 1.3.6]**

- **A.** Force Analysis Unit
- **B.** Supervisor's Report of Response to Resistance (SRRR): (Annex B)
- **C.** Notification of Supervisor:
- **D.** Preparation of SRRR:
- **E.** Medical Attention: [CALEA 1.3.5]
- **F.** Administrative Assignment: [CALEA 1.3.8]
- **G.** Relief From Duty:

**III. DISCHARGE OF FIREARMS AND IN-CUSTODY DEATH INVESTIGATIONS/REPORTS INVOLVING MDPD LAW ENFORCEMENT OFFICERS:**

- **A.** Notifications:
- **B.** Case Reports:
- **C.** Incidents Involving MDPD Law Enforcement Officers Occurring Within Unincorporated Miami-Dade County:
- **D.** Incidents Involving MDPD Law Enforcement Officers Occurring Within a Miami-Dade County Municipality:
- **E.** Incidents Involving MDPD Law Enforcement Officers Occurring Outside Miami-Dade County:
- **F.** Replacement of an Impounded Firearm:
- **G.** Attorney or Psychotherapist/Client Privilege:

**H.** Administrative Investigative Review and Report of Findings:

**SECTION 3 - NONLETHAL WEAPONS AND PROCEDURES [CALEA 1.3.4]**

**I. GENERAL: [CALEA 1.3.9a; 1.3.11b; 1.3.12]**

**A.** Side-Handle and Expandable Police Batons:

**B.** Chemical Agents:

**C.** Electronic Control Weapon (ECW):

**SECTION 4 - FIREARMS**

**I. GENERAL: [CALEA 1.3.9a; 41.3.4]**

**A.** Drawing a Firearm:

**B.** Surrendering a Firearm:

**C.** Authorization to Carry Firearms: [CALEA 1.3.10; 1.3.12]

**D.** Supervisory Inspection: [CALEA 1.3.9c]

**E.** Handling Firearms:

**II. APPROVED ON-DUTY FIREARMS: [CALEA 1.3.9a,b; 41.3.4]**

**A.** Revolvers:

**B.** Semiautomatics:

**C.** Shotguns:

**D.** Rifles:

**E.** Additional On-Duty Firearm:

**F.** Special-Purpose Tactical Firearms:

**III. APPROVED OFF-DUTY FIREARMS FOR NONUNIFORMED PERSONNEL: [CALEA 1.3.9a]**

**A.** Revolvers:

**B.** Semiautomatics:

**IV. HOLSTERS:**

**A.** Uniform Provisions:

**B.** On-Duty Non-uniformed Personnel:

**C.** Other Holster Types:

**V. OTHER ACCESSORIES: [CALEA 41.3.4]**

**A.** Magazine Pouches:

**B.** Grips:

C. Trigger Shoes:

D. High-Capacity Magazines:

**VI. SECURITY OF FIREARMS: [CALEA 1.3.9f]**

A. Vehicles:

B. Other:

**VII. DEPARTMENTALLY-APPROVED AMMUNITION: [CALEA 1.3.9b]**

A. Prohibited Ammunition:

B. Duty Ammunition Supply:

C. Spare and Training Ammunition:

D. Ammunition Reliability:

**SECTION 5 - OTHER**

**I. PROFICIENCY: [CALEA 1.3.10]**

A. Criteria:

B. Personnel Failing Proficiency: [CALEA 1.3.11c; 33.1.5]

**II. ARMAMENT REPAIRS AND SERVICEABILITY: [CALEA 1.3.9c,d]**

A. Repairs:

B. Negligence:

C. Alterations:

D. Report of Alterations:

E. Departmental Armament Maintenance:

F. Inventory and Control of Departmental Firearms:

**III. AIRPORT/AIR CARRIER RESTRICTIONS:**

A. Carrying Firearms into Concourses of Miami International Airport (MIA):

B. Transportation of Firearms on Air Carriers:

**SECTION 6 - FIREARMS REGISTRATION**

**I. GENERAL:**

A. Firearms Registration Files:

B. Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE):

**ANNEXES:**

**A.** Legal Aspects of Use of Force

**B.** Supervisor's Report of Response to Resistance

**C.** Supervisor's Report of Response to Resistance Instruction Sheet

**D.** Shooting Investigations Memorandum

**E.** Electronic Control Weapon Cartridge Log

**F.** Electronic Control Weapon Usage Report

**G.** Sample Employing Agency Message

## SECTION 1 - GENERAL

### I. BASIS FOR USE OF FORCE:

There are occasions in the course of police action which demand that a law enforcement officer utilize force to execute legal authority. Any application of force may result in injury, complaint of injury, or complaint that unnecessary or excessive force was used. Court decisions have held officers and their employers liable for misuse of authority or weapons, including firearms, regardless of the officer's duty status.

Officers may encounter situations requiring the use of force, both non-deadly and deadly, to control situations, to effect arrest or to protect public safety. Control may be achieved through advice, warning, persuasion, or by physical force. The decision to resort to force and the degree of force to be used must be based on the totality of the circumstances confronting the officer at the time, judged from the perspective of what actions would be taken by a reasonable officer on the scene faced with similar facts, or what reasonably appears to be fact, to the officer at the time the action is taken. An officer may use that force which he reasonably believes is necessary to prevent serious physical harm, either to the officer or to others. [CALEA 26.1.1]

### II. NECESSITY THAT OFFICERS BE ARMED:

As long as members of the public are victims of violent crimes and officers in the performance of duty are confronted with deadly force, it will remain necessary for police officers to be properly armed. All sworn personnel will be issued copies of, and be instructed in, the departmental use of force policy before being authorized to carry and utilize nonlethal weapons and firearms. [CALEA 1.3.12]

## SECTION 2 - USE OF FORCE [CALEA 1.3.2 - 1.3.13; 26.1.1]

### I. GENERAL:

The Miami-Dade Police Department (MDPD) recognizes the value of human life and is committed to respecting the dignity of every individual. Accordingly, the sanctity of human life is central to the Department's mission, policies, training and tactics. When reviewing police use of force situations, the MDPD assesses whether the force in any given situation is not only legal, but also necessary, proportional, and ethical.

Florida law governing the justifiable use of force can be found in Florida Statutes, Chapter 776. It must be noted, however, that MDPD policy described herein is more restrictive than state and federal law, and employees are required to comply with this policy.

In order to achieve safe control over a subject, MDPD officers may use the force necessary to affect lawful objectives. [CALEA 1.3.1] When time and circumstances permit, officers will identify themselves as law enforcement officers and use de-escalation and/or tactical flexibility techniques to effect a safe outcome.

**A. Definitions:**

1. Chemical agents: Disorder control agents composed of irritants which in low concentrations act primarily on the eyes and respiratory system. The chemical agents authorized for use are Ortho-chlorobenzylmalononitrile (CS) Gas or Oleoresin Capsicum (OC).

2. Chokehold/stranglehold: A physical maneuver that restricts an individual's ability to breathe for the purposes of incapacitation.

3. Conflict: A forceful (verbal, non-verbal or physical) or violent effort to get free from restraints or resist lawful efforts.

4. Contact shooting: A shooting in which an MDPD officer shoots any person, including himself/herself, intentionally or accidentally, on duty or off duty, or when an MDPD officer is shot

by any person; or when a person is struck by a projectile, or a secondary projectile, such as glass, wood, concrete, etc.

5. Containment: The creation and enforcement of boundaries that limit a subject(s) movements to a specific area without placing officers or the public at unreasonable or unnecessary risk. As circumstances change, these areas can expand or contract at the discretion of the officer.

6. Crisis: Any situation in which a subject perceives a sudden loss of ability to use effective problem-solving and coping skills. Individuals in crisis may have underlying mental health issues, or there may be other potential causes including, but not limited to, the effects of alcohol or drugs, or temporary emotional disturbances based on situational factors such as death of a loved one, divorce, loss of job, natural disasters, criminal victimization, suicidal or homicidal thoughts, or underlying medical conditions.

7. Deadly force: Force that is likely to cause death or serious physical injury.

8. De-escalation: The result of techniques used by law enforcement in crisis situations to slow down and evaluate a potentially volatile non-criminal situation. These techniques allow officers more time, distance, and space in order to introduce new tactics such as: establishing containment areas, seeking cover, controlling the scene, engaging the subject in conversation, and calling for back-up officers and additional resources (i.e., crisis managers, family members, clergy, etc.).

9. Electronic Control Weapon (ECW): A non-lethal conducted energy device designed to conduct and deliver battery-powered energy of which when deployed upon an individual causes neuromuscular incapacitation to a person's sensory and motor functions within the central nervous system.

10. ECW-user certified: Personnel who have satisfactorily completed the Department's 8-hour training course and are authorized to carry and utilize the ECW. Authorized personnel shall complete a prescribed departmental annual refresher course, as required under Florida Statutes Section 943.1717 (5).

11. Imminent: Impending, or about to occur.

12. Necessary: Required to be done; alternative steps are not likely to lead to safe control of the subject.

13. Non-contact shooting: A shooting in which an MDPD officer discharges a firearm (except during training, practice, or personal recreational activities) and no person is struck by the projectile. Animal shootings are considered non-contact shootings for the purposes of this policy.

14. Less lethal force: A type or quantity of force which is neither likely, nor intended, to cause death or serious physical injury. Such force normally includes, but is not limited to, the use of physical strength or skill, chemical agents, the defensive police baton, ECWs, or any other departmentally-approved less lethal tool or technique.

15. Proportionality: Using only the level of force necessary that reasonably corresponds to the threat present to safely achieve lawful objectives. Officers should consider the nature and severity of the underlying event and individual(s) involved, and consider whether other reasonable options exist to safely control the situation.

16. Reasonable belief: Facts that would cause a reasonable officer in the same situation to conclude that the point at issue is probably true.

17. Serious physical injury: Includes, but is not limited to, an injury which creates a substantial risk of death or serious physical disfigurement, disability, or protracted loss or impairment of the functioning of any organ or part of the body.

18. Tactical flexibility: Techniques used to create more reaction time, more physical distance from threats and more maneuvering space so that officers can assess and mitigate volatile conflict situations more safely. If employed with successful results, these techniques afford officers the opportunity to resolve conflict situations with the least amount of force necessary. Reducing or eliminating conflict situations will improve scene safety and reduce injuries.

19. Threat: An expression of intention to inflict pain, injury, or damage, or other hostile action or reckless behavior.

20. Vascular Neck Restraint: A physical maneuver that restricts an individual's blood flow for the purposes of incapacitation (e.g., Applied Carotid Triangle Restraint (ACTR).

**B. Use of Force:**

A description of all situations wherein the use of force, whether less lethal or deadly force, would be justified is not feasible. The standard used by courts to determine whether or not the use of force is justifiable was outlined in *Graham v. Connor*, 490 U.S. 386 (1989), where the Court explained:

> In determining whether force used in a particular arrest, investigatory stop, or other seizure is reasonable, the inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation.

In *Graham*, the Supreme Court emphasized facts and circumstances that courts will examine in determining the reasonableness of the use of force; the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of officers or others; and whether the offender is actively resisting arrest or attempting to evade arrest by flight. Additional variables exist, but the most important factor continues to be the need to prevent serious physical harm either to the officer or to others. (See Annex A, Legal Aspects of Use of Force, for additional factors.)

**C. Reasonable Force:**

Pursuant to Florida law, a law enforcement officer, or any person whom the officer has summoned for assistance, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest, and may use reasonable force to complete the arrest. Force can be used against another when and to the extent that the person reasonably believes that force is necessary to defend one's self or others from the imminent use or threat of unlawful force.

Protecting the safety of both officers and the public is the most important factor for officers to consider. Officers shall only use such force as is reasonably necessary and authorized to effect an arrest or defend themselves or others. Officers shall use the minimal amount of force that is necessary to effect an arrest apprehension, or physically control a violent or resisting person.

When time and circumstances permit, officers shall use de-escalation and/or tactical flexibility techniques to reduce the amount of force needed, if any. Officers shall continually assess the situation; consider the seriousness of the underlying offense, if any; consider options for the safest possible crisis and/or conflict resolutions, and request additional resources as needed.

**D. Use of Deadly Force: [1.3.2]**

The use of deadly force is the most serious action in which a police officer may engage. The authority to use deadly force in the course of public service is an enormous responsibility. Respect for human life requires that, in all cases, deadly force be used only as a last resort. Above all, the safety of the public and officers must be the overriding concern whenever the use of deadly force is considered.

1. Deadly force shall only be used as a last resort in a life and death situation to protect an officer or another person from imminent danger of death or serious physical injury. [CALEA 1.3.2]

2. When the decision is made to use deadly force, officers must cease its application when the threat no longer exists and there is a reasonable belief that they or another person are no longer in imminent danger of death or serious physical injury.

3. Officers may use only the minimal amount of force necessary to protect human life.

4. In all cases where officers use deadly force, they shall attend a mandatory training program at the Miami-Dade Public Safety Training Institute (MDPSTI) immediately, or as soon as practicable, following the application of such force.

**E. General Prohibitions Regarding the Use of Deadly Force:**

1. Police Officers are prohibited from using deadly force against any person, including fleeing felons, except as a last resort in a life and death situation when necessary in self-defense or the defense of another person when those officers have reasonable belief that they or another person are in imminent danger of death or serious physical injury.

2. Police Officers are prohibited from using chokeholds, strangleholds and vascular neck restraints against any person, except as a last resort in a life and death situation when necessary in self-defense or the defense of another person when those officers have reasonable belief that they or another person are in imminent danger of death or serious physical injury.

3. Police officers are prohibited from using deadly force in the defense of property.

4. Police officers are prohibited from firing warning shots. [CALEA 1.3.3]

5. Police officers are prohibited from using deadly force when circumstances do not provide a reasonable probability of striking the intended target.

6. Police officers are prohibited from using deadly force when there is a foreseeable risk to the safety of innocent bystanders or officers.

7. Police officers are prohibited from using deadly force against individuals who pose a danger only to themselves, and not to other members of the public or to officers. Officers shall consider the use of available less-lethal options in these situations, and be prepared to exercise considerable discretion to wait as long as necessary to increase the probability of a safe resolution.

**F. Prohibitions Regarding the Use of Deadly Force At or From Motor Vehicles:**

1. Police officers are prohibited from discharging their firearms **at** a moving vehicle unless a person in the vehicle is imminently threatening the officer or another person with deadly force by a means **other** than the vehicle itself. The only exception is an apparent act of terrorism where the vehicle is being used as a weapon.

   a. Police officers shall not intentionally place themselves in the path of a moving vehicle or remain in the path of a moving vehicle when attempting to approach, pursue, and/or stop a motor vehicle.

   b. Physically being in the path of a moving vehicle shall not be justification for discharging a firearm at the vehicle or any of its occupants.

   c. An officer in the path of an approaching vehicle shall move to a position of safety rather than discharging a firearm at the vehicle or at any of the occupants of the vehicle.

2. Police officers are prohibited from discharging their firearms **from** a moving vehicle unless exigent circumstances exist warranting the imminent defense of human life.

**G. Animal Shootings:**

Police officers are prohibited from discharging their firearms at a dog or other animal except to protect themselves or another person from imminent danger of death or serious physical injury, and there is no other reasonable means to eliminate the threat.

**II. USE OF FORCE REPORTING: [CALEA 1.3.6]**

**A. Force Analysis Unit:**

The goal of the MDPSTI's Force Analysis Unit (FAU), is to use empirical data related to performance, vision, attention, training, decision-making, human error and memory, coupled with the forensic analysis of video recordings for the purpose of determining clear and concise answers, as to how and why events occurred, or are perceived to have occurred during use of force incidents and whether the actions taken by MDPD officers comply with policy.

The purpose of the FAU is not to determine right or wrong, but to provide objective information and data on a use of force incident for review by the appropriate body of disposition. Additionally, the unit is responsible for collecting data associated with use of force incidents and developing training related to the deficiencies and/or contributing trends noted during case analysis.

Members of the FAU will respond to incidents that meet the criteria outlined in Chapter 20 – Part 01 – Communications Procedures. The FAU call-out procedures are also outlined in Chapter 20 – Part 01 – Communications Procedures.

The FAU will be responsible for review of any use of force incident in which command staff requests an FAU evaluation of the incident.

**B. Supervisor's Report of Response to Resistance (SRRR): (Annex B)**

An SRRR form shall be prepared when an officer acts in an official capacity on or off duty, regardless of whether an arrest is made and whenever the following occurs: [CALEA 1.3.6a-d]:

1. A firearm is discharged resulting in a contact or non-contact shooting, except for training, practice, or recreational activities, in unincorporated Miami-Dade County, a municipality or outside Miami-Dade County. Whenever an officer discharges a firearm, an immediate investigation by the appropriate investigators will be conducted, independent from the SRRR.

2. A degree of force is applied or a struggle occurs which results in any injury, up to and including death.

3. A degree of force is applied or a struggle occurs which is likely to cause injury, even when one is not immediately apparent or visible.

4. A chemical agent is discharged in the direction of, or causes injury to a person.

5. An injury or a complaint of injury which results from the guiding, holding, directing, or handcuffing of a person who offers resistance.

6. The side-handle or expandable defensive police baton is used as a striking instrument.

7. An ECW deployment results in the subject being impacted by probes, drive stunned, or stimulated by electrical energy.

When an officer is the only injured party during the course of an arrest, and the criteria listed above do not apply, the SRRR form is not required. All complaints of injuries, regardless of whether the above criteria are met, require documentation and supervisory notification as detailed in the Departmental Manual, Chapter 18 - Part 02 - Prisoner Related Activities, Section III. Procedures, N. Sick or Injured Prisoners. Additionally, a complaint of injury does not constitute the implementation of a SRRR if not related to an actual use of force incident.

**C. Notification of Supervisor:**

The involved officer(s) shall immediately notify the dispatcher and request that his/her supervisor respond when physical contact is made with an individual in response to active physical resistance during the arrest or lawful detention process.

Supervisors will respond to any scene where a weapon (including a firearm, edged weapon, rocks, or other improvised weapon) is reported or when an officer and/or dispatcher believes that there is a potential for significant violence or aggression.

If the officer's immediate supervisor is not available, a supervisor from the officer's unit of assignment will be advised. If the involved officer's immediate supervisor or a supervisor from his unit of assignment is unable to respond within a reasonable period of time, a uniformed supervisor (sergeant or higher) from the affected district, or nearest district when the incident is in a municipality, will respond and prepare the SRRR form (Annex B) in compliance with the SRRR Instruction Sheet (Annex C). A case report will be prepared and include all pertinent details of the incident.

**D. Preparation of SRRR:**

1. Color photos will be taken of all subjects and employees who were directly involved in the original incident and were listed on the SRRR form. Color photos will also be taken of all injured parties; i.e., officers, subjects, and other individuals who are involved in the incident, except when the incident is a contact shooting investigated by the Florida Department of Law Enforcement (FDLE).

2. Close up photographs should depict all injuries sustained and the specific area of the body when there is a complaint of injury. All photographs and a copy of the case report will be attached to the original SRRR form.

3. All SRRR forms will be forwarded to the Professional Compliance Bureau (PCB), via the chain-of-command for review and storage. Copies of SRRR forms will also be forwarded to the FAU via email at FAU@mdpd.com. [CALEA 1.3.7]

4. The supervisor will not enter an opinion or conclusion when completing the Narrative Section of the form.

   a. With the exception of shooting incidents, if the incident is going to be investigated by PCB, the preparing supervisor must include a short synopsis of the incident in the Narrative Section of the form. When a PCB investigator responds to the scene of an incident and initiates an investigation, the supervisor will not include comments relating to the PCB investigation in his report.

   b. If the incident is to be investigated by a specialized unit, including non-contact and animal shootings investigated by the PCB, the preparing supervisor shall enter in the Narrative Section, SEE CASE REPORT PREPARED BY (enter specialized unit). Upon approval by the appropriate district/bureau commander, the signed original SRRR form will be forwarded promptly through the chain-of-command (concerned division chief, assistant director, or commander of an office reporting to the Director) to PCB, and a copy will be provided to the investigative unit.

**E. Medical Attention: [CALEA 1.3.5]**

In use of force incidents, both nonlethal and lethal, first-aid will be rendered. If a subject complains of pain or injury; is unconscious; or, in the opinion of the concerned officer or supervisor, has an obvious injury requiring medical attention beyond the capability afforded by training and issued first aid items, officers shall request a Miami-Dade Fire Rescue (MDFR) unit be dispatched to the scene to render first aid or transport the injured party to a medical facility.

**F. Administrative Assignment: [CALEA 1.3.8]**

Any employee, whose action(s) or use of force in an official capacity, results in death or serious injury, will be removed from line-duty assignment, pending an administrative review.

**G. Relief From Duty:**

It is the responsibility of the involved officer(s) chain-of-command to determine if it is necessary to relieve the officer(s) of duty in accordance with departmental guidelines and, if so, to complete that process.

## III. DISCHARGE OF FIREARMS AND IN-CUSTODY DEATH INVESTIGATIONS/REPORTS INVOLVING MDPD LAW ENFORCEMENT OFFICERS:

**A. Notifications:**

The involved officer shall immediately notify an on-duty supervisor who will contact the Communications and Technology Services Bureau (CTSB) Shift Commander. The CTSB Shift Commander will immediately notify the Crime Scene and Evidence Bureau, Public Information and Education Bureau, PCB, concerned division chief, Psychological Services Bureau, MDPSTI, and Police Legal Bureau. If the incident involves a contact shooting or an in-custody death, the CTSB Shift Commander will also immediately notify Homicide Bureau (HB) and the Florida Department of Law Enforcement (FDLE).

**B. Case Reports:**

Case reports concerning other incidents associated with the use of force; e.g., robbery, burglary, will be the responsibility of the affected investigative element. Copies will be requested when case reports are prepared by other agencies.

**C. Incidents Involving MDPD Law Enforcement Officers Occurring Within Unincorporated Miami-Dade County:**

1. General:

   a. A supervisor advised of such an incident will proceed immediately to the scene, evaluate the incident, and request assistance as warranted.

   b. An uninvolved uniformed unit will be dispatched to render assistance, secure the scene, initiate an investigation, and prepare initial case reports.

   c. HB and PCB investigators will respond to all contact shootings. An FDLE investigator will be the primary (lead) investigator on all contact shootings and in-custody deaths involving MDPD law enforcement personnel. The on call HB Lieutenant will liaison with the FDLE investigator, assist and provide additional HB resources and staff, if requested.

   d. A PCB investigator will respond and conduct an investigation on all non-contact shootings. The PCB investigator will be the primary (lead) investigator for that part of the investigation involving the discharge of firearms.

2. Supervisory responsibility at contact shootings and in-custody deaths:

   The on-scene uniformed supervisor is responsible for ensuring the following:

a. The prompt security and integrity of the shooting scene by establishing two perimeters (an interior perimeter for concerned investigators, departmental command staff, and supervisors, and an exterior perimeter for media, members of the public, etc.). No other officer, regardless of rank, should enter the scene prior to the arrival of a HB investigator, HB supervisor or FDLE investigator.

b. Even if the CTSB Shift Commander has been notified, an on-scene supervisor will notify the HB by telephone as soon as possible. The notification should include the condition and/or location of any subject(s).

c. All witness officers, involved officers, and civilian witnesses shall be separated to ensure statement integrity. Contact with the involved officer(s) should be kept to an absolute minimum.

d. No firearms should be impounded, checked, or in any way disturbed by anyone other than MDPD Crime Scene and Evidence Bureau personnel. However, these actions must be performed in the presence of the FDLE investigator, a HB investigator, or HB supervisor, after the HB Lieutenant has consulted with the FDLE investigator.

e. The involved officer's firearm should be re-holstered or left where it was dropped. Shotguns and/or rifles should remain exactly where they were left by the officer after the shooting.

f. Where exigent circumstances may exist and there is a possibility of a firearm being removed prior to the scene being secured, the firearm should be secured by arriving officers or supervisors.

g. Arrange to supply officers who discharge their firearms with a replacement firearm for any firearm that is impounded by the Crime Scene and Evidence Bureau or FDLE.

h. Officers equipped with body-worn camera (BWC) systems that captured the incident will stop recording by powering down the device at the conclusion of the event. The BWC system will remain affixed to the officer(s) in the same position as it was affixed throughout the event, and shall not be handled in any fashion unless emergency medical attention is necessary, requiring that the device be removed. The BWC Unit supervisor will process the BWC(s) according to agency standards for handling evidence and will be responsible for the recovery and storage of all data evidence captured on the device unless directed otherwise by the FDLE investigator.

3. Supervisory responsibility at non-contact shootings:

a. The on-scene uniformed supervisor is responsible for ensuring the following:

(1) Prompt security and integrity of the shooting scene in the same manner as with contact shootings.

(2) Notifying the CTSB Shift Commander to request that PCB, Crime Scene and Evidence Bureau, MDPSTI, and the appropriate investigative element respond.

(3) If the officer who discharged a firearm is injured and must leave the scene prior to the arrival of PCB, preserve the firearm at the scene as evidence. If the firearm was holstered, ensure it is left holstered and retain the entire gun belt or non-uniform holstered gun at the scene. The unarmed officer will be escorted by another armed officer. The identity and location of all involved persons shall be determined. All witness officers, involved officers, and civilian witnesses shall be separated to ensure statement integrity. Contact with the involved officers should be kept to an absolute minimum.

(4) Making basic inquiries to determine generally what occurred and briefing the PCB investigator(s). Witness officers are required to respond to supervisor's inquiries and write

reports concerning the incident. If the witness officer becomes an involved officer, the provisions of paragraph D.1., below, apply.

(5) Making arrangements to supply officers who discharge their firearms with a replacement for any firearm that is impounded by PCB.

(6) If necessary for the investigation, the officer who discharged the firearm will be advised to contact the Firearms Unit of the Forensic Services Bureau in order to schedule an appointment for a test firing of the weapon. The PCB investigator will be responsible for contacting the Firearms Section to provide information pertaining to the investigation and the reason that the test firing is being requested.

**D. Incidents Involving MDPD Law Enforcement Officers Occurring Within a Miami-Dade County Municipality:**

1. The uniformed supervisor's responsibility upon learning of such a shooting is to ensure that appropriate notifications have been made. The supervisor of the involved officer may respond to the scene at the discretion of that supervisor's chain-of-command.

2. HB and PCB investigators will respond, conduct an investigation, and prepare appropriate case reports on all contact shootings. A PCB investigator will respond and conduct an investigation on all non-contact shootings (also refer to Section 2, Paragraph III, B. Case Reports, above).

**E. Incidents Involving MDPD Law Enforcement Officers Occurring Outside Miami-Dade County:**

1. During normal business hours, the supervisor of the involved officer will cause the concerned chief, assistant director, or commander of an office reporting to the Director, to be notified to determine what, if any, support personnel should respond to the incident.

2. At all other times, the CTSB Shift Commander will be notified. The CTSB Shift Commander will notify the PCB Major.

3. If the incident occurred in Broward, Monroe, Palm Beach, or Collier Counties, a PCB investigator will respond.

4. Response of departmental personnel to incidents which occurred beyond adjacent counties will be evaluated on an individual basis, and appropriate personnel assigned by the concerned chief, assistant director, or supervisor of an office reporting to the Director, as appropriate (also refer to Section 2, Paragraph III. B., Case Reports, above).

**F. Replacement of an Impounded Firearm:**

1. The supervisor shall ensure that the involved officer is not left unattended without a firearm.

2. Replacement firearms, of the same manufacturer and ammunition, are available at district stations and the MDPSTI armory.

**G. Attorney or Psychotherapist/Client Privilege:**

1. Involved officers: Officers who discharge their firearms are defined as involved officers in an administrative investigation. Involved officers should not be asked what happened. Attorneys or a representative of their choice, however, are permitted to talk to the involved officer(s). A representative, however, does not enjoy the attorney or psychotherapist/client privilege and could be compelled to provide a statement.

2. Witnesses: There is no entitlement for a witness to speak to an attorney or representative of choice prior to responding to the inquiries of a supervisor or PCB investigator in an administrative investigation.

**H. Administrative Investigative Review and Report of Findings:**

1. Upon completion of the investigation, investigating elements will forward a copy of all case reports to the PCB.

2. In the event of a contact shooting, the investigative file will be forwarded to a disposition panel assigned by PCB. Following review and disposition by the panel and review by the Police Legal Bureau, the file and panel findings will be returned to the concerned division chief, assistant director, or the Director for an office reporting to the Director, for appropriate action.

3. In the event of a non-contact shooting, the investigative file will be forwarded to the supervisor of the major organizational element of the concerned officer. A Shooting Investigation Memorandum (Annex D), indicating review of the file and action taken, will be prepared by the concerned supervisor of the major organizational element and forwarded with the investigative file to the concerned division chief, assistant director, or the Director for an office reporting to the Director, for approval and forwarding as follows:

   a. If disciplinary action is recommended, the completed case file will be routed for review as enumerated in **Chapter 15 – Part 04 - Complaint, Counseling, and Discipline.**

   b. If discipline is not recommended, the completed case file will be forwarded, via PCB, to the Director for final review.

4. After review of the incident, and if the facts support a conclusion that the discharge was the result of officer negligence, the officer may be required to undergo firearms certification training.

5. At the conclusion of the shooting investigation, the PCB will forward a complete copy of the case file to the MDPSTI, Firearms Section, for review, evaluation, and research. The MDPSTI will utilize information gathered to improve methods, training, and tactics.

## SECTION 3 - NONLETHAL WEAPONS AND PROCEDURES [CALEA 1.3.4]

### I. GENERAL: [CALEA 1.3.9a; 1.3.11b; 1.3.12]

Agency personnel authorized to carry and/or use nonlethal weapons and techniques are issued a copy of the departmental use of force policy as described in this directive. Proficiency will be documented during annual qualification training, which will signify receipt of instruction. The following nonlethal weapons and procedures are authorized for use by departmental personnel:

**A. Side-Handle and Expandable Police Batons:**

Police batons will be carried only by personnel who have completed departmentally-approved training and have demonstrated proficiency annually in its use.

**B. Chemical Agents:**

To minimize injury to suspects, officers, and others, or to avoid property damage, use of a chemical agent may be necessary. Although police chemical agents are currently considered nonlethal, use of the individually-issued canisters must be carefully evaluated by the officer.

1. Approved chemical agents: Officers shall carry only chemical agents which have been approved by the Department.

2. Use of chemical agents: No tactical advantage is realized by indiscriminate use of chemical agents

against non-combative persons. Chemical agents will not be used until all other reasonable efforts to control an incident have failed. Chemical agents will only be used by personnel who have completed departmentally-approved training and have demonstrated proficiency annually in its use.

3. Authority to employ: During crowd control situations, or civil disturbances, the on-scene commander has responsibility for authorizing use of a chemical agent and for directing its application. Although smoke is not considered to be a chemical agent, smoke grenades may be employed to disperse a crowd.

4. Projectiles: Projectiles are designed to deliver chemical agents in containers that can be fired from gas guns or 12-gauge shotguns. The muzzle velocities of these projectiles enable them to penetrate windows, doors, and room partitions; therefore, chemical agent projectiles shall not be fired directly at any person.

5. Reports: Appropriate reports shall be completed whenever a chemical agent or weapon is employed.

6. Duration: The duration of application of chemical agents shall be limited to that required for effective control.

7. First aid: When a chemical agent has been applied, first aid shall be administered as soon as practicable. [CALEA 1.3.5]

**C. Electronic Control Weapon (ECW):**

1. ECWs are issued to officers for utilization to neutralize potentially combative subjects, as an alternative to physical control in arrest or custodial situations. Only those employees who have completed the approved ECW User Certification course may utilize an ECW.

   The subject's mere failure to comply with verbal commands shall not in itself serve as a justification for ECW deployment. Officers should only use that force which is necessary to control and seize an individual for the purpose of taking the person into custody or treatment, where the individual escalates resistance to the officer, from passive physical resistance to active physical resistance, and/or the individual has the apparent ability to endanger the officer. ECW deployments are also authorized in situations where the subject is in the process of committing self-inflicted injuries. No policy or guidelines can anticipate every situation that officers might face, however, in general terms, the following guidelines are established:

   a. The primary purpose in the decision to deploy the ECW is to prevent the continued escalation of a subject's resistance or violence to minimize injury to all involved.

   b. An officer's response level to subject resistance should always depend upon subject/officer factors such as age, size, weight, and the subject's apparent ability to physically endanger the officer or do harm to oneself or others, balanced against the seriousness of the incident.

   c. Prior to deployment of the ECW, officers must take into consideration environmental factors which may contribute to serious injury; e.g., subjects standing on or near the edge of a roof, stairwell, window, or body of water.

   d. Active physical resistance includes threatening body language associated with verbal threats, or the subject is refusing to comply with the officer's instructions **and** has the apparent ability to physically endanger the officer. Examples of this include but are not limited to:

      (1) Blading the body

      (2) Assuming a "boxer stance"

      (3) Circling the officer

(4) Moving hands from open to closed forming a fist, etc.

Physically evasive movements to defeat an officer's attempt at control in the form of bracing or tensing the body, attempts to kick, push, or pull away from the officer, or prohibiting the officer from getting within close proximity of the subject, to include fleeing.

2. Fleeing subject:

a. A decision to deploy an ECW on fleeing felons and violent misdemeanants who are subject to arrest should be predicated upon the subject exhibiting physically evasive movements to defeat attempts to lawfully control a scene. A violent misdemeanant is someone who has inflicted or has threatened to inflict physical harm to another person.

b. A decision to deploy an ECW on a fleeing subject who is being taken into custody, pursuant to the Florida Mental Health Act, should be based upon the subject clearly exhibiting behavior that would cause harm to himself/herself or others, and who have the apparent ability to carry out those intentions.

3. Multiple Officer Deployment:

It is not recommended that more than one officer deploy an ECW at the same individual at one time, unless the ECW malfunctions and/or is ineffective. Under these circumstances, a secondary ECW deployment would be tactically necessary, based on factors confronting the officer at the time of the incident where the subject continues to actively resist.

4. When a secondary officer is on scene, the officers shall take a tactical advantage and utilize the window of opportunity given while the individual is experiencing neuro muscular incapacitation to control and handcuff the subject. Repetitive cycle:

The ECW should be activated for one standard cycle of (5 seconds). Utilizing ECW repetitive cycles should not exceed an accumulative total of three (5 second) cycles or deployments, unless tactically necessary to seize an individual based on factors confronting the officer at the time of the incident such as:

a. The subject continues to actively resist or exhibit physically evasive movements to defeat the officers attempt to control.

b. The subject refuses to follow the officer's command to stop actively resisting.

c. A tactical method is not feasible or could place the officer and/or subject in jeopardy.

d. Notwithstanding the above, the attempt by the subject to defeat the ECW deployment connection is sufficient justification for repetitive cycle deployment.

e. Exigent circumstances:

(1) The duration of any deployment or cycle should not exceed 15 seconds, unless tactically necessary to seize an individual for custodial treatment purposes.

(2) The supervisor conducting the preliminary ECW investigation for the purpose of writing the SRRR shall notify the CTSB Shift Commander and ask that PCB be notified on all ECW incidents involving a cumulative total of three or more cycles or deployments; regardless of the number of officers deploying an ECW, and/or any ECW deployments/cycles exceeding 15 seconds of duration. Separate from the SRRR, PCB shall start an inquiry regarding these ECW incidents and report their findings via memorandum to the Director and Assistant Director in the officer's chain-of-command. The PCB will

also keep an accounting/log of all ECW incidents which involve three or more cycles/deployments and/or any ECW deployments/cycles exceeding 15 seconds of duration.

5. ECW deployment on animals:

An ECW can also be utilized to neutralize an attack by an animal. In the event an animal is struck with an ECW, the Miami-Dade Animal Services Department will be requested to respond to the scene. An SRRR is not necessary; however, the ECW Usage Report will be completed and forwarded to MDPSTI's Police Officer Service Training Section

6. Issuance of ECW and cartridges:

The MDPSTI, Police Officer Service Training Section, issues all assigned ECWs to departmental elements. All districts, bureaus, and sections listed on the Table of Organization that are assigned ECWs shall designate a station control officer/administrative officer to maintain ECWs assigned to certified personnel. Station control officers/administrative officers will issue ECW cartridges as needed and record the cartridge serial number in the Electronic Control Weapon Cartridge Log (Annex E). ECW cartridges shall be issued after supervisors submit completed ECW Usage Reports.

a. ECWs assigned to officers will remain assigned to those officers even when transferred to other districts, bureaus, sections. Station control officers/administrative officers from the departing entity shall notify the MDPSTI ECW inventory coordinator of the transfer. Once this notification has been made, the station control officer/administrative officer will remove the transferred ECW from inventory.

b. Uniform district personnel are the MDPD's first priority when issuing ECWs. At the discretion of the MDPSTI, in concert with command staff of Investigative Services, ECWs will be collected from specialized units and re-issued to certified uniform personnel.

c. All personnel trained and issued an ECW are required to wear the ECW and have ECW accessories in their possession when working on duty or in an off-regular duty status in uniform. The Director reserves the right to exclude specific officers from the mandatory carrying of an ECW.

7. ECW aftercare procedures:

Departmental personnel will adhere to the following procedures when deployment of the ECW probes or drive stuns impact a subject:

a. Once the subject is handcuffed and in custody, the officer(s) shall advise the police dispatcher that the subject has been probed or drive stunned by an ECW and request that a supervisor respond to the scene.

b. Only ECW-user certified officers will remove the probes from the subject using departmentally-issued safety gloves. If needed, a Band-Aid will be applied to the affected area. An ECW-user certified female officer should be utilized to remove probes that strike a female whenever practicable. Any adult prisoner impacted by the ECW probes shall be transported to a detention facility via the nearest medical facility, when determined to be necessary.

c. In the event an ECW probe strikes a subject's head, neck, or genital area, officers should not attempt to remove it, but have MDFR respond to remove it. After being treated by MDFR personnel, the subject will be transported to the nearest medical facility.

d. Any juvenile impacted by an ECW shall be transported to a medical facility for evaluation. Upon written release from the medical facility, the juvenile prisoner shall be transported to the Juvenile Services Department.

8. MDFR notifications:

MDPD personnel will notify MDFR under the following circumstances:

a. When a probe is embedded in the head, neck, or genital area. Additionally, procedures discussed in Section 3, Paragraph I., subsection D. 7. c. above, shall be followed.

b. When the person is unconscious even for a short period of time.

c. When the person is in an "excited delirium" state; displaying wildly agitated behavior, possibly hallucinating, or appears to be under the influence of a stimulant drug, especially urgent if the skin feels hot.

d. There is obvious significant injury from a fall or take down.

e. The person volunteers/states that they are having chest pain or trouble breathing.

f. The person exhibits persistent confusion or altered mental status more than one minute after application of the ECW.

g. If an ECW is used by a member of the public on an individual; i.e., non-police use.

h. If the individual requests MDFR or medical assistance.

i. If used on a juvenile (18 years of age or under).

j. If there is any doubt as to the health of the person. (For example, the person complains of chest pains, has difficulty breathing, or it appears the person may be having an epileptic or other type of seizure.)

9. Medical Considerations:

a. Continuous monitoring of the person must take place regardless of whether MDFR is called or not, especially within the first 60 minutes after an ECW application.

b. Care must be taken to avoid positional asphyxia. No person should be restrained and left prone (face down) for an extended period of time.

10. Documentation and photographs:

a. The supervisor shall document the ECW cartridge(s) serial number in the narrative of the SRRR. Subject or officer injury shall be photographed and attached to the SRRR.

b. The supervisor shall ensure that a completed draft copy of the SRRR shall be faxed to PCB within 24 hours of the incident. The final SRRR shall be forwarded to the concerned Assistant Director for review within five days of the incident. The Assistant Director reviewing the final SRRR may forward a copy to the Director when deemed necessary.

c. The supervisor shall complete an Electronic Control Weapon Usage Report (Annex F) and include a detailed account of the circumstances surrounding the deployment and any additional cycle deployments from an ECW. A copy of the SRRR should be attached to the Electronic Control Weapon Usage Report and the original SRRR should be routed to PCB for review and storage.

d. The officer shall treat the expended probes and used safety gloves as biohazard material. The probe(s) shall be inserted point first back into the ports of the air cartridge. The cartridge ports will then be sealed with tape and placed in a biohazard bag in accordance with procedures in **Chapter 14 - Part 02 - Communicable Diseases.**

e. Investigative entities that determine expended ECW cartridge(s) or probe(s) are of evidentiary

value shall follow procedures outlined in **Chapter 19 - Part 01 - Impounded Property**.

f. Station control officer/administrative officer at the affected entities will be responsible for issuing replacement cartridges after ECW users submit completed Electronic Control Weapon Usage Reports, and shall forward copies of all Electronic Control Weapon Usage Reports to the MDPSTI, Police Officer Service Training Section.

g. In an arrest or custodial situation when only the ECW is drawn from the holster, and compliance is achieved, only an Electronic Control Weapon Usage Report shall be completed and forwarded to the MDPSTI, Police Officer Service Training Section .

11. Records retention:

All entities that employ personnel equipped with an ECW shall maintain an assignment log to include ECW assignments, cartridge assignments and transfers.

12. ECW-user responsibilities:

a. All sworn personnel trained and issued an ECW are required to wear the ECW and have in their possession ECW accessories when working on duty or in an off-regular duty status in uniform. The Director reserves the right to exclude specific officers from the mandatory carrying of an ECW.

b. Personnel equipped with an ECW will be responsible for ensuring proper operation of the ECW by removing the cartridge and conducting a spark test every working day. The spark test will be documented on the bottom of the Daily Activity Report, i.e., time of test, the word "Test", and the ECW serial number. For officer safety and equipment maintenance purposes, officers should not be limited to a single daily spark test; however, firings which appear to be unsystematic and/or reckless should be reviewed by a lieutenant or higher.

c. Arrest or custodial situations that generate subject compliance utilizing the ECW by any means other than exposure to electrical stimulation or being impacted with a probe, will require an ECW Usage Report. The report will be forwarded to the MDPSTI, Police Officer Service Training Section, no later than the conclusion of the officer's work shift.

d. When circumstances permit and officer safety or the safety of others is not compromised, the officer will provide a verbal warning to the subject by announcing "Taser". This warning will also alert other officers that may be in the vicinity of the deployment.

e. After deployment, an officer shall announce the code word "CLEAR" to alert other officers prior to approaching the subject to affect an arrest.

f. ECW-certified personnel will maintain certification by attending a minimum of one hour recertification course, annually, whether or not they are currently assigned an ECW.

13. Supervisor's responsibilities:

a. When an ECW is discharged in a manner that makes contact with an individual, in addition to completion of the SRRR, the supervisor shall ensure that a download is conducted for comparison with information in the report. A supervisor of the rank of lieutenant or higher, shall review and initial the download, Electronic Control Weapon Usage Report, and SRRR, to ensure that all documentation is consistent and accurate.

b. Supervisors are to review each Daily Activity Report to determine whether function checks are being conducted and to identify any unsystematic firings which appear to be reckless in manner. A supervisor of the rank of lieutenant or higher shall review all such cases. Any discrepancies which cannot be resolved at the element level shall be forwarded to PCB.

14. ECW prohibitions:

Below is a list of prohibited ECW uses unless deadly force is encountered, alternative measures have been exhausted, or exigent circumstances exist:

a. Officers shall not discharge an ECW near flammable liquids or fumes. An ECW shall not be discharged if self-defense spray has been deployed as the ECW can ignite when discharged near flammable liquids or fumes.

b. An ECW shall not be deployed on subject(s) in physical control of any motor vehicle including ATV's, motorcycles, and scooters, while the vehicle is in motion.

c. An ECW shall not be used on women who are known to be pregnant and/or women who appear to be pregnant.

d. An ECW shall not be intentionally aimed at the head, neck, or genital area.

e. The (X)DPM for the X26 model will not be removed unless it's being changed or downloaded for information. The ECW shall not be altered, i.e., engraved, taken apart, or repaired. Officers experiencing malfunctions with the ECW shall report to the MDPSTI, Police Officer Service Training Section.

f. Officers shall not utilize ECWs or ECW accessories not approved and issued by the MDPSTI.

15. ECW Removal:

a. Entity commanders employing ECW-certified personnel shall consider, and have the authority, to remove and reassign an ECW when it has been determined by an element level or PCB investigation that an officer misused an ECW or failed to follow departmental guidelines in its use. An immediate supervisor may remove an ECW from a subordinate's possession pending final approval from the entity commander, when circumstances dictate.

b. The MDPSTI, Police Officer Service Training Section, may remove an ECW from an officer's possession if they fail to demonstrate proficiency.

16. ECW Holsters:

Uniformed personnel can wear the issued holster or any other approved holster as established by the MDPSTI.

## SECTION 4 - FIREARMS

### I. GENERAL: [CALEA 1.3.9a; 41.3.4]

Civilian employees shall not carry or possess a firearm or weapon, concealed or unconcealed, while on duty or while in County premises, facilities, offices, or vehicles unless authorized by State law and the Director. Departmental employees may, as part of their official duties, handle, analyze or examine, transmit, store, or receive for the following purposes, any firearm or weapon that has been impounded by or submitted to the Department for analysis, examination, storage, and/or safekeeping.

Sworn personnel shall carry an authorized firearm on duty which meets departmental specifications (firearms utilized for licensed hunting or organized competitive shooting activities are excluded), unless exempted by a supervisor. The on-duty carrying of shotguns or rifles is optional unless directed otherwise. Handguns approved for non-uniformed assignment shall be carried openly in a holster approved by MDPSTI only when displaying MDPD sworn employee credentials (i.e., police badge). The MDPSTI maintains a current list of departmentally-approved firearms, holsters, weapons, and ammunition.

**A. Drawing a Firearm:**

The decision to draw or direct a firearm at an individual should be based on the tactical situation and

reasonable belief by the officer that there is a substantial and imminent risk that the situation may escalate to a point where deadly force may be justified. Officers should exercise cautious discretion when drawing a firearm.

**B. Surrendering a Firearm:**

All efforts should be made to avoid surrendering your firearm.

**C. Authorization to Carry Firearms: [CALEA 1.3.10; 1.3.12]**

Sworn personnel will be authorized to carry only departmentally-authorized firearms, and only after receiving copies of, and instruction in, the Department's use of force policy as specified herein and demonstrating required proficiency as determined by the MDPSTI.

**D. Supervisory Inspection: [CALEA 1.3.9c]**

Supervisors shall routinely inspect firearms, ammunition, and reloading devices carried by subordinates. Personnel are responsible for proper care, cleaning, and treatment of firearms carried in the line of duty.

**E. Handling Firearms:**

Firearms will be handled in a safe and reasonable manner.

1. Prohibition on direct contact:

   A handgun, rifle, or shotgun muzzle will not be held in direct contact with an individual except as a last resort when the use of deadly force is justified and it is the only manner in which the firearm can be discharged without increasing the risk of death or serious physical injury to the officer or another person.

2. Handguns:

   a. When a handgun is drawn, the trigger finger will be kept outside the trigger guard and parallel to the cylinder or frame until the weapon clears the holster.

   b. The hammer of a revolver will not be drawn back to the single-action firing position except when cleaning or disassembling the weapon.

   c. Handguns will be secured as soon as practicable after determining that use of deadly force is not necessary.

3. Shotguns:

   a. The trigger finger shall be kept outside the trigger guard unless deadly force becomes necessary.

   b. The safety button shall be engaged or disengaged only from outside of the trigger guard. The safety shall be disengaged only when deadly force may become necessary.

   c. The shotgun will be carried with the chamber closed and empty, the magazine filled, and the safety on.

   d. Officers carrying shotguns are discouraged from running or engaging in foot pursuits unless exigent circumstances exist.

   e. Absent exigent circumstances:

      (1) Shotguns will be loaded and unloaded in a safe manner and location with the barrel pointing downward.

(2) Routine loading and unloading will be into and from the magazine tube.

(3) Shotguns will be transported in vehicles with an empty chamber, in battery (slide locked forward), and the safety on.

(4) A round shall be chambered only when an officer determines that deadly force may be necessary. A chambered round will be removed directly from the chamber.

(5) Shotguns will be secured as soon as practicable.

## II. APPROVED ON-DUTY FIREARMS: [CALEA 1.3.9a,b; 41.3.4]

All firearms will be inspected by the firearms staff during annual qualification. Weapon condition will be documented on the Annual Firearm Qualification Record, and unsafe firearms removed from service until repaired. [CALEA 1.3.9d] Departmentally-approved firearms, as determined by the MDPSTI, Police Officer Service Training Section, shall be utilized for all approved on-duty and off-duty firearms; i.e., revolvers, semiautomatics, shotguns, rifles, and special purpose tactical firearms, and a list of authorized firearms is maintained by the Police Officer Service Training Section. Questions regarding specific firearms approved by the Department should be directed to the Police Officer Service Training Section.

### A. Revolvers:

The weapon must be manufactured by Colt, Rugger, or Smith and Wesson, and meet the criteria specified for uniformed assignment.

1. Uniformed assignment: A departmentally-issued revolver chambered to accept six .38 special cartridges, with a barrel length of four inches. Uniformed personnel may elect to carry a personally-owned revolver in lieu of the departmental issue.

2. Non-uniformed and Special Response Team (SRT) assignments: Sworn personnel assigned to a non-uniformed assignment and SRT members engaged in a tactical operation may carry a revolver which:

   a. Has a barrel length not exceeding four inches.

   b. Is capable of holding a minimum of five cartridges.

   c. Is not less than .38 special nor greater than .45 caliber.

   d. Is approved by the Ordnance Technician as being a make and model which is functionally reliable and safe for carriage. [CALEA 1.3.9c]

### B. Semiautomatics:

Sworn personnel, regardless of assignment, may carry any semiautomatic pistol approved by the Department after successfully completing the MDPSTI's semiautomatic transitional course, qualifying with the weapon, and the following criteria are met (Refer to Miami-Dade Police Department, MDPSTI, Authorized Weapons for Departmental Use Memorandum):

1. Minimum magazine capacity is eight rounds.

2. Semiautomatics will be carried with a round in the chamber, a full magazine, and the safety off.

### C. Shotguns:

Officers may carry departmentally-issued or personally-owned shotguns meeting the following criteria:

1. Manufactured by Remington, Model 870, or Smith and Wesson, Model 3000; 18-20 inch barrel; 12-

gauge; and blue, black, parkerized, or matte gray finish. Extended magazine tubes are authorized. All magazine tubes may be loaded to capacity.

2. Inspected by the Ordnance Technician and identifying information concerning the weapon and qualification recorded on the Firearms Qualification Record. [CALEA 1.3.9c]

**D. Rifles:**

Departmental rifles are provided to deliver additional safety to officers and the community during situations that involve a heightened probability of violence. Supervisors will take all appropriate measures to ensure that rifles are available and being carried by certified officers while on duty. Certified officers will carry departmentally issued or personally owned rifles when the following criteria are met:

1. Successful completion of the MDPSTI's 16-hour rifle training course.

2. Approved list of manufacturers is used.

3. Inspected by the Ordnance Technician and identifying information concerning the weapon recorded with the officer's assigned unit. [CALEA 1.3.9c]

4. The rifle will be carried with the chamber closed and empty, the magazine filled, and the safety on.

5. SRT members engaged in training or tactical operations may utilize any SRT approved rifle.

Once the above is met, all personnel certified to carry a rifle are required to carry their rifle, whether departmentally issued or personally owned, in their vehicle when working on-duty or in a regular off-duty status, in uniform.

Personnel equipped with a rifle, whether departmentally issued or personally owned, will be responsible for ensuring proper maintenance and operation of the rifle.

**E. Additional On-Duty Firearm:**

Sworn personnel are authorized to carry an additional, personal revolver or semiautomatic pistol while on duty if the weapon meets the specifications for any on-duty firearm, regardless of uniformed or non-uniformed assignment.

**F. Special-Purpose Tactical Firearms:**

The Department will supply officers with special-purpose tactical firearms as necessary, including firearms with burst-firing or fully automatic capabilities. Comparable privately-owned firearms will be carried and used only upon written authorization of the Director. This authorization shall specify the unit or individuals approved to carry and use such firearms, and the duration of the approval. Special-purpose tactical firearms which are privately owned must be inspected and approved by the Ordnance Technician as being a make and model which is functionally reliable and safe for carriage.

## III. APPROVED OFF-DUTY FIREARMS FOR NONUNIFORMED PERSONNEL: [CALEA 1.3.9a]

Sworn personnel, except police reserve officers, are required to have an authorized firearm and ammunition in their possession unless off-duty activity dictates otherwise, such as sports activities.

**A. Revolvers:**

Off-duty sworn personnel may carry any revolver which conforms to specifications for any on-duty firearm.

**B. Semiautomatics:**

Off-duty sworn personnel may carry any semiautomatic pistol approved by the Department after

successfully completing the MDPSTI's semiautomatic transitional course and qualifying with the weapon.

## IV. HOLSTERS:

### A. Uniform Provisions:

Uniformed personnel can wear the issued holster or any of the other approved holsters as established by the MDPSTI. [CALEA 41.3.4] Personnel must demonstrate proficiency with any non-issued uniform holster prior to utilizing it on or off duty.

### B. On-Duty Non-uniformed Personnel:

On-duty non-uniformed personnel shall carry handguns in holsters equipped with safety strap. Firearms carried in a purse must be holstered with safety strap or flap secured and in a separate compartment away from personal effects.

### C. Other Holster Types:

Personnel utilizing an ankle or other special holster on duty will be required to demonstrate firing proficiency using that holster as normally worn, during departmental proficiency firing. Firearms Proficiency Record cards will indicate that proficiency was attained with the special holster. [CALEA 41.3.4]

## V. OTHER ACCESSORIES: [CALEA 41.3.4]

### A. Magazine Pouches:

Personnel approved to carry semiautomatics may carry either horizontal or vertical magazine pouches. Vertical pouches worn with the flap side down are prohibited.

### B. Grips:

Grips shall be wood, rubber, or those supplied by the manufacturer of the weapon. Any other modifications must be approved by the MDPSTI's Police Officer Service Training Section.

### C. Trigger Shoes:

Trigger shoes are prohibited.

### D. High-Capacity Magazines:

Sworn personnel may purchase high-capacity magazines (10 rounds or more) for their personally owned weapons.

## VI. SECURITY OF FIREARMS: [CALEA 1.3.9f]

Firearms will not be left unsecured. Departmental personnel (both on-duty and off-duty) shall take the necessary steps to ensure that their firearms are secured at all times and not readily accessible to others. All firearms, including shotguns and rifles, not being personally carried or which are otherwise unattended, shall be secured as indicated below.

### A. Vehicles:

Firearms may be secured in vehicles temporarily when a secure location inside a building is not available or is impractical. Firearms secured in a vehicle shall be locked in the trunk or in an interior locked compartment if the vehicle has no trunk. Storage in an unattended vehicle overnight or longer is prohibited.

### B. Other:

Firearms will be secured in a locked cabinet, drawer, secure compartment, or as otherwise designated,

when: [CALEA 73.3.1]

1. Unattended.

2. Officers attend judicial proceedings when not on official duty. In this case, police officers will surrender their firearms for safekeeping at the designated security section of the courthouse.

3. An officer processes a subject; e.g., fingerprints, books, or performs driving under the influence (DUI) testing in a departmental facility.

4. An officer enters a governmental facility and does not intend to carry the weapon upon his person.

5. On-duty personnel are engaged in nontraditional police duties and carrying a firearm would not be practical, e.g., community policing officers, in departmentally-approved sport activities.

## VII. DEPARTMENTALLY-APPROVED AMMUNITION: [CALEA 1.3.9b]

Departmentally-approved ammunition, as determined by the MDPSTI, Police Officer Service Training Section , shall be utilized for all approved on-duty and off-duty firearms; i.e., revolvers, semiautomatics, shotguns, rifles, and special purpose tactical firearms. [CALEA 41.3.4] Ammunition undergoes continual testing and evaluation, and a list of authorized ammunition is maintained by the Police Officer Service Training Section. Questions regarding specific ammunition approved by the Department should be directed to the Police Officer Service Training Section.

### A. Prohibited Ammunition:

The following handgun ammunition will not be carried or used without the authorization of the Director or his designee:

1. Explosive or combustible rounds.

2. Magnum or armor-piercing rounds to include rounds designed to penetrate armor plate, soft body armor, and bullet-resistant glass, plastic, or fibers.

3. Rounds containing multiple pellets or projectiles.

### B. Duty Ammunition Supply:

1. Uniformed officers will carry sufficient ammunition to supply two complete reloads for the approved primary firearm.

2. Non-uniformed officers shall carry sufficient ammunition to supply a complete reload for the approved primary firearm. Dependent upon nature of assignment, the requirement may be waived by the respective district/bureau commander.

3. Officers needing replacement duty ammunition (.38 Special, 9 mm, .40 caliber, or .45 caliber cartridges; or 12-gauge shotgun shells) should contact the MDPSTI, Police Officer Service Training Section.

### C. Spare and Training Ammunition:

Officers may, at their expense, carry departmentally-approved spare ammunition.

### D. Ammunition Reliability:

1. To ensure cartridge reliability, officers shall fire their old service ammunition during annual proficiency firing and be issued new cartridges by the MDPSTI.

2. To ensure shot-shell reliability, officers shall fire their old service shotgun shells during annual proficiency firing and be issued five new shotgun shells by the MDPSTI.

**SECTION 5 - OTHER**

**I. PROFICIENCY: [CALEA 1.3.10]**

Certified weapons instructors will ensure that sworn personnel demonstrate proficiency biannually with the approved firearm they carry. A minimum score of 80 percent is required throughout the designated course. [CALEA 1.3.11a]

**A. Criteria:**

1. Personnel who demonstrate proficiency with an approved revolver will be considered proficient with any approved revolver of the same manufacturer, caliber, barrel length, frame size, and method of operation.

2. Personnel who demonstrate proficiency with an approved semiautomatic pistol will be considered proficient with any semiautomatic pistol of the same manufacturer, caliber, and method of operation.

3. Personnel authorized to use special-purpose tactical firearms are required to attend familiarization and proficiency training as prescribed by the MDPSTI and must demonstrate proficiency semiannually with each authorized firearm.

**B. Personnel Failing Proficiency: [CALEA 1.3.11c; 33.1.5]**

Personnel who fail to demonstrate proficiency during scheduled firearms qualification sessions will be required to achieve proficiency during a scheduled remedial session. Personnel who fail to demonstrate proficiency because of an injury, illness, or other disabling cause, or fail to attend scheduled firearms qualification will be required to demonstrate proficiency upon return to full duty or upon a rescheduled session. Remedial training will be tailored to individual needs based on MDPSTI recommendations, and will not exceed five consecutive days.

1. Handguns:

   a. Officers who fail to demonstrate proficiency during scheduled Annual Qualification will be required to achieve proficiency during a scheduled eight-hour Qualification Enhancement Course. Officers who fail to demonstrate proficiency in the Qualification Enhancement Course will be scheduled to attend a Remedial Qualification Session not to exceed five consecutive days. All scheduling will be done by memorandum, from the MDPSTI to the concerned officer's commander, indicating the type of training needed.

   b. Notice of failure to demonstrate proficiency:

      (1) If an officer fails to demonstrate proficiency in the Remedial Qualification Session, the MDPSTI will notify the commander of the concerned officer by a memorandum entitled Notice of Failure to Demonstrate Proficiency.

      (2) Upon receipt of a Notice of Failure to Demonstrate Proficiency, the officer shall be prohibited from carrying a firearm, assigned to administrative duties, and will be officially notified by a memorandum, entitled Notice of Failure to Demonstrate Proficiency, from the concerned commander. The concerned officer's supervisor will be present to witness and sign the memorandum. A copy will be placed in the officer's unit personnel file until proficiency is achieved.

2. Personnel failing proficiency with shotguns or rifles:

   Officers who voluntarily carry a shotgun or rifle shall demonstrate proficiency annually by firing a

minimum approved score throughout a designated course. Officers who fail to meet proficiency standards will be prohibited from carrying a shotgun or rifle until proficiency is achieved.

3. Reclassification or dismissal:

   Inability to show proficiency after remedial firearms training will result in permanent reclassification to a non-sworn position or dismissal. Such reclassification or dismissal will be initiated by the commander of the concerned officer upon notification by the MDPSTI that the officer has failed to show proficiency after remedial training.

4. MDPSTI responsibilities:

   The MDPSTI will conduct annual, make-up, specialized, and remedial firearms training sessions as required, and will maintain a record of departmental personnel who achieve proficiency, fail to achieve proficiency, or fail to attend. [CALEA 1.3.11b]

   a. A record of firearms which the individual officer is considered proficient to carry will be maintained by the MDPSTI. [CALEA 1.3.11b]

   b. The MDPSTI shall immediately notify concerned district/bureau commanders of departmental personnel who fail to demonstrate proficiency with an approved on-duty firearm.

   Upon conclusion of scheduled make-up sessions, a memorandum will be forwarded to the Director, with a copy to appropriate commanders, listing employees and their units of assignment who failed to attend either scheduled or make-up sessions.

**II. ARMAMENT REPAIRS AND SERVICEABILITY: [CALEA 1.3.9c,d]**

The Ordnance Technicians assigned to the MDPSTI are responsible for inspection and repair of all departmentally-approved firearms.

**A. Repairs:**

While repairs are being made, the officer will be issued a serviceable loaner weapon by the Ordnance Technician.

**B. Negligence:**

When unserviceability of departmental armament is determined to have been caused by misuse, carelessness, or neglect, cost for repair or reconditioning may be charged to the responsible employee.

**C. Alterations:**

Departmental firearms shall not be altered. Repairs and installation of approved grips or sights on handguns, shotguns, and rifles, will be done by the Ordnance Technician assigned to MDPSTI.

**D. Report of Alterations:**

Any unauthorized alteration will be reported by the MDPSTI Major to the affected officer's commander for appropriate action.

**E. Departmental Armament Maintenance:**

Units in possession of departmental armament will perform preventive maintenance; i.e., cleaning, lubricating, and monthly inspections.

**F. Inventory and Control of Departmental Firearms:**

All firearms purchased or confiscated by MDPD or entities within the Department will be sent to the MDPSTI, Police Officer Service Training Section prior to being assigned to any section, bureau, district, or unit. The Police Officer Service Training Section will inspect and inventory the firearms. The firearms will be recorded with the Internal Services Department by make, model, caliber, and serial

number. Upon completion of this process, the firearms will be distributed as needed.

**III. AIRPORT/AIR CARRIER RESTRICTIONS:**

**A. Carrying Firearms into Concourses of Miami International Airport (MIA):**

On-duty personnel who wish to pass concourse screening points must display a badge and the approved MIA photo identification, even in uniform. Off-duty personnel who are armed must sign a log which is kept at each screening point. Personnel who are unarmed must pass through screening.

**B. Transportation of Firearms on Air Carriers:**

1. Personnel required to carry a firearm in the cabin compartment of commercial aircraft will:

   a. Respond to the Warrants Bureau, Extradition Supervisor, and request a National Law Enforcement Telecommunications System (NLETS) message be submitted to the Transportation Security Administration (TSA) via teletype. Annex G, Sample Employing Agency Message, provides the requester with a sample of the information that must be provided to TSA on the NLETS message. After automated validation of the NLETS message, a return message with a unique eight character alphanumeric identifier will be sent to the requesting agency indicating that the officer is approved to fly armed. A copy of the NLETS approval teletype should be presented to TSA by the officer on the day of travel and an additional copy should be maintained at the unit of assignment together with the other travel documents.

   b. Successfully complete the federally mandated Law Enforcement Officers Flying Armed training program.

   c. Present departmental badge and identification card and personally notify the concerned air carrier at least one hour prior to flight departure or, in an emergency, as soon as practicable.

2. Personnel shall not consume alcoholic beverages while carrying a firearm in the cabin compartment of commercial aircraft.

3. Personnel traveling in an unofficial capacity will transport the weapon (unloaded) in locked baggage which is placed in a section of the aircraft inaccessible to passengers. The baggage will not be placed in the cabin area of the flight crew.

   a. Before checking the baggage, notify the air carrier, either orally or in writing, that the baggage contains an unloaded firearm.

   b. The baggage should be a hard-cased container which can be locked.

   c. The key or combination to the locked baggage will be retained only by the concerned officer.

**SECTION 6 - FIREARMS REGISTRATION**

**I. GENERAL:**

**A. Firearms Registration Files:**

In accordance with Florida Statutes Section 790.335, MDPD is prohibited from maintaining any list, record, or registry of privately-owned firearms, or any list, record, or registry of the owners of firearms. Florida Statutes do allow law enforcement agencies to maintain records documenting firearms owned by its law enforcement officers, employees, or agents, if such firearms are used in the course of business performed on behalf of the employer.

**B. Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE)**

1. Firearm Sales and Federal Firearms License Application Forms:

   The Violent Crime Control and Law Enforcement Act of 1994 requires that a U.S., Department of Justice, BATFE, Report of Multiple Sale of Other Disposition of Pistols or Revolvers form be completed by federally-licensed firearms dealers, and forwarded to the local law enforcement agency. This form is for law enforcement use only, and is confidential. Departmental elements will forward any of these forms, or any other BATFE Federal firearms license application/firearms sales forms received, to the Police Legal Bureau. The Police Legal Bureau will process them in accordance with applicable laws as follows:

   a. Destroy the form and any record of the contents no more than 20 days from the date such form is received.

   b. Certify to the United States Attorney General, every six months, that none of the information on the form has been disclosed to any unauthorized person or entity and that any record of the contents has been destroyed.

**ANNEXES:**

**A. Legal Aspects of Use of Force**

**B. Supervisor's Report of Response to Resistance**

**C. Supervisor's Report of Response to Resistance Instruction Sheet**

**D. Shooting Investigation Memorandum**

**E. Electronic Control Weapon Cartridge Log**

**F. Electronic Control Weapon Usage Report**

**G. Sample Employing Agency Message**