UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 26-mj-03259-LFL
Case No. 26-mj-03260-LFL

IN THE MATTER OF EXTRADITION OF
TRISTAN TATE
_______________________________________/

IN THE MATTER OF EXTRADITION OF
EMORY ANDREW TATE
_______________________________________/

**NOTICE OF FILING DECLARATION OF EUGEN C. VIDINEAC**

Andrew and Tristan Tate submit the declaration of their Romanian criminal defense counsel, Eugen Constantin Vidineac, addressing the status of the Romanian proceedings and the prejudice the brothers suffer as a result of their continued detention.

Respectfully submitted,

*/s/ Thomas Maniotis*
**THOMAS MANIOTIS**
Florida Bar No. 122414
EQUITY LEGAL, PLLC
5201 Blue Lagoon Drive, Floor 8
Miami, Florida 33126
(305) 407-1005
tamaniotis@equitylegalfirm.com

*/s/ Joseph D. McBride*
**JOSEPH D. MCBRIDE**
New York Bar No. 5445879
THE MCBRIDE LAW FIRM, PLLC
305 Broadway
Suite 700
New York, New York 10007

*/s/ Jackie Perczek*
**HOWARD SREBNICK** (FBN 919063)
**JACKIE PERCZEK** (FBN 042201)
**ALEXA KLEIN** (FBN 1002299)
**JAKE GOLDMAN** (FBN 1074657)
BLACK SREBNICK
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

HSrebnick@RoyBlack.com
JPerczek@RoyBlack.com
AKlein@RoyBlack.com
JGoldman@RoyBlack.com

(917) 757-9537
jmcbride@mcbridelawnyc.com
Admitted Pro Hac Vice

<u>/s/ *Stephen James Binhak*</u>
**STEPHEN JAMES BINHAK**
Florida Bar Number 736491
LAW OFFICES OF STEPHEN JAMES BINHAK
One Southeast Third Avenue
Suite 1800
Miami, Florida 33131
(305) 361-5500
binhaks@binhaklaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 26-mj-03259-LFL
Case No. 26-mj-03260-LFL

IN THE MATTER OF EXTRADITION OF
TRISTAN TATE
_______________________________________/

IN THE MATTER OF EXTRADITION OF
EMORY ANDREW TATE
_______________________________________/

**Declaration of Eugen Constantin Vidineac**

I, Eugen Constantin Vidineac, voluntarily make the following declaration under oath and based upon personal knowledge.

1. I am more than eighteen (18) years of age, I am under no legal disability, and I am competent to give this Declaration. The information in this Declaration is based upon my personal knowledge unless otherwise stated.
2. I am a Romanian attorney and the coordinating partner of Vidineac și Asociații, with offices in Brașov and Bucharest, Romania. I am Romanian defense counsel for Emory Andrew Tate and Tristan Tate.
3. I have practiced criminal law in Romania for approximately 20 years and have substantial experience in criminal investigations, preventive measures, proceedings before DIICOT, preliminary-chamber proceedings, trial proceedings, appeals, and related judicial review. I also have academic experience as an adjunct faculty member at Transilvania University of Brașov, in which capacity I have published several academic papers and participated

in national conferences with international participation, while maintaining a continuous commitment to academic and scientific research.

4. I have represented Andrew and Tristan continuously through detention, house arrest, judicial control, the preliminary chamber, and the extradition proceeding in Bucharest.
5. The Romanian record related to the Tate brothers' prosecution involves three principal files: No. 1305/D/P/2022, No. 2557/D/P/2023, and No. 1927/93/2026/a1

**File No. 1305/D/P/2022**

6. In File No. 1305/D/P/2022, an indictment was issued against Andrew and Tristan in June 2023 and the case entered the Romanian preliminary-chamber process. Under Articles 342-348 of the Romanian Code of Criminal Procedure, the preliminary chamber is a mandatory procedural gatekeeping stage where the judge determines the legality of the referral to trial, the legality of evidence gathering, and the legality of acts undertaken during the criminal investigation. The judge may exclude evidence, order trial, or return the case to the prosecutor.
7. The June 2023 prosecution of the Tate brothers did not survive preliminary-chamber appellate review. The Bucharest Court of Appeal identified material defects, excluded evidence and, on 19 December 2024, returned the entire file to DIICOT rather than allowing the indictment to progress into a merits trial.
8. It is now for the prosecutor to redraft the indictment, remedy the deficiencies in the committal document and clarify the relevant issues, amend the legal classification of the alleged offences, discontinue charges, or take any other appropriate procedural measures. In our situation, the prosecutor decided to

continue the investigation and joined case file 1305/D/P/2022 to case file 2557/D/P/2023 on 3 July 2026.

**File No. 2557/D/P/2023**

9. Andrew and Tristan are defendants in criminal case file no. 2557/D/P/2023 (as noted above, this was recently joined with criminal case file no.1305/D/P/2022). This file is pending before the Prosecutor's Office attached to the High Court of Cassation and Justice, Directorate for Investigating Organized Crime and Terrorism Offences (DIICOT). The case is currently at the criminal investigation stage. All evidentiary proceedings have been completed, and we know that issuance of the Indictment is imminent.
10. The offenses presently alleged against the Tate brothers in this file, their statutory bases, their present procedural status, and the applicable sentencing ranges are set out in Schedules I and II appended to this declaration.
11. When an indictment issues, the case will enter the Romanian preliminary-chamber framework. At that stage, the defense must examine the legality of the indictment, evidence and investigative acts, formulate objections and exceptions, and take the procedural steps required to protect the Tates' position.
12. Except for arguing the absolute-nullity of the indictment, the failure to raise an objection during the preliminary-chamber stage generally waives the objection for trial. Further, identifying facts at a later point does not generally cure a prior waiver.
13. Therefore, the preliminary chamber cannot be treated as just an administrative formality. And the history of case file no. 1305/D/P/2022 demonstrates that the quality, speed, and detail of defense preparation at that

stage can determine whether a prosecution is permitted to advance toward a merits trial.

**File No. 1927/93/2026/a1**

14. On June 17, 2026, the prosecutor issued an indictment concerning Tristan Tate and co-defendant Naghel Georgiana Manuela on an alleged offense of instigation to battery or other acts of violence. The resulting court matter is registered as File No. 1927/93/2026/a1 before the Ilfov Tribunal and is presently in the preliminary-chamber stage. Tristan has been summoned for the first scheduled hearing on 10 September 2026. At that hearing, defense counsel is expected to present objections to the indictment, after which the judge will consider and rule upon them.

**Representation Before the Brothers Were Detained**

15. Before their detention in the United States, the Tates and I and my team maintained an intensive working relationship concerning the Romanian cases.
16. That work included in-person meetings and video conferences, review of documents in the criminal investigation file, translation of Romanian-language materials, comparison of the prosecution record against the Tates' factual instructions, identification of evidentiary inaccuracies, and development of a defense position for individual documents and allegations
17. Between 18 June and 18 July 2026, we conducted more than 15 video conferences and meetings and reviewed approximately 50 files and electronic information with the Tates.
18. I planned to meet with the brothers in Romania on or about July 28, 2026, to prepare for the September 10 preliminary chamber proceeding. Their arrest and detention in the United States made this meeting and subsequent meetings

impossible. Such detention and unavailability of Andrew and Tristan has already impacted my ability to prepare for the September 10 hearing.

**The Volume of the Record Requires Sustained, Evidence-Specific Work**

19. The record in the Tate brothers' Romanian criminal investigations includes 159 paper volumes; the 154 indexed volumes contain approximately 112,957 pages; and the electronic evidence exceeds 30 terabytes, including hundreds of hours of recordings.

20. Serious review will require the Tate brothers and me to search documents, compare translations, play and replay audio and video, identify speakers and locations, and formulate defenses. This is a photograph of only the first-file volumes:



**Real-Time Client Participation is Critical**

21. The brothers' direct participation with me in their defense has previously enabled me to identify factual and evidentiary errors in the Romanian prosecution material and respond while the relevant issue remained live.

22. Although the criminal investigation file is currently not public, I will illustrate one of the moments of overwhelming importance in this case. On the occasion of the proposal for pre-trial detention of Andrew Tate, filed on 29 December 2022, concerning, among other things, the suspicion that he had committed the offense of rape against an injured party, with a detailed description of the factual circumstances in which the event allegedly occurred, Andrew indicated to me that the factual situation was entirely different, supporting his position with evidence. At that time, although the court ordered pre-trial detention, it did not uphold the reasonable suspicion of the offense of rape, precisely due to Andrew's prompt and direct response, communicated immediately to me along with reference to direct evidence supporting his position.

23. This example demonstrates that the participation of the Tate brothers in their defense is not ceremonial. Andrew's immediate factual instructions enabled me to identify inaccuracies, challenge evidence, and obtain favorable procedural outcomes.

24. The brothers' collaboration with me has brought about other favorable results, including the return of the original indictment to the prosecutor through the preliminary-chamber proceeding and the progressive easing of preventive measures and restrictions. At the relevant hearings, the brothers were available to give instructions, address factual misunderstandings, and, when permitted, speak directly to the court. During Romanian hearings, translation problems

have arisen and the brothers have needed to consult with me immediately to understand what was said and correct misunderstandings. Questions, factual corrections, evidentiary objections, and strategic decisions have also arisen in real time. Their knowledge of the underlying events cannot be replaced by counsel's review of the file alone.

**Physical Presence, Videoconferencing, and Proceedings in Absentia**

25. The provision for videoconference court appearance under Romanian law does not solve the present problem unless the United States detention facility can provide the brothers a compatible, confidential, and sufficiently functional videoconference connection when the Romanian proceedings require it.

26. For any hearing or procedural act at which the Tates' participation is required or permitted by videoconference, the practical requirements include: an accepted technical connection between FDC-Miami and the Romanian court; authorization and scheduling by both systems; sufficient advance notice; privileged simultaneous consultation with Romanian counsel; the ability to see and discuss the evidence under consideration; and a connection capable of continuing for the duration of the Romanian proceeding.

**Continued Detention Creates a Severe Time and Access Barrier**

27. I have my own law practice in Romania, the demands of which, preclude travel. I therefore cannot meet with the brothers in the detention facility, review the Romanian file with them in person, or sit beside them during a Romanian remote proceeding.

28. I have been advised by American counsel that the detention facility does not provide the brothers with Wi-Fi or unrestricted, on-demand access to Zoom or an equivalent secure videoconferencing platform. I understand that attorney

communications must instead occur through telephone and that no videoconference is available for attorneys to meet with clients. I do not have authority to change those procedures or compel an overnight connection on short notice.

29. The time difference makes those limitations prohibitive. On 10 September 2026, Bucharest will observe Eastern European Summer Time (UTC+3), while Miami will observe Eastern Daylight Time (UTC−4). Bucharest will be seven hours ahead of Miami.

30. A Romanian hearing beginning at 9:00 a.m. on September 10, 2026, will begin at 2:00 a.m. in Miami. A three- to four-hour hearing would run until approximately 5:00 or 6:00 a.m. in Miami. The brothers would need secure access before and throughout the hearing—not merely a scheduled daytime call.

31. The same problem affects preparation. A four- to five-hour working session scheduled from 9:00 a.m. to 2:00 p.m. in Bucharest corresponds to 2:00 a.m. to 7:00 a.m. in Miami. Moving every session to Romanian evening hours does not solve the problem because court and prosecutorial activity occurs during Romanian business hours, new material may arrive then, and short deadlines may begin to run immediately.

32. An occasional telephone call cannot substitute for this work. The clients must be able to view specific pages, compare statements, watch recorded evidence, identify persons and events, and give instructions while counsel is working in the file. Reviewing more than 112,957 indexed pages and more than 30 terabytes of electronic material requires a computer, secure storage, adequate bandwidth, screen-sharing or equivalent display, and private communications of substantial duration.

**Concrete Repercussions for the Romanian Defense**

33. The prejudice to the brothers is immediate. Tristan has been summoned for the September 10 preliminary-chamber hearing at which counsel is expected to present objections to the 17 June 2026 indictment. Without a secure overnight connection and adequate pre-hearing preparation, Tristan cannot meaningfully review the issues being presented, exercise his Article 83 rights, instruct counsel, respond to new developments, or participate under the safeguards required by Romanian law.
34. In the consolidated investigation, an indictment or summons may issue on short notice. Continued detention would prevent the brothers from promptly reviewing any new charging instrument or evidence, comparing it to the existing record, deciding which motions or objections to authorize, and preparing for an appearance within the timeframe selected by the Romanian authority.
35. If the brothers cannot participate, the Romanian authority will have to determine whether to adjourn, attempt a remote arrangement, or proceed to the extent Romanian law permits. Each option carries a material consequence: delay in already lengthy proceedings, litigation over attendance and waiver, or action taken without the clients' full and timely input.
36. I do not state that every act would automatically be void or that an adverse ruling is guaranteed. In my professional judgment, however, the inability to participate would materially impair the defense, substantially reduce the brothers' ability to obtain favorable rulings, and make adverse procedural and ultimate outcomes materially more likely.
37. Andrew's need to prepare is separate from Tristan's September 10 hearing and is equally immediate. All evidentiary proceedings in the consolidated

investigation have been completed. Based on the present procedural posture and my professional experience, I expect the prosecutor to issue a new indictment concerning Andrew in early September 2026. That indictment will place Andrew into a new preliminary-chamber process, and the work necessary to protect his position cannot reasonably begin with his current lack of access to Romanian counsel.

38. The anticipated indictment will follow the return of the June 2023 indictment, the joinder of Files Nos. 1305/D/P/2022 and 2557/D/P/2023, and the prosecutor's continued investigation. I will need to have meaningful access to and work with Andrew to determine whether the new indictment remedies the defects identified during the prior preliminary-chamber proceedings; whether evidence previously excluded has been reused, reformulated, or replaced; whether the factual allegations or legal classifications have changed; and whether any newly asserted theory is consistent with the underlying investigative record.

39. Andrew's direct participation is indispensable to that analysis. Many of the anticipated allegations depend upon the identity of individuals, the chronology and location of events, the ownership or use of accounts and devices, the context and meaning of communications, the accuracy of translations, and the nature of particular personal or financial relationships. Andrew is the person best positioned to identify inaccuracies, supply missing context, distinguish among persons or events, and direct me to communications, recordings, witnesses, or other evidence that may contradict the prosecution's account. I cannot reliably reconstruct those matters from the paper record alone.

40. Meaningful preparation must therefore occur before the indictment issues, while there is still time to investigate discrepancies and locate responsive

evidence. If that work is postponed until the indictment is served, the defense will begin a time-sensitive proceeding already behind.

41. Once the indictment issues, the defense will be required to review the charging instrument immediately, compare it with an exceptionally large and complex record, consult Andrew concerning the factual basis of each allegation, and decide which objections, exceptions, evidentiary challenges, and procedural requests must be presented. Those decisions cannot be made effectively through occasional telephone calls or without Andrew being able to view the same documents, communications, translations, and audiovisual evidence being reviewed by me. If Andrew cannot participate in that process promptly and confidentially, objections may be delayed or lost, factual errors may go uncorrected, and the defense's position may be fixed at the preliminary-chamber stage without the benefit of his direct knowledge and instructions.

42. Tristan's participation in the preparation for the September 10 preliminary-chamber hearing is urgent because the limitations period applicable to the charged offense requires the case to proceed to trial before the end of October 2026. In my professional opinion, if the preliminary chamber sustains the defense objections and returns or invalidates the June 17, 2026 indictment, the prosecution will not have sufficient time to correct the defects, issue a legally sufficient replacement indictment, complete another preliminary-chamber proceeding, and commence a merits trial before the limitations period expires. A favorable preliminary-chamber ruling would therefore dispose of the present indictment and prevent Tristan from being tried on that charge.

43. Andrew is also a material exculpatory witness to Tristan's defense. Andrew has direct exculpatory knowledge concerning the persons involved, the

relationships and communications among them, the events surrounding the alleged incident, and evidence bearing upon the inaccuracy of the prosecution's account. Preparing Tristan's preliminary-chamber defense therefore requires that I confer confidentially and extensively with Andrew, compare his recollection against the allegations and supporting evidence, identify communications and witnesses that corroborate or contradict the charging theory, and prepare Andrew to provide testimony or other admissible evidence when required. If Andrew remains unable to review the relevant materials and prepare extensively with me before the September 10 hearing, Tristan may lose a time-sensitive opportunity to defeat the indictment before he is required to be tried prior to the limitations period expiring at the end of October 2026.

**The Liberty Interests at Stake**

44. The Romanian proceedings expose both brothers to potentially grave custodial consequences. Based on my representation of both brothers and my review of the relevant investigative files, the allegations asserted against Andrew have been greater in number and broader in scope than those asserted against Tristan and include offenses carrying substantial individual sentencing ranges.

45. Schedule 1 identifies the offenses presently alleged against Andrew and Tristan, the applicable statutory provisions and sentencing ranges, and the operation of Romanian concurrence rules. The precise aggregate sentence could be determined only after any offenses referred to trial are adjudicated and individual sentences are imposed. Nevertheless, the brothers face substantial custodian sentences. Impairing my ability to prepare their defense

may determine whether Andrew and Tristan remain at liberty or lose substantial periods of their liberty.

**Prescription / Statute of Limitations**

46. Schedule 2 sets out the prescription analysis for each Romanian offense, including the alleged date, statutory maximum, base prescription period, interrupting acts, suspensions, currently calculated expiry date, and the effect, if any, of foreign detention.
47. The consequences of delay can operate in more than one direction. Delay may affect whether particular allegations prescribe, but it can also extend the period during which unresolved allegations remain pending and prevent the brothers from obtaining finality.

**How Release in the United States Materially Remedies the Prejudice**

48. Substantial prejudice can be remedied with home detention, which can provide the essential tools that detention does not: a private room, a secure computer, protected storage, reliable high-bandwidth video, and access during the overnight Miami hours when Romanian courts and prosecutors are working.
49. Such conditions would permit the brothers to communicate confidentially with me, regularly and as needed, screen-share, review extensive digital evidence, work through translations, review audiovisual evidence, provide immediate factual instructions, prepare objections and applications, respond quickly to developments in Romania, prepare for the September 10 proceeding, and participate by secure video if the Romanian judicial authority authorizes that procedure.

50. Without release or a guaranteed, secure, confidential, evidence-capable connection available at Romanian working hours and on short notice, my ability to represent my clients and their ability to exercise their defense rights will be substantially and immediately impaired.

51. If a Romanian court subsequently orders Mr. Tate's physical attendance, that question can be addressed with this Court when the Romanian summons or order exists and the relevant judicial authorities can consider the appropriate mechanism.

52. If the brothers remain detained, the minimum arrangements capable of reducing the prejudice would include scheduled confidential video conferences during Romanian business hours; sessions of sufficient duration for document-intensive preparation; secure exchange and simultaneous review of evidentiary materials; an urgent communication mechanism for Romanian deadlines; and functioning remote participation in Romanian proceedings where Romanian law permits it.

53. For all these reasons, it is my professional opinion that continued detention of the brothers would materially prejudice the preparation and presentation of their defenses, interfere with their ability to satisfy or respond to Romanian procedural obligations, and substantially increase the likelihood of adverse rulings and outcomes. I cannot guarantee the result of any proceeding or state that detention would inevitably cause the Tate brothers to lose in Romania. But based on my direct experience representing them, if detention continues to deprive them of sustained, confidential, evidence-capable access to me during these critical stages, their ability to prepare and participate meaningfully—and, consequently, the defense's prospects of obtaining favorable rulings—would be reduced to close to nil.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

______________________________ ______________

**Eugen Constantin Vidineac** **Date**

VIDINEAC EUGEN-CONSTANTIN

Digitally signed by VIDINEAC EUGEN-CONSTANTIN
Date: 2026.09.01 07:22:59 +03'00'

# SCHEDULE 1 - CURRENT ROMANIAN OFFENSES AND CUSTODIAL EXPOSURE

## PART A - ANDREW TATE: CONSOLIDATED INVESTIGATION

| Offense | Romanian statutory provision | Alleged date/period | Current procedural status | Sentencing range | Concurrence/aggregate effect |
|---|---|---|---|---|---|
| Formation of an organized criminal group | Art. 367(1), (3), (6), Criminal Code | 2015-December 29, 2022 | Criminal proceedings initiated | 1-5 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Rape, continued form | Art. 218(1), Criminal Code | March 20-27, 2022 | Criminal proceedings initiated | 5-10 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Trafficking of minors | Art. 211(1), (2)(a), Criminal Code | 2014-December 2021 | Criminal proceedings initiated | 7-12 years under the pre-July 1, 2024 form identified through Art. 5 | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Trafficking in persons, continued form | Art. 210(1)(a), (b), Criminal Code | July 2015-September 2021 | Criminal proceedings initiated | 3-10 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Sexual act with a minor, continued form | Art. 220(1), (4)(e), Criminal Code | Beginning December 4, 2020 | Criminal proceedings initiated | 3-10 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Influencing statements, continued form | Art. 272(1), Criminal Code | December 2023-January 2024 | Criminal proceedings initiated | 1-5 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Money laundering, continued form | Art. 49(1)(b), Law No. 129/2019 | December 2023-July 2024 | Criminal proceedings initiated | 3-10 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Removal of property from seizure | Art. 261(1), (2), Criminal Code | May 16-October 9, 2025 | Criminal proceedings initiated | 6 months-2 years, or fine | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Incitement to hatred or discrimination, continued form | Art. 369, Criminal Code | May 22, 2021-February 24, 2024 | Criminal proceedings initiated | 6 months-3 years, or fine | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |

# SCHEDULE 1 - TRISTAN TATE OFFENSES

Joined Files Nos. 1305/D/P/2022 and 2557/D/P/2023, plus separate File No. 1927/93/2026/a1

## PART B - TRISTAN TATE: CONSOLIDATED INVESTIGATION

| Offense | Romanian statutory provision | Alleged date/period | Current procedural status | Sentencing range | Concurrence/aggregate effect |
|---|---|---|---|---|---|
| Formation of an organized criminal group | Art. 367(1), (3), and (6), Criminal Code | 2015-December 29, 2022 | Previously indicted in File No. 1305/D/P/2022; indictment returned to DIICOT; remains under investigation in the joined Files Nos. 1305/D/P/2022 and 2557/D/P/2023; new consolidated indictment anticipated | 1-5 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Human trafficking, continued form - 34 material acts | Art. 210(1)(a), (b), with reference to Art. 182(c), applying Arts. 35(1) and 5, Criminal Code | Alleged course of conduct summarized as 2014-December 2022; offense-specific last-act schedule to be confirmed from the operative indictment | Criminal action initiated; DIICOT identified 34 material acts as of July 23, 2026; remains under investigation in the joined files | 3-10 years under the pre-July 1, 2024 form identified by DIICOT | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Complicity in trafficking of a minor | Art. 48(1) with reference to Arts. 211(1), (2)(a), 210(1)(a), (b), and 182(c), applying Art. 5, Criminal Code | November 2014-December 2021 | Criminal prosecution extended in personam June 15, 2026; criminal action extended July 3, 2026; remains under investigation in the joined files | Principal-offense range: 7-12 years under the pre-July 1, 2024 form; complicity is punished within the same statutory limits, subject to individualization | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Money laundering, continued form - concealment modality; 5 material acts | Art. 49(1)(b), Law No. 129/2019, applying Art. 35(1), Criminal Code | May 7, 2018-October 6, 2022 and December 2023-July 2024; operative continued-offense formulation to be confirmed | Criminal action initiated in 2024 and extended July 3, 2026; DIICOT identified 5 material acts as of July 23, 2026 | 3-10 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Influencing statements, continued form - 12 material acts | Art. 272(1), applying Art. 35(1), Criminal Code | August 2023-May 2024 | Criminal action initiated in 2024 and extended July 3, 2026; DIICOT identified 12 material acts as of July 23, 2026 | 1-5 years | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |
| Removal of property from seizure, aggravated form | Art. 261(1), (2), Criminal Code | June 16, 2025 | Criminal prosecution extended in personam July 1, 2026; criminal action extended July 3, 2026 | 6 months-2 years, or fine | Heaviest penalty imposed, plus one-third of the remaining penalties imposed |

# SCHEDULE 1 - PART C: TRISTAN TATE, SEPARATE JUNE 2026 INDICTMENT

File No. 1927/93/2026/a1

| Offense | Romanian statutory provision | Alleged date/period | Current procedural status | Sentencing range | Concurrence/aggregate effect |
|---|---|---|---|---|---|
| Instigation to battery or other acts of violence | Art. 47 in relation to Art. 193(1), Criminal Code | October 28, 2021 | Indicted in June 2026; File No. 1927/93/2026/a1; preliminary chamber before the Ilfov Tribunal; first scheduled hearing September 10, 2026 | 3 months-2 years, or fine, under the 2021 form identified in the charging record; lex mitior must be confirmed | No aggregate calculation stated for this separate count. Any later combination with sentences in another proceeding requires a separate concurrence analysis. |

# SCHEDULE 2 - ROMANIAN CRIMINAL LIMITATION (PRESCRIPTION) ANALYSIS

Andrew and Tristan Tate - Position as of September 1, 2026

## PART A - ANDREW TATE: CONSOLIDATED INVESTIGATION

| No. | Offense/legal basis | Charged period/Romanian dies a quo | Statutory maximum/Article 154 term | Baseline expiry before interruption or suspension | Interruption, suspension, and foreign custody |
|---|---|---|---|---|---|
| 1 | Organized criminal group; Art. 367(1), (3), (6), Criminal Code | 2015-December 29, 2022. Treated as continuing; T0 is cessation of the relevant participation or group activity. Supplied record: December 29, 2022. | Maximum 5 years; Art. 154(1)(d): 5 years. | December 29, 2027. Article 155(4) outer ceiling, if interruptions operate: December 29, 2032, before proven suspension. | No qualifying acts supplied. A post-May 30, 2022 act must be one that the law requires to be communicated to the suspect or defendant. A valid interruption restarts a five-year period, subject to the ceiling. Foreign custody does not automatically toll; Article 156 requires a proven legal or unavoidable impediment that actually prevented proceedings. |
| 2 | Rape, continued form; Art. 218(1), Criminal Code | Material acts alleged on March 20 and 27, 2022. If continued, T0 is March 27, 2022. | Maximum 10 years for the charged 2022 form; counterfactual Article 154 period: 8 years. | No limitation expiry stated: Article 218 was in the imprescriptible category by both alleged dates following Law No. 186/2021, effective July 5, 2021. | Interruption and suspension are not material to extinction by prescription if the count is imprescriptible. |
| 3 | Trafficking of minors; Art. 211(1), (2)(a), Criminal Code | 2014-December 2021. T0 cannot be fixed without determining whether the charge alleges one legally unitary offense or multiple autonomous offenses or victims. | For the aggravated form in 2021, the stated maximum was 12 years (7-12 years), not the 20-year maximum introduced in 2024. Counterfactual Article 154 period: 10 years. | If a unitary offense continued beyond July 5, 2021 and ended in December 2021: no expiry. If separate offenses ended before July 5, 2021: calculate each separately, including any special minor-victim commencement rule. | For any prescriptible pre-July 5, 2021 component, CCR Decisions Nos. 297/2018 and 358/2022 and HCCJ Decision No. 67/2022 may make the June 25, 2018-May 30, 2022 interval decisive as lex mitior. Do not assume interruption without the actual acts. Foreign custody does not automatically toll. |
| 4 | Trafficking in persons, continued form; Art. 210(1)(a), (b), Criminal Code | July 2015-September 2021. For a continued offense, T0 is the last material act in September 2021. | Maximum 10 years; counterfactual Article 154 period: 8 years. | No expiry if the legally unitary continued offense includes a material act after July 5, 2021 and therefore falls within the imprescriptible regime. | If the continued-form characterization fails, earlier autonomous acts require separate analysis. Foreign custody does not automatically toll. |
| 5 | Sexual act with a minor, continued form; Art. 220(1), (4)(e), Criminal Code | Beginning December 4, 2020. The date of the last material act is required to establish T0 and determine the governing temporal regime. | Charged aggravated maximum: 10 years; counterfactual Article 154 period: 8 years. | Indeterminable on the present record. If an act occurred on or after July 5, 2021: no expiry. If all acts ended earlier: historical limitation analysis is required, including the minor-victim commencement rule and lex mitior. | If the offense ended before July 5, 2021, interruption must be reconstructed under the applicable CCR and HCCJ prescription authorities. No interrupting act should be assumed. Foreign custody does not automatically toll. |
| 6 | Influencing statements, continued form; Art. 272(1), Criminal Code | December 2023-January 2024. T0 is the exact date of the last material act in January 2024; the day has not been supplied. | Maximum 5 years; Art. 154(1)(d): 5 years. | Corresponding day in January 2029; provisional range January 1-31, 2029. Article 155(4) ceiling: corresponding day in January 2034, before suspension. | No qualifying acts supplied. A qualifying communicable act may restart the period, subject to the outer ceiling. Foreign custody does not automatically toll. |
| 7 | Money laundering, continued form; Art. 49(1)(b), Law No. 129/2019 | December 2023-July 2024. T0 is the exact date of the last alleged laundering act in July 2024. | Maximum 10 years; Art. 154(1)(c): 8 years. | Corresponding day in July 2032; provisional range July 1-31, 2032. Article 155(4) ceiling: corresponding day in July 2040, before suspension. | No qualifying acts supplied. A valid communicable act may restart the eight-year period, subject to the ceiling. Foreign custody does not automatically toll. |
| 8 | Removal of property from seizure; Art. 261(1), (2), Criminal Code | May 16-October 9, 2025. If one removal occurred on May 16, T0 ordinarily is that act; October 9 matters only if it was a distinct last act or continued-offense event. | For paragraph (2): maximum 2 years or fine; Art. 154(1)(d): 5 years. | May 16, 2030 on the single-act hypothesis; October 9, 2030 only if that date is legally the last act. Outer ceilings: May 16 or October 9, 2035, respectively, before suspension. | No qualifying acts supplied. Qualifying communicable acts may interrupt and restart the five-year period. Foreign custody does not automatically toll. |
| 9 | Incitement to violence, hatred, or discrimination, continued form; Art. 369, Criminal Code | May 22, 2021-February 24, 2024. If one continued offense, T0 is February 24, 2024. | Maximum 3 years or fine; Art. 154(1)(d): 5 years. | February 24, 2029. Article 155(4) outer ceiling: February 24, 2034, before proven suspension. | No qualifying acts supplied. Post-May 30, 2022 communicable procedural acts may interrupt. Legislative changes during 2021-2024 should be checked for substantive continuity and lex temporis. Foreign custody does not automatically toll. |

# SCHEDULE 2 - PART B: TRISTAN TATE, CONSOLIDATED INVESTIGATION

Joined Files Nos. 1305/D/P/2022 and 2557/D/P/2023

| No. | Offense/legal basis | Charged period/Romanian dies a quo | Statutory maximum/Article 154 term | Baseline expiry before interruption or suspension | Interruption, suspension, and foreign custody |
|---|---|---|---|---|---|
| 1 | Organized criminal group; Art. 367(1), (3), (6), Criminal Code | 2015-December 29, 2022. Treated as continuing; T0 is cessation of the relevant participation or group activity. Supplied record: December 29, 2022. | Maximum 5 years; Art. 154(1)(d): 5 years. | December 29, 2027. Article 155(4) outer ceiling, if qualifying interruptions operate: December 29, 2032, before proven suspension. | No interrupting act is assumed. The June 2023 indictment and later communicated acts must be tested count by count under Article 155 and the applicable temporal regime. Foreign custody does not automatically toll; Article 156 requires a proven legal or unavoidable impediment. |
| 2 | Human trafficking, continued form - 34 material acts; Art. 210(1)(a), (b), with reference to Art. 182(c), applying Arts. 35(1) and 5, Criminal Code | DIICOT summarized the alleged course of conduct as 2014-December 2022. For a legally unitary continued offense, T0 is the last material act; the exact act schedule remains required. | Maximum 10 years under the pre-July 1, 2024 form; counterfactual Art. 154 period: 8 years. | No expiry if the legally unitary continued offense includes a material act on or after July 5, 2021 and falls within the imprescriptible regime. Otherwise, calculate autonomous earlier acts separately. | The operative indictment must identify legal unity, victims, and last acts. If the continued-form characterization fails, pre-July 5, 2021 acts require separate prescription and lex mitior analysis. Foreign custody does not automatically toll. |
| 3 | Complicity in trafficking of a minor; Art. 48(1) with reference to Arts. 211(1), (2)(a), 210(1)(a), (b), and 182(c), applying Art. 5, Criminal Code | November 2014-December 2021. The July 3, 2026 ordinance alleges assistance throughout that period. T0 depends on the legally unitary characterization and the last act of complicity. | Principal-offense maximum 12 years under the pre-July 1, 2024 form; counterfactual Art. 154 period: 10 years. | If the legally unitary offense and alleged complicity continued on or after July 5, 2021: no expiry. If legally severable conduct ended earlier, each component requires a separate calculation, including any minor-victim commencement rule. | The June 15 and July 3, 2026 ordinances are relevant to procedural history but do not replace analysis of imprescriptibility, legal unity, and the complete communicated-act ledger. Foreign custody does not automatically toll. |
| 4 | Money laundering, continued form - concealment modality; 5 material acts; Art. 49(1)(b), Law No. 129/2019, applying Art. 35(1), Criminal Code | Alleged subperiods May 7, 2018-October 6, 2022 and December 2023-July 2024. If one continued offense, T0 is the exact last material act in July 2024. | Maximum 10 years; Art. 154(1)(c): 8 years. | Corresponding day in July 2032; provisional range July 1-31, 2032. Article 155(4) ceiling: corresponding day in July 2040, before suspension. | No interrupting act is assumed. A qualifying communicable act may restart the eight-year period, subject to the ceiling. The operative indictment must confirm whether all five acts form one continued offense. Foreign custody does not automatically toll. |
| 5 | Influencing statements, continued form - 12 material acts; Art. 272(1), applying Art. 35(1), Criminal Code | August 2023-May 2024. T0 is the exact date of the last material act in May 2024. | Maximum 5 years; Art. 154(1)(d): 5 years. | Corresponding day in May 2029; provisional range May 1-31, 2029. Article 155(4) ceiling: corresponding day in May 2034, before suspension. | No interrupting act is assumed. The June 30 and July 3, 2026 ordinances and their communication history must be tested under Article 155. Foreign custody does not automatically toll. |
| 6 | Removal of property from seizure, aggravated form; Art. 261(1), (2), Criminal Code | June 16, 2025. The July 3, 2026 ordinance alleges a single vehicle disposition on that date. | Maximum 2 years or fine; Art. 154(1)(d): 5 years. | June 16, 2030. Article 155(4) outer ceiling: June 16, 2035, before proven suspension. | No interrupting act is assumed. The July 1 and July 3, 2026 ordinances and their communication history must be tested under Article 155. Foreign custody does not automatically toll. |

# SCHEDULE 2 - PART C: TRISTAN TATE, SEPARATE JUNE 2026 INDICTMENT

File No. 1927/93/2026/a1

| No. | Offense/legal basis | Charged period/Romanian dies a quo | Statutory maximum/Article 154 term | Baseline expiry before interruption or suspension | Interruption, suspension, and foreign custody |
|---|---|---|---|---|---|
| 1 | Instigation to battery or other acts of violence; Art. 47 in relation to Art. 193(1), Criminal Code | October 28, 2021. T0 is October 28, 2021, subject to confirmation in the operative June 2026 indictment. | Maximum 2 years under the 2021 form; Art. 154(1)(d): 5 years. | October 28, 2026, before any qualifying interruption or proven suspension. Article 155(4) outer ceiling: October 28, 2031, if qualifying interruptions operate. | Operative expiry is indeterminable without the communicated-act ledger. The June 2023 indictment, the June 2026 indictment, and other qualifying communicable acts may restart the period under Article 155, subject to temporal and lex mitior analysis. Foreign custody does not automatically toll; Article 156 requires a proven legal or unavoidable impediment. A favorable preliminary-chamber ruling could be practically dispositive only if prescription expires before a legally sufficient replacement prosecution can proceed. |