# DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Emory Andrew Tate. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and the United Kingdom are found in the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, signed at Washington March 31, 2003 (the "Treaty"), and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United

Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "Instrument"), with annex (the "Annex") and related Exchanges of Notes, signed at London December 16, 2004. A copy of the Instrument and Annex is attached to this declaration.

3. In accordance with the provisions of the Annex, the British Embassy has submitted Embassy Note No. 095/2026, dated September 9, 2026, which the Department of State received on the same day, formally requesting the extradition of Emory Andrew Tate. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 20 of the Annex, the Government of the United States appears in court in the United States on behalf of, and represents the interests of, the United Kingdom in any proceeding that arises out of a U.K. request for Extradition. The United Kingdom provides the same legal representation in its courts on behalf of the United States with regard to extradition requests made by the United States.

5. The offenses of distributing an indecent photograph of a child (Category C), in violation of section 1(1)(b) of the Protection of Children Act 1978, as charged in count 16 and 20 of the Warrant of Arrest dated August 5, 2026; and making indecent photographs of a child (Category C), in violation of section 1(1)(a) of the Protection of Children Act 1978, as charged in count 28 of the

Warrant of Arrest dated August 5, 2026; for which extradition is sought are not referred to the court for consideration.[1] The remaining offenses included in the United Kingdom's request, for which extradition is sought, are covered under Article 2 of the Annex.

6. Under Article 9 of the Annex, documents that bear the certificate or seal of the Ministry of Justice or Ministry or Department responsible for foreign affairs of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in London. The United Kingdom, in submitting documents in the instant case that bear the certificate or seal of the Home Office, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to

[1] The three charges that are not referred to the Court for consideration are also respectively enumerated as counts xxvi (26), xxx (30), and xxxviii (38) in the Statement of Facts by Detective Constable Lee-Anne Marshall, which accompanies the United Kingdom's request for Emory Andrew Tate's extradition.

the best of my knowledge.

Executed in Santa Fe, New Mexico, on September 25, 2026.



TOM HEINEMANN

Attachments:

1. Copy of Notes

2. Copy of Instrument with Annex

British Embassy
Washington

Embassy Note No: 095/2026

**REQUEST FOR THE EXTRADITION OF EMORY ANDREW TATE FROM THE UNITED STATES OF AMERICA TO THE UNITED KINGDOM.**

His Britannic Majesty's Embassy presents its compliments to the Department of State and encloses documents in support of the extradition from the United States of America of Emory Andrew TATE to the United Kingdom.

His extradition is sought under the UK-US Extradition Treaty 2003, as amended, as a person accused of the following offences:

1. Arrange or facilitate travel of another person with a view to exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015, (two (2) offences)

2. Arrange or facilitate travel of another person with a view to sexual exploitation, contrary to sections 2(1) and 5 (1) of the Modern Slavery Act 2015, (three (3) offences).

3. Rape a women 16 years of age or over, contrary to Section 1, Sexual Offences Act 2003 (ten (10) offences)

4. Assault a person thereby occasioning them actual bodily harm, contrary to Section 47 Offences Against the Person Act 1861 (seven (7) offences)

5. Control prostitution for gain, contrary to Section 53 of Sexual Offences Act 2003 (one (1) offence

6. Distributing an indecent photograph of a child, contrary to Section 1(1)(b) of the Protection of Children Act 1978, (seven (7) offences)

7. Making an indecent photograph of a child, contrary to Sections 1(1)(a) of the protection of Children Act 1978, (eight (8) offences)

8. Possessing extreme pornography contrary to section 63(1), (7)(d) of the Criminal Justice and Immigration Act 2006, (four (4) offences)

The Embassy would be grateful if the enclosed papers could be transmitted as soon as possible to the appropriate authorities with a request for the extradition of Emory Andrew TATE.

In the event of his return being ordered the Embassy would appreciate being notified as soon as possible so that arrangements can be made for his prompt return to the United Kingdom.

His Majesty's Embassy avails itself of this opportunity to express to the Department of State the renewed assurance of its highest consideration.

**British Embassy, Washington DC**

**9th September 2026**

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.23

# EXTRADITION

**Instrument Amending the**
**Treaty of March 31, 2003**
**Between the**
**UNITED STATES OF AMERICA**
**and the UNITED KINGDOM OF**
**GREAT BRITAIN AND**
**NORTHERN IRELAND**

Signed at London December 16, 2004

*with*

Annex

*and*

Exchange of Notes

NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

"...the Treaties and Other International Acts Series issued under the authority of the Secretary of State shall be competent evidence . . . of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and international agreements other than treaties, as the case may be, therein contained, in all the courts of law and equity and of maritime jurisdiction, and in all the tribunals and public offices of the United States, and of the several States, without any further proof or authentication thereof."

# UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

## Extradition

*Instrument amending the treaty of March 31, 2003.*
*Signed at London December 16, 2004;*
*Transmitted by the President of the United States of America to the Senate September 28, 2006 (Treaty Doc. 109-14, 109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations July 29, 2008 (Senate Executive Report No. 110-12, 110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Instruments of Ratification at London July 6, 2009;*
*Entered into force February 1, 2010.*
*With annex and exchange of notes.*

Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003

1. As contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the Extradition Agreement"), the Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland acknowledge that, in accordance with the provisions of this Instrument, the Extradition Agreement is applied in relation to the bilateral Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003 (hereafter "the 2003 Extradition Treaty") under the following terms:

a) Article 5(1) of the Extradition Agreement shall be applied as set forth in Article 8(1) and 12(4) of the Annex to this Instrument to provide for the mode of transmission of the extradition request and supporting documents;

b) Article 5(2) of the Extradition Agreement shall be applied as set forth in Article 9 of the Annex to this Instrument to provide for the requirements concerning certification, authentication or legalization of the extradition request and supporting documents;

c) Article 7(1) of the Extradition Agreement shall be applied as set forth in Article 12(4) of the Annex to this Instrument to provide for an alternative method for transmission of the request for extradition and supporting documents following provisional arrest;

d) Article 8(2) of the Extradition Agreement shall be applied as set forth in Article 10(2) of the Annex to this Instrument to provide for the channel to be used for submitting supplementary information;

e) Article 10 of the Extradition Agreement shall be applied as set forth in Article 15 of the Annex to this Instrument to provide for the decision on requests made by several States for the extradition or surrender of the same person; and

f) Article 14 of the Extradition Agreement shall be applied as set forth in Article 8 bis of the Annex to this Instrument to provide for consultations where the Requesting State contemplates the submission of particularly sensitive information in support of a request for extradition.

2. The Annex reflects the integrated text of the operative provisions of the 2003 Extradition Treaty and the Extradition Agreement that shall apply upon entry into force of this Instrument.

3.a) This Instrument shall apply to the United States of America and to Great Britain and Northern Ireland. Subject to subparagraph b), the application of the 2003 Extradition Treaty to the Channel Islands, the Isle of Man, and any other territory of the United Kingdom to which

the 2003 Extradition Treaty may apply in accordance with its terms, shall remain unaffected by the Extradition Agreement and this Instrument.

b) This Instrument shall not apply to any territory for whose international relations the United Kingdom is responsible unless the United States of America and the European Union, by exchange of diplomatic notes duly confirmed by the United Kingdom in accordance with Article 20(1) (b) of the Extradition Agreement, agree to extend its application thereto. The exchange of notes shall specify the authority in the territory responsible for the measure set forth in Article 9 of the Annex and the channels between the United States of America and the territory for transmissions pertaining to the extradition process, in lieu of those designated in the Annex. Such application may be terminated by either the United States of America or the European Union by giving six months' written notice to the other through the diplomatic channel, where duly confirmed between the United States of America and the United Kingdom in accordance with Article 20(2) of the Extradition Agreement.

4. In accordance with Article 16 of the Extradition Agreement, this Instrument shall apply to offenses committed before as well as after it enters into force.

5. This Instrument shall not apply to requests for extradition made prior to its entry into force.

6. (a) This Instrument shall be subject to the completion by the United States of America and the United Kingdom of Great Britain and Northern Ireland of their respective applicable internal procedures for entry into force. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the Extradition Agreement.

(b) In the event of termination of the Extradition Agreement, this Instrument shall be terminated and the 2003 Extradition Treaty shall be applied. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at London, in duplicate, this 16th day of December 2004.

FOR THE GOVERNMENT OF UNITED STATES OF AMERICA:

John Ashcroft

FOR THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND:

Charles Clarke

ANNEX

EXTRADITION TREATY
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

TABLE OF CONTENTS


| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offenses |
| Article 3 | Nationality |
| Article 4 | Political and Military Offenses |
| Article 5 | Prior Prosecution |
| Article 6 | Statute of Limitations |
| Article 7 | Capital Punishment |
| Article 8 | Extradition Procedures and Required Documents |
| Article 8 *bis* | Sensitive Information in a Request |
| Article 9 | Authentication of Documents |
| Article 10 | Additional Information |
| Article 11 | Translation |
| Article 12 | Provisional Arrest |
| Article 13 | Decision and Surrender |
| Article 14 | Temporary and Deferred Surrender |
| Article 15 | Requests for Extradition or Surrender Made by Several States |
| Article 16 | Seizure and Surrender of Property |
| Article 17 | Waiver of Extradition |
| Article 18 | Rule of Specialty |
| Article 19 | Transit |
| Article 20 | Representation and Expenses |
| Article 21 | Consultation |
| Article 22 | Termination |

## Article 1
## Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses.

## Article 2
## Extraditable Offenses

1. An offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty.

2. An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any offense described in paragraph 1 of this Article.

3. For the purposes of this Article, an offense shall be an extraditable offense:

   (a) whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or

   (b) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only.

4. If the offense has been committed outside the territory of the Requesting State, extradition shall be granted in accordance with the provisions of the Treaty if the laws in the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws in the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may grant extradition provided that all other requirements of this Treaty are met.

5. If extradition has been granted for an extraditable offense, it may also be granted for any other offense specified in the request if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

Article 3
Nationality

Extradition shall not be refused based on the nationality of the person sought.

Article 4
Political and Military Offenses

1. Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2. For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a) an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b) a murder or other violent crime against the person of a Head of State of one of the Parties, or of a member of the Head of State's family;

(c) murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

(d) an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(e) placing or using, or threatening the placement or use of, an explosive, incendiary, or destructive device or firearm capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(f) possession of an explosive, incendiary, or destructive device capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(g) an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any of the foregoing offenses.

3. Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the competent authority of the Requested State determines that the request was politically motivated. In the United States, the executive branch is the competent authority for the purposes of this Article.

4. The competent authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law. In the United States, the executive branch is the competent authority for the purposes of this Article.

## Article 5
## Prior Prosecution

1. Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

2. The Requested State may refuse extradition when the person sought has been convicted or acquitted in a third state in respect of the conduct for which extradition is requested.

3. Extradition shall not be precluded by the fact that the competent authorities of the Requested State:

(a) have decided not to prosecute the person sought for the acts for which extradition is requested;

(b) have decided to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

(c) are still investigating the person sought for the same acts for which extradition is sought.

## Article 6
## Statute of Limitations

The decision by the Requested State whether to grant the request for extradition shall be made without regard to any statute of limitations in either State.

## Article 7
## Capital Punishment

When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority in the Requested State may refuse extradition unless the Requesting State provides an assurance that the death penalty will not be imposed, or, if imposed, will not be carried out.

Article 8
Extradition Procedures and Required Documents

1. All requests for extradition shall be submitted through the diplomatic channel.

2. All requests for extradition shall be supported by:

(a) as accurate a description as possible of the person sought, together with any other information that would help to establish identity and probable location;

(b) a statement of the facts of the offense(s);

(c) the relevant text of the law(s) describing the essential elements of the offense for which extradition is requested;

(d) the relevant text of the law(s) prescribing punishment for the offense for which extradition is requested; and

(e) documents, statements, or other types of information specified in paragraphs 3 or 4 of this Article, as applicable.

3. In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall be supported by:

(a) a copy of the warrant or order of arrest issued by a judge or other competent authority;

(b) a copy of the charging document, if any; and

(c) for requests to the United States, such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested.

4. In addition to the requirements in paragraph 2 of this Article, a request for extradition relating to a person who has been convicted of the offense for which extradition is sought shall be supported by:

(a) information that the person sought is the person to whom the finding of guilt refers;

(b) a copy of the judgment or memorandum of conviction or, if a copy is not available, a statement by a judicial authority that the person has been convicted;

(c) a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(d) in the case of a person who has been convicted *in absentia*, information regarding the circumstances under which the person was voluntarily absent from the proceedings.

Article 8 bis
Sensitive Information in a Request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

Article 9
Authentication of Documents

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall mean, for the United States, the United States Department of Justice; and, for the United Kingdom, the Home Office.

Article 10
Additional Information

1. If the Requested State requires additional information to enable a decision to be taken on the request for extradition, the Requesting State shall respond to the request within such time as the Requested State requires.

2. Such additional information may be requested and furnished directly between the United States Department of Justice and the Home Office.

Article 11
Translation

All documents submitted under this Treaty by the Requesting State shall be in English or accompanied by a translation into English.

Article 12
Provisional Arrest

1. In an urgent situation, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition. A

request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and such competent authority as the United Kingdom may designate for the purposes of this Article.

2. The application for provisional arrest shall contain:

(a) a description of the person sought;

(b) the location of the person sought, if known;

(c) a brief statement of the facts of the case including, if possible, the date and location of the offense(s);

(d) a description of the law(s) violated;

(e) a statement of the existence of a warrant or order of arrest or a finding of guilt or judgment of conviction against the person sought; and

(f) a statement that the supporting documents for the person sought will follow within the time specified in this Treaty.

3. The Requesting State shall be notified without delay of the disposition of its request for provisional arrest and the reasons for any inability to proceed with the request.

4. A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the documents supporting the extradition request as required in Article 8. For this purpose, receipt of the formal request for extradition and supporting documents by the Embassy of the Requested State in the Requesting State shall constitute receipt by the executive authority of the Requested State.

5. The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

## Article 13
## Decision and Surrender

1. The Requested State shall promptly notify the Requesting State of its decision on the request for extradition. Such notification should be transmitted directly to the competent authority designated by the Requesting State to receive such notification and through the diplomatic channel.

2. If the request is denied in whole or in part, the Requested State shall provide reasons for the denial. The Requested State shall provide copies of pertinent judicial decisions upon request.

3. If the request for extradition is granted, the authorities of the Requesting and Requested States shall agree on the time and place for the surrender of the person sought.

4. If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

## Article 14
## Temporary and Deferred Surrender

1. If the extradition request is granted for a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. If the Requested State requests, the Requesting State shall keep the person so surrendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States.

2. The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State. The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

## Article 15
## Requests for Extradition or Surrender Made by Several States

1. If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2. If the United Kingdom receives an extradition request from the United States and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its executive authority shall determine to which State, if any, it will surrender the person.

3. In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

(a) whether the requests were made pursuant to a treaty;
(b) the places where each of the offenses was committed;
(c) the respective interests of the requesting States;
(d) the seriousness of the offenses;
(e) the nationality of the victim;
(f) the possibility of any subsequent extradition between the requesting States; and
(g) the chronological order in which the requests were received from the requesting States.

Article 16
Seizure and Surrender of Property

1. To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items in whatever form, and assets, including proceeds, that are connected with the offense in respect of which extradition is granted. The items and assets mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2. The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

Article 17
Waiver of Extradition

If the person sought waives extradition and agrees to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

Article 18
Rule of Specialty

1. A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a) any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense on which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b) any offense committed after the extradition of the person; or

(c) any offense for which the executive authority of the Requested State waives the rule of specialty and thereby consents to the

person's detention, trial, or punishment. For the purpose of this subparagraph:

(i) the executive authority of the Requested State may require the submission of the documentation called for in Article 8; and

(ii) the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request for consent is being processed.

2. A person extradited under this Treaty may not be the subject of onward extradition or surrender for any offense committed prior to extradition to the Requesting State unless the Requested State consents.

3. Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of the person to a third State, if the person:

(a) leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

(b) does not leave the territory of the Requesting State within 20 days of the day on which that person is free to leave.

4. If the person sought waives extradition pursuant to Article 17, the specialty provisions in this Article shall not apply.

## Article 19
## Transit

1. Either State may authorize transportation through its territory of a person surrendered to the other State by a third State or from the other State to a third State. A request for transit shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit shall be detained in custody during the period of transit.

2. Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the other State. If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 1 of this Article, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 96 hours of the unscheduled landing.

## Article 20
## Representation and Expenses

1. The Requested State shall advise, assist, and appear on behalf of, the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same.

2. The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3. Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

## Article 21
## Consultation

The Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

## Article 22
## Termination

Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

**EMBASSY OF THE**
**UNITED STATES OF AMERICA**

No. 120

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honor to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honor to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America
London, England. December 16, 2004

LONDON, ENGLAND

The Consular Directorate of the Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Embassy's Note No. 120 of 16 December 2004 which reads as follows:

"The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honour to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the United States of America and the Government of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honour to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of this opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration."

In reply, the Foreign and Commonwealth Office has the honour to confirm that the proposal set out in the Embassy's Note is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland and that the Embassy's Note, and this Reply, shall constitute an agreement between the two Governments which shall enter into force on the date of entry into force of the Instrument.

The Consular Directorate of the Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.

London
16 December 2004

FOREIGN AND COMMONWEALTH OFFICE LONDON

Note No. 30/10

The Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed on 25 June 2003, as to the application of the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America, signed on 31 March 2003.

Further to the Exchange of Notes to that Instrument, done at London on 16 December 2004, the Foreign and Commonwealth Office has the honour to confirm that the necessary domestic legislation is now in place to allow the Government of the United Kingdom of Great Britain and Northern Ireland to apply Article 5(2) of the Agreement on Extradition between the European Union and the United States of America, as set forth in Article 9 of the Annex of the Instrument, relating to the authentication of extradition documents.

The Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.

FOREIGN & COMMONWEALTH OFFICE
LONDON

Embassy of the United States of America

24 Grosvenor Square

London

W1A 1AE

20 October 2010

5

EMBASSY OF THE UNITED STATES OF AMERICA
LONDON

No. 108

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to acknowledge receipt of Diplomatic Note No. 30/10, dated October 20, 2010, from Her Majesty's Foreign and Commonwealth Office which reads as follows:

"The Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed on 25 June 2003, as to the application of the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America, signed on 31 March 2003.

Further to the Exchange of Notes to that Instrument, done at London on 16 December 2004, the Foreign and Commonwealth Office has the honour to confirm that the necessary domestic legislation is now in place to allow the Government of the United Kingdom of Great Britain and Northern Ireland to

apply Article 5(2) of the Agreement on Extradition between the European Union and the United States of America, as set forth in Article 9 of the Annex of the Instrument, relating to the authentication of extradition documents.

The Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration."

On behalf of the United States Government, the Embassy has the honor to confirm that pursuant to the Foreign and Commonwealth Office's note and this Note in reply, Article 5(2) of the Agreement on Extradition between the United States and the European Union, as set forth in Article 9 of the Annex to the Instrument, applies between the two Governments as of the date of this note.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America
London, England. November 23, 2010

Home Office

Extradition Section
UK Central Authority
6th Floor Fry Building
2 Marsham Street
London
SW1P 4DF

Home Office - GOV.UK

Our ref: EXO-000028472-US

US Department of Justice
Washington DC,20530
United States of America

**8 September 2026**

Dear Sir / Madam,

**REQUEST FROM THE UNITED KINGDOM TO UNITED STATES OF AMERICA FOR THE EXTRADITION OF EMORY ANDREW TATE**

The British Government respectfully extends its gratitude and appreciation to the Government of United States of America for its assistance and support in respect of the request for the extradition to the United Kingdom of Emory Andrew TATE.

Please find enclosed the full extradition request for Emory Andrew TATE which is made under Article 8 of the Extradition Treaty between the United Kingdom of Great Britain and Northern Ireland and United States of America dated 31 March 2003 and in force from 26 April 2007.

It would be appreciated if, in the event of the return to the United Kingdom being ordered, the Home Secretary could be informed, so that, when appropriate, arrangements can be made for Emory Andrew Tate's escort back to the United Kingdom.

Many thanks and kind regards

Noorel Haque
Senior Extradition Caseworker
Extradition Team | UK Central Authority
Serious Organised Crime (SOC) and International Criminality Directorate


SBU - LEGAL

## ne Office

.

arding the attached papers, to be used in support of an application for the surrender e United States of America of Emory Andrew Tate, who is accused of 42 offences:

Arrange or facilitate travel of another person with a view to exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015, (two (2) offences)

Arrange or facilitate travel of another person with a view to sexual exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015, (three (3) offences)

Rape a woman 16 years of age or over contrary to Section 1, Sexual Offences Act 2003, (Ten (10) offences)

Assault a person thereby occasioning them actual bodily harm contrary to Section 47, Offences Against the Person Act 1861, (Seven (7) offences)

Control prostitution for gain, contrary to Section 53 of Sexual Offences Act 2003 (one (1) offence)

Distributing an indecent photograph of a child, contrary to Section 1(1)(b) of the Protection of Children Act 1978, (Seven (7) offences)

Making indecent photograph of a child, contrary to Section 1(1)(a) of the protection of Children Act 1978, (eight (8) offences)

Possessing extreme pornography contrary to section 63(1), (7)(d) of Criminal Justice and Immigration Act 2006, Four (4) offences)

eby certify that, to the best of my knowledge and belief, the signature on the lementary evidence dated 8 September 2026 contained herein is the signature of der Dhillon at Crown Prosecution Service.

her certify that the documents authenticated here are in support of the request for the der of Emory Andrew TATE.

Home Office

# C.R.

In forwarding the attached papers, to be used in support of an application for the surrender from the United States of America of Emory Andrew Tate, who is accused of 42 offences:

1. Arrange or facilitate travel of another person with a view to exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015, (two (2) offences)

2. Arrange or facilitate travel of another person with a view to sexual exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015, (three (3) offences)

3. Rape a woman 16 years of age or over contrary to Section 1, Sexual Offences Act 2003, (Ten (10) offences)

4. Assault a person thereby occasioning them actual bodily harm contrary to Section 47, Offences Against the Person Act 1861, (Seven (7) offences)

5. Control prostitution for gain, contrary to Section 53 of Sexual Offences Act 2003 (one (1) offence)

6. Distributing an indecent photograph of a child, contrary to Section 1(1)(b) of the Protection of Children Act 1978, (Seven (7) offences)

7. Making indecent photograph of a child, contrary to Section 1(1)(a) of the protection of Children Act 1978, (eight (8) offences)

8. Possessing extreme pornography contrary to section 63(1), (7)(d) of Criminal Justice and Immigration Act 2006, Four (4) offences)

I hereby certify that, to the best of my knowledge and belief, the signature on the supplementary evidence dated 8 September 2026 contained herein is the signature of Narinder Dhillon at Crown Prosecution Service.

I further certify that the documents authenticated here are in support of the request for the surrender of Emory Andrew TATE.


SBU - LEGAL

Date: 9 September 2026

Noorel Haque
Senior Extradition Caseworker
UK Central Authority
Home Office

# RE: THE EXTRADITION OF

# EMORY ANDREW TATE

# FROM

# THE UNITED STATES OF AMERICA

Before the Westminster Magistrates' Court (code 2570)

ACCUSED: **Emory Andrew TATE** D.O.B: [redacted]

ADDRESS: [redacted] Romania

OFFENCE:

(4) Details of the alleged offence(s)

CrimPR 7.3 requires that an allegation of an offence in an application for the issue of a summons or warrant must contain (a) a statement of the offence that (i) describes the offence in ordinary language, and (ii) identifies any legislation that creates it; and (b) such particulars of the conduct constituting the commission of the offence as to make clear what the prosecutor alleges against the defendant.

1. **Offence:**

Arrange or facilitate travel of another person with a view to exploitation Contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (03/04/2016 - 30/04/2016)

**Particulars:**

Between 03/04/2016 and 30/04/2016 arranged or facilitated the travel of [redacted] with a view to her being exploited.

2. **Offence:**

Arrange or facilitate travel of another person with a view to exploitation Contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (31/08/2016 - 01/10/2016)

**Particulars:**

Between 31/08/2016 and 01/10/2016 arranged or facilitated the travel of [redacted] with a view to her being exploited.

3. **Offence:**

Rape a woman 16 years of age or over – Section 1 SOA 2003 (01/01/2015 - 01/03/2015)

**Particulars:**

Between 01/01/2015 and 01/03/2015, intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

4. **Offence:**

Rape a woman 16 years of age or over – Section 1 SOA 2003 (01/01/2015 - 01/03/2015)

**Particulars:**

Between 01/01/2015 and 01/03/2015 intentionally penetrated the vagina of a woman [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

5. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (01/01/2015 - 01/03/2015)

**Particulars:**

Between 01/01/2015 and 01/03/2015 assaulted [redacted] hereby occasioning her, actual bodily harm.

6. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (01/01/2015 - 01/03/2015)

**Particulars:**

Between 01/01/2015 and 01/03/2015, assaulted [redacted] thereby occasioning her, actual bodily harm.

7. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (03/07/2014 - 07/07/2014)

**Particulars:**

Between 03/07/2014 and 07/07/2014, assaulted [redacted] thereby occasioning her, actual bodily harm.

8. **Offence:**

Rape a woman 16 years of age or over – Section 1 SOA 2003 (31/08/2015 - 31/12/2015)

**Particulars:**

between 31/08/2015 and 31/12/2015, intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

9. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (31/08/2015 - 31/12/2015)

**Particulars:**

Between 31/08/2015 and 31/12/2015, assaulted [redacted] thereby occasioning her, actual bodily harm.

10. **Offence:**

Control prostitution for gain -Section 53 SOA 2003 (01/05/2015 - 02/09/2015)

**Particulars:**

Between 01/05/2015 and 02/09/2015 intentionally controlled activities of another person [redacted] in relation to her prostitution in any part of the world for or in expectation of gain for yourself.

Information having been laid before me on ~~oath~~ *affirmation* by DC5913 Lee-Anne Marshall on Friday 19th January 2024

That the accused committed the above offences.

**DIRECTION:** You, the constables, are hereby required to arrest the accused and to bring the accused before the Westminster Magistrates Court immediately unless the accused is released on bail as directed below.

**BAIL:** ~~On arrest, after complying with the condition(s) specified in Schedule I hereto, the accused shall be released on bail subject to the conditions specified in Schedule II hereto and with a duty to surrender to the custody of the above court on —————— at 10 a.m.~~

**~~SCHEDULE I~~**

**~~Conditions to be complied with before release on bail~~**

~~To provide N/A surety(ies) in the sum of £ N/A (each) to secure the Accused's surrender to custody at the time and place appointed.~~

**~~SCHEDULE II~~**

**~~Conditions to be complied with after release on bail~~**

NONE

Date: 19/1/24 ~~15th September 2016~~

District Judge (Magistrates' Court) SDJ Goldspring
~~Justice of the Peace for the inner London~~ Area
~~By Order of the Court/Clerk of the Court~~

| |
|---|
| **M.C.A. 4**<br>Warrant of arrest in first instance. |

I certify that this is a true and redacted copy of the original warrant issued by Senior District Judge Goldspring on 19 January 2024

TANWEER IKRAM
Dep Senior District Judge
07/09/2026.

**Before the Westminster Magistrates' Court (code 2570)**

**ACCUSED:** Emory Andrew Tate D.O.B: [redacted]

**ADDRESS:** [redacted], Romania

**OFFENCES:**

**Details of the alleged offences:**

CrimPR 7.3 requires that an allegation of an offence in an application for the issue of a summons or warrant must contain (a) a statement of the offence that (i) describes the offence in ordinary language, and (ii) identifies any legislation that creates it; and (b) such particulars of the conduct constituting the commission of the offence as to make clear what the prosecutor alleges against the defendant.

1. **Offence:**

   Rape a woman 16 years of age or older, contrary to Section 1 Sexual Offences 2003 (between 01 November 2011 – 31 October 2012)

   **Particulars:**

   Between 01 November 2011 and 31 October 2012 intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

2. **Offence:**

   Rape a woman 16 years of age or older, contrary to Section 1 Sexual Offences Act 2003 (between 01 November 2011 – 31 October 2012)

   **Particulars:**

   Between 01 November 2011 and 31 October 2012, on not less than three occasions, other than that specified on count [1 relating to [redacted] intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting

3. Offence:

Assault a person thereby occasioning them Actual Bodily Harm, contrary to Section 47 Offences Against the Person Act 1861 (between 01 November 2011 – 31 October 2012)

Particulars:

Between 01 November 2011 and 31 October 2012 assaulted [redacted], thereby occasioning her actual bodily harm

4. Offence:

Assault a person thereby occasioning them Actual Bodily Harm, contrary to Section 47 Offences Against the Person Act 1861 (between 01 November 2011 – 31 October 2012)

Particulars:

Between 01 November 2011 and 31 October 2012 on not less than three occasions, other than that specified on count [3 relating to [redacted]] assaulted [redacted], thereby occasioning her actual bodily harm

5. Offence:

Rape a woman 16 years of age or older, contrary to Section 1 Sexual Offences Act 2003 (between 01 April 2017 – 30 April 2017)

Particulars:

Between 01 April 2017 and 30 April 2017 intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting

6. Offence:

Rape a woman 16 years of age or older, contrary to Section 1 SOA 2003 (between 01 April 2017 and 30 April 2017)

Particulars:

Between 01 April 2017 and 30 April 2017 intentionally penetrated the mouth of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting

7. Offence:

Assault a person thereby occasioning them Actual Bodily Harm, contrary to Section 47 Offences Against the Person Act 1861 (between 01 April 2017 and 30 April 2017)

Particulars

Between 1 April 2017 and 30 April 2017 assaulted [redacted], thereby occasioning her actual bodily harm

8. Offence:

Arranging or facilitating travel of another with a view to sexual exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (between 27 April 2016 – 18 August 2017)

Particulars:

Between 27 April 2016 and 18 August 2017 arranged or facilitated the travel of another [redacted] with the Intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel

9. Offence:

Rape a woman 16 years of age or older, contrary to s.1 of the Sexual Offences Act 2003 (between 1 April 2015 and 30 March 2016)

Particulars:

Between 1 April 2015 and 30 March 2016 intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

10. Offence:

Rape a woman 16 years of age or older, contrary to s.1 of the Sexual Offences Act 2003 (between 1 April 2015 and 30 March 2016)

Particulars:

Between 1 April 2015 and 30 March 2016 intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

11. Offence:

Arranging or facilitating travel of another with a view to sexual exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (between 31 July 2015 and 30 March 2016)

Particulars:

Between 31 July 2015 and 30 March 2016 arranged or facilitated the travel of another [redacted] with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel

12. Offence:

Rape a woman 16 years of age or older, contrary to s.1 of the Sexual Offences Act 2003 (between 1 June 2016 and 3 September 2016)

Particulars:

Between 1 June 2016 and 3 September 2016 intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

13. Offence:

Arranging or facilitating travel of another with a view to sexual exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (between 1 June 2016 and 30 March 2017)

Particulars:

Between 1 June 2016 and 30 March 2017 arranged or facilitated the travel of another [redacted] with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel

14. Offence

Distributing an indecent photograph of a child, contrary to section 1(1)(b) of the Protection of Children Act 1978 (on 1 June 2015)

Particulars:

On 1 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 18:57hrs appearing within exhibit RMH21

15. Offence

Distributing an indecent photograph of a child, contrary to section 1(1)(b) of the Protection of Children Act 1978 (on 3 June 2015)

Particulars:

On 3 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 16:06hrs appearing within exhibit RMH14

16. Offence

Distributing an indecent photograph of a child, contrary to section 1(1)(b) of the Protection of Children Act 1978 (on 8 June 2015)

Particulars:

On 8 June 2015 Andrew Tate distributed two Category C Indecent images of a child, namely two images sent at 20:38hrs appearing within exhibit RMH37

17. Offence

Distributing an indecent photograph of a child, contrary to section 1(1)(b) of the Protection of Children Act 1978 (on 14 June 2015)

Particulars:

On 14 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an Image sent at 07:49hrs appearing within exhibit RMH15

18. Offence

Distributing an Indecent photograph of a child, contrary to section 1(1)(b) of the Protection of Children Act 1978 (on 19 June 2015)

Particulars:

On 19 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an Image sent at 14:56hrs appearing within exhibit RMH07

19. Offence

Distributing an indecent photograph of a child, contrary to section 1(1)(b) of the Protection of Children Act 1978 (on 19 June 2015)

Particulars:

On 19 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 14:57hrs appearing within exhibit RMH07

20. Offence

Distributing an indecent photograph of a child, contrary to section 1(1)(b) of the Protection of Children Act 1978 (on 19 June 2015)

Particulars:

On 19 June 2015 Andrew Tate distributed a Category C indecent image of a child, namely an image sent at 15:07hrs appearing within exhibit RMH07

21. Offence

Making indecent photographs of a child, contrary to section 1(1)(a) of the Protection of Children Act 1978 (on or before 18 July 2015)

Particulars:

On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 36 Category A images and videos appearing within exhibit AT01.

22. Offence

Making indecent photographs of a child, contrary to section 1(1)(a) of the Protection of Children Act 1978 (on or before 18 July 2015)

Particulars

On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 13 Category B images and videos appearing within exhibit AT01.

23. Offence

Making indecent photographs of a child, contrary to section 1(1)(a) of the Protection of Children Act 1978 (on or before 18 July 2015)

Particulars

On or before 18 July 2015 Andrew Tate made indecent Images of a child, namely 41 Category C images and videos appearing within exhibit AT01.

24. Offence

Making indecent photographs of a child, contrary to section 1(1)(a) of the Protection of Children Act 1978 (on or before 18 July 2015)

Particulars

On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 3 Category B images appearing within exhibit PKB02.

25. Offence

Making Indecent photographs of a child, contrary to section 1(1)(a) of the Protection of Children Act 1978 (on or before 18 July 2015)

Particulars

On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 17 Category C images appearing within exhibit PKB02.

26. Offence

Making indecent photographs of a child, contrary to section 1(1)(a) of the Protection of Children Act 1978 (on or before 18 July 2015)

Particulars

On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 30 Category A images and videos appearing within exhibit SJB1

27. Offence

Making indecent photographs of a child, contrary to section 1(1)(a) of the Protection of Children Act 1978 (on or before 18 July 2015)

Particulars

On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 10 Category B images and videos appearing within exhibit SJB1

28. Offence

Making indecent photographs of a child, contrary to section 1(1)(a) of the Protection of Children Act 1978 (on or before 18 July 2015)

Particulars

On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 18 Category C images and videos appearing within exhibit SJB1

29. Offence

Possessing extreme pornography contrary to section 63(1), (7)(d) and 67(3) Criminal Justice and Immigration Act 2008 (on or before 18 July 2015)

Particulars

On or before 18 July 2015, Andrew Tate possessed, within exhibit SJB1, an extreme pornographic image which portrayed, in an explicit and realistic way, a person performing an act of intercourse with a live animal, namely an eel, which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person or animal was real.

30. Offence

Possessing extreme pornography contrary to section 63(1), (7)(d) and 67(3) Criminal Justice and Immigration Act 2008 (on or before 18 July 2015)

Particulars

On or before 18 July 2015, Andrew Tate possessed, within exhibit SJB1, an extreme pornographic image which portrayed, in an explicit and realistic way, a person performing an act of intercourse with a live animal, namely a horse, which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person or animal was real

31. Offence

Possessing extreme pornography contrary to section 63(1), (7)(b) and 67(2) Criminal Justice and Immigration Act 2008 (on or before 18 July 2015)

Particulars

On or before 18/7/15, Andrew Tate possessed, within exhibit PKB02, an extreme pornographic image which portrayed in an explicit and realistic way an act which resulted or was likely to result in serious injury to a person's genitals and which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person was real (a 9 second video with file path USERDATA (ExtX)\Root\media\0\.thumbnails\I9305XXUEMK1_4.3\movie_281290)

32. Offence

Possessing extreme pornography contrary to section 63(1), (7)(b) and 67(2) Criminal Justice and Immigration Act 2008 (on or before 18 July 2015)

Particulars

On or before 18/7/15, Andrew Tate possessed, within exhibit PKB02, an extreme pornographic image which portrayed in an explicit and realistic way an act which resulted or was likely to result in serious injury to a person's genitals and which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person was real (a 9 second video with file path USERDATA (ExtX)\Root\media\0\.thumbnails\I9305XXUEMK1_4.3\movie_281290)

Information having been laid before me on oath/affirmation by DS 30 Clare Matier on xxxx 5/8/26

that the accused committed the above offences.

**DIRECTION:** You, the constables, are hereby required to arrest the accused and to bring the accused before the Westminster Magistrates' Court immediately.

The warrant is without bail.

Date: xxxxx 5/8/2026

**Senior District Judge Paul Goldspring (Chief Magistrate) For England & Wales**

District Judge (Magistrates' Court)

I certify that this is a true and redacted copy of the original warrant.

**Senior District Judge Paul Goldspring (Chief Magistrate) For England & Wales**

**RE: THE EXTRADITION OF**

**EMORY ANDREW TATE**

**FROM**

**THE UNITED STATES OF AMERICA**

## INDEX TO STATEMENTS AND EXHIBITS


| | Item Description | Page Number |
|---|---|---|
| 1. | Detective Constable Lee-Anne MARSHALL statement of fact (dated 7 September 2026) | 1-105 |
| | Exhibit LM/01 – photograph | 106-107 |
| 2. | Narinder DHILLON statement of law (dated 8 September 2026) | 108-139 |

**LEE-ANNE MARSHALL states as follows:**

## INTRODUCTION

1. I am a Detective Constable in the Major Crime Unit employed by Bedfordshire Police in England. I am the officer in the case concerning the criminal conduct of Emory Andrew Tate. I can provide a summary of the evidence for the purpose of extradition proceedings.

2. Emory Andrew Tate (hereafter referred as "Andrew Tate") is wanted to stand trial in England for a total of forty-two charges including rape, assault occasioning actual bodily harm, human trafficking, controlling prostitution for gain, distributing indecent images of a child, making indecent images of a child, and possessing extreme pornography.

3. The charges are included in two separate warrants as described in Paragraphs 5 and 6 below. The complainants' names have been anonymised and will be referred to as Complainant 1 to 7. Each respective Complainant is the same Complainant as referred to (by the same number) in the request for Tristan Tate where they have been jointly charged.

4. Andrew Tate was arrested on 18 July 2026 in Miami, Florida on a provisional arrest request and has been detained in custody on these matters.

## ARREST WARRANT

5. On 19 January 2024 a warrant of arrest was issued by Senior District Judge Paul Goldspring sitting at Westminster Magistrates Court for charges one (i) to ten (x) set out below. The warrant is live and in force.

**CHARGES**

i. Between 3 April 2016 and 30 April 2016 Andrew Tate and Tristan Tate[1] arranged or facilitated the travel of Complainant 1 with a view to her being exploited, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

ii. Between 31 August 2016 and 1 October 2016 Andrew Tate and Tristan Tate[2] arranged or facilitated the travel of Complainant 1 with a view to her being exploited, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

iii. Between 1 January 2015 and 1 March 2015 Andrew Tate intentionally penetrated the vagina of Complainant 2 with his penis, when she did not consent, and he did not reasonably believe she was consenting, contrary to section 1 of the Sexual Offences Act 2003.

iv. Between 1 January 2015 and 1 March 2015 [on an occasion other than that specified in charge 3 (iii)] Andrew Tate intentionally penetrated the vagina of Complainant 2 with his penis, when she did not consent, and he did not reasonably believe she was consenting, contrary to section 1 of the Sexual Offences Act 2003.

v. Between 1 January 2015 and 1 March 2015 Andrew Tate assaulted Complainant 2, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

[1] The corresponding charge for Tristan Tate is charge x.
[2] The corresponding charge for Tristan Tate is charge xi.

vi. Between 1 January 2015 and 1 March 2015 [on an occasion other than that specified in charge 5 (v)] Andrew Tate assaulted Complainant 2, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

vii. Between 3 July 2014 and 7 July 2014 Andrew Tate assaulted Complainant 3, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

viii. Between 31 August 2015 and 31 December 2015 Andrew Tate intentionally penetrated the vagina of Complainant 3 with his penis, when she did not consent, and he did not reasonably believe she was consenting, contrary to section 1 of the Sexual Offences Act 2003.

ix. Between 31 August 2015 and 31 December 2015 Andrew Tate assaulted Complainant 3, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

x. Between 1 May 2015 and 2 September 2015 Andrew Tate intentionally controlled activities of Complainant 3 in relation to her prostitution in any part of the world for or in expectation of gain for himself, contrary to section 53 of the Sexual Offences Act 2003.

**ADDITIONAL CHARGES**

6. On 10 July 2026 additional charges were authorised by the Crown Prosecution Service, and on 5 August 2026 a warrant of arrest was issued by Senior District Judge Paul Goldspring sitting at Westminster Magistrates Court for charges eleven (xi) to forty-two (xl ii) set out below. The warrant is live and in force.

xi. Between 1 November 2011 and 31 October 2012 Andrew Tate intentionally penetrated the vagina of Complainant 7 with his penis, when she did not consent, and he did not reasonably believe that she was consenting, contrary to Section 1 Sexual Offences Act 2003.

xii. Between 1 November 2011 and 31 October 2012 Andrew Tate on not less than three occasions, other than that specified on count 1 [xi above] intentionally penetrated the vagina of Complainant 7 with his penis, when she did not consent, and he did not reasonably believe that she was consenting, contrary to Section 1 Sexual Offences Act 2003.

xiii. Between 1 November 2011 and 31 October 2012 Andrew Tate assaulted Complainant 7, thereby occasioning her actual bodily harm, contrary to Section 47 Offences Against the Person Act 1861.

xiv. Between 1 November 2011 and 31 October 2012 Andrew Tate on not less than three occasions, other than that specified on count 3 [xiii above] assaulted Complainant

7, thereby occasioning her actual bodily harm, contrary to Section 47 Offences Against the Person Act 1861.

xv. Between 1 April 2017 and 30 April 2017 Andrew Tate intentionally penetrated the vagina of Complainant 7 with his penis, when she did not consent, and he did not reasonably believe that she was consenting, contrary to Section 1 Sexual Offences Act 2003.

xvi. Between 1 April 2017 and 30 April 2017 Andrew Tate intentionally penetrated the mouth of Complainant 7 with his penis, when she did not consent, and he did not reasonably believe that she was consenting, contrary to Section 1 Sexual Offences Act 2003.

xvii. Between 1 April 2017 and 30 April 2017 Andrew Tate assaulted Complainant 7, thereby occasioning her actual bodily harm, contrary to Section 47 Offences Against the Person Act 1861.

xviii. Between 27 April 2016 and 18 August 2017 Andrew Tate and Tristan Tate[3] arranged or facilitated the travel of Complainant 7 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

xix. Between 1 April 2015 and 30 March 2016 Andrew Tate intentionally penetrated the vagina of Complainant 5 with his penis, when she did not consent and he did not

[3] The corresponding charge for Tristan Tate is charge xvii.

reasonably believe that she was consenting, contrary to Section 1 Sexual Offences Act 2003.

xx. On a day between 1 April 2015 and 30 March 2016 Andrew Tate intentionally penetrated the vagina of Complainant 5 with his penis, when she did not consent and he did not reasonably believe that she was consenting, contrary to Section 1 Sexual Offences Act 2003.

xxi. Between 31 July 2015 and 30 March 2016 Andrew Tate and Tristan Tate[4] arranged or facilitated the travel of Complainant 5 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

xxii. Between 1 June 2016 and 3 September 2016 Andrew Tate intentionally penetrated the vagina of Complainant 6 with his penis, when she did not consent and he did not reasonably believe that she was consenting, contrary to Section 1 Sexual Offences Act 2003.

xxiii. Between 1 June 2016 and 30 March 2017 Andrew Tate and Tristan Tate[5] arranged or facilitated the travel of Complainant 6 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by

[4] The corresponding charge for Tristan Tate is charge xv.
[5] The corresponding charge for Tristan Tate is charge xvi.



6

another during or after travel, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

xxiv. On 1 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 18:57hrs appearing within exhibit RMH21, contrary to section 1(1)(b) of the Protection of Children Act 1978.

xxv. On 3 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 16:06hrs appearing within exhibit RMH14, contrary to section 1(1)(b) of the Protection of Children Act 1978.

xxvi. On 8 June 2015 Andrew Tate distributed two Category C indecent images of a child, namely two images sent at 20:38hrs appearing within exhibit RMH37, contrary to section 1(1)(b) of the Protection of Children Act 1978.

xxvii. On 14 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 07:49hrs appearing within exhibit RMH15, contrary to section 1(1)(b) of the Protection of Children Act 1978.

xxviii. On 19 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 14:56hrs appearing within exhibit RMH07, contrary to section 1(1)(b) of the Protection of Children Act 1978.

xxix. On 19 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 14:57hrs appearing within exhibit RMH07, contrary to section 1(1)(b) of the Protection of Children Act 1978.

xxx. On 19 June 2015 Andrew Tate distributed a Category C indecent image of a child, namely an image sent at 15:07hrs appearing within exhibit RMH07, contrary to section 1(1)(b) of the Protection of Children Act 1978.

xxxi. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 36 Category A images and videos appearing within exhibit AT01, contrary to section 1(1)(a) of the Protection of Children Act 1978.

xxxii. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 13 Category B images and videos appearing within exhibit AT01, contrary to section 1(1)(a) of the Protection of Children Act 1978.

xxxiii. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 41 Category C images and videos appearing within exhibit AT01, contrary to section 1(1)(a) of the Protection of Children Act 1978.

xxxiv. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 3 Category B images appearing within exhibit PKB02, contrary to section 1(1)(a) of the Protection of Children Act 1978.

xxxv. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 17 Category C images appearing within exhibit PKB02, contrary to section 1(1)(a) of the Protection of Children Act 1978.

xxxvi. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 30 Category A images and videos appearing within exhibit SJB1, contrary to section 1(1)(a) of the Protection of Children Act 1978.

xxxvii. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 10 Category B images and videos appearing within exhibit SJB1, contrary to section 1(1)(a) of the Protection of Children Act 1978.

xxxviii. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 18 Category C images and videos appearing within exhibit SJB1, contrary to section 1(1)(a) of the Protection of Children Act 1978.

xxxix. On or before 18 July 2015 Andrew Tate possessed, within exhibit SJB1, an extreme pornographic image which portrayed, in an explicit and realistic way, a person performing an act of intercourse with a live animal, namely an eel, which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person or animal was real, contrary to section 63(1), (7)(d) and 67(3) Criminal Justice and Immigration Act 2008.

xl. On or before 18 July 2015 Andrew Tate possessed, within exhibit SJB1, an extreme pornographic image which portrayed, in an explicit and realistic way, a person performing an act of intercourse with a live animal, namely a horse, which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person or animal was real, contrary to section 63(1), (7)(d) and 67(3) Criminal Justice and Immigration Act 2008.

xli. On or before 18 July 2015, Andrew Tate possessed, within exhibit PKB02, an extreme pornographic image which portrayed in an explicit and realistic way an act which resulted or was likely to result in serious injury to a person's genitals and which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person was real, contrary to section 63(1), (7)(b) and 67(2) Criminal Justice and Immigration Act 2008.

xlii. On or before 18 July 2015, Andrew Tate possessed, within exhibit PKB02, an extreme pornographic image (other than that described in charge xli. above) which portrayed in an explicit and realistic way an act which resulted or was likely to result in serious injury to a person's genitals and which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person was real, contrary to section 63(1), (7)(b) and 67(2) Criminal Justice and Immigration Act 2008.

**PARTICULARS OF IDENTITY**

7. I have gathered information about Andrew Tate's identity as follows:

**Name:** Emory Andrew Tate

**Date of birth:** [redacted]

**Nationality:** British and United States of America

**Last known address:** [redacted]

Romania.

**Passport number:** [redacted] **Expiry date:** [redacted]

**USA Passport Number:** [redacted]

8. A copy of Andrew Tate's passport photograph is produced as **Exhibit LM/01**. Complainant 1, Complainant 2, Complainant 3, Complainant 5, Complainant 6 and Complainant 7 have been shown a copy of the passport photograph of Andrew Tate, and have each identified the person depicted in the photograph as Andrew Tate, the person who committed the offences against them.

9. I confirm that this is the Andrew Tate named in the warrants of arrest issued by Westminster Magistrates' Court on 19 January 2024 and 5 August 2026, who is wanted to stand trial for the charges set out therein. I am satisfied and certify this photograph as being a true likeness of Andrew Tate.

## OVERVIEW

### Introduction

10. The United Kingdom seeks the extradition of Andrew Tate and Tristan Tate (by separate request) to stand trial for serious criminal allegations made by seven complainants over a seven-year period between 2010 and 2017. The allegations include, rape (Andrew Tate and Tristan Tate), offences of violence (Andrew Tate and Tristan Tate), controlling prostitution for gain (Andrew Tate), human trafficking for the purposes of sexual exploitation (Andrew Tate and Tristan Tate) and offences relating to indecent images of children and extreme pornography (Andrew Tate). The prosecution does not contend that every complainant was subjected to every form of offending. Rather, the evidence demonstrates an overarching pattern of behaviour in which the Tate brothers employed similar methods of recruitment, grooming, control and coercion, with the precise nature of the offending varying according to the individual circumstances of each complainant.

11. This overview is derived from evidence in the case as set out in detail below. Whilst its primary purpose is to describe the alleged human trafficking operation and the methods employed by the Tate brothers to recruit women into their sex webcamming business, and to control and coerce them following recruitment, it is important to specify that Complainants 2, 3 and 4 are not alleged to have been victims of human trafficking. The allegations made by those complainants are nonetheless extremely serious. Each alleges rape; complainants 2 and 3 also allege violence, and complainant 3 was used for prostitution in the UK. The general descriptions of the Tate brothers' attitude towards women and their alleged desire to dominate through violence and the removal of women's autonomy as set

out in paragraph 29 below, apply equally to those complainants. The specific allegations relating to each of the seven complainants are addressed separately in the individual case summaries and charge analyses below.

**Overall Method of the Operation**

12. The brothers are both citizens of the United Kingdom and the United States of America. They grew up in both jurisdictions, but in 2014 (the date from which the charged human trafficking conduct starts) they were sharing a two-bedroom apartment in Luton, England. Although only in their early twenties, Andrew Tate being 24 years old and Tristan Tate being 22 years old, both had already achieved a degree of public prominence through their professional kickboxing careers and Tristan Tate's appearance on a reality television programme in the UK. In 2016 Andrew Tate appeared on a different UK reality show.

13. The prosecution case is that the Tate brothers established and operated a webcam business since 2014, which involved recruiting young women to perform on webcam platforms and produce bespoke sexual content for paying subscribers using different platforms such as *MyFreeCams* and *AdultWorks*. Where a complainant was caused to perform sexual activity online, including in private chat rooms or through the production of bespoke videos, access to the chat room or delivery of the video was restricted to subscribers who had made the requisite payment set by the Tate brothers. The operation was initially based in the UK and was subsequently relocated to Romania, where the Tates relocated permanently in 2017.

**Roles**

14. Andrew Tate acted as the principal recruiter. The prosecution case is that he identified women whom he perceived to be vulnerable, established intimate relationships with them, and persuaded, coerced and arranged for them to travel internationally, and played a significant role in maintaining their compliance and directing their activities thereafter.

15. Tristan Tate also established an intimate relationship with one of the complainants and recruited her into the webcam industry. On 8 April 2016 he set up the company *ModelStars* through which the webcam operation was conducted.

16. Tristan Tate and [redacted] provided operational and logistical support. Their roles included arranging travel, collecting complainants from airports, transporting them to accommodation and facilitating the day-to-day running of the operation. Together with Andrew Tate, they also played a role in directing complainants' webcam activities, including determining when complainants worked and the nature of the content they were expected to produce.

**Recruitment Methods**

17. Having attained a level of prominence and influence the Tate brothers used their status to attract and pursue vulnerable women. The complainants were often individuals who had experienced failed or abusive relationships, social isolation, low self-esteem or other personal vulnerabilities. The prosecution case is that these vulnerabilities were not incidental but were deliberately identified and exploited by the Tate brothers.

18. From the outset, the relationships were characterised by marked imbalances of power. The prosecution case is that the Tate brothers exploited these imbalances through emotional manipulation, intimidation, coercive behaviour and sexual dominance. Those complainants who allege rape describe aggressive sexual conduct, including choking or suffocation, which is said to exemplify the Tate brothers' broader disregard for their autonomy, dignity and wellbeing. It is alleged that the Tate brothers' actions were driven by a desire to exert control and obtain personal gratification, with little or no regard for the complainants' wishes, welfare or ability to freely consent.

**Use of the "Lover-Boy" Model**

19. It is alleged that these relationships were not genuine romantic partnerships but formed part of a wider pattern of coercive conduct through which the Tate brothers established and maintained control over the complainants. The operation incorporated features commonly associated with the "lover-boy" model of exploitation. This method involves an offender presenting himself as a romantic partner, demonstrating affection, attention and apparent commitment in order to establish emotional dependency.

20. Through this process, complainants may come to view the offender as someone they trust, love or rely upon. Once that dependency is established, the relationship can be manipulated to facilitate exploitation. Requests initially framed as acts of loyalty, support or commitment may gradually become demands that place the complainant in situations of exploitation for the offender's benefit.

21. The apparent romantic relationship therefore functions as a means of control rather than a genuine partnership, enabling the offender to maintain influence over the complainant while disguising the exploitative nature of the arrangement.

**Promises of Financial Gain**

22. Andrew Tate further encouraged complainants to relocate to Romania from the UK, by representing that they could earn substantial sums of money through participation in his webcam business should they wish to do so. Some complainants describe being shown videos of women purportedly earning significant amounts of money through webcam activity whilst remaining fully clothed. It is alleged that Andrew Tate represented that participation would be voluntary, that complainants would retain control over the nature of any work undertaken, and that they would be free to leave if dissatisfied with the arrangements.

23. The prosecution case is that these representations were fraudulent. Whilst some complainants travelled to Romania believing that any participation in webcam activities would be optional, it is alleged that, upon arrival, they encountered a significantly greater degree of control and direction than they had been led to expect.

**Movement From the UK to Romania**

24. The complainants' journeys to Romania were outwardly voluntary. They were not physically forced to travel and, in many cases, travelled believing they were doing so as Andrew Tate's romantic partner. Some also understood that webcam work was available

and believed that any such work would be undertaken on their own terms and subject to their own choices. The prosecution case, however, is that these beliefs were founded upon a carefully cultivated deception. By the time travel occurred, the Tate brothers had already established emotional influence and control over the trafficked complainants through physical and sexual violence and emotional dependency. The complainants were therefore unable to appreciate the true nature of the arrangements into which they were entering, or the extent to which they would later be controlled, directed and exploited.

**Controlling Measures and Use of Violence**

25. Whilst the complainants had travelled to Romania ostensibly of their own free will, the prosecution case is that, upon arrival, they were subjected to a range of controlling measures. Their passports were removed and retained, they were accommodated in premises under the Tate brothers' control, and they became dependent upon the Tate brothers for accommodation, transport and financial support. The females were vulnerable and trusted the brothers to care for them in a foreign country. The removal of travel documents, combined with the complainants' emotional dependency upon the Tate brothers and their unfamiliarity with their surroundings, substantially reduced their ability to leave the situation or exercise independent choice.

26. The prosecution case is that Andrew Tate and Tristan Tate used and threatened physical and sexual violence in order to maintain control and compliance. There was a culture of fear and intimidation created by Andrew and Tristan Tate. By means of manipulation, coercion and violence the complainants were pressured to produce increasingly intimate pornographic material for subscribers on webcams. It is further alleged that the Tate

brothers employed emotional manipulation by rewarding behaviour they considered desirable, including praising those generating the highest earnings, whilst belittling others whom they knew were seeking their approval.

27. Two complainants ultimately left by fabricating emergencies at home in order to secure permission to leave. Another complainant left after being compelled to engage in webcam work, despite this not having been discussed prior to her arrival. When she resisted, she was threatened, forced to participate in further webcam activity and sexual acts with others, before eventually being allowed to leave. A further complainant reported being threatened with a machete and was later ejected after the Tate brothers suspected her of try to sabotage their business.

**Conclusion**

28. Viewed cumulatively, the allegations describe a consistent pattern of conduct in which the Tate brothers are said to have used their status, relationships and commercial interests to recruit, influence and control vulnerable women for their own financial, sexual and personal benefit.

29. Although the circumstances of each complainant differ, a consistent theme emerges of women being treated as commodities whose value lay in the money, sexual gratification or services they could provide to the Tate brothers. The prosecution case is that the offending was facilitated by an entrenched imbalance of power which the Tate brothers deliberately created, maintained and exploited. The Tate brothers would repeatedly use rape and sexual

violence to establish control and other violence as a means of establishing dominance over women.

30. The allegations concerning trafficking, rape, violence and controlling prostitution for gain, together with the allegations against Andrew Tate relating to the making and distribution of indecent images of a child and the possession of extreme pornographic images, are relied upon by the prosecution as demonstrating a wider pattern of alleged sexually exploitative conduct spanning a number of years and involving multiple complainants.

**SUMMARY OF EVIDENCE**

**COMPLAINANT 1**

31. Complainant 1 first contacted the Police in January 2023 after seeing media reports that Tristan Tate was under investigation in Romania for sexual offences. There are two charges that relate to Complainant 1. The Police interviewed Complainant 1 in a video recorded interview on 6 January 2023 and again on 10 January 2023 in which she provided an account of the allegations summarised below.

**BACKGROUND**

32. Complainant 1 was in a relationship with Tristan Tate between [redacted]. Their relationship was violent. Complainant 1 alleges that she was anally and vaginally raped by Tristan Tate, she also alleges that he assaulted her on multiple occasions causing bruising, marks and welts on her body, face and neck from being choked and hit

with a belt. It was during this relationship that Complainant 1 developed what she described as a good relationship with Andrew Tate. Complainant 1 believed Andrew Tate to be the nicer brother, they got on well and were on the same wavelength. In [redacted], the relationship between Complainant 1 and Tristan Tate ended. Thereafter, contact between them was limited and sporadic.

33. In April 2016, Complainant 1 was contacted by *ModelStars*, a webcam business established by Tristan Tate. Following renewed contact, Complainant 1 travelled on two occasions to work in webcam businesses operated by Andrew Tate and Tristan Tate. She states that she was recruited by promises of earnings and assurances that she could leave if she wished. On both occasions she travelled abroad at their expense and performed sexual acts online for paying subscribers. Complainant 1 alleges that Andrew Tate and Tristan Tate exercised control over her work, failed to pay her as promised, and exploited her for their financial gain. These allegations form the basis of charges i and ii below. Andrew Tate and Tristan Tate have been jointly charged in respect of these two offences.

**CHARGES**

**HUMAN TRAFFICKING**

i. **Between 3 April 2016 and 30 April 2016 Andrew Tate and Tristan Tate arranged or facilitated the travel of Complainant 1 with a view to her being exploited:**

34. In April 2016, Complainant 1 was contacted via Facebook by *ModelStars*, a webcam business established by Tristan Tate. Although she had blocked Tristan Tate following the end of their relationship in [redacted], she resumed contact with him after being encouraged to do so by the company. Tristan Tate invited Complainant 1 to work as a webcam model in Liverpool, Amsterdam or Romania. Complainant 1 initially refused because she did not want to perform sexual acts online. Tristan Tate nevertheless continued to encourage her, describing the work as a lucrative opportunity and telling her that some women earned up to £8,000 per month.

35. Tristan Tate told Complainant 1 that she could try webcamming and return home after three days if she did not like it. He offered to arrange and pay for her travel and told her that she could earn approximately £2,000 per fortnight. Complainant 1 states that Tristan Tate was aware that she was unemployed, living with her parents and recovering from a relationship breakdown. She recalls him encouraging her by telling her that "*uglier girls than you*" were making substantial amounts of money through webcamming. The communications subsequently moved to WhatsApp and Andrew Tate became involved in the recruitment process. Complainant 1 eventually agreed to travel.

36. Andrew Tate arranged Complainant 1's travel. Flight records show that she travelled from [redacted] Airport to Kosice, Slovakia, on 15 April 2016, accompanied by another female intending to work for the business. Andrew Tate collected them from the airport. He created a *MyFreeCams* account for Complainant 1 using an email address which she believed he exclusively controlled, preventing her from changing the password. After observing other women performing on webcam platforms, Complainant 1 quickly

concluded that the work was not something she wanted to do. Nevertheless, she briefly went online that evening because she did not want to disappoint Andrew Tate.

37. The following day, Andrew Tate drove Complainant 1 and two other females to an apartment in Brasov, Romania, used by Andrew and Tristan Tate. Complainant 1 remained there for approximately four or five days. Andrew Tate encouraged her to perform increasingly sexual acts online, telling her that the more sexual she was, the more money she would make.

38. Complainant 1 states that Andrew Tate controlled the operation of her *MyFreeCams* account and communicated with subscribers on her behalf. Subscribers were led to believe they were communicating directly with Complainant 1. She recalls that subscribers would request increasingly sexual acts in exchange for tokens, including nudity and masturbation. Complainant 1 states that her IP address was altered so that it appeared she was broadcasting from the UK rather than Romania.

39. Complainant 1 recalls performing sexual acts on camera, including masturbation and nudity. She describes a pricing structure under which subscribers paid tokens to view increasingly explicit content. She states that she undertook this work believing that she would receive the payments promised by Andrew and Tristan Tate. Tristan Tate had previously told her that she would be paid £1,000 every two weeks at the outset, whilst Complainant 1 recalls being told she could expect to earn approximately £2,000 per fortnight. Andrew Tate also told her that she would receive a percentage of her earnings after deductions. Despite this, the percentage was never disclosed.

40. On approximately the fourth day of Complainant 1's stay in Romania, Tristan Tate arrived at the apartment. Complainant 1 states that she told him she no longer wished to work online and wanted to return home. In response, Tristan Tate became angry, brandished a machete and told her that if she wanted to leave she could walk down the hill and obtain a taxi herself. Complainant 1 recalls that the apartment was situated in an isolated location outside Brasov, that she had no money and could not speak the language. She believed that Andrew and Tristan Tate were responsible for facilitating her return home. Andrew Tate laughed during the incident and only agreed to assist her after she repeatedly begged to leave.

41. Complainant 1 states that she was eventually driven to the airport and returned to the UK. Despite performing webcam work whilst in Romania, she received no payment. She estimates that she generated approximately $1,000 through the work she carried out during her stay.

42. The Prosecution case is that Andrew Tate and Tristan Tate jointly arranged and facilitated Complainant 1's travel to Romania with a view to her exploitation through commercial webcam work. It is alleged that they recruited her through promises of earnings and assurances that she could leave if she wished, exercised control over her work and online accounts, and failed to pay her for the sexual performances she carried out whilst in Romania.

**HUMAN TRAFFICKING**

ii. **Between 31 August 2016 and 1 October 2016 Andrew Tate and Tristan Tate arranged or facilitated the travel of Complainant 1 with a view to her being exploited:**

43. In June 2016, Complainant 1 emailed Tristan Tate asking whether he had any webcamming work available because she needed money to go travelling. Tristan Tate told her that there was no space available. Looking back, Complainant 1 does not believe she was in the right frame of mind when she contacted him because of the abuse she says she had previously suffered during their relationship. Messages recovered during the investigation show that, in September 2016, Tristan Tate contacted Complainant 1 and asked for her telephone number. Andrew Tate subsequently contacted her and offered her the opportunity to work as a webcam model from a house in Bucharest, Romania. He told her that she would have better working conditions, would be paid a percentage of what she earned, would continue to receive money fortnightly, and that she would be safe. Andrew Tate also told her that there were "*loads of other females working there*". Complainant 1 states that she believed she had a relationship of mutual trust with Andrew Tate, which made her feel safe. Andrew Tate arranged and paid for her travel. Flight information confirms that Complainant 1 travelled from [redacted] to Bucharest on 21 September 2016.

44. On arrival, Complainant 1 was collected from the airport and taken to a large house where a number of women were working as webcam models. She recalls seeing one woman who was visibly distressed and wanted to return home. Complainant 1 resumed using the *MyFreeCams* account previously established by Andrew Tate. She states that she felt under

pressure to engage in increasingly sexual activity on the webcam because she believed she owed Andrew Tate for the opportunity he had given her.

45. Complainant 1 states that she worked overnight shifts from approximately 22:00 hours until 08:00 hours. She had not anticipated working through the night and says that she was not given a choice. She found it difficult to stay awake and was concerned about stepping out of line, particularly because she feared a repeat of the earlier incident involving Tristan Tate and a machete. Subscriber communications were controlled by Andrew and Tristan Tate's cousin, who responded to messages on her behalf. Complainant 1 recalls that her expressed boundaries were ignored. In particular, she made clear that she did not wish to perform sexual acts involving her anus. She states that the person controlling the account ignored those wishes and that she would have to do whatever paying subscribers requested. Reflecting on the situation, she recalls feeling that "*they were willing to sell me for anything*".

46. Complainant 1 recalls that a laptop would be positioned on the bed whilst she performed in front of the camera. Subscribers could purchase sexual content through a token-based system. She recalls a pricing structure under which increasingly explicit acts commanded higher payments. She also recalls there being both public and private chatrooms, with subscribers paying additional tokens for private interactions. On one occasion, a subscriber paid a substantial amount of money to watch her spank herself 100 times. Although she felt uncomfortable doing so, she complied and sustained bruising to her buttocks.

47. Complainant 1 states that the sexual acts she performed online included masturbating vaginally and anally, using sex toys anally, and pretending to have orgasms. She recalls

making clear that she did not want to perform sexual acts involving her anus but states that those boundaries were ignored. Complainant 1 states that she was compelled to create recorded content for sale to subscribers. She recalls making three or four videos, including one in which she used a sex toy in the shower and others in which she appeared in her underwear "*teasing*". These recordings were sold to subscribers in exchange for tokens. She further recalls that her telephone number and Skype details were sold to subscribers so that they could contact her directly for private calls.

48. Complainant 1 states that Andrew Tate and Tristan Tate closely monitored her movements whilst she was living at the property and would want to know where she was going and when she would return if she left the house. She recalls having very little money during her stay in Bucharest and says that she would often go without food. Complainant 1 felt uncomfortable asking Andrew Tate or Tristan Tate for money and did not feel able to approach them for financial assistance.

49. Complainant 1's involvement ended after Tristan Tate accused her of attempting to sabotage the business. She states that Tristan Tate drove her to a hotel near the airport whilst shouting, swearing and attempting to intimidate her. He left her there overnight and returned the following morning with her belongings. Andrew Tate subsequently offered her the opportunity to continue working from the apartment in Brasov. Complainant 1 declined the offer, booked her own return flight and returned to England.

50. Complainant 1 estimates that she remained in Bucharest for approximately six or seven days. Despite carrying out webcam work during that period, she states that she received no payment. Although she understood generally what webcamming involved, she says that

she did not know what to expect, did not know what happened behind the scenes, did not know about the long hours, and did not know what she would be expected to do. She states that she travelled believing that Andrew Tate and Tristan Tate would look after her.

**CORROBORATION**

51. Police recovered email communications between Complainant 1 and Tristan Tate from April 2016 concerning webcam work. Those communications are capable of corroborating Complainant 1's account that Tristan Tate recruited her to travel abroad to engage in online sex work. In an email dated 3 April 2016, Tristan Tate told Complainant 1: "*You know the business i'm in. I'll work you from my place in Amsterdam or my studio... work 9-10 hours per day 5 days a week (it isn't easy) but I'll pay you every 2 weeks*." He further stated: "*There are girls on the Internet uglier than you making 8k a month.*" and: "*Quit your shitty... job and I'll book you a flight.*" He also told Complainant 1: "*Fly to Amsterdam for 5 days. Don't quit your job. Try the job for 3 days. Then fly home if you don't like it*."

52. In the same email exchange, Complainant 1 stated that she did not have the "*guts or the confidence*" to undertake webcam work and sought reassurance regarding the earnings she had been promised. Tristan Tate responded that he had "*20+ employees*", that some women earned substantially more than the amount discussed, and assured her that she would be paid. These communications are capable of corroborating Complainant 1's account that she was encouraged to travel by promises of income, paid travel and assurances that she could leave if she did not enjoy the work. It also supports that the purpose of travel was to work for the Tates as a cam girl to earn money for them by performing sexual acts for their financial gain.

53. Flight information shows that Complainant 1 travelled from [redacted] Airport to Kosice (Slovakia) on 15 April 2016 and from [redacted] Airport to Bucharest (Romania) on 21 September 2016. These records are capable of corroborating Complainant 1's account that travel was arranged for her in connection with the webcam work described in Charges i and ii.

54. Flight information shows that Complainant 1 travelled from [redacted] to Kosice (Slovakia) on 15 April 2016, and from [redacted] to Bucharest (Romania) on 21 September 2016. In 2018 Complainant 1 disclosed the allegations to a colleague. The colleague subsequently provided a statement to Police regarding the disclosure.

**COMPLAINANT 2**

55. Complainant 2 contacted the Police in August 2022. She stated that she had tried to repress what happened, but that had not worked and it reached a stage where she had to report the allegations. There are four charges that relate to Complainant 2. The Police interviewed Complainant 2 on 11 January 2023 in which she provided an account of the allegations in a video recorded interview as set out below.

**BACKGROUND**

56. In [redacted] Complainant 2 met Andrew Tate through a mutual acquaintance. At the time she was already involved in the webcam business. The mutual acquaintance told Complainant 2 that a man (Andrew Tate) who had a house in Luton, was setting up his own webcam business and "*paid really good*". The mutual acquaintance asked if Complainant 2 was interested in working for him or training girls.

57. At some point, the mutual acquaintance either gave Complainant 2 Andrew Tate's contact details or his were given to her. Complainant 2 and Andrew Tate made contact on WhatsApp for a couple of days, and he and Complainant 2 were to arrange a meeting for her to be shown the house in Luton.

58. Complainant 2 says the alleged offences occurred in January 2015. She was 27 years old at the time. Complainant 2 thought they would meet for lunch however Andrew Tate did not reply for hours. It got into the evening; Complainant 2 cannot recall how late this was. Andrew Tate called, apologised and said he had been busy, he told Complainant 2 that he was on his way. Andrew Tate arrived at Complainant 2's house and they went out to get some food. She knows it was late as there was nothing open. They drove to a McDonald's drive through. They returned to Complainant 2's house, which is where the incidents took place. She recalls getting out of her car and walking to the door.

**CHARGES**

**RAPE**

iii. **Between 1 January 2015 and 1 March 2015 Andrew Tate intentionally penetrated the vagina of Complainant 2 with his penis, when she did not consent, and he did not reasonably believe she was consenting:**

59. Complainant 2 recalls that it all spiralled quickly when they went inside her house. They sat on the sofa. She remembers that she put her food bag next to her and reached down for the remote, and before she could do anything else Andrew Tate from a sitting position, put

his arm around her neck and squeezed it. She remembers she was wearing black trousers. She cannot recall the exact words used but recalls Andrew Tate demanded that she took her trousers down.

60. She describes positions of herself and Andrew Tate on the sofa. In her video interview she is positioning herself on the sofa in the interview room (lays across the sofa she's sitting on, puts her left hand to her throat). She does not recall all of it but states the main thing she remembers after that is thinking that he was going to kill her and that her head would "*pop*" off her body.

61. All she cared about was him letting go of her neck, which he relentlessly did not do. She recalls him saying something like *"...take your fucking trousers off, and I won't hurt you, or take your trousers off and I won't, and I'll kill, or I'll kill you..."*. Complainant 2 states that she was unable to recall the precise words used.

62. Complainant 2 says she took her trousers down and that Andrew Tate's penis went into her vagina. She recalls that her phone rang. It was there on the floor, and she saw her sister's name come up. Andrew Tate kicked the phone across, and it span into the kitchen. She states events were a bit fuzzy from then on. She states *...it was just hours of that really..."* *"....it just went on forever..."*. The thought repeating in her head was that Andrew Tate was going to kill her. She lost consciousness once.

63. She thought she was going to die and that her family would find her dead. She is upset and tearful as she talks about this. She talks about not being able to answer the phone to tell her sister that she loved her, and her phone just there ringing while she was dying. However,

Andrew Tate released her briefly for a second so she could get a breath but went back to the choking again. He continued choking and raping her.

64. Complainant 2 recalls there being a point the first time she came round when she forgot what she was doing and who she was for a brief minute. She then remembered waking up because Andrew Tates' tears were splashing on her face, and he was crying, saying, *"I love you... that's why I am raping you because I love you."*. She remembers thinking that he was a psychopath and that she had let a serial killer in her house. She states that it that went on for what felt like an eternity. She does not know how long. He was choking her. She could not talk, she could not say anything. Andrew Tate threatened to anally rape her. This terrified her. He released her neck and she had to say she loved him and beg him not to rape her anally. He then went back to strangling her.

65. She recalls there being a break. After he finished that first time, they were sitting on the sofa, and she remembers acting like she was not fazed because she did not know if he was just a rapist or if he would also kill her. She tried to act casual and did not touch her phone because she did not want to alert him. She remembers planning how to escape in her head. She knew the police station was only up the road from her house. She recalls having racing thoughts to act normal, to pretend that they were dating or to love him back or whatever she needed to do not to die that night.

66. Complainant 2 recalls conversations they had during the encounter. Andrew Tate spoke about the mafia and buying children, and then he asked her opinion of him once being offered what she thinks was a nine-year-old. She remembers that he told her a story about him being in Africa sitting on the back of a jeep and they ran over an African child. The

child died. He laughed about this. He told her just random bits of weird stuff that she remembers. She kept up the pretence of them being "*good*".

67. Complainant 2 cannot recall how many hours passed when she said that she was going to bed. Andrew Tate started following her up the stairs, she asked him what he was doing. Andrew Tate said that he was staying. She told him no and that she did not like people staying over. She states that she put blame on herself for what happened next. Andrew Tate said to her "*If I go now, you'll never see me again*". She thought for a minute and then let him stay. She now knows it was because she did not want to startle him, she did not want to provoke him to hurt or kill her.

**RAPE**

**iv. Between 1 January 2015 and 1 March 2015 [on an occasion other than that specified in charge 3 (iii)] Andrew Tate intentionally penetrated the vagina of Complainant 2 with his penis, when she did not consent, and he did not reasonably believe she was consenting:**

68. Complainant 2 and Andrew Tate went upstairs to her bedroom; her phone was still downstairs on the floor. Complainant 2 says she did not want to get it as she was too paranoid that he would know that she was going to text someone. Instead, she asked if he wanted to see what she was like on the webcam, thinking she would open her laptop to see if someone rang through that she would be able to send a message to. He agreed and she turned it on. Nobody came through, after a few minutes she back tracked and did not have the nerve to say anything even if anyone did come online.

69. Complainant 2 recalls hovering around in the bedroom and Andrew Tate telling her to come over to the bed. She remembers him pondering out loud whether to rape her orally but before she could respond he strangled her again. Complainant 2 stated that she is pretty sure that Andrew Tate's penis was in her mouth for a period of time. There was more strangling while he was doing that and then he reverted back to vaginally raping her.

70. She states that there was more strangling, more sex and more strangling. Andrew Tate "finished" and then went to sleep. She does not think she slept. She recalls being squashed up against the wall in bed. She thinks she stayed there all night not daring to move or get her phone. She must have fallen asleep probably after a few hours. When they woke up, he acted normally and made Complainant 2 make him breakfast. She describes having every intention to run but something broke inside her mentally and she just went numb. She lost her fight and carried on like normal.

71. Complainant 2 recalls being reminded by a friend prior to her interview that she had disclosed the incidents to her friend, that she had said that Andrew Tate ejaculated inside her vagina. She has no recollection of this herself.

72. Complainant 2 did not consent to any sexual activity with Andrew Tate. Andrew Tate did not use protection on either occasion.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**v. Between 1 January 2015 and 1 March 2015 Andrew Tate assaulted Complainant 2, thereby occasioning her actual bodily harm:**

73. This incident stems from the first rape whilst Andrew Tate and Complainant 2 were on the sofa (described in charge iii above). Andrew Tate assaulted Complainant 2 by strangling her before and during the rape as detailed above. Complainant 2 details this starting almost immediately when they got into her house and sat down. Andrew Tate was behind her on the sofa with his arm around the front of her neck in a chokehold. She does not recall trying to get his arm off her neck because she was frightened. In terms of the force used, Complainant 2 says she remembers that it felt like Andrew Tate was going to "*pop*" her head off her body. She remembers sheer panic and says she had never been choked so strongly in her life. With his free hand he tried to pull her trousers down. She feared he would strangle her to death. At times he would release his grip to allow her to breathe but at one point he squeezed too long and she lost consciousness. She regained consciousness when she felt his tears on her face as detailed above. Complainant 2 does not refer to any physical injuries in her police interview, but a witness recalls seeing bruising to her neck when she disclosed the rape to him (as described in paragraph 77 below).

## ASSAULT OCCASIONING ACTUAL BODILY HARM

**vi. Between 1 January 2015 and 1 March 2015 [on an occasion other than that specified in charge 5 (v) Andrew Tate assaulted Complainant 2, thereby occasioning her actual bodily harm:**

74. Complainant 2 describes being strangled as she was raped in the bedroom (described above in charge iv). She does not remember much of the detail and states that she has repressed it in her memory. She recalls fragments. She says the strangling on this occasion was not as

intense as it had been before. Andrew Tate would release her before it got to the point where she thought that death was imminent.

75. For the first 48 hours after he left, Andrew Tate and Complainant 2 exchanged messages. She recalls replying as if she was not upset but she was in fact terrified. She says this was because he knew where she lived. A couple of days later she was angry. She sent him messages that she has shown to Police, telling him that she hopes that he gets raped. He then threatened to rape her again and wait for her in the bushes. Complainant 2 recalls receiving a voice note (which is no longer available) a couple of weeks later from Andrew Tate apologising for raping her.

**CORROBORATION**

76. Although Complainant 2 did not report the allegations to Police at the time, she did make disclosures to friends in the days and weeks following the incident, and then years later in more detail to her partner. These disclosures were made before Complainant 2 reported the offence to Police.

77. Complainant 2 reported the incident to a male friend who provided a witness statement to Police in 2023. In the statement the witness recalls Complainant 2 visiting his house approximately 6 years previously, although he accepts it could have been longer. When Complainant 2 arrived at his house she was visibly distressed and appeared frightened. Complainant 2 told the witness a man had been at her address and subjected her to *"Brutal, rough"* sex that she did not want. The witness recalls Complainant 2 telling her the man had penetrated her from behind, he choked her and she had gone in and out of consciousness. Complainant 2 told the witness she was too frightened to tell the attacker to

stop. The witness recalls he saw Complainant 2 had visible bruising to her neck. From the account he has given, the witness was under the impression the incident had occurred in the preceding day or so. The witness does not remember the name of alleged assailant but does recall at some point he learned the assailant had been on the TV show "Big Brother".

78. Complainant 2 has also disclosed the alleged rape to her partner who in June 2023 made a statement to the Police. Her partner recalls that in early 2015 (the time period of this allegation) he and Complainant 2 were not together and were on a break in their relationship. When the relationship resumed he and Complainant 2 discussed sexual partners they had during the period of their separation. Complainant 2 told him she had met a male through the webcam industry who had been horrible. His impression was Complainant 2 was downplaying the incident. He noticed Complainant 2 had become more withdrawn and emotional in the period they had been separated. He estimates this conversation was about 8 years ago. Sometime later he recalls being at home with Complainant 2 when the TV show "Big Brother" was being advertised on TV. Complainant 2 became distressed about the advertisement and identified a male on the TV as the person she had met when they were separated. At this stage her partner learned this male's name was Andrew Tate. He describes Complainant 2's mental health further declined as Andrew Tate's media profile increased. Complainant 2 decided to report the incident to Police, however before she did, she told her partner more detail about what Andrew Tate had done to her. She described that Andrew Tate had strangled her and had raped her during which she had become unconscious. She described details about the location of her phone during the incident and what Andrew Tate had said to her. Complainant 2 told her partner after the incident she had messaged Andrew Tate to say she hoped he would die and he responded to say he would hide in the bushes near her address.

79. Complainant 2 also disclosed details of the alleged attack to a female friend. This witness provided the Police with a statement in January 2024. She described that approximately 8 years previously she was at her home address talking to Complainant 2 when she began describing an incident which the witness understood had happened in the preceding month or so. Complainant 2 told the witness that she was at her home address and had been subjected to a violent sexual assault, whereby she had been grabbed and choked and told she was getting "*fucked*". The witness recalls Complainant 2 describing her eyes rolling back in her head and pain in her vagina. The witness remembers Complainant 2 playing and forwarding an audio recording received from the alleged assailant in which he said he would rape her again. The witness no longer has the device on which this recording was saved. Unfortunately, whilst Complainant 2's mobile phone contains a voice note, the audio file cannot be accessed. The witness cannot recall the name of the alleged assailant described by Complainant 2 but recalls he used to be a fighter, had a large online presence, had been on the TV show "Big Brother" and was located in Romania.

80. The Police have retrieved messages from Complainant 2's phone between her and another after the alleged rapes and assaults. The messages between her and another show a screenshot of a WhatsApp conversation between Complainant 2 and Andrew Tate. The screenshot includes messages from Andrew Tate threatening to rape Complainant 2 again: *"I might rape you again" "I'll wait outside ur house" "I'm gona be waiting for you" "With a rope" "And a boner" "And I'm gona rape you"*.

81. Complainant 2 also provided the Police with a copy of her communications with Andrew Tate on Twitter, in which Andrew Tate used the Twitter handle @CobraTate, a handle he has returned to using on 'X'. The screenshot provided by Complainant 2 shows a profile photograph of Andrew Tate next to his messages.

**COMPLAINANT 3**

82. Complainant 3 contacted the Police in January 2023 having seen that Andrew Tate had been arrested for similar offences to those she alleges to have experienced, in Romania. There are four charges relating to Complainant 3. The Police interviewed Complainant 3 on 23 March 2023, 11 April 2023 and 19 April 2023 in which she provided an account of the allegations in a video recorded interview as set out below.

**BACKGROUND**

83. In [redacted] Complainant 3 matched with Andrew Tate on Tinder, a dating app. They met for a date in London and at the time Complainant 3 described herself as extremely vulnerable following the breakdown of a relationship. Andrew Tate somehow knew that Complainant 3 had a vulnerability, which caught her off guard and made her confide in him. She confided in him about things that had happened in a previous relationship. Complainant 3 says she trusted him. He was charming and confident; he told her a lot about himself and showed interest in her. At the time she had very little confidence in herself. She had no support network in London and wanted stability in her life, which is what attracted her to Andrew Tate.

84. Complainant 3 and Andrew Tate met again a few weeks later. Complainant 3 and Andrew Tate continued to communicate on Facebook and WhatsApp, although the contact was frequent at first, it later became sporadic and infrequent. Andrew Tate made her think that they were in a relationship. He quickly became controlling and possessive; and would tell

Complainant 3 that she could not speak to other men. He would constantly tell her to obey him and would refer to himself as a *pimp*.

85. Complainant 3 recalls an occasion when Andrew Tate asked her to have sex with other men for money. He told her that she would get paid £3000. He said he found it attractive and that he would want to have sex with her before and after. Complainant 3 was repulsed by the suggestion and refused.

86. Upon reflection, Complainant 3 recognised that she was treated badly by Andrew Tate. At the time she met him, she had low self-esteem and was extremely vulnerable, she felt flattered that someone was interested in her. She did not know if she liked him or was terrified of him.

**CHARGES**

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**vii. Between 3 July 2014 and 7 July 2014 Andrew Tate assaulted Complainant 3, thereby occasioning her actual bodily harm:**

87. Around 4 July 2014, [redacted] Complainant 3 went to a festival with a friend. Andrew Tate picked Complainant 3 up from the festival and took her to his flat in Luton. This was the first time they had been intimate. She recalls that although she initially consented to having sexual intercourse with Andrew Tate, she was surprised at how rough he was, he had not given her any indication that it would be rough. She said that it

was rough because she thinks that he choked her. Complainant 3 was shocked because it was not how she expected it to be. She thought it would be *"...a bit less rough."* She sustained injuries in the form of marks on her neck following the incident. She thinks that he also slapped or spanked her on her buttocks. She recalls feeling like an object.

**RAPE**

**viii. Between 31 August 2015 and 31 December 2015 Andrew Tate intentionally penetrated the vagina of Complainant 3 with his penis, when she did not consent, and he did not reasonably believe she was consenting:**

88. In Autumn or Winter 2015, Complainant 3 had moved house. Andrew Tate phoned Complainant 3 and told her he was on the motorway driving to her house, because wanted to talk to her about becoming a web cam girl; he arrived at her house an hour later. Prior to this she had not had any contact with Andrew Tate for months. By this point Complainant 3 did not want to have sex with Andrew Tate, he was no longer a person that she liked, she had learnt more about him and had realised that he was not a nice person, she feared him.

89. Whilst in Complainant 3's apartment they somehow ended up on her bed having sexual intercourse with his penis inside her vagina. She recalls that he was on top of her with both of his hands around her neck choking her. Complainant 3 says she was scared. She could not breathe very well. She tried to loosen his grip and tried to get his hands off her neck. She thinks it would have been obvious to Andrew Tate that she could not breathe. She cannot be sure but is "*nearly sure*" that she did say stop and that it was hurting her. Andrew Tate just ignored her and continued. He only stopped when he had ejaculated.

90. He degraded her by calling her a "*slut*" and a "*bitch*". It was quite clear that she was uncomfortable, and if anything, it encouraged him. He did not stop to check if she was ok. The sexual intercourse was rough and scary, according to Complainant 3. She believed he did not care how she felt, and she felt like he was going to do what he wanted regardless of how she felt. She felt disgusted and violated during and after the incident. She was relieved when it was over and when he left the next morning. She just did what he said because she thought he would stop hurting her.

91. Complainant 3 initially consented to vaginal sexual intercourse, but she did not consent to choking. Accordingly, when Andrew Tate applied pressure to her neck, any consent previously given to the sexual activity was negated, and the continued vaginal intercourse became non-consensual.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**ix. Between 31 August 2015 and 31 December 2015 Andrew Tate assaulted Complainant 3, thereby occasioning her actual bodily harm:**

92. Whilst Complainant 3 and Andrew Tate were having sexual intercourse in her apartment (as described above in charge viii), Andrew Tate pinned Complainant 3 down and assaulted her by choking her to the point that she struggled to breathe. He was on top of her with his hands around her neck, she tried to loosen his grip with her hands and thinks that she told him to stop. However, he continued. She did not want to be choked; she thought that he was going to kill her. He told her to tell him that she loved him, which she eventually did because she wanted him to stop. Again, she sustained red marks on her neck following the incident.

**CONTROLLING PROSTITUTION FOR GAIN**

x. **Between 1 May 2015 and 2 September 2015 Andrew Tate intentionally controlled the activities of Complainant 3 in relation to her prostitution in any part of the world for or in expectation of gain for himself:**

93. When Complainant 3 and Andrew Tate initially met, he told her that he had a marketing business and that he made his money online. However, as the months went on, it transpired that this was untrue. Andrew Tate started to encourage Complainant 3 to become a cam girl. He said that she would make a lot of money. He offered her £40 per hour. Andrew Tate frequently asked her to move into his apartment, so that she could work with other females as a cam girl. He made it sound like the females had a good lifestyle. Andrew Tate was persistent, but Complainant 3 declined his offer many times. However, Andrew Tate continued to try and recruit her, he knew that she was not financially secure. He also knew that she was vulnerable as set out in paragraph 83 above.

94. Complainant 3 was told that she did not need to do anything sexual or show her body online, she just had to be smart enough to get men to speak to her online in a private chatroom, because the longer they were in the chatroom the more money she could make. She thought that part of her still believed that she was different and that Andrew Tate really liked her. He used to tell her that she was intelligent knowing that it would flatter her. Complainant 3 says that after a while she started to think that if what Andrew Tate was saying was right, she could do this and just talk to people online. The figure he mentioned was a lot of money to her at the time. Complainant 3 eventually agreed but only if she could work from her own house. Andrew Tate managed the whole operation. He told Complainant 3 that he

would take a small percentage of the earnings to cover administrative and marketing fees, and she would be paid either weekly or fortnightly. Andrew Tate created an account for Complainant 3 with a website called *AdultWork*.

95. Andrew Tate would message Complainant 3 whilst she was online in the chatroom to give instructions and tips on how to keep men in the private chatroom. She would talk to people through a webcam whilst she was sat at home in her bedroom in her underwear. After a week or so, it became apparent that she would have to take her clothes off if she wanted to make money. It was hard to keep users in the private chatroom because they wanted her to perform sex acts, which she initially refused to do.

96. Andrew Tate sent Complainant 3 videos of other women that he employed performing and using sex toys. He suggested that she would need to do the same if she wanted make money. Complainant 3 reluctantly agreed and did perform the sex acts requested by men online. Complainant 3 felt pressured to do things that she did not want to do, which left her feeling disgusted and deeply ashamed.

97. The sex acts performed by Complainant 3 on camera include what she describes as "*doing pornographic things, taking her clothes off, touching herself and things like that*". She was asked to take her bra off, to move around the room in different positions and to show her buttocks. Things progressed with the men wanting to see more of her body and her taking more of her underwear off. They would ask her to move the laptop around so they could see different parts of her and see her doing different things for example, using a sex toy.

98. Complainant 3 says that pressure was put on her to spend more time online. She says it seemed like targets were being set and she was being pressured to do more, to spend more time online and make more money. Andrew Tate would tell her how much money the other females were making and when she was not getting the same results she wondered why. This is when she started to do things that she was not comfortable with, because she was trying to prove that she was capable.

99. Andrew Tate suggested to Complainant 3 that she could earn £3,000 by having sex with a stranger. He would drop her off and pick her up afterwards. Complainant 3 was disgusted by this suggestion and refused to do this. His argument was that girls went out and slept with men all the time for free so why would Complainant 3 not do it and get paid for it.

100. Complainant 3 recalls receiving approximately £200 after a week or two for the work that she did but recalls that she was not provided with a description of what it was for. She does not remember receiving any money after this and was told that there had been an issue with her payments; by this point she was being managed by another woman (whose name she could not recall) employed by Andrew Tate who monitored her when she was online, which she added to the pressure. When Complainant 3 stopped receiving payment from Andrew Tate, she cut all ties and no longer worked for him. She felt disgusted that someone else had profited from her doing work that she had not wanted to do in the first place. Banking evidence shows that Complainant 3 was mistaken and received more than £200.

101. Andrew Tate contacted Complainant 3 in 2017 to offer her a job as a studio manager (to manage the girls that were working for him). Complainant 3 was not interested and declined the offer; following this she had no further contact with Andrew Tate.

**CORROBORATION**

102. Corroborative evidence includes Facebook messages between Complainant 3 and Andrew Tate telling her "*I'm gonna strangle you asleep before I cum*", to which she replied "*I'm scared. And excited. Not sure how I feel right now*". In a further exchange of messages, which have been recovered from a mobile phone belonging to Andrew Tate (Exhibit AT01 referred to in paragraph 195 below), Complainant 3 told Andrew Tate *not to rape her* and asked Andrew Tate *not to hit her with a belt*. Banking evidence also shows that Complainant 3 received several payments from Andrew Tate during the period she was exploited to perform sex work online for Andrew Tate.

103. In 2014 and 2015 Complainant 3 disclosed some of the allegations to a friend. The friend subsequently provided a statement to the Police regarding the disclosure.

**ADDITIONAL CHARGES**

104. The charges numbered one (represented by xi above) to thirteen (represented by xxiii above) in the warrant issued on 5 August 2026 concern three further Complainants (Complainant 5, Complainant 6 and Complainant 7). A summary of the evidence is set out below (in the order they have been referred to in the arrest warrant).

## COMPLAINANT 7

105. Complainant 7 was contacted by Police in March 2025. She provided the Police with a formal account in a video recorded interview on 14 July 2025, as summarised below. There are eight charges concerning Complainant 7.

## BACKGROUND

106. Complainant 7 met Andrew Tate and Tristan Tate [redacted] at a nightclub in London. She exchanged telephone numbers with Andrew Tate, and they met the following day for breakfast. Following this they started a relationship and would see each other regularly. She believed the relationship was exclusive. He would attend her address in [redacted], and she would visit his address, a ground floor apartment in Luton. Andrew Tate was a kickboxer when they met. They were in a relationship for approximately a year.

107. Complainant 7 was 20 years old at the time she met Andrew Tate. She believes Andrew Tate was around 25 years old. She reflects that she was young and naïve during their relationship and Andrew Tate had a dominant personality, she felt he was powerful and mysterious.

108. Complainant 7 has stated there was violence in the relationship. This took place at Andrew Tate's Luton address. Examples of the non-sexual violence committed by Andrew Tate during this period included: Andrew Tate holding a samurai sword to her throat and forcing her to do housework, such as his ironing. He would film himself making threats

and would then play it back to her. He would shout abuse at her, calling her a "*stupid bitch*" or "*stupid hoe*".

109. Whilst they were in a relationship, Andrew Tate acquired a '*pimp cane*'. This was a cane with a cobra head on it which he would carry around with him. He would threaten Complainant 7 with the cane and demand that she kissed the head of the cane.

110. When they would have sex, Andrew Tate wanted to play the "*daddy*" role and would have her wear clothing of young girls like frilly socks. Both Andrew Tate and Tristan Tate would joke in front of Complainant 7 that they were paedophiles and that they liked little girls.

111. Complainant 7 describes their sexual relationship as "*rapey sex*". She recalls thinking he could not get an erection unless he was raping her. This would take place at Andrew Tate's Luton apartment. He would strangle Complainant 7 causing her to lose consciousness a lot during sex.

112. Not long before they split up Andrew Tate asked Complainant 7 to be his '*bottom bitch*', but she declined. Complainant 7 states that '*bottom bitch*' is pimp parlance for a woman who is tasked to recruit prostitutes and to keep them in line. Complainant 7 states this was after Andrew Tate had broken his hand fighting so was looking for other avenues of work.

113. The relationship lasted approximately 12 months and ended [redacted] when Complainant 7 learned that Andrew Tate had been seeing someone else.

114. Complainant 7 moved on, met someone else, and got married [redacted]. Andrew Tate sent Complainant 7 occasional emails. He invited her to eastern European countries and attend business meetings with him which she refused. He sent her an email saying he wanted to rape her, Complainant 7 deleted this email as she did not want her husband to see it.

115. In 2017 Complainant 7 responded to one of Andrew Tate's emails. This resulted in dialogue between the two culminating with him travelling to meet her in England. They visited a hotel. When they were leaving, he grabbed her by the throat in a lift and forcibly kissed her. After this initial meeting he then '*love-bombed*' her, seeking fast-paced commitment.

**CHARGES**

**RAPE**

**xi. Between 1 November 2011 and 31 October 2012 Andrew Tate intentionally penetrated the vagina of Complainant 7 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

116. Complainant 7 outlines a specific incident within Andrew Tate's apartment in Luton where Andrew Tate choked her unconscious and continued having sexual intercourse with her whilst she was unconscious. He would put all his weight on her from behind. A lot of their sex involved Complainant 7 lying on her front and then Andrew Tate would place his whole bodyweight on her and then reach around and grab her throat. As a result of being strangled Complainant 7 would pass out and convulse, however he would continue having sex with her after she had been rendered unconscious.

**RAPE**

**xii. Between 1 November 2011 and 31 October 2012 Andrew Tate on not less than 3 occasions and on an occasion other than that specified in charge 1 (xi above), Andrew Tate intentionally penetrated the vagina of Complainant 7 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

117. This charge relates to Andrew Tate vaginally raping Complainant 7 on multiple occasions at his apartment in Luton. During intercourse he would choke her and she would become unconscious, however he continued to have sexual intercourse with her after she had been rendered unconscious. These incidents occurred on occasions other than that described in charge xi above. Complainant 7 describes it was not what she wanted to happen. She recalls she would fit / convulse following strangulation and would lose consciousness. Andrew Tate would be penetrating her when she regained consciousness. This happened four or five times from November 2011 and made Complainant 7 feel scared, weak, small and helpless.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**xiii. Between 1 November 2011 and 31 October 2012 Andrew Tate assaulted Complainant 7, thereby occasioning her actual bodily harm:**

118. This incident follows on from the incident described in count xi above. During sexual intercourse at his apartment in Luton, Andrew Tate choked Complainant 7 until she lost consciousness, thereby occasioning her actual bodily harm.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**xiv. Between 1 November 2011 and 31 October 2012 on not less than 3 occasions and on occasions other than that specified in charge 3 (xiii above), Andrew Tate assaulted Complainant 7, thereby occasioning her actual bodily harm:**

119. This charge relates to Andrew Tate choking Complainant 7 on multiple occasions at his Luton apartment until she lost consciousness (on occasions other than that described in charge xiii above.

120. During sexual intercourse Andrew Tate would put all his weight on her from behind. Complainant 7 would be lying on her front and then Andrew Tate would place his whole bodyweight on her and then reach around and grab her throat causing her to lose consciousness.

**RAPE**

**xv. Between 1 April 2017 and 30 April 2017 Andrew Tate intentionally penetrated the vagina of Complainant 7 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

121. This charge relates to a specific incident. In 2017 Complainant 7 had a "*lapse in judgment*" as she responded to one of Andrew Tate's emails and then ended up in dialogue. This resulted in Complainant 7 meeting Andrew Tate in England where she was living. They visited hotels and restaurants in the area. On the occasion leading to this charge, they were checked into a hotel; the room allocated had two single beds. As soon as they walked into the room Andrew Tate grabbed Complainant 7 by the throat, threw her on the bed face down and then had vaginal sex with her whilst choking her. She lost consciousness. Complainant 7's recollection is that Andrew Tate was probably having sex with her when she came round. There was no discussion and no foreplay before the attack.

**RAPE**

**xvi. Between 1 April 2017 and 30 April 2017 Andrew Tate intentionally penetrated the mouth of Complainant 7 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

122. This charge relates to an incident which occurred immediately following the vaginal rape described above in the hotel room (charge xv above). Following the vaginal rape in which she lost consciousness Andrew Tate forced Complainant 7 to perform oral sex on him. Due to the amount of force Andrew Tate was exerting on Complainant 7's head she vomited.

## ASSAULT OCCASIONING ACTUAL BODILY HARM

**xvii. Between 1 April 2017 and 30 April 2017 Andrew Tate assaulted Complainant 7, thereby occasioning her actual bodily harm:**

123. This charge relates to the specific incident described above at charge xv and xvi. Andrew Tate and Complainant 7 walked into the hotel room, Andrew Tate grabbed Complainant 7 by the throat and threw her on the bed face down. He then had vaginal sex with her and choked her causing her to lose consciousness.

## HUMAN TRAFFICKING

**xviii. Between 27 April 2016 and 18 August 2017 Andrew Tate and Tristan Tate arranged or facilitated the travel of Complainant 7 with a view to her being exploited:**

124. This charge relates to Andrew Tate and Tristan Tate arranging and facilitating travel for Complainant 7 to Romania to work for them as a cam girl by pressuring her to perform sexual acts online in exchange for money.

125. Andrew Tate encouraged Complainant 7 to leave her husband and for her to move in with him in Romania. He told her he loved her. He said she would live with him and another female in a big house and lead a lifestyle of eating out and partying. He promised she would have her own money, she would not have to do webcam work (online pornography), but

she could if she wanted to earn money. She was told if she did the webcam work, she would keep 80% of her earning and Andrew Tate would keep 20% to cover overheads.

126. Eventually Complainant 7 agreed to go to Romania. Andrew Tate booked her flight and in June 2017 she flew to Romania. Andrew Tate, Tristan Tate and another female from the house collected her from the airport. When she arrived, she was taken to a house where there were four or five other young females staying. There were webcams set up in the rooms, and each room was made to look like a bedroom. [redacted] was there too; she was running the business.

127. The time in Romania was not what Complainant 7 had been promised. She was working on camera often for 12 hours a day. Others in the house, including Andrew Tate and Tristan Tate would control the chat function on the webcam broadcast and would accept payment for sex acts for Complainant 7 to carry out on camera irrespective of Complainant 7's agreement. They controlled everything she did. She describes there was a complete disregard for her autonomy and consent to carry out sexual acts on camera. Complainant 7 had made it clear that she did not want to do any anal activity, but this was ignored Tristan Tate and others controlling the webchat would accept payment for Complainant 7 to carry out anal sex acts – including inserting sex toys in her anus, she would be pressured into doing them. She did not feel like she was allowed to say no. One time Complainant 7 had to "*fuck a bed knob for an hour*." She describes it felt like sexual slavery.

128. In contrast to the indication Complainant 7 had been given before she travelled, Complainant 7 was only allowed to keep 20% of her earnings and had to pay her own living

expenses. The banking documentation obtained specifically references Tristan Tate's payments to Complainant 7 during the period she was in Romania.

129. Complainant 7 had sex with Andrew Tate whilst in Romania out of obligation. This happened frequently. Complainant 7 would sleep in her studio room so she did not have to share a room with Andrew Tate who would demand sex from Complainant 7.

130. Andrew Tate used violence against Complainant 7 and other females in the house whilst in Romania. Complainant 7 was thrown in the pool, choked, tripped, slapped and left on the floor unconscious. She describes the brothers would make death threats to her and the others living there. Those living in the house were subject to an environment of intimidation and control, causing them to feel fearful of Andrew Tate and Tristan Tate.

131. Her movements were restricted and controlled by Andrew and Tristan Tate, she recalls being hungry and wanting to go to a McDonalds restaurant, it was made clear to her this was not allowed. She feared for her personal safety, felt isolated and alone.

132. After approximately three months Complainant 7 left Romania in August 2017. She booked a flight and waited until Andrew Tate was out. She ran to [redacted]'s apartment and came up with an elaborate lie saying she had to go return to the UK as her mother was in hospital.

133. The whole experience has massively affected Complainant 7's life and mental health. It was only when Complainant 7 reflected following Andrew Tate's growth to fame that she realised that she had been trafficked.

## CORROBORATION

134. Prior to her disclosure to the Police about Andrew Tate's conduct, on 27 September 2024 Complainant 7 disclosed to her ex-husband that she had been trafficked by Andrew Tate. Complainant 7 has provided this text message to the Police. Complainant 7 had also disclosed details about her experiences with Andrew Tate to her friends. Some of the disclosure is retained in text messages recovered from digital devices.

135. In support of Complainant 7's account that Andrew Tate had a predilection for choking during sex, Complainant 7 has supplied a photograph saved on her phone from the period of the relationship, in the photograph Complainant 7 is pictured with a hand around her throat. Complainant 7 states the hand on her throat in the picture is Andrew Tate's. A further photograph supplied by Complainant 7 shows her in bed with Andrew Tate - Andrew Tate's face is visible in this photograph.

136. Email correspondence has been provided which demonstrates the contact between Complainant 7 and Andrew Tate in the period before she left for Romania in 2017. The emails show that Andrew Tate emailed the Complainant in 2013, 2014, 2016 and 2017. In 2013 he asked how she was and asked her to accompany him on a business trip to Kosice, he said she would spend three nights clubbing. She refused. In 2014 he asked for Complainant's phone number, she refused. He emailed her again in 2014 asking her to be a webcam girl on his webcam platform, he told her fully clothed girls made £700-£1000 per week, she refused. Later in 2014 he unsuccessfully tried again to obtain her phone number and persuade her to do webcam work and this time said she would earn £1500-£2000 per week. In April 2017 Andrew Tate emailed Complainant 7 prior to her leaving for

Romania. He told her she did not need to do webcam work in Romania if she did not want to, "*daily life would be perfect*", she was his "*Number 1*" and he felt excited at the prospect of them being around each other. Complainant 7's email shows she was unsure about the prospect of going to Romania.

137. In relation to her time in Romania Complainant 7 has provided details of her flights to and from Romania. Banking documentation has been obtained which shows the payments Complainant 7 received from Tristan Tate during the period she was in Romania. The banking documentation shows between 4 July 2017 and 26 August 2017 Complainant 7 received four payments from Tristan Tate totalling £2,711.01. A further payment scheduled to take place on the 8 September 2017 for £128.18 was cancelled and Complainant 7 did not receive the money.

138. Finally, the Police have obtained copies of the invoices showing Andrew Tate stayed in hotels and ate in restaurants near Complainant 7's hometown in England in April 2017.

**COMPLAINANT 5**

139. Complainant 5 was contacted by the Police in February 2025. There are three charges that relate to Complainant 5. She provided a formal account to the Police in November 2025 in a video recorded interview as set out below.

**BACKGROUND**

140. Andrew Tate contacted Complainant 5 on social media in [redacted]. Complainant 5 was 20 or 21 years old at the time. They met at a cocktail bar in England. Complainant 5 described Andrew Tate as confident, cocky and charming; they spoke and met often and started dating.

141. Andrew Tate strangled, slapped and hit Complainant 5 throughout their relationship (within a sexual and non-sexual setting). There was never any discussion or agreement about being hit or strangled. She had to do what he wanted or there would be consequences. Andrew Tate never enquired how Complainant 5 felt about the rough nature of their sexual relationship. Following sexual intercourse with Andrew Tate, Complainant 5 often recalls having bruises and her vagina being raw, sore and painful. Complainant 5 feared Andrew Tate, but after he would hurt her, he would tell her that he loved her.

142. Reflecting on her relationship with Andrew Tate, Complainant 5 realised that the way he treated her was wrong. Complainant 5 described herself as vulnerable and lacking in confidence. Andrew Tate would tell her that he loved her and could see a future with her, he would "*love bomb*" her. She recalls feeling scared and uncomfortable but at the same time she thought it is what love was supposed to be like. At the time she was also unaware that it was rape if you told someone to stop during sexual intercourse and they continued.

**CHARGES**

**RAPE**

**xix. Between 1 April 2015 and 30 March 2016 Andrew Tate intentionally penetrated the vagina of Complainant 5 with his penis, when she did not consent and he did not reasonably believe that she was consenting:**

143. Not long after they started dating [redacted], Andrew Tate took Complainant 5 to his apartment in Luton. Tristan Tate was there and they all started drinking together. Complainant 5 wanted to have sex with Andrew Tate and recalls being very drunk. This would have been the first time Complainant 5 and Andrew Tate had sex; she was his girlfriend by this point. Andrew Tate and Complainant 5 went into Andrew Tate's bedroom. They started having sexual intercourse with his penis in her vagina, which she consented to.

144. Andrew Tate started to become quite rough during intercourse; he started hitting and slapping Complainant 5. He started by slapping her on her face and body which was quite rough, she did not like it, she told him that she did not like it; he then responded by grabbing her head and pulling it back and hitting her again because she was not complying with what he wanted her to do. He turned her over and hit her on her buttocks, which left her with red marks the next day. He then flipped her over again and put his hands around her neck and choked her so she could not breathe. She was scared. She remembers trying to get his hands off her neck (which she indicates by clawing at her neck), he then stopped strangling her, grabbed her hands and pinned them down and continued until he ejaculated; she recalls his

weight on her chest and hands (indicates hands/arms being pinned back) whilst he continued having sex with her. She recalls the incident going on for a long time and wanting it to end. Complainant 5 wanted him to stop, she did not tell him to stop, she says that she just let it happen. Complainant 5 was too scared to sleep that night, she just wanted to go home and never see Andrew Tate again.

145. Complainant 5 thought that they were just going to have normal sex. She did not consent to the force used by Andrew Tate during intercourse. Complainant 5 initially consented to vaginal sexual intercourse, but she did not consent to being slapped, hit or choked. Accordingly, when Andrew Tate slapped, hit and choked her, any consent previously given to the sexual activity was negated, and the continued vaginal intercourse became non-consensual. Complainant 5 recalls sustaining big red marks like bruising all over her body, around her legs and buttocks following the incident. They had no discussion beforehand about strangulation or hitting.

146. After this incident Complainant 5 stopped seeing Andrew Tate, she felt uncomfortable with the way he treated her that night, she felt scared and intimidated. Despite Complainant 5 not wanting to see Andrew Tate, he still messaged her on Instagram and sent her text messages telling her that he loved her and wanted to be with her. Complainant 5 referred to Andrew Tate love bombing her. They met in a hotel bar near South Kensington some weeks later. It was during this evening that Andrew Tate disclosed to Complainant 5 that he owned a webcam agency and had girls that worked for him as prostitutes. He said that it was legal.

147. During this period, Complainant 5 was vulnerable and her living situation was not ideal. As result of this, Andrew Tate attempted to recruit her. He told her that she could earn £2,000 per week for doing nothing, it was easy money for just talking to people online. She reluctantly agreed to let him show her how it worked. Andrew Tate signed Complainant 5 up to *ModelStars* and showed her how it worked. After being in a chat room for a few minutes someone recognised her, because of this Complainant 5 was clear that it was not something she wanted to do.

148. Following this Andrew Tate continued to contact Complainant 5. He told her that he loved her and wanted to help her financially. He sent her a photograph of a female that worked for him and told Complainant 5 that she could earn double what the female earnt. They ended up falling out over the photograph, Andrew Tate had told Complainant 5 that he was sleeping with the female in the photograph.

**RAPE**

**xx. Between 1 April 2015 and 30 March 2016 Andrew Tate intentionally penetrated the vagina of Complainant 5 with his penis, when she did not consent and he did not reasonably believe that she was consenting.**

149. Andrew Tate continued to contact Complainant 5, and about a month or so later they met up at another hotel in London. Andrew Tate reassured Complainant 5 that he was not sleeping with the female in the photograph, that she only worked for him. Again, he told Complainant 5 that he loved her, wanted to be with her and wanted her to go to Romania with him.

150. Complainant 5 and Andrew Tate went to a room in the hotel in which they started having sexual intercourse. During intercourse Complainant 5 could not stop thinking that Andrew Tate was also sleeping with the female in the photograph; she no longer wanted to have sex with him, so she told him to stop. Andrew Tate was on top of Complainant 5 having sex with her when she told him to stop, she recalls trying to push him off and telling him to stop, however he did not stop. He got her hands and pinned them down and he continued to have sex with her. Complainant 5 just lay there until he was finished. She recalls feeling sore and uncomfortable afterwards. Complainant 5 vividly recalls telling Andrew Tate to stop on this occasion. Complainant 5 initially consented to vaginal sexual intercourse, but she told him to stop and tried to push him off her. Accordingly, when Andrew Tate continued to have sexual intercourse following her instruction to stop, any consent previously given to the sexual activity was negated, and the continued vaginal intercourse became non-consensual.

151. Again, they did not speak for about a month or so following this incident. Andrew Tate would still message Complainant 5 on different platforms, he would message her using multiple different accounts on Facebook and Instagram, he would also send her text messages and call from different phone numbers. She recalls ignoring him a lot of the time. Andrew Tate would continue with his usual spiel that he loved and wanted her back and that she could be his wife if she obeyed him. He invited her to go to Romania with him under the pretence that it would be the two of them spending time together on holiday. In 2016 Complainant 5 agreed to go to Romania with Andrew Tate based on his promises.

## HUMAN TRAFFICKING

**xxi. Between 31 July 2015 and 30 March 2016 Andrew Tate and Tristan Tate arranged or facilitated the travel of Complainant 5 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel.**

152. Andrew Tate booked and paid for Complainant 5's trip and she flew to Romania. Andrew Tate was meant to be travelling with Complainant 5 but at the last minute she had to travel without him because he said that he was already there. She was met by Tristan Tate and another female at the airport and was driven to the apartment. There were three females at the apartment. That night they all consumed alcohol in a hot tub. Andrew Tate then told the females to get to work and accompanied them into a room. Complainant 5 was told to stay with Tristan Tate in the other room.

153. Tristan Tate was working on his laptop (on the webcam platform), when he asked Complainant 5 to try webcamming. Complainant 5 refused and told him that she had made it clear to Andrew Tate that she was not participating. He told her that she was going to have to do it, all she had to do was sit there. So, she sat there whilst Tristan Tate typed to men online, he then told her to pretend that she was typing. She was fully clothed sat on the bed at this point. Complainant 5 was given a keyboard but was not typing convincingly, which annoyed Tristan Tate. He told her she needed to do it properly. He then told her that a man online wanted her to take her top off. She refused. She had only met Tristan Tate a handful of times before this and felt uncomfortable.

154. Tristan Tate then left the room and Andrew Tate entered; Complainant 5 recalls being pinned up against the wall by Andrew Tate, he put his hand around her neck and told her to do as Tristan Tate told her, "*you do what the captain says. You fucking do what he says*". She was really scared so she got back onto the bed and took her top off. Complainant 5 became very distressed during this incident and started crying, because of this they stopped.

155. That night she slept in the same room as Andrew Tate and another female. The female was drunk and was passed out on the bed next to Complainant 5. Complainant 5 recalls fearing Andrew Tate when he came into the bedroom, he started kissing her, took her clothes off and started having sexual intercourse with her (Complainant 5), she did not want to have intercourse with him, but she just lay there and let him do it. This does not form part of the charge but shows the level of control Andrew Tate had over Complainant 5.

156. On the second night, Andrew Tate told the females to get to work, Complainant 5 refused and told him that she was not there to work. Andrew Tate verbally threatened her and told her to get ready, so she did because by this point, she was utterly terrified of him. He told her that she was going to be in the room with the other two females. Andrew Tate was in the same room, typing on the laptop. There were people logged onto the chatroom watching them on the laptop. Andrew Tate instructed them all to perform oral sex on each other, they all did as they were instructed, including Complainant 5. Complainant 5 did not consent to this, she did not want to participate, she felt uncomfortable.

157. Following this, Complainant 5 physically vomited in the bathroom and spent the night in the bathroom with the door locked. Complainant 5 told Andrew Tate that she did not want to be there anymore. He told her that she was not allowed to leave; Andrew Tate had

her passport, he had taken this off her when she arrived in Romania under the pretence that he needed it to book flights for the two of them to go on holiday. Complainant 5 realised that Andrew Tate did not love her, he only wanted to make money off her. He initially refused to let Complainant 5 go home but eventually agreed after she told him that her family knew that she was in Romania with him.

158. On the same day Andrew Tate took Complainant 5 to an apartment complex which she thought was a brothel where he persisted to try and convince her to stay. When Complainant 5 refused, Andrew Tate became angry and threatened to kill her and her family if she told anyone what happened. He then drove her to what she thought was a service station and returned her passport. She was driven to the airport by a man who did not speak English. She felt sick and was terrified the entire journey. She got on a plane and went home.

159. Complainant 5 went to Romania for the sole purpose of spending time with her boyfriend, Andrew Tate. She did not expect to be in an apartment with Tristan Tate or other women, nor did she expect that she would be forced and threatened to perform sexual acts on a webcam. The last time she saw Andrew and Tristan Tate in person was in Romania. Andrew Tate has been jointly charged with Tristan Tate in respect of this offence.

## CORROBORATION

160. The Police have obtained a screen recording of Facebook messages between Complainant 5 and Andrew Tate in October 2015, November 2015 and June 2016, where he states that he is a *pimp,* and persistently tries to recruit Complainant 5 to work for him

"*You don't have to do shit but sit there and talk*" "*Nothing else*". "*I guarantee u 2k a week and free place to live*".

161. On 20 November 2015 he sends a photograph of a female to Complainant 5 stating "*sits at a computer gets 5K a week*" and "*… plus she gets fucked by me. Dream life obviously*" "*You would make double that*".

**COMPLAINANT 6**

162. Complainant 6 was first contacted by the Police in January 2025. She provided the Police with her evidential account in June 2025 in a video recorded interview as summarised below. There are two charges that relate to Complainant 6.

**BACKGROUND**

163. Complainant 6 met Andrew Tate through Tinder in [redacted]. In her video recorded interview she [redacted]. Other evidence demonstrates that she met Andrew Tate [redacted]. They went on a first date to a cocktail bar or restaurant in [redacted]. Andrew Tate picked her up in his BMW motor vehicle. The plan was for Andrew Tate to take Complainant 6 home after the date as she was at work the next day. Instead, Andrew Tate suggested that they stay in a hotel. Complainant 6 agreed but made it clear that she would not have sexual intercourse with him. Andrew Tate did not attempt to have sexual intercourse with Complainant 6 on that occasion.

164. Complainant 6 was 21 years old at the time she met Andrew Tate. Andrew Tate told Complainant 6 to write him love letters expressing how deeply in love she was with him and how she adored him. He did not reciprocate. She reflects that she was young and very vulnerable; at that point in her life she felt completely alone, she was experiencing family difficulties, had left a difficult romantic relationship and had no friends she could turn to. She believes that Andrew Tate picked up on this vulnerability. He made her feel like she had someone in her corner. Instead, he lied to her and exploited her vulnerability.

165. After giving her evidential account Complainant 6 expressed that she's now ten years older and ten years wiser but when she looks back at herself at 21 years of age, she realises that it was a horrible experience. She says she would never wish for anybody to go through it in the way that she did.

**CHARGES**

**RAPE**

**xxii. Between 1 June 2016 and 3 September 2016 Andrew Tate intentionally penetrated the vagina of Complainant 6 with his penis, when she did not consent and he did not reasonably believe that she was consenting:**

166. During the period 1 June 2016 and 3 September 2016, Complainant 6 believed that she and Andrew Tate were dating. He was staying at a hotel in Luton during this period and Complainant 6 would visit him there after she finished work and would regularly spend the night with him. The pair had vaginal sexual intercourse on multiple occasions at the hotel.

Complainant 6 explains that the sexual intercourse was "*always on his terms*", "*very aggressive*", "*always very violent*" and says "*it was always about him being in charge, him being in power, him being able to overpower you in those situations*".

167. Complainant 6 explains that the act of sex itself was always very forceful but consensual. However, the violence within the sex was never consensual. She explains that when Andrew Tate had vaginal intercourse with her from behind, he grabbed the back of her head and pushed her face down into the bed. She remembers trying to lift her head up, but Andrew Tate kept pushing her face back down onto the bed so she was unable to breathe.

168. Complainant 6 initially consented to vaginal sexual intercourse, but she did not consent to choking or suffocation. Accordingly, when Andrew Tate applied pressure to her neck or pushed her face into the bed so that she could not breathe, any consent previously given to the sexual activity was negated, and the continued vaginal intercourse became non-consensual.

169. There was no discussion before or after the violence took place, there was no care or tenderness shown towards her afterwards.

**HUMAN TRAFFICKING**

**xxiii. Between 1 June 2016 and 30 March 2017 Andrew Tate and Tristan Tate arranged or facilitated the travel of another Complainant 6 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel:**

170. This charge relates to Andrew Tate and Tristan Tate arranging and facilitating travel for Complainant 6 to Romania to work for them as a cam girl by exploiting her to perform sexual acts online in exchange for money.

171. Andrew Tate recruited Complainant 6 to work as a cam girl in his and Tristan Tate's webcam business based in Romania. He achieved this by telling her she would be his girlfriend and that she could make money from doing webcam work without taking her clothes off. He showed her a webcam site of another female who was clothed and earning money. He put the prospect of her being his girlfriend and doing webcam work forward as an exciting opportunity.

172. On 2 September 2016, Complainant 6 left the UK for Romania believing she would be in an exclusive relationship with Andrew Tate. Complainant 6 did not book or pay for the flight and is not sure who did. However, she recalls being met at the airport and taken to the house in Romania by Tristan Tate and a female called [redacted].

173. When Complainant 6 arrived at the house, her passport was taken from her and locked away. Andrew Tate was present at the house and seemed pleased to see her. Andrew Tate

showed her around the house, and she recalls seeing an area with lots of screens and keypads. She was shown to her bedroom and told that she was to share a bed with Andrew Tate and another female. At this point she still believed she was Andrew Tate's girlfriend.

174. The reality of Complainant 6's life in Romania differed from the promises: she was lured to Romania with a promise of being Andrew Tate's girlfriend - he had no intention of being in a relationship with Complainant 6 and within two months of her arriving in Romania, he sent her a text message saying that she was no longer his girlfriend.

175. Complainant 6 acknowledged that she expected to do some clothed webcam work from Romania. However, within 24 hours of arriving in Romania, she was made to perform naked on webcams. She often worked a minimum of nine hour days doing webcam sex work; others (usually [redacted] but sometimes Tristan Tate) controlled the webchat and accepted payments for sex acts regardless of her agreement. As well as the webcam work, she was required to produce bespoke pornographic videos for Andrew and Tristan Tate's subscribers.

176. Complainant 6 describes some of the sexual acts she was required to do on camera for payment, including spanking her buttocks and spanking her vagina – she would be instructed on how hard she was to hit herself; suck a sex toy on camera; wear nipple clamps, a gag or sex toys. Complainant 6 had not engaged in anal sexual activity before she was trafficked to Romania. She also engaged in digital anal penetration of other females. On one occasion it was pre-agreed that she would behave like a three-year-old and recalls coming off the Skype chat and sobbing because she felt really dirty.

177. She recalls Tristan Tate and [redacted] taking her to Ikea and purchasing items for her webcam room to make it look like she was a girl in the UK working from her own bedroom. They also purchased a transparent plastic chair which Complainant 6 was told to use to film herself engaging in sexual activity.

178. Complainant 6 describes being required to make bespoke sexual videos depicting herself urinating in the shower. The videos were requested by Andrew Tate and Tristan Tate's subscribers; she did not have the option to refuse the requests because others controlling her messages agreed on her behalf.

179. Complainant 6 explains there was a culture of fear in the house, the girls had to do as they were instructed.

180. Complainant 6 alleges that Andrew Tate orally raped her whilst in Romania. That offence cannot be charged in England and Wales due to jurisdictional issues, however, it is relevant insofar as it demonstrates a course of conduct involving the use of violence, whether sexual or otherwise, to coerce and control Complainant 6. Having entered the bedroom where Complainant 6 was made to share a bed with Andrew Tate and another female, he said to complainant 6 "*you are going to suck my dick*". Complainant 6 was frightened and moved onto the floor beside the bed. She did not agree to perform oral sex on Andrew Tate; he grabbed hold of her head and forced her face towards his genitals. She performed oral sex for approximately five minutes after which he told her she was "*shit*" and made her massage his shoulders whilst another female performed oral sex on him.

181. Andrew Tate committed non-sexual violent acts towards Complainant 6. Whilst in Romania he made it clear that he did not like Complainant 6 smoking and on one occasion when he challenged her about it, she initially lied and said that she had not been smoking, she quickly admitted the truth as she was frightened. Andrew Tate grabbed her by the throat and lifted her off the floor. He told her not to disrespect him, that he would send her home and threatened to kill her if he caught her again. She describes being petrified. She had marks on her neck which lasted a day or two. She explained that Andrew Tate was very good at making everyone aware that he was a kickboxing champion and he "*made you feel small and weak*".

182. On another occasion Complainant 6 had been abandoned by Andrew Tate in a nightclub in Bucharest. She sent him a message complaining but then was terrified of the repercussions. Tristan Tate told her to apologise to Andrew Tate as he (Andrew Tate) was fuming. Andrew Tate said she was lucky he liked her – if she was any other girl, he would send her back to the UK.

183. Andrew Tate and Tristan Tate manipulated the trafficked females by creating a culture of belonging to a family in Romania; the trafficked females wanted to please Andrew Tate and Complainant 6 confirms that she sought validation from him. The threat of being sent back to the UK carried with it a sense of failure and lack of validation. Andrew Tate and Tristan Tate also praised any female who made big money and would belittle those who made less.

184. On 17 March 2017, Complainant 6 fled back to the UK. She told Andrew Tate and Tristan Tate that she was attending a funeral. She booked the flight ticket on 8 March 2017

and was made to purchase a return flight for 18 March 2017. Complainant 6 did not use the prebooked return portion on 18 March 2017, and the same day she told Andrew Tate that she would not be returning to Bucharest. Andrew Tate suggested that she continue doing webcam work from a flat [redacted]. Complainant 6 had left her belongings, some of which had sentimental value attached to them, at the house in Romania; to enable her to safely return to recover her belongings she ostensibly agreed to Andrew Tate's proposal of working from a flat [redacted] but in reality, had no intention of doing so. She was collected from the airport by Tristan Tate and [redacted]. Tristan Tate would not speak to her, and [redacted] told her that Tristan was "*disappointed*" with her. When being taken back to the airport to return to the UK Tristan Tate told Complainant 6 that she was a "*piece of shit*" for leaving them.

185. After finally leaving Romania Complainant 6 did not undertake any further webcam work. She blocked Andrew Tate, Tristan Tate and [redacted] in her phone contacts list and on all social media sites.

**CORROBORATION**

186. Evidence obtained from *MyFreeCams* confirms that Complainant 6 signed a *MyFreeCams* agreement on 27 August 2016.

187. Complainant 6's bank accounts have been reviewed and reveal that on 2 September 2016 she made non flight purchases at [redacted] airport. Thereafter, bank transactions all take place in Romania until she returns to the UK on 17 March 2017.

188. A screenshot of a message sent by Complainant 6 to Tristan Tate dated 11 March 2017 asking for permission to go out and buy a new phone has been obtained.

189. Enquiries with Wizz Air reveal that Complainant 6 booked her first flight back to the UK on 8 March 2017. She boarded the flight departing Bucharest Henri Coanda airport in Romania bound for [redacted] airport on 17 March 2017. Those same enquiries reveal that Complainant 6 did not board the return flight from [redacted] airport to Bucharest Henri Coanda airport in Romania on 18 March 2017. Further on 27 March 2017 Complainant 6 booked a flight through Wizz Air departing from Bucharest Henri Coanda airport in Romania to [redacted] airport on 29 March 2017. Complainant 6 boarded the flight to [redacted] airport on 29 March 2017.

190. Evidence has been obtained which demonstrates that Complainant 6 worked a total of 1,248 hours online between September 2016 and March 2017 earning $115,469.90. Applying an average exchange rate in January 2017 of £0.81 to $1, this equates to £93,530.62. Complainant 6 received £26,454.52 demonstrating she was paid a fraction of what she earned, with Andrew Tate and Tristan Tate making significant profits from her.

191. Screenshots demonstrating that Andrew Tate, Tristan Tate and [redacted] are blocked contacts on Complainant 6's mobile phone contact list and social media sites have also been obtained.

## IMAGES CASE

192. The charges numbered fourteen (represented by xxiv above) to thirty-two (represented by xlii above) in the warrant issued on 5 August 2026 relate to making and distributing indecent images of a child and possession of extreme pornographic images. A summary of the evidence is below.

## BACKGROUND

193. Operation Lagetto is the investigation into offences of making and distributing indecent images of children and possession of extreme pornographic imagery by Andrew Tate.

194. On 18 July 2015 Andrew Tate was arrested by police from Flat 3, The Exchange, Queen Street Hitchin, Hertfordshire, SG4 9TY for separate matters.

195. Whilst in custody a white iPhone mobile telephone was seized from Andrew Tate by UK law enforcement. This device was subsequently given exhibit number as AT01.

196. Whilst in custody, police seized the keys for Flat 3, The Exchange, Queen Street, Hitchin, Hertfordshire, SG4 9TY, from Andrew Tate. At 18:00 hours on 18 July 2015 a lawful search of the address was undertaken by other police officers. A number of devices were seized by the police from the address, including Exhibit PKB02, a yellow-backed Samsung mobile telephone and Exhibit SJB1, a laptop. Both devices were seized from the dining room table.

**Illegal Imagerv found on the Devices**

197. Analysis of Exhibits AT01, PKB02 and SJB1 identified indecent images of children and extreme pornographic images. Indecent images of children are classified by appropriately trained police officers into Categories A, B and C, as defined below:

a. **Category A:**

material showing penetrative sexual activity, sadism, or bestiality, involving a child

b. **Category B**

material showing non-penetrative sexual activity involving a child

c. **Category C:**

material showing other indecent images of a child not falling in category A or B

198. In order for an image to be classified as **Extreme** it must depict either:

a. adult violent images and should include images of actual scenes of serious violence or realistic depictions of serious violence produced for the purpose of sexual arousal or

b. Sexual images involving penetration of or by animals with adults.

199. An appropriately trained police officer identified and categorised the images found on devices AT01 PKB02 and SJB1 as follows:

| Category | AT01 | PKB02 | SJB1 |
|---|---|---|---|
| A | 36 | 0 | 30 |
| B | 13 | 3 | 10 |
| C | 41 | 17 | 18 |
| Extreme | 7 | 77 | 33 |
| Total | 97 | 97 | 91 |

**Images of a Female Child**

200. An appropriately trained police officer examined the indecent images and confirmed that all 168 Category A, B and C images depict the same female child. To assist with that identification, the officer was provided with a photograph of the child, whose identity was known to the investigation team, The police also recovered a copy of the child's passport, which confirms that she was under the age of 18 throughout the relevant period. In addition, messages recovered from Andrew Tate's devices demonstrate that he knew she was a child at the time he made and/or distributed the indecent images and that he was aware that such conduct was unlawful.

201. The female child came to the United Kingdom from abroad in 2014, when she was aged 17 years. Soon after her arrival into the United Kingdom, the female child began working for Andrew Tate in his sex webcam business. The female child was 17 years old when

Andrew Tate was arrested on 18 July 2015. Accordingly, the Category A to C indecent images of the female child must have depicted her whilst she was under the age of 18 years.

202. On 19 June 2015 in a WhatsApp group chat recovered from AT/01 between Andrew Tate and three other people, Andrew Tate sent images of the female child and stated she works on the webcam. He goes on to state "*one guy said he would pay her 1000 dollars every day if she could fist herself. So I told her she had to do it....*". He then sent a video of the female child "fisting" herself, stating "*and finally she learnt how*". He then sent a screenshot into the group of a bank account, with $1,000.00 (US) being paid in, before stating "*and the man sends me 1000 dollars everyday*". Later in the chat Andrew Tate stated "*men are obsessed with [the female child]. They do anything to talk to her and she gives me all the money. She's on webcam everyday*".

**Andrew Tate's Knowledge and Belief as to the Age of the Female Child Depicted in the Images**

203. On 5 January 2015 WhatsApp messages recovered from Exhibit AT01 demonstrate that messages were exchanged between Andrew Tate and the female child in which she explains that her parents have discovered that she is doing webcam and believes that Andrew Tate is using her as a prostitute. In particular her father wants her to stop and return home. Andrew Tate asks "*what will he (her father) do if I tell him your not coming [home]*", The female child replied "*Fly his ass his with police*" "*start a court case*" "*I don't know he's crazy*". Andrew Tate replied "*Well then we have a problem legally Ur not old enough to do this*". "*He needs to agree for u to stay or he can cause issues*" "*We might have to say we split and Uve gone to live [elsewhere] and Arnt coming home. Or someone he doesn't*

*know*". "*If he wants to bring direct heat on me it'll be easy and I could get in legal trouble cause ur 17*" and "*So it's not simple*"

204. On the same day Andrew Tate and Tristan Tate discussed how to deal with the problem. Andrew Tate says "*Im thinking what is best reply to him*" "*Theyll ask [the female child] for id and she will havr to say she doednt havr any and her dads lying to try and get her back*" and "*She doednt look 17 at least*". Tristan Tate replied "*Exactly*".

205. These exchanges demonstrate that Andrew Tate knew the female child was 17 years old and was developing a plan to avoid detection and/or create a defence if he was arrested.

**Andrew Tate's Interview Under Caution**

206. On 12 August 2016 Andrew Tate was interviewed under caution in relation to the use of his devices; internet activity and use of pornography and whether he had created a folder called "porn vids". He was specifically asked about extreme pornography. As to his use of devices, he stated that AT01 was one of several which were freely available within the property and that all devices at the address were used by visitors. He explained that the girls using the address would access whichever device was available and charged to communicate with clients, he effectively claimed the devices were "pool devices".

207. Andrew Tate denied having any interest in pornography, stating that he did not find such material arousing. He further denied ever downloading, receiving, or viewing material showing people engaged in sexual activity with animals and denied having any interest in such content.

208. He stated that he was in WhatsApp groups with large numbers of participants in which substantial volumes of messages and media were shared. He suggested that the images may have been circulated within such groups and subsequently auto saved to the devices. He also proposed that the devices may have synchronised with one another, resulting in images being saved across multiple devices.

209. When specifically asked whether he could identify which device was his personal mobile telephone, he stated that he could not recall. He then stated that the telephone seized from him whilst in custody was not, in fact, his own device. He explained that, at the time of his arrest, he had simply picked up a device from within the address and that the telephone taken from him was that device rather than his personal mobile telephone.

210. Exhibits AT01, PKB02 and SJB1 have all been attributed to Andrew Tate.

**ATTRIBUTION OF THE DEVICES TO ANDREW TATE**

Email address **emoryatate@gmail.com**

211. The email address emoryatate@gmail.com featured in the evidence gathered during the investigation. Following a request made to Google, UK law enforcement was provided with subscriber information for the email address emoryatate@gmail.com The details provided by Google are as follows:

- Name: A-TATE
- Created: 21/09/2010
- DOB: [redacted]
- Last used: 05/02/2026

**Exhibit AT01**

212. Exhibit AT01 was seized from Andrew Tate by UK law enforcement when he was arrested on 18 July 2015. He provided the passcode to the device to the officer as "andyv". The code was used by police to unlock the device. The mobile phone number linked to the device is +00447852768271.

213. In an email sent from Andrew Tate (using email address emoryatate@gmail.com) to the female child dated 17 January 2015 he stated "My number is +447852768271"

214. In messages recovered from a WhatsApp Chat group stored on Exhibit AT01 in which Andrew Tate distributed indecent images of the female child he is referred to as "Andrew" by participants in that chat. See paragraphs 249, 255 and 259 below.

215. Complainant 2 has the telephone number ending 8271 saved in her mobile phone contacts as "Andrew Tate".

216. Andrew Tate used emoryatate@gmail.com when lodging a complaint with the Independent Police Complaints Commission on 21 June 2016. In his complaint he wrote *"I was arrested for something I did not do over 1.5 years ago. At the time my mobile phone and laptop were confiscated from me."* He also accused the police of leaking videos from the phone to the media as *"…they ONLY existed on the phone which was confiscated from me."*

**Exhibit PKB02**

217. Exhibit PKB02 is a yellow backed Samsung mobile telephone, seized by UK law enforcement from Andrew Tate's home address whilst he was in custody on 18 July 2015. The mobile phone number linked to WhatsApp on the device is +447561360433.

218. Subscriber details for the number ending 60433 no longer exist. However, the email address emorytate@gmail.com was logged into this device when the police examined it.

219. There is content on PKB02 which indicates that this phone was used by Andrew Tate rather than this being a pool device. What follows below is a small sample of the material recovered from PKB02.

a. At least 1,337 WhatsApp messages were recovered from Exhibit PKB02. These messages comprise conversations between Andrew Tate, using the telephone number ending 60433, and the female child between 10 June 2014 and 4 January 2015. The conversations relate to various personal matters, including life in [redacted] and the female child's webcamming activities. They also contain references to Tristan's activities, and the user of the device refers to himself as Andrew Tate. The messages also relate to discussions between Andrew Tate and the female child about the child's parents continuing to express concern about their relationship.

b. A message sent on 2 January 2015 by the user which states *"Im a figher a good one. Im a hard bastard and i get paid. Thats why im in china now, fighting. But im also smart. Really smart. So i run business i do both things. Use all my assets not just one. Most 55year old men are out there working i could retire for life right now and im 28. Im on holiday 6 months a year. Cause i do both."*. Preceding messages sent by the user on 28 December 2014 state "*While im in shanghai this number is the only way to contact me facebook twitter and gmail are all illegal in china. Ill be back in thailand in march and UK in april. Thanks"* and *"this number works best in China"*. The number is 00447561360433.

c. At least 350 WhatsApp chat messages exchanged between Andrew Tate (using the number ending 60433) and Tristan Tate between 8 June 2014 and 1 January 2015. The messages include Andrew Tate sending two indecent images of the female child to Tristan Tate on 8 June 2014 and further indecent image on 1 December 2014. They also contain extensive discussions concerning the brothers' webcam business, including income generated from the enterprise, the recruitment of other females, operational matters such as which females were working and at what times, and the brothers' finances. On 29 December 2014, PKB02 received a video presentation from Tristan Tate, containing his narration regarding the income generated by the female child through webcam work, together with proposals for the future operation of the business, including how it should be structured and how earnings could be maximised. In response Andrew Tate stated "Thats 8333 tokens a day at 6 days a week right?" The conversation continued with the brothers discussing the female child and other females who are loyal who will "need to skype work and not care" to generate

more income for them. During the same exchange, Andrew Tate stated "Timmers wants me to go samui to sign a glory contract" which is believed to relate to Andrew Tate's kickboxing venture. On 1 January 2015 the device received a message from Tristan Tate depicting a screenshot showing a payment of $6401.80 being made to Mr Emory A Tate. The messages further include discussion regarding travel arrangements, including taking trips to Serbia and a flight to Bangkok.

220. PKB02 contains images of Andrew Tate and a girl performing sexual acts.

221. PKB02 contains a series of email exchanges between the female child and Andrew Tate, as well as between Andrew Tate and the female child's parents. The email account used in these communications is emoryatate@gmail.com which is evidentially linked to Andrew Tate as described above. Emails dated 4 and 5 January 2015 include messages from the female child's parents addressed specifically to "Andrew", in which they express concerns regarding their daughter's activities while in the United Kingdom with him and seeking her return home. The user responds in detail to these messages, discussing matters relating to the female child and indicating that he is in China fighting. He further states that he has purchased an earlier return ticket to the United Kingdom so that he can speak with the female child.

**Exhibit SJB1**

222. Exhibit SJB1 is a laptop seized by PC Barrett from Andrew Tate's home address whilst he was in custody on 18 July 2015.

223. To assist with attribution, subscriber details on the serial number of the laptop were sought from Apple. Subsequently, UK law enforcement was provided with information from Apple as follows:

- Device registered: 5 November 2014 at 15:13:14 hours
- Name of customer: Emory Tate
- Email address of customer: emoryatate@gmail.com
- Customer mailing address: [redacted], Luton, LU3 3SG
- Customer business telephone number: 07845879301

224. Examination of SJB1 shows it accessed various Wi-Fi networks which suggests that the device was taken with Andrew Tate when he travelled. Financial information relating to Andrew Tate has been obtained by UK law enforcement. A police Financial Investigator has compared Andrew Tate's banking transaction with the Wi-Fi connection data recovered from SJB1 to determine whether the device could be associated with Andrew Tate's known travel. A number of correlations were identified, below is a sample of the co-locations relied upon.

a. SJBl connected to the "Hotel Pantex Lobby" network on 23 March 2015. The hotel is located in Brașov, Romania. Financial records show that, on the same date, Andrew Tate made a card payment to Hotel Pantex Reception in Brașov, Romania.

b. SJBl also connected to the "Radisson_Guest" network on 26 April 2015. Although the location of that hotel's wireless network has not been established, financial records show two ATM withdrawals from Andrew Tate's bank account

the following day (27 April 2015) in Alžbetína, Slovakia, indicating his presence abroad soon after connecting to a hotel network.

c. On 8 June 2015, SJB1 connected to the "Luton Airport WiFi" network. Financial records show that three days earlier Andrew Tate made a payment to Thomson Airways Ltd, consistent with the purchase of air travel, and that on 8 June 2015 there was an ATM withdrawal from his bank account in Hlavná, Slovakia. The connection to Luton Airport Wi-Fi, together with the airline transaction and subsequent banking activity in Slovakia, is consistent with his travel from the United Kingdom to Slovakia during that period.

d. SJB1 connected to the "Hotel Pantex" network on 20 June 2015 and again on 23 June 2015. The hotel is based in Brașov, Romaina. During the same period, Andrew Tate's financial records show multiple transactions in Brașov and Bucharest, Romania, including a card payment to Hotel Pantex on 23 June 2015. These correlations between SJB1's network connections and Andrew Tate's financial activity provide further evidence linking SJB1 to his use and travel during the relevant period.

225. A Dropbox account was installed on SJB1. The account was signed into on this device using the email address emoryatate@gmail.com.

226. When reviewing the device's web history, it revealed that it was used to visit various My Free Cams pages on 18 and 30 June 2015 and 9 July 2015. These pages are where Andrew Tate conducts his sex webcam business.

## CHARGES

227. Below is a list of charges which have been authorised by the Crown Prosecution Service of England and Wales.

228. An appropriately trained officer has categorised the images as set out in paragraph 199 above.

229. UK law enforcement reviewed the digital downloads of Andrew Tate's devices and organised them into groups of exhibits for ease of use. For example, he grouped together instant messages, Facebook Messenger messages and WhatsApp chats, and further grouped them by user. From the download of Exhibit AT01 and PKB02, a number of exhibits were produced including:

   i. RMH/21 - WhatsApp chat on AT01 between A-TATE (number ending 68271) and number ending [redacted], between 19/02/2015 and 10/07/2015. Contains 12 messages.

   ii. RMH/14 - WhatsApp chat on AT01 between A-TATE (number ending 68271) and number ending [redacted], on 03/06/2015. Contains 7 messages.

   iii. RMH/15 - WhatsApp chat on AT01 between A-TATE (number ending 68271) and number ending [redacted], between 14/06/2015 and 17/06/2015. Contains 29 messages.

iv. RMH/07 - WhatsApp group chat on AT01 called 'Plot', with A-TATE (number ending 68271) and three other participants, on 19/06/2015. Contains 97 messages.

v. RMH/37 - WhatsApp chat on PKB02 between A-TATE (number ending 60433) and number ending [redacted], on 08/06/2014. Contains 3 messages.

## DISTRIBUTING INDECENT IMAGES OF A CHILD

230. In relation to the charges of distributing indecent images of children, examination of devices attributable to Andrew Tate has revealed direct evidence that he transmitted the relevant images to another person. The message exchanges demonstrating distribution are set out in respect of each count. There are seven charges of distributing indecent images of a child, detailed below

**xxiv. On 1 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 18:57hrs appearing within exhibit RMH21:**

231. RMH/21 - WhatsApp chat on AT01 between A-TATE (number ending 68271) and number ending [redacted], between 19/02/2015 and 10/07/2015.

232. Immediately prior to sending the Category A image, Andrew Tate exchanged messages with the same recipient. These messages included:

i. "I got a girl in [...]" and

ii. "Does anything I say".

233. The Category A image subsequently sent by Andrew Tate to the recipient showed the female child lying on her back with her breasts and vagina exposed. She penetrates her vagina with her fingers.

234. Immediately after sending the Category A image, Andrew Tate exchanged further messages with the same recipient. These messages included:

i. An image showing a screenshot of messages between Andrew Tate and a female believed to be the female child. Within the screenshot are video thumbnail images received by Andrew Tate. It is believed that the videos were sent by the female child following instructions from Andrew Tate to fist herself. He says to her "I WANT WHOLE HAND UP TO YOUR WRIST". A further video thumbnail is then shown to which Andrew Tate stated "GETTING BETTER".

ii. A message stating "Told her I'd dump her if she didn't fist herself So now she keeps sending me vids trying.

iii. The recipient replied "lol ! Bad boy".

iv. A message stating "She won't give up 6 vids so far" and

v. "[... hoes are the best]

**xxv. On 3 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 16:06hrs appearing within exhibit RMH14:**

235. RMH/14 - WhatsApp chat on AT01 between A-TATE (number ending 68271) and number ending [redacted], on 03/06/2015.

236. Immediately prior to sending the Category A image, Andrew Tate exchanged messages with the same recipient. These messages included:

i. "I got a girl who works for me there who's in love with me",

ii. "Begging for me to come and see her but I'm always abroad Bla Bla" and

iii. "She has a client who keeps offer her a grand to fist herself so I said. Learn to fist yourself so you can take a grand a week off that punk and I'll come"

237. The Category A image subsequently sent by Andrew Tate to the recipient showed the female child lying on her side with her buttocks facing the camera and her vagina exposed. She then penetrates her vagina with her fingers and then proceeds to place all five fingers and a portion of her hand into her vagina. She changes position and continues to push her hand deeper inside her vagina.

238. Immediately after sending the Category A image, Andrew Tate exchanged further messages with the same recipient. These messages included:

i. "And she did. That's true love" and

ii. "So better go see her for a few days".

iii. The recipient replied "lol sounds like a good girl"

**xxvi. On 8 June 2015 Andrew Tate distributed two Category C indecent images of a child, namely two images sent at 20:38hrs appearing within exhibit RMH37:**

239. RMH/37 - WhatsApp chat on PKB02 between A-TATE (number ending 60433) and number ending [redacted], on 08/06/2014.

240. There is no contact between Andrew Tate and the recipient immediately prior to sending the Category C images.

241. The Category C indecent images show

i. A still image of the female child naked, lying on her front with the camera focussing on her buttocks.

ii. A screenshot of a conversation between Andrew Tate and the female child. It contains an image of the child with her bare breasts exposed. In the same screenshot there is a message from the female child saying "As you can see Im your whore. You decide what to do with me (devil emoji). Im your slave"

242. Immediately after sending the two Category C images, Andrew Tate exchanged a further message with the same recipient stating "[…] ho"

**xxvii. On 14 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 07:49hrs appearing within exhibit RMH15:**

243. RMH/15 - WhatsApp chat on AT01 between A-TATE (number ending 68271) and number ending [redacted], between 14/06/2015 and 17/06/2015.

244. Immediately prior to sending the Category A image, Andrew Tate exchanged messages with the same recipient. These messages included:

i. "I told [...] Id dump her if she didn't learn to fist herself",

ii. "Took her a month" and

iii. "she's close now tho".

iv. The recipient replied "Haha"

245. The Category A image subsequently sent by Andrew Tate to the recipient shows the female child lying on her side with her buttocks facing the camera and her vagina exposed. She then penetrates her vagina with her fingers and then proceeds to place all five fingers and a portion of her hand into her vagina. She changes position and continues to push her hand deeper inside her vagina.

246. There were no messages exchanged between Andrew Tate and the recipient immediately after the Category A image was sent. However, on 17 June 2015 between 10:33 and 10:37 Andrew Tate and the recipient exchanged further messages regarding the female child. These messages included:

i. "I've told you about the fisting right?"

ii. "with the [...] hoe?".

iii. The recipient replied, "Yes video is amazing".

iv. Messages stating, "A rich guy on webcam wanted her to fist herself so I made her send me vids everynight and learn how" and "now she can".

v. The recipient replied "Hahahahahgahahahah".

vi. Andrew Tate sent an image showing a screenshot of two payments of $1,000.00 received into his PayPal account on 15 June 2015, followed by:

vii. "And he gave 2000 dollars"

viii. "To watch her do it".

ix. The recipient replied, "Make her work", "What a ledge" and "Fighting is for peasants".

x. A message stating, "Saggy pussy but ass is still tight she can fist all day I want my money!".

xi. The recipient replied, "Get it hoe" and "We'll trained".

**xxviii. On 19 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 14:56hrs appearing within exhibit RMH07:**

247. RMH/07 - WhatsApp group chat on AT01 called 'Plot', with A-TATE (number ending 68271) and three other participants, on 19/06/2015.

248. Immediately prior to sending the Category A image, Andrew Tate and other members of the WhatsApp group chat exchanged messages. These messages included:

i. Andrew Tate stated "I have storys you probably wouldn't believe"

ii. Andrew Tate sent a non-indecent image of the female child and stated "This girl […] is super obsessed with me" "works on webcam and loves me".

iii. Participant 1 replied "Fuck Andrew!!!", "She's perfect!" and "And I bet you don't even bother with her lol"

iv. Andrew Tate stated, "One guy said he would pay her 1000 dollars every day if she could fist herself", "so I told her she had to do it", "And she started practising" and "sending me vids".

v. Participant 2 replied "That's it man. Andrew I wanna work and make your money! Lol" and then "A fist LOL".

vi. Participant 1 replied "Fisting lol wtf".

vii. Participant 2 replied "ur fist is like"

viii. Participant 3 replied "You're a wrong un lol"

ix. Participant 1 replied "Andrew show us the way".

x. Andrew Tate stated "Lemme show you".

249. The Category A image subsequently sent by Andrew Tate showed a screenshot of messages between Andrew Tate and the female child. The screenshot included a video thumbnail depicting the female child penetrating her vagina with a finger. Within the screenshot is a message sent by the female child to Andrew Tate which states "DOES IT MAKE YOU SMILE DADDY?". Andrew Tate replied, "I'LL SMILE WHEN YOUR FIST IS INSIDE". The female child replied ""IM GETTING THERE", Andrew Tate stated "KEEP TRYING" and the female child replied "CANT PUT DEEPER". Andrew Tate replied, "YOU CAN AND YOU WILL" and "PUT IT IN UP TO YOUR WRIST".

250. Immediately after sending the Category A image, members of the WhatsApp group chat exchanged further messages. These included:

i. Participant 1 replied "No way!" and "Your actually a living legend"

ii. Participant 3 replied "HAHAHAHAHAHAHAHA"

**xxix. On 19 June 2015 Andrew Tate distributed a Category A indecent image of a child, namely an image sent at 14:57hrs appearing within exhibit RMH07 Contrary to section 1(1)(b) of the Protection of Children Act 1978.**

251. RMH/07 - WhatsApp group chat on AT01 called 'Plot', with A-TATE (number ending 68271) and three other participants, on 19/06/2015.

252. The Category A image was sent during the same WhatsApp group chat conversation referred to in Charge xxviii. The messages immediately preceding the sending of the Category A image in this charge are those set out above at paragraphs 249 to 251 above.

253. The Category A image showed the female child lying on her side with her buttocks facing the camera and her vagina exposed. She then penetrates her vagina with her fingers and then proceeds to place all five fingers and a portion of her hand into her vagina. She changes position and continues to push her hand deeper inside her vagina.

254. Immediately after sending the Category A image, members of the WhatsApp group chat exchanged further messages. These included:

i. Andrew Tate stated "And finally she learnt how" and "cause I said I won't talk to her till she can do it".

ii. Participant 1 replied "Andrew I'll fist my myself if you teach me the ways"

iii. Participant 2 replied with a message containing with four "crying with laughter" emojis and "Nah I take it back", "Tristan ain't no legend", "Lol" and "Andrew you're the man looooool".

iv. Andrew Tate stated "And the man sends me my 1000 dollars everyday".

v. Andrew Tate sent a screenshot of his PayPal account showing receipt of two payments of $1,000.00 on 15 June 2015.

vi. Participant 1 replied "I'm speechless at how legendary you guys are"

vii. Andrew Tate stated "Hahaha I got Tristan beat I have loads of storys like this"

**xxx. On 19 June 2015 Andrew Tate distributed a Category C indecent image of a child, namely an image sent at 15:07hrs appearing within exhibit RMH07:**

255. RMH/07 - WhatsApp group chat on AT01 called 'Plot', with A-TATE (number ending 68271) and three other participants, on 19/06/2015.

256. The Category C image was sent during the same WhatsApp group chat conversation referred to in charges xxviii and xxix. Immediately prior to sending the Category C image in this charge, Andrew Tate and the other participants exchanged further messages. These messages included:

i. "Men are obsessed with […]",

ii. "They do anything to talk to her",

iii. "And she give me all the money" and

iv. "She's on webcam everyday"

257. The Category C image subsequently sent by Andrew Tate is a moving image, it shows the female child sat directly behind Andrew Tate wearing lingerie. She kisses his neck. Another female enters the room and removes her bra. The female child then starts to kiss the other adult female on the lips whilst Andrew Tate continues to speak into the camera.

258. Immediately after sending the Category C images, members of the WhatsApp group chat exchanged further messages. These messages included:

i. Participant 1 replied "Absolute legend Andrew, I'm giving you a virtual handshake"

**MAKING INDECENT IMAGES OF A CHILD**

259. In relation to the charges of making indecent images of children, there is evidence that the relevant images were stored on devices attributable to Andrew Tate. It can be inferred from the circumstances that those images came to be stored as a result of some act on his part. Such acts may have included taking the photograph using the device, downloading the image, moving the image into a folder, opening an image attached to a message, or opening or reading a message to which the image was attached. In respect of each image, Andrew Tate did something to cause that image to exist on that particular device; to produce it by

his action; or to bring it about. There are eight charges of making indecent images of a child, as set out below.

**xxxi. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 36 Category A images and videos appearing within exhibit AT01.**

260. An appropriately trained officer has described a representative example of the Category A images found on Exhibit AT01. A distilled version of his description is provided to explain the level of sexual activity which proves this charge. The video depicts a female child engaging in repeated anal penetration using her hand. The penetration is clearly visible throughout the footage and occurs on multiple occasions. The video focuses on the child's genital and anal area, with the penetration forming the central activity shown. The image presents the female child in a sexualised context.

**xxxii. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 13 Category B images and videos appearing within exhibit AT01.**

261. An appropriately trained officer has described a representative example of the Category B images found on Exhibit AT01. A distilled version of his description is provided to explain the level of sexual activity which proves this charge. The image depicts non-penetrative physical contact between a female child and an adult female. Both individuals are partially unclothed and are positioned together on a bed. The child is wearing lingerie, including stockings and underwear, her breasts are exposed. The child appears to be touching the adult female's exposed breast. The image presents both individuals in a sexualised context.

**xxxiii. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 41 Category C images and videos appearing within exhibit AT01.**

262. An appropriately trained officer has described a representative example of the Category C images found on Exhibit AT01. A distilled version of his description is provided to explain the level of sexual activity which proves this charge. The image depicts a female child lying on a bed with her legs raised and spread apart. Her lower body is unclothed, and her entire genital area is clearly visible and prominently displayed to the camera. She is wearing a black top and has her hands positioned on her breasts. The image presents the female child in a sexualised context.

**xxxiv. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 3 Category B images appearing within exhibit PKB02.**

263. An appropriately trained officer has described a representative example of the Category B images found on Exhibit PKB02. A distilled version of his description is provided to explain the level of sexual activity which proves this charge. The image depicts a female child lying on her front on a bed with her buttocks raised. She is not wearing any clothing on her lower body, and her vagina is clearly visible to the camera. With her right hand, she is reaching around and placing her finger onto her exposed vagina. It appears as though an object is inserted into her vagina, but it cannot be said that the image depicts actual penetration. The image presents the female child in a sexualised context.

**xxxv. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 17 Category C images appearing within exhibit PKB02.**

264. An appropriately trained officer has described a representative example of the Category C images found on Exhibit PKB02. A distilled version of his description is provided to explain the level of sexual activity which proves this charge. The image depicts a female child appearing to take a self-photograph. The child is unclothed from the waist up, with her breasts fully exposed and prominently displayed within the frame. She has one hand resting on a breast and is looking directly towards the camera. The female is wearing makeup and red lipstick. The image presents the female child in a sexualised context.

**xxxvi. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 30 Category A images and videos appearing within exhibit SJB1.**

265. An appropriately trained officer has described a representative example of the Category A images found on Exhibit SJB1. A distilled version of his description is provided to explain the level of sexual activity which proves this charge. The image depicts a female child who appears unclothed and positioned in a manner that exposes her genital area to the camera. The child is shown holding an object which appears to be inserted into her genital area, indicating vaginal penetration. The child is looking directly towards the camera. The image presents the female child in a sexualised context.

**xxxvii. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 10 Category B images and videos appearing within exhibit SJB1.**

266. An appropriately trained officer has described a representative example of the Category B images found on Exhibit SJB1. A distilled version of his description is provided to explain the level of sexual activity which proves this charge. The video depicts an adult male, identified as Andrew Tate, seated on a bed and speaking directly to the camera. A female child, wearing lingerie and holding what appears to be a championship belt, is positioned behind him. During the footage, the child is shown kissing Andrew Tate's neck and remaining in close physical contact with him. An adult female subsequently joins them on the bed and engages in intimate physical contact initially with Andrew Tate. The adult female's breasts are exposed. The adult female leans over Andrew Tate's shoulder and begins kissing child who has her hand on Andrew Tate's shoulder. The video presents the female child in a sexualised context.

**xxxviii. On or before 18 July 2015 Andrew Tate made indecent images of a child, namely 18 Category C images and videos appearing within exhibit SJB1.**

267. An appropriately trained officer has described a representative example of the Category C images found on Exhibit SJB1. A distilled version of his description is provided to explain the level of sexual activity which proves this charge. The video depicts a female child wearing lingerie, stockings and high-heeled footwear, together with heavy makeup and cat-ear headwear. The camera focuses on the child's body, including buttocks and torso, before revealing her face. The child poses and gestures towards the camera. The image presents the female child in a sexualised context.

## POSSESSION OF EXTREME PORNOGRAPHIC IMAGES

268. In relation to the charges of possession of extreme pornographic images, there is evidence that the relevant images were stored on devices attributable to Andrew Tate. The presence of those images on devices under his control provides evidence of his possession of them.

269. There are two charges of possession of extreme pornographic images portraying, in an explicit and realistic way, a person performing an act of intercourse with a live animal as set out below:

**xxxix. On or before 18 July 2015 Andrew Tate possessed, within exhibit SJB1, an extreme pornographic image which portrayed, in an explicit and realistic way, a person performing an act of intercourse with a live animal, namely an eel, which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person or animal was real.**

**xl. On or before 18 July 2015 Andrew Tate possessed, within exhibit SJB1, an extreme pornographic image which portrayed, in an explicit and realistic way, a person performing an act of intercourse with a live animal, namely a horse, which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person or animal was real.**

270. There are two charges of possession of extreme pornographic images portraying, in an explicit and realistic way an act which resulted or was likely to result in serious injury to a person's genitals as set out below:

**xli. On or before 18 July 2015, Andrew Tate possessed, within exhibit PKB02, an extreme pornographic image which portrayed in an explicit and realistic way an act which resulted or was likely to result in serious injury to a person's genitals and which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person was real**

271. The extreme pornographic image is described by an appropriately trained police officer as follows. The video starts with a white male lying on his back, with his legs separated and in the air. The male is completely naked, thus showing his anus, testicles and penis to the camera. The camera is positioned in such a way that his anus, testicles and penis are the focal of the camera. The male is reaching over his body with one hand, and within this hand, he is holding a white item. The nature of this item is not discernible from this video. However, he is rubbing the item on his penis and testicles. 3.5 seconds into the video, the scene changes. The scene is now showing a bloodied penis and testicles. The camera is zoomed in, so that it is only showing the testicles and penis. The male does not appear to be wearing any clothing. The whole penis is covered in blood, and there are various piercings on the penis and testicles. Within this footage, two hands can also be seen. The first is placed behind the penis, and the other is holding a small surgical knife, or scalpel. The hand holding the scalpel is using the knife to cut through the penis, from the top. Due to this, the head of the penis has been cut in two, and blood is pouring down from the site

of the cut. The hand continues to cut through the penis until 5.7 seconds into the video, at which the scene changes again. This new scene shows a male who appears to be standing up. The male is completely naked, and his penis appears erect. The camera is zoomed in on the male's penis, so that it is taking up the entirety of the screen. The male's hand can also be seen in the video, and the male appears to have his little finger thread through the frenulum of the foreskin of his penis. He is then moving his finger in and out of the frenulum and using his other hand to masturbate the shaft of his penis. This continues until 7.8 seconds into the video, at which point the scene changes once again. This new scene shows a naked male. This male is being suspended in the air by a chain, which is tied tightly around the base of his penis. The weight of the male being suspended, has caused the male's penis and testicles to be significantly stretched. The camera moves slightly, to show the male's arms. Here, it shows that male has rope around his right arm, suggesting he is tied in place. The video then ends.

**xlii. On or before 18 July 2015, Andrew Tate possessed, within exhibit PKB02, an extreme pornographic image which portrayed in an explicit and realistic way an act which resulted or was likely to result in serious injury to a person's genitals and which was grossly offensive, disgusting or otherwise of an obscene character and a reasonable person looking at the image would think that any such person was real (an image other than that in charge xli)**

272. The extreme pornographic image is described by an appropriately trained police officer as follows. It starts by showing a close-up shot of testicles tied down to a bench. It appears rope has been used to tie it down, and the rope is tied tightly around the testicles, which appears to have made them swollen. A hand can also be seen. This hand is holding a long

nail, with the sharp end against the testicles. From the top of the shot, the head of a hammer can be seen. The head of the hammer then hits the nail multiple times, causing the nail to pierce the testicles. This continues until 4.6 seconds into the video, at which point the scene changes. The new scene is now a close up of a naked male, holding his penis with one hand. The camera is zoomed in on the penis, so it is taking up the majority of the screen. There appears to be several pins or nails protruding from the length of the penis. These nails appear to have caused a wound along the length of the penis. This wound is so deep, that it has split the penis into two from the base, so that the inside of the penis can be seen. The male appears to be rubbing the end of his penis with his hand, and a white liquid is pouring from the wound caused by the nails. This continues until 7.6 seconds within the video, at which point the scene changes again. This new scene shows a close-up video of a penis and testicles. There are several piercings in the testicles and at the head of the penis. There appears to be a hole in the head of the penis, which is enlarging and shrinking as the footage progresses. A finger then enters the frame and is placed into the hole. The footage then ends.

**OTHER PROCEEDINGS**

273. On 12 March 2024 Andrew Tate was arrested in Romania on a Trade and Cooperation Agreement (TACA) warrant, issued by the United Kingdom in relation to charges one (i) to ten (x) as set out in the arrest warrant dated 19 January 2024. Extradition was ordered by the Romanian authorities on the same date; however, surrender was deferred until the conclusion of domestic proceedings in Romania. This does not prevent the United Kingdom seeking the surrender of Andrew Tate from the United States of America. Since extradition was ordered by the Romanian authorities, the Crown Prosecution Service have laid further charges which are encompassed in the warrant issued on 5 August 2026 as set out above.

Signed: _[signature]

**Lee-Anne Marshall**

Dated: 07/09/2026

**EXHIBIT**

This is Exhibit LM/01 referred to in the statement of Lee-Anne Marshall.

**Exhibit LM/01**

**Photograph of Emory Andrew Tate**



**NARINDER DHILLON states as follows:**

1. I am a Solicitor and Specialist Prosecutor employed by the Crown Prosecution Service of England and Wales based in the Extradition Unit. I am well acquainted with the criminal law of England and Wales. I have conduct of the request made to the United States of America for the extradition of Emory Andrew Tate (hereafter referred to as "Andrew Tate") to the United Kingdom.

2. This extradition request is made so that Andrew Tate can be extradited to the United Kingdom to stand trial for a total of forty-two offences as set out in the two arrest warrants for Andrew Tate. The first warrant is dated 19 January 2024 and relates to ten offences; the second warrant is dated 5 August 2026 and relates to thirty-two offences.

3. For ease of reference, in the extradition request and in this statement of law, the charges in the second warrant have been numbered consecutively after charges 1 to 10 in the first warrant. Accordingly, the numbering continues from the first warrant. Any number shown in brackets denotes the original numbering of that charge within the second warrant itself.

4. In summary these offences are:

| Offence | Warrant of Arrest dated 19 January 2024 | Warrant of Arrest dated 5 August 2026 | Maximum Sentence if convicted |
|---|---|---|---|
| Human trafficking | Charges 1 and 2 | Charges 18(8), 21(11), 23(13) | Life imprisonment |
| Rape | Charges 3, 4 and 8 | Charges 11(1), 12(2), 15(5), 16(6), 19(9), 20(10) and 22(12) | Life imprisonment |
| Assault occasioning actual bodily harm | Charges 5, 6, 7, and 9 | Charges 13(3), 14(4) and 17(7) | 5 years' imprisonment |
| Controlling Prostitution for gain | Charge 10 | | 7 years' imprisonment |
| Distributing an indecent photograph of a child | | Charges 24(14), 25(15), 26(16), 27(17), 28(18), | 10 years' imprisonment |

| | | | |
|---|---|---|---|
| | | 29(19) and 30(20) | |
| Making indecent photographs of a child | | Charges 31(21), 32(22), 33(23), 34(24), 35(25), 36(26), 37(27), 38(28) | 10 years' imprisonment |
| Possession of extreme pornographic images | | Charges 39(29), 40(30), 41(31), And 42(32) | 3 years' imprisonment |

5. I set out below the relevant law applicable at the time the offences were committed. Each offence is punishable under the law of the United Kingdom by a term of imprisonment of more than one year.

**Rape**

6. Rape is an offence contrary to section 1 of the Sexual Offences Act 2003.

7. Section 1 of the Sexual Offences Act 2003 provides:

(1) A person (A) commits an offence (Rape) if –

(a) he intentionally penetrates the vagina, anus or mouth of another person (B) with his penis,

(b) B does not consent to the penetration, and

(c) A does not reasonably believe that B consents.

(2) Whether a belief is reasonable is to be determined having regard to all the circumstances, including any steps A has taken to ascertain whether B consents.

**Penetration**

8. Penetration is a continuing act from entry to withdrawal so that it follows that consensual intercourse will become rape if the woman or man ceases to consent during the intercourse and the accused with the necessary mens rea continues the intercourse. Similarly non-consensual intercourse will become rape if the accused continues intercourse after ceasing to believe on reasonable grounds that the complainant was consenting.

9. Where vaginal rape is alleged, it is not necessary to prove penetration of the vagina; it is sufficient that there was *any* degree of penetration by the penis within the labia.

**Consent**

10. Section 74 of the Sexual Offences Act 2003 provides that for the purposes of this offence, *"a person consents if he agrees by choice and has the freedom and capacity to make that choice."*

**Evidential presumptions about consent**

11. Certain evidential (i.e. rebuttable) presumptions are applied to the issue of consent by section 75 of the Sexual Offences Act 2003:

(1) If in proceedings for an offence to which this section applies it is proved –

(a) that the defendant did the relevant act;

(b) that any of the circumstances specified in subsection (2) existed, and

(c) that the defendant knew that those circumstances existed,

the complainant is to be taken not to have consented to the relevant act unless sufficient evidence is adduced to raise an issue as to whether the complainant consented, and the defendant is to be taken not to have reasonably believed that the complainant consented unless sufficient evidence is adduced to raise an issue as to whether he reasonably believed it.

(2) The circumstances are that –

(a) any person was, at the time of the relevant act or immediately before it began, using violence against the complainant or causing the complainant to fear that immediate violence would be used against him;

(b) any person was, at the time of the relevant act or immediately before it began, causing the complainant to fear that violence was being used, or that immediate violence would be used, against another person;

(c) the complainant was, and the defendant was not, unlawfully detained at the time of the relevant act;

(d) the complainant was asleep or otherwise unconscious at the time of the relevant act;

(e) because of the complainant's physical disability, the complainant would not have been able at the time of the relevant act to communicate to the defendant whether the complainant consented;

(f) any person had administered to or caused to be taken by the complainant, without the complainant's consent, a substance which, having regard to when it was administered or taken, was capable of causing or enabling the complainant to be stupefied or overpowered at the time of the relevant act.

(3) In subsection (2)(a) and (b), the reference to the time immediately before the relevant act began is, in the case of an act which is one of a continuous series of sexual activities, a reference to the time immediately before the first sexual activity began.

**Conclusive presumptions about consent**

12. Additional presumptions, this time irrefutable or conclusive in nature are set out in section 76 of the Act:

(1) If in proceedings for an offence to which this section applies it is proved that the defendant did the relevant act and that any of the circumstances specified in subsection (2) existed, it is to be conclusively presumed –

(a) that the complainant did not consent to the relevant act, and

(b) that the defendant did not believe that the complainant consented to the relevant act.

(2) The circumstances are that –

(a) the defendant intentionally deceived the complainant as to the nature or purpose of the relevant act;

(b) the defendant intentionally induced the complainant to consent to the relevant act by impersonating a person known personally to the complainant.

In relation to an offence to which sections 75 and 76 apply, references to the relevant act mean the defendant intentionally penetrating, with his penis, the vagina, anus or mouth of another person ("the complainant").

**Allocation**

13. Rape is an indictable-only offence and may be tried only on indictment before a jury at the Crown Court.

**Punishment**

14. Section 1(4) of the Sexual Offences Act 2003 provides that the maximum penalty which may be imposed following conviction on indictment for an offence of rape is imprisonment for life.

**Limitation**

15. There is no time limit for bringing a charge under section 1 of the Sexual Offences Act 2003.

**Life Sentence**

16. Where a life sentence (whether mandatory or discretionary) is imposed the sentencing judge determines what part of the sentence must be served in prison before the offender may be considered for release on licence: That period is referred to as the minimum term. Every person sentenced on indictment has the right to ask for a review of that minimum term by the Court of Appeal.

17. The offender must serve the appropriate minimum term that reflects the punitive element of the sentence. Once this punitive term of imprisonment has expired, the offender enters the 'risk' element of the sentence. He may only be detained if he continues to present a risk to the public.

18. An independent Parole Board conducts a review of the prisoner's sentence once the punitive element of the sentence has expired. A judge chairs this panel. An oral hearing can take place to determine whether the prisoner's detention should continue. The Parole Board must decide whether it is necessary for the protection of the public, for the prisoner's detention to continue. At this hearing the prisoner has the right to be present, to be legally represented and to call and question witnesses.

19. The Parole Board can direct the release of the prisoner. If it decides that the prisoner should not be released, then a further hearing will take place within 2 years to review the prisoner's detention and at regular intervals thereafter.

20. All life sentence prisoners are released under a licence that remains in force for the rest of their lives. The life licence can be revoked at any time, if necessary, on public protection grounds.

21. In every case, including cases where a whole life term or a minimum term exceeding twenty years has been imposed, the prisoner may apply for compassionate release under section 30 of the Crime (Sentences) Act 1997 and/or for release under the powers of the Royal Prerogative of Mercy. The Secretary of State may release a serving prisoner at any point in the sentence if they are satisfied that exceptional circumstances exist which justify the prisoner's release on compassionate grounds.

**Assault occasioning actual bodily harm**

22. Assault occasioning actual bodily harm is an offence contrary to section 47 of the Offences against the Person Act 1861 which provides:

Whosoever shall be convicted on indictment of any assault occasioning actual bodily harm shall be liable to imprisonment for not more than five years.

**Assault**

23. An assault is any act, and not a mere omission to act, by which a person intentionally or recklessly causes another to apprehend immediate and unlawful violence. Assault can also include a "battery" which is the intentional or reckless application of unlawful force to the victim. The act must be accompanied by a hostile intent calculated to cause

apprehension in the mind of the victim.

**Occasioning**

24. The prosecution must prove the assault "occasioned" or caused the bodily harm.

**Actual bodily harm**

25. "Bodily harm" has its ordinary meaning and includes any hurt or injury calculated to interfere with the health or comfort of the complainant. Such hurt or injury need not be permanent but must be more than merely transient and trifling (*Donovan* *[1934] 2 K.B. 498* (1936) 25 Cr. App. R. 1, CCA). "Bodily harm" also includes a momentary loss of consciousness (*R. (T) v DPP* [2003] EWHC 266 (Admin); [2003] Crim. L.R. 622, QBD).

**Consent**

26. In *R v Brown* [1994] 1 AC 212, the House of Lords held that a person cannot validly consent to the infliction of actual bodily harm or more serious injury unless the conduct falls within a recognised exception, such as properly conducted sport, lawful surgery, tattooing or ritual circumcision. The satisfaction of sadomasochistic sexual desires was specifically held not to constitute a good reason capable of creating such an exception.

27. The principle is not confined to sadomasochistic homosexual activity. In *R v Emmett* (1999) WL 477810. the Court of Appeal applied *Brown* to consensual heterosexual sexual activity involving asphyxiation and burning. The Court held that consent was no defence where the activity caused actual bodily harm and exposed the complainant to a risk of serious injury. The Court expressly stated that there was no basis for distinguishing between homosexual and heterosexual sadomasochistic activity.

28. Accordingly, where sexual activity involves the intentional infliction of actual bodily harm, including injury caused by choking, strangulation or other forms of rough sexual violence, consent will not ordinarily provide a defence to an offence under section 47 of the Offences Against the Person Act

**Allocation**

29. Assault occasioning actual bodily harm is an either-way offence and can proceed summarily at the Magistrates' Court, or on indictment before a jury at the Crown Court.

**Punishment**

30. Section 47 of the Offences Against the Person Act 1861 provides that the maximum penalty which may be imposed following conviction on indictment for an offence of assault occasioning actual bodily harm is imprisonment for a term not exceeding five years.

**Limitation**

31. There is no time limit for bringing a charge under section 47 of the Offences Against the Person Act 1861.

**Human trafficking**

32. Section 2 of the Modern Slavery Act 2015 provides:

(1) A person commits an offence if the person arranges or facilitates the travel of another person ("V") with a view to V being exploited.

(2) It is irrelevant whether V consents to the travel (whether V is an adult or a child).

(3) A person may in particular arrange or facilitate V's travel by recruiting V, transporting or transferring V, harbouring or receiving V, or transferring or exchanging control over V.

(4) A person arranges or facilitates V's travel with a view to V being exploited only if—

(a) the person intends to exploit V (in any part of the world) during or after the travel, or

(b) the person knows or ought to know that another person is likely to exploit V (in any part of the world) during or after the travel.

(5) "Travel" means—

(a) arriving in, or entering, any country,

(b) departing from any country,

(c) travelling within any country.

(6) A person who is a UK national commits an offence under this section regardless of—

(a) where the arranging or facilitating takes place, or

(b) where the travel takes place.

[…]

**Meaning of exploitation**

33. Section 3 of the Modern Slavery Act defines the meaning of exploitation.

(1) For the purposes of section 2 a person is exploited only if one or more of the following subsections apply in relation to the person.

[…]

*Sexual exploitation*

(3) Something is done to or in respect of the person—

(a) which involves the commission of an offence under—

(i) section 1(1)(a) of the Protection of Children Act 1978 (indecent photographs of children), or

(ii) Part 1 of the Sexual Offences Act 2003 (sexual offences), as it has effect in England and Wales, or

(b) which would involve the commission of such an offence if it were done in England and Wales.

[…]

*Securing services etc by force, threats or deception*

(5) The person is subjected to force, threats or deception designed to induce him or her—

(a) to provide services of any kind,

(b) to provide another person with benefits of any kind, or

(c) to enable another person to acquire benefits of any kind.

[…]

34. For the purpose of construing Section 3 (a) (ii), Part 1 of the Sexual Offences 2003 includes but is not limited to sexual offences against adults and children and controlling prostitution for gain. The offence of controlling prostitution for gain is set out below at paragraph 39.

**Allocation**

35. The offence under Section 2 of The Modern Slavery Act 2015 is triable either-way and can proceed summarily at the Magistrates' Court, or on indictment before a jury at the Crown Court.

**Punishment**

36. Section 5 (1) of the Modern Slavery Act 2015 provides that the maximum penalty which may be imposed following conviction on indictment for an offence of human trafficking is imprisonment for life.

37. The operation of life sentences as described in paragraphs 16-21 above would be applicable in the event a life sentence was imposed following conviction of an offence of human trafficking.

**Limitation**

38. There is no time limit for bringing a charge under section 2 of the Modern Slavery Act 2015.

**Controlling prostitution for gain**

39. By section 53 of the Sexual Offences Act 2003:

(1) A person commits an offence if–

(a) he intentionally controls any of the activities of another person relating to that person's prostitution in any part of the world, and

(b) he does so for or in the expectation of gain for himself or a third person.

40. Section 54 of the Sexual Offences Act 2003 defines 'gain', 'prostitute' and 'payment' as used in section 53 as follows:

**Gain**

(1) In sections 52, 53 and 53A "gain" means

(a) any financial advantage, including the discharge of an obligation to pay or the provision of goods or services (including sexual services) gratuitously or at a discount; or

(b) the goodwill of any person which is or appears likely, in time, to bring financial advantage.

**Prostitute**

(2) In sections 51A, 52, 53 and 53A "prostitute" means a person (A) who, on at least one occasion and whether or not compelled to do so, offers or provides sexual services to another person in return for payment or a promise of payment to A or a third person; and "prostitution" is to be interpreted accordingly.

**Sexual**

41. Whilst sexual services is not defined, section 78 of the Sexual Offence Act 2003 does provide a definition of sexual.

42. Section 78 states for the purposes of this Part, penetration, touching or any other activity is sexual if a reasonable person would consider that–

(a) whatever its circumstances or any person's purpose in relation to it, it is because of its nature sexual, or

(b) because of its nature it may be sexual and because of its circumstances or the purpose of any person in relation to it (or both) it is sexual.

**Payment**

(3) In subsection (2) and section 53A "payment" means any financial advantage, including the discharge of an obligation to pay or the provision of goods or services (including sexual services) gratuitously or at a discount.

**Allocation**

43. The offence under section 53 of the Sexual Offences Act 2003 is triable either-way and can proceed summarily at the Magistrates' Court, or on indictment before a jury at the Crown Court.

**Punishment**

44. Section 53 (2) of the Sexual Offences Act 2003 provides that the maximum penalty which may be imposed following conviction on indictment for an offence of controlling prostitution for gain is imprisonment for a term not exceeding seven years.

**Limitation**

45. There is no time limit for bringing a charge under section 53 of the Sexual Offences Act 2003.

**Making or Distributing Indecent Images of Children**

46. Section 1 of the Protection of Children Act 1978 provides that:

(1) Subject to sections 1A and 1B, it is an offence for a person -

(a) to take, or permit to be taken, or to make, any indecent photograph or pseudo-photograph of a child; or

(b) to distribute or show such indecent photographs or pseudo-photographs; or

[...]

(2) For the purposes of this Act, a person is to be regarded as distributing an indecent photograph or pseudo-photograph if he parts with possession of it to, or exposes or offers it for acquisition by, another person.

(3) Proceedings for an offence under this Act shall not be instituted except by or with the consent of the Director of Public Prosecutions.

(4) Where a person is charged with an offence under subsection (1)(b) or (c), it shall be a defence for him to prove –

(a) that he had a legitimate reason for distributing or showing the photographs or pseudo-photographs or (as the case may be) having them in his possession; or

(b) that he had not himself seen the photographs or pseudo-photographs and did not know, nor had any cause to suspect, them to be indecent.

47. Section 7 of the Protection of Children Act 1978 provides interpretations for the terms used in the Act:

(1) The following subsections apply for the interpretation of the Act.

(2) References to an indecent photograph include an indecent film, a copy of an indecent photograph or film, and an indecent photograph comprised in a film.

(3) Photographs (including those comprised in a film) shall, if they show children and are indecent be treated for all purposes of this Act as indecent photographs of children and so as respects pseudo-photographs.

(4) References to a photograph include –

(a) the negative as well as the positive version; and

(b) data stored on a computer disc or by other electronic means which is capable of conversion into a photograph.

(4A) References to a photograph also include –

(a) a tracing or other image, whether made by electronic or other means (of whatever nature) –

(i) which is not itself a photograph or pseudo-photograph, but

(ii) which is derived from the whole or part of a photograph or pseudo-photograph (or a combination of either or both); and

(b) data stored on a computer disc or by other electronic means which is capable of conversion into an image within paragraph (a);

(5) Film includes any form of video recording.

(6) Child means a person under the age of 18.

[…]

48. For offences of making or distributing indecent images of children, the images themselves are categorised within the charge. The A, B, and C categorisation for

indecent images of children is not defined in the Protection of Children Act 1978. Its legal origin stems from the Sentencing Council's definitive guidelines for sexual offences in England and Wales, which introduced the A, B and C categorisation in April 2014. In summary these are:

**Category A**: Penetrative sexual activity, sexual activity with an animal, or sadism.

**Category B**: Non-penetrative sexual activity.

**Category C**: Indecent images not falling within Category A or B (such as sexually suggestive poses or nudity without active sexual acts)

**Allocation**

49. The offences under section 1(1)(a) and section 1(1)(b) of the Protection of Children Act 1978 are triable either-way and can proceed summarily at the Magistrates' Court, or on indictment before a jury at the Crown Court.

**Punishment**

50. Section 6 of the Protection of Children Act 1978 provides that the maximum penalty which may be imposed following conviction on indictment for offences of making or distributing indecent images of children is imprisonment for a term not exceeding ten years.

**Limitation**

51. There is no time limit for bringing a charge under section 1(1)(a) or for a charge under section 1(1)(b) of the Protection of Children Act 1978.

**DPP Consent**

52. Proceedings for offences contrary to sections 1(1) (a) and 1(1)(b) of the Protection of Children Act 1978 (making an indecent image of a child and distributing an indecent image of a child) require the consent of the Director of Public Prosecutions (DPP).

53. Pursuant to section 1(7) of the Prosecution of Offences Act 1985, such consent may be given by a prosecutor acting on behalf of the DPP. The issuing of a charging authority is sufficient for this purpose, and no separate record of consent is required.

54. On 10 July 2026, when the Crown Prosecution Service authorised the charges under sections 1(1)(a) and 1(1)(b) of the Protection of Children Act 1978, the reviewing prosecutor also provided the necessary DPP consent to prosecute each of those offences.

**Possession of Extreme Pornographic Images**

55. Section 63 of the Criminal Justice and Immigration Act 2008 creates the offence of possession of extreme pornographic images. It provides that:

(1) It is an offence for a person to be in possession of an extreme pornographic image.

(2) An "extreme pornographic image" is an image which is both—

(a) pornographic, and

(b) an extreme image.

(3) An image is "pornographic" if it is of such a nature that it must reasonably be assumed to have been produced solely or principally for the purpose of sexual arousal.

(4) Where (as found in the person's possession) an image forms part of a series of images, the question whether the image is of such a nature as is mentioned in subsection (3) is to be determined by reference to—

(a) the image itself, and

(b) (if the series of images is such as to be capable of providing a context for the image) the context in which it occurs in the series of images.

(5) So, for example, where—

(a) an image forms an integral part of a narrative constituted by a series of images, and

(b) having regard to those images as a whole, they are not of such a nature that they must reasonably be assumed to have been produced solely or principally for the purpose of sexual arousal,

the image may, by virtue of being part of that narrative, be found not to be pornographic, even though it might have been found to be pornographic if taken by itself.

(5A) In relation to possession of an image in England and Wales, an "extreme image" is an image which—

(a) falls within subsection (7) or (7A), and

(b) is grossly offensive, disgusting or otherwise of an obscene character.]

[...]

(7) An image falls within this subsection if it portrays, in an explicit and realistic way, any of the following—

(a) an act which threatens a person's life,

(b) an act which results, or is likely to result, in serious injury to a person's anus, breasts or genitals,

(c) an act which involves sexual interference with a human corpse, or

(d) a person performing an act of intercourse or oral sex with an animal (whether dead or alive),

and a reasonable person looking at the image would think that any such person or animal was real.

(7A) An image falls within this subsection if it portrays, in an explicit and realistic way, either of the following—

(a) an act which involves the non-consensual penetration of a person's vagina, anus or mouth by another with the other person's penis, or

(b) an act which involves the non-consensual sexual penetration of a person's vagina or anus by another with a part of the other person's body or anything else,

and a reasonable person looking at the image would think that the persons were real.

(7B) For the purposes of subsection (7A)—

(a) penetration is a continuing act from entry to withdrawal;

(b) "vagina" includes vulva.

(8) In this section "image" means—

(a) a moving or still image (produced by any means); or

(b) data (stored by any means) which is capable of conversion into an image within paragraph (a).

(9) In this section references to a part of the body include references to a part surgically constructed (in particular through gender reassignment surgery).

(10) Proceedings for an offence under this section may not be instituted—

(a) in England and Wales, except by or with the consent of the Director of Public Prosecutions; or

[…]

**Allocation**

56. The offence under section 63 of the Criminal Justice and Immigration Act 2008 is triable either-way and can proceed summarily at the Magistrates' Court, or on indictment before a jury at the Crown Court.

**Punishment**

57. Section 67 of the Criminal Justice and Immigration Act 2008, provides that the maximum penalty which may be imposed following conviction on indictment for an offence of possession of extreme pornographic images, is imprisonment for a term not exceeding three years.

**Limitation**

58. There is no time limit for bringing a charge under section 63 of the Criminal Justice and Immigration Act 2008.

**DPP Consent**

59. Proceedings for offences contrary to section 63 of the Criminal Justice and Immigration Act 2008 (possession of an extreme pornographic image) require the consent of the DPP.

60. Pursuant to section 1(7) of the Prosecution of Offences Act 1985, such consent may be given by a prosecutor acting on behalf of the DPP. The issuing of a charging authority is sufficient for this purpose, and no separate record of consent is required.

61. On 10 July 2026, when the Crown Prosecution Service authorised the charges under section 63 of the Criminal Justice and Immigration Act 2008, the reviewing prosecutor also provided the necessary DPP consent to prosecute each of those offences.

**Evidence**

62. The Youth Justice and Criminal Evidence Act 1999 ("the YJCEA") provides a statutory framework for the admission of evidence from vulnerable and intimidated witnesses in criminal proceedings in England and Wales.

63. Pursuant to section 17(4) of the YJCEA, complainants in sexual offence cases are automatically eligible for special measures as intimidated witnesses.

64. Section 27 of the YJCEA provides that a video recording of an interview with a witness may be admitted as the witness's evidence-in-chief, subject to the directions of the trial court.

65. The complainants in this case have each provided their accounts during video recorded Achieving Best Evidence ("ABE") interviews conducted by police officers. Those recordings form part of the prosecution evidence and are capable of being admitted as evidence-in-chief in criminal proceedings in England and Wales.

66. The use of video-recorded interviews is intended to maximise the quality and completeness of a witness's evidence by obtaining and preserving their account at an early stage of the investigation.

67. The admission of a video-recorded interview as evidence-in-chief does not prevent the defendant from challenging that evidence. If the matter proceeds to trial, the complainants may be required to attend court and may be cross-examined on behalf

of the defendant in accordance with the procedures of the courts of England and Wales.

68. Accordingly, under the laws and procedures of England and Wales, the complainants' video-recorded ABE interviews constitute admissible evidence capable of being relied upon by the prosecution at trial, subject to the rules of evidence and any directions of the trial court.

**Extradition Act 2003**

62. Section 151A makes provision for dealing with a person for other offences following extradition:

(1) This section applies if a person is extradited to the United Kingdom from a territory which is not—

(a) a category 1 territory, or

(b) a territory falling within section 150(1)(b). [this relates to Commonwealth countries etc]

(2) The person may be dealt with in the United Kingdom for an offence committed before the person's extradition only if—

(a) the offence is one falling within subsection (3), or

(b) the condition in subsection (4) is satisfied.

(3) The offences are—

(a) the offence in respect of which the person is extradited;

(b) an offence disclosed by the information provided to the territory in respect of that offence;

(c) an offence in respect of which consent to the person being dealt with is given on behalf of the territory.

(4) The condition is that—

(a) the person has returned to the territory from which the person was extradited, or

(b) the person has been given an opportunity to leave the United Kingdom.

(5) A person is dealt with in the United Kingdom for an offence if—

(a) the person is tried there for it;

(b) the person is detained with a view to trial there for it.

Signed ____________

**Narinder Dhillon**

Dated 8.9.2026