**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.** 26-mj-03260-LOUIS

**IN THE MATTER OF THE EXTRADITION**
**OF EMORY ANDREW TATE,**

_______________________________________________/

**MEMORANDUM IN SUPPORT OF EXTRADITION**

The United Kingdom ("U.K.") requests that the United States extradite dual U.S.-U.K. citizen Emory Andrew TATE ("A. TATE" or "the fugitive") so that he can be prosecuted for more than three dozen offenses stemming from conduct that allegedly occurred in the United Kingdom between 2011 and 2017. An extradition hearing is currently scheduled for Thursday, November 19, 2026, at 10:00 a.m.

During the extradition hearing, the Court's limited role under the extradition statute is to determine whether the United Kingdom has presented evidence "sufficient to sustain the charge[s] under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. As discussed below, the five requirements for certification are satisfied. *First*, under 18 U.S.C. § 3184 and this District's local rules, the Court is authorized to conduct the extradition proceeding. *Second*, under 18 U.S.C. § 3184, the Court has jurisdiction over A. TATE because the government found and arrested him within this District. *Third*, the extradition treaty between the United States and the United Kingdom (the "Treaty")[1] is in full force and effect. *Fourth*, the offenses for which

---

[1] Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc No. 108-23 (2004), *as amended by the* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition

extradition is sought are covered by the Treaty. *Fifth*, there is probable cause to conclude that A. TATE committed the offenses alleged by the United Kingdom. The Court should therefore certify to the Secretary of State that A. TATE can be extradited to the United Kingdom.

**BACKGROUND**

**I. THE EXTRADITION PROCEEDINGS IN THE UNITED STATES**

The United States—in response to a request from the United Kingdom pursuant to 18 U.S.C. §§ 3181 *et seq.* and the United States' obligations under its extradition treaty with the United Kingdom— filed a Complaint in this District on July 18, 2026, seeking a warrant for A. TATE's provisional arrest with a view toward extradition. ECF No. 3. This Court issued an arrest warrant that same day, and A. TATE was provisionally arrested in Miami on July 18, 2026, for the purpose of initiating extradition proceedings.[2]

On July 20, 2026, the Court conducted an initial appearance and temporarily detained A. TATE. On August 27, 2026, the Court conducted a detention hearing and thereafter ordered that A. TATE be detained pending extradition proceedings. ECF No. 64. In compliance with the deadline set forth in Article 12(4) of the Treaty, the United Kingdom submitted its formal request for A. TATE's extradition to the U.S. Department of State on September 9, 2026.[3] ECF No. 68-1

---

Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument. ECF No. 68-1 at 7-25.

[2] A. TATE was arrested alongside his brother, Tristan Tate, who is also wanted for prosecution in the United Kingdom and is subject to separate extradition proceedings. *In the Matter of the Extradition of Tristan Tate*, Case No. 26-mj-03259-Louis.

[3] The United States provided a redacted copy of the formal extradition request to the Tates on October 5, 2026. An unredacted copy was also offered, subject to the entry of a protective order over sensitive information contained within the formal extradition request. But, on October 8,

at 5-6. The State Department subsequently issued a Declaration certifying the authenticity of the request and related documents, in accordance with the Treaty. *Id.* at 1-4.

## II. THE U.K. OFFENSES

A. TATE has been charged with 42 offenses in the United Kingdom, 39 of which are relevant to this extradition proceeding:[4]

- Five (5) counts of human trafficking in violation of Sections 2(1) and 5(1) of the Modern Slavery Act 2015;
- Ten (10) counts of rape in violation of Section 1 of the Sexual Offenses Act 2003;
- Seven (7) counts of assault occasioning actual bodily harm in violation of Section 47 of the Offences Against the Person Act 1861;
- One (1) count of controlling prostitution for gain in violation of Section 53 of the Sexual Offenses Act 2003;
- Five (5) counts of distributing an indecent photograph of a child in violation of Section 1(1)(b) of the Protection of Children Act 1978;
- Seven (7) counts of making an indecent photograph of a child in violation of Section 1(1)(a) of the Protection of Children Act 1978; and
- Four (4) counts of possession of extreme pornographic images in violation of Sections 63(1), 7(d) and 67(3) of the Criminal Justice and Immigration Act 2008.

---

2026, T. Tate and A. Tate both rejected the Government's proposal and decided to forgo disclosure of unredacted copies.

[4] As reflected in Declaration from the Department of State, three of the charges for which the United Kingdom sought extradition are not forwarded to the Court for consideration. ECF No. 68-1 at 2-3. The three charges for which the Government does not seek certification are listed in the Warrant of Arrest dated August 5, 2026, as counts 16, 20 and 28, and enumerated as counts xxvi (26), xxx (30), and xxxvii (38) in the Statement of Facts by Detective Constable Lee-Anne Marshall, which accompanies the United Kingdom's request for A. TATE's extradition. *Id.* at 2-3 & n.1. For ease of reference, this Memorandum will mimic the count numbers in the Detective Constable's Statement of Facts but will use Arabic numerals instead of Roman numerals.

ECF No. 68-1 at 155-156. These offenses were committed within the jurisdiction of the United Kingdom and are set forth in two separate warrants included in the U.K.'s request. A warrant for A. TATE's arrest was first issued on January 19, 2024, by Senior District Judge Paul Goldspring, Chief Magistrate, of the Westminster Magistrates Court and includes ten (10) charges. *Id*. at 34-36; 154. Judge Goldspring issued a second warrant issued on August 5, 2026, which includes 32 total offenses, 29 for which extradition is being considered. *Id.* at 37-46; 154. Both warrants remain valid and enforceable. *Id*. at 47, 50.

The allegations largely arise in connection with a webcam "business" A. TATE ran with his brother Tristan Tate ("T. Tate," and collectively "the Tate brothers"), wherein A. TATE is alleged to have used coercion, violence, and rape at times to compel, or attempt to compel, women to work for him by performing commercial sexual acts online in Romania and in the United Kingdom. The unlawful image counts arise from an investigation in which A. TATE was arrested and wherein devices were seized from A. TATE. An examination of the devices later revealed that A. TATE had produced and distributed videos and images involving a minor female who was also working for him in his webcam business. The United Kingdom also alleged that A. TATE possessed extreme images of pornography.

According to the United Kingdom, the Tate brothers ran an operation beginning in 2014, in which they recruited young women to perform on webcam platforms and then produce bespoke sexual content for paying subscribers using different platforms. According to evidence in the case as further detailed below, these young women, referred to as "cam girls," performed sexual acts online for subscribers in exchange for money. When a "cam girl" performed sexual activity online, including in private chat rooms or through the production of bespoke videos, access to the chat room or delivery of the video was restricted to subscribers who had made the requisite payment

set by the Tate brothers. The operation was initially based in the United Kingdom and was subsequently relocated to Romania, where the Tate brothers permanently resided beginning in 2017. ECF No. 68-1 at 59.

The United Kingdom alleges that A. TATE acted as the principal recruiter for the webcam enterprise. A. TATE identified women whom he perceived as vulnerable, established intimate relationships with them, and persuaded, coerced, and arranged for them to travel internationally for the purposes of commercial sexual exploitation. A. TATE sometimes used dating apps to "match" with women and then falsely present himself as a romantic partner, demonstrating affection, attention, and apparent commitment in order to establish emotional dependency—features commonly associated with the "lover-boy" model of exploitation. A. TATE would also use, or attempt to use, rape and sexual violence as a method of obtaining and maintaining control over these women and then use his emotional influence and control to convince the women into travelling to Romania in furtherance of his webcam business. *Id*. at 60-63.

It is alleged that, while A. TATE was the principal recruiter, T. Tate also established an intimate relationship with one of the complainants and recruited her into the webcam industry. T. Tate, and others, also provided operational and logistical support. T. Tate's role included arranging travel, collecting complainants from airports, transporting them to accommodation and facilitating the day-to-day running of the operation. Together with his brother, T. Tate directed webcam activities of the women who worked for them, including determining when women worked and the nature of the commercial sexual content they were expected to produce. *Id*. at 60.

Once these women arrived in Romania, they were subjected to a range of controlling measures. A. TATE played a significant role in maintaining their compliance and directing their activities thereafter. The women's passports were removed and retained at times, the women were

accommodated in premises under the Tate brothers' control, and they became dependent on the Tate brothers for accommodation, transport, and financial support. A. TATE and T. Tate both threatened to use, and did use physical violence to maintain control and compliance. By means of manipulation, coercion, and violence, women were pressured to produce increasingly explicit and sexual pornographic material for subscribers on webcams for the Tate brothers' financial benefit. *Id*. at 63-64.

The U.K. authorities have identified six (6) alleged adult victims of A. TATE. The identities of these victims are known to U.K. authorities, as they have provided multiple recorded video statements memorializing their accounts, and have each identified a photograph of A. TATE as the accused. *Id*. at 57. While each victim details her own unique experience, the *modus operandi* of A. TATE and his brother T. Tate is readily apparent. The victims' highly detailed individual testimonies, and corroborating evidence in support thereof, are summarized as follows:

**A. <u>Complainant 1: Counts 1 and 2 (human trafficking)</u>**

Complainant 1 (hereinafter "C1") first contacted the police in January 2023, after seeing media reports that T. Tate, her former romantic partner, was under investigation in Romania for sexual offenses. She was interviewed on multiple occasions by police, and her statements have been captured on video recording. ECF No. 68-1 at 65.

Prior to the facts giving rise to the two charges involving C1, C1 had been in a relationship with T. Tate that was often violent, including multiple allegations of anal and vaginal rape and physical abuse which left bruising, marks and welts on her body, face and neck from being choked and hit with a belt. After the relationship broke down, C1's contact with T. Tate was limited, and she blocked him on social media accounts. In contrast, C1 described her relationship with A. TATE as "good." *Id*. at 65-66. Following renewed contact with the Tate several years later, C1

traveled to Romania on two occasions to work for the Tates brothers' webcam business, where she performed sexual acts for paying webcam customers at the Tates brothers' direction and for their financial gain. Allegations pertaining to these two trips form the basis of Counts 1 and 2, respectively, as set forth in the January 2024 warrant. *Id*. at 66.

1. <u>Facts Supporting Count 1 (human trafficking)</u>[5]

Specific to Count 1, C1 told U.K. authorities that, in April 2016, several years after C1's relationship with T. Tate ended, she was contacted via Facebook by *ModelStars*, a webcam business established by T. Tate. T. Tate encouraged C1 to work as a webcam model in Liverpool, Amsterdam or Romania. C1 initially refused because she did not want to perform sexual acts online, but T. Tate nevertheless persisted in attempting to recruit her, describing the work as a lucrative opportunity in which some women earned up to £8,000 per month. *Id*. at 67.

Police have obtained emails between T. Tate and C1 from the same time period demonstrating T. Tate's efforts to recruit C1 to travel to Romania to perform commercial sex acts online. For example, T. Tate told C1 in an email, "*You know the business i'm in. I'll work you from my place in Amsterdam or my studio… work 9-10 hours per day 5 days a week (it isn't easy) but I'll pay you every 2 weeks*." He told C1, "*There are girls on the Internet uglier than you making 8K a month," and told her to "quit your shitty… job and I'll book you a flight*." *Id*. at 73.

C1 subsequently began communicating on WhatsApp with A. TATE, who C1 described as the "nicer brother." *Id.* at 66. A. TATE became involved in the recruitment process, ultimately arranged C1's travel from the United Kingdom to Kosice, Slovakia, on April 15, 2016,

[5] A. TATE and T. Tate are jointly charged with human trafficking based on C1's two trips to Romania; these offenses are charged as Counts 10-11 against T. Tate.

accompanied by another female intending to work for the business. Flight records confirm C1's travel to Slovakia on that date. *Id.* at 67.

According to C1, A. TATE collected C1 and the second female from the airport and created a *MyFreeCams* account for C1. After observing other women performing on webcam platforms, C1 determined that the work was not something she wanted to do; however, she briefly went online that evening because she did not want to disappoint A. TATE. The following day, A. TATE drove C1 and two other females to an apartment in Romania, where C1 remained for 4 or 5 days. A. TATE encouraged her to perform increasingly sexual acts online, telling her that the more sexual she was, the more money she would make. C1 recalled performing sexual acts on camera, including masturbation and nudity, under a pricing structure whereby subscribers paid tokens to view increasingly explicit content. C1 did so on the understanding that she would receive the payments promised by the Tate brothers. *Id*. at 67-68.

On approximately the fourth day, C1 told T. Tate that she no longer wanted to work online and wanted to return home. T. Tate then brandished a machete and told C1 that if she wanted to leave that she could walk down the hill and obtain a taxi herself. A. TATE was present during the altercation and laughed. A. TATE ultimately agreed to assist C1 after she repeatedly begged to leave. C1 was eventually driven to the airport, returned to the United Kingdom, and never received any payment for the commercial sexual services she provided at the behest of A. TATE and T. Tate. *Id*. at 69.

2. <u>Facts Supporting Count 2 (human trafficking)</u>

Later that same year, in September 2016, C1 traveled again to Romania at the behest of A. TATE and T. Tate to perform commercial sexual services for their financial gain. According to

C1, T. Tate contacted C1 and asked for her telephone number.[6] These messages have been recovered by U.K. law enforcement.

A. TATE subsequently contacted C1 and offered her the opportunity to work as a webcam "model" from a house in Bucharest, Romania. A. TATE told her that she would have better working conditions, be paid a percentage of what she earned, receive money every two weeks, and would be safe. C1 agreed to go. *Id*. at 70.

A. TATE arranged and paid for C1's travel, and C1 traveled to Bucharest on September 21, 2016, as confirmed by flight records. According to C1, she was collected from the airport and taken to a large house where numerous women were working on webcams. She recalled seeing one woman who was visibly distressed and wanted to return home. C1 resumed using the *MyFreeCams* account previously established by A. TATE, working overnight shifts from approximately 22:00 until 08:00. C1 did not have a choice whether to work through the night and often found it difficult to stay awake. *Id*. at 70–71. C1 performed sexual acts online, included masturbating vaginally and anally, using sex toys anally, and pretending to have orgasms, all for fees paid by customers through a token-based system. The customers provided instructions to C1 from both public and private chat rooms. *Id*. at 71–72.

According to C1, subscriber communications were controlled by a cousin of the Tate brothers, who responded to messages pretending to be C1. C1 recalled that her expressed boundaries were ignored, particularly her request not to perform sexual acts involving her anus.

---

[6] C1 told law enforcement that she had emailed T. Tate a few months prior in June 2016, asking whether he had any webcamming work available because she needed money. At the time, T. Tate told her that there was no space available. C1 told law enforcement that, reflecting back, she does not believe that she was in the right frame of mind when she contacted him because of the abuse that she had previously suffered during their relationship. ECF No. 68-1 at 70.

However, the person controlling the account ignored her wishes and ordered that she do whatever the paying subscribers requested. She recalls feeling like "*they were willing to sell me for anything*." *Id*. at 71. For example, C1 described a subscriber paying a substantial amount of money to watch her spank herself 100 times. She complied and sustained bruising to her buttocks as a result. *Id***.**

According to C1, the Tate brothers would closely monitor her movements while she was living at the property and would want to know where she was going and when she would return if she left the house. C1 recalls having very little money in Bucharest, often going without food. C1 felt uncomfortable asking A. TATE for money and did not feel able to approach him or T. Tate for financial assistance or payments as promised. *Id*. at 72.

C1's time in Romania ended after T. Tate accused her of attempting to sabotage the business. He drove her to a hotel near the airport, berating her along the way, and left her overnight. He returned the next morning with her belongings. A. TATE, however, offered C1 the opportunity to continue working from the apartment in Brasov, Romania. C1 declined, booked her own flight home, and returned to the United Kingdom. She received no payment for the commercial sexual acts she performed at the direction of the Tate brothers. *Id*.

In 2018, C1 disclosed to a colleague what had happened to her. That colleague has provided a statement to police regarding C1's disclosure. *Id*. at 74.

**B. <u>Complainant 2: Counts 3, 4 (rape), Counts 5, 6 (assault)</u>**

Complainant 2 (hereinafter "C2")[7] contacted the police in August of 2022, about conduct that A. TATE allegedly committed in 2015. She said that she had tried to repress what had

[7] Complainant 2 is referred to in the Complaint as "Complainant A." ECF No. 3.

happened to her, but it had not worked and things had reached a stage where she felt compelled to report that, on a date between January and March 2015, A. TATE raped and assaulted her by strangulation twice in the same evening inside her home. ECF No. 68-1 at 74.

According to C2's video-recorded account to U.K. law enforcement, she met A. TATE through a mutual acquaintance. At the time, C2 was already involved in the webcam business, and the mutual acquaintance told her that A. TATE was setting up his own webcam business and "paid really good." *Id*. The mutual acquaintance asked if C2 was interested in working for A. TATE or training girls. *Id*.

1. Facts Supporting Counts 3 (rape) and 5 (assault)

C2 and A. TATE made contact through WhatsApp for a couple of days, and they planned to meet. In approximately January 2015, C2 thought that they had plans to meet for lunch, but A. TATE did not reply to her for hours. It got into the evening hours, when A. TATE called, apologized, and said that he was on his way. After arriving at C2's house, they went out to get some food. C2 recalled that it was late and nothing was open, so they drove through a McDonald's drive-through. A. TATE and C2 returned to C2's house. *Id*. at 75.

C2 described that things spiraled quickly when they went inside her home. She recalled putting her food bag next to her and reaching for the remote. Before she could do anything else, A. TATE, from a seated position, put his arm around C2's neck and squeezed it. *Id*. at 75–76.

In her video testimony, C2 described and reenacted the positioning of herself and A. TATE on the sofa and demonstrated how A. TATE had his hand to her throat. C2 told the police that the main thing she remembers after that is thinking that he was going to kill her and that her head would "pop" off her body. *Id*. at 76. All she cared about was him letting go of her neck, which she said that he relentlessly did not do. She remembered that she was wearing black trousers and

that A. TATE demanded that C2 take her trousers down, either saying "*take your fucking trousers off, and I won't hurt you*" or "*take your trousers off and I won't, and I'll kill, or I'll kill you*." *Id*. C2 cannot recall the precise words. *Id*.

C2 took her trousers down as demanded, and A. TATE put his penis into C2's vagina without her consent. C2 recalled that her phone, which was on the floor, rang and her sister's name came up. A. TATE kicked the phone, and it spun into the kitchen. C2 explained that things were fuzzy from there. She said that "*it just went on forever*" and that she kept thinking A. TATE was going to kill her. *Id*. She lost consciousness at one point. *Id*.

C2 recalled regaining consciousness while A. TATE was crying and saying, "*I love you… that's why I am raping you because I love you*." *Id*. at 77. A. TATE threatened to anally rape her, which terrified her, and she had to appease him by telling him that she loved him. She begged him not to anally rape her. A. TATE then continued to strangle her. When A. TATE stopped raping her, C2 attempted to act normally out of fear of being killed. *Id*. This forcible rape is charged in Count 3, and the related assault by strangulation resulting in loss of consciousness is charged in Count 5.

2. Facts Supporting Counts 4 (rape) and 6 (assault)

After a period of time, C2 indicated that she was going to go to bed, and A. TATE started following her upstairs. C2 told him that she did not want him to stay but ultimately acquiesced out of fear of provoking him to hurt or kill her. In bed, A. TATE pondered out loud whether to rape her orally but began strangling her again before she could respond. C2 believes that A. TATE put his penis in her mouth for "a period of time" while strangling her. A. TATE continued to strangle C2 while vaginally raping her until he "finished" (ejaculated). *Id*. at 79. C2 recalled that the strangling was not as intense as it had been before, and that A. TATE released her before it got

to the point where she thought that death was imminent. *Id*. at 81. This second forcible rape is charged in Count 4 and the related assault by strangulation in Count 6.

For the first 48 hours after A. TATE left, C2 and A. TATE continued to exchange messages. She recalled replying as if she was not upset, but she in fact was terrified because he knew where she lived. She then became angry and sent him messages wherein she told A. TATE that she hopes that *he* gets raped, which she has shown to the police. In response, he threatened to wait for her in the bushes and rape her again. A. TATE also sent C2 a voice note apologizing for raping her.[8] *Id*. at 81.

C2 disclosed the incidents to at least three individuals, two of them contemporaneously. C2 disclosed the rapes and assaults to two friends in the days and weeks following the incident, one male and one female, both of whom provided statements to the police corroborating the victim's account. *Id*. at 81–83.

According to the statement C2's male friend provided to the police, C2 arrived at his house, visibly distressed and frightened and disclosed that she had been raped. C2's friend was under the impression that the incident had occurred in the preceding day or so. C2 told him that a man had been at her house and subjected her to "brutal, rough" sex that she did not want. *Id*. at 81. She told him that her assailant had choked her, that she had gone in and out of consciousness, and that she was too frightened to tell her attacker to stop. The male friend saw that C2 had visible bruising to

[8] According to the United Kingdom's request, "whilst Complainant 2's mobile phone contains a voice note, the audio file cannot be accessed." ECF No. 68-1 at 83.

her neck. At some point later, he learned that C2's assailant, whose name he did not remember, had been on the TV show "Big Brother."[9] *Id*.

C2's female friend further corroborated C2's account. She informed police in January 2024, that approximately eight years prior, C2 had disclosed that she had been the victim of a violent sexual assault, wherein she had been grabbed and choked by an individual whose name the female friend could not recall. She did recall, however, that C2's assailant was a former fighter who had a large online presence, had been on the TV show "Big Brother" and was located in Romania. C2's female friend told police that C2 had played and forwarded to her an audio recording that C2 had received from the assailant in which he told her that he would rape her again. U.K. authorities have not been able to retrieve the voice note. *Id*. at 83.

Messages retrieved from C2's phone include a screenshot of a WhatsApp conversation between C2 and A. TATE, which reveals additional threatening messages from A. TATE saying, "*I'll wait outside ur house*," "*I'm gona be waiting for you*" "*With a rope*" "*And a boner*" "*And I'm gona rape you*." *Id*.

**C. <u>Complainant 3: Counts 7, 9 (assault), Count 8 (rape), Count 10 (controlling prostitution for gain)</u>**

Complainant 3 (hereinafter "C3")[10] contacted the police in January 2023, after seeing that A. TATE was arrested in Romania for similar offences to those she alleges to have experienced. She provided a detailed account to police over the course of multiple interviews, all memorialized

---

[9] C2 also disclosed the rape to her partner, who provided a statement to the police in June 2023. He described how C2 became distressed after seeing A. TATE on a TV advertisement for the show "Big Brother," and he observed that C2's mental health further declined as A. TATE's profile increased. ECF No. 68-1 at 82.

[10] Complainant 3 is referred to in the Complaint as "Complainant B." ECF No. 3.

in video recordings. C3 alleges two assaults and a rape at the hands of A. TATE, as well as facts that detail A. TATE's control of C3's online prostitution activities in the United Kingdom. ECF No. 68-1 at 84.

According to C3, before the incidences giving rise to Counts 7-10, she had "matched" with A. TATE on a dating app. *Id*. C3 describes herself as being in a particularly vulnerable state, attributed to a breakdown of a relationship. C3 began communicating and confiding in A. TATE, and, according to C3, he seemed to recognize that C3 was vulnerable. Their communication continued on Facebook and WhatsApp, and A. TATE made C3 think that they were in a relationship. A. TATE quickly became controlling and possessive and would tell C3 that she could not speak to other men. He would constantly tell her to obey him and would refer to himself as a "pimp."[11] He frequently tried to recruit her to become a "cam girl," knowing that she was vulnerable and not financially secure. Eventually she acquiesced as further outlined below. *Id*. at 84-85. C3 also alleges one incident of assault in July 2014 by A. TATE and, sometime between August 2015 and December 2015, a separate incident of rape and assault at the hands of A. TATE. These sexual encounters included periods of choking during intercourse and painful, rough sex that made C3 believe that A. TATE was going to kill her.

1. <u>Facts Supporting Count 7 (assault)</u>

The first instance of assault occurred in July 2014, a few weeks after their first date. A. TATE picked up C3 from a festival and took her to his flat in Luton. According to C3, although she initially consented to sexual intercourse with A. TATE, this was the first time that they had

[11] C3 recalled an occasion where A. TATE asked her to have sex with other men for money. He told her that she would get paid £3000, that he found it attractive and that he would want to have sex with her before and after. C3 refused. *Id*. at 85.

been intimate, and she was surprised at how rough A. TATE was. According to C3, A. TATE had not given her any indication that the sex would be rough. She was shocked because it was not how she expected it to be. She believes he choked her, and she sustained injuries in the form of marks on her neck. ECF No. 68-1 at 85–86.

2. Facts Supporting Count 10 (controlling prostitution for gain)

The conduct of which A. TATE is accused in Count 10 alleged occurred between May 1, 2015, and September 2, 2015. As stated above, during their ostensible relationship, A. TATE encouraged C3 to become a cam girl working for him at his residence in Luton. C3 was told that she did not need to do anything sexual or show her body online, instead offering for C3 to only speak to men online in a private chatroom. C3 declined A. TATE's offer on multiple occasions, but A. TATE continued to make efforts to recruit her, with knowledge of her vulnerability and financial insecurity. The figure he mentioned was "a lot of money to her at the time." *Id*. at 88. C3 eventually agreed to become a cam girl but on the condition that she could work out of her own home. *Id*.

According to C3, A. TATE managed the whole operation. He told her that he would take a small percentage of the earnings to cover administrative and marketing fees and that she would be paid either weekly or fortnightly. A. TATE created an account for C3 with a website called *AdultWork*. A. TATE messaged C3 while she was online in the chatrooms, giving instructions on how to keep men in the private chatroom. A. TATE also sent C3 videos of other women performing and using sex toys and told C3 that she would need to do the same if she wanted to make money. C3 felt pressured to do things that she did not want to do. *Id*.

C3 did as instructed and performed sex acts requested by men online. C3 felt pressured to do things that she did not want to do, including "doing pornographic things, taking her clothes off,

touching herself and things like that." *Id*. A. TATE pressured C3 to spend more time online and told C3 she could earn money by having sex with a stranger, which she refused to do. After a week or two of working as a cam girl, C3 recalled receiving only approximately £200 and did not recall receiving any further payments, despite continuing to work online for a period of time longer than that. According to the U.K. investigators, banking evidence shows that C3 received several payments from A. TATE during the relevant period of time that she was performing sex acts online for A. TATE. *Id*. at 90.

3. Facts Supporting Counts 8 (rape) and 9 (assault)

After a period without contact, A. TATE contacted C3 in autumn or winter 2015. A. TATE said he wanted to come to her house to talk to her (presumably again) about working as a cam girl. He arrived at her house an hour later. At this point, C3 told police that she did not want to have sex with A. TATE as he was no longer a person that she liked, and she feared him. *Id*. at 86.

However, while at the apartment, C3 told police that they began having vaginal intercourse, during which A. TATE put both hands around C3's neck and strangled her, obstructing her breathing. She was scared. C3 tried to loosen A. TATE's grip and get his hands off her neck. She told police that, while she thinks it would have been obvious to A. TATE that she could not breathe, she is "nearly sure" that she told A. TATE to stop and that it was hurting her. *Id*. at 86. A. TATE ignored her and only stopped when he ejaculated. C3 recalled that there were clear physical signs that she was uncomfortable and that she did not want to be choked. She thought he was going to kill her. He called her a "slut" and a "bitch," and she said that it was "rough and scary." He told her to tell him that she loved him, which she eventually did because she wanted him to stop. *Id*. at 87. According to C3, she "just did what he said because she thought he would stop hurting her."

*Id*. C3 again sustained red marks on her neck following the incident. *Id*. This vaginal rape is charged in Count 8, and the accompanying assault by choking is charged in Count 9.

Corroborative evidence relative to the rape and assaults includes Facebook messages between C3 and A. TATE where A. TATE wrote, "*I'm gonna strangle you asleep before I cum*," to which C3 replied, "*I'm scared. And excited. Not sure how I feel right now*." In messages recovered from A. TATE's phone (Exhibit AT01), C3 asked A. TATE "*not to rape her*" and "*not to hit her with a belt*." *Id*. at 91.

**D. <u>Complainant 7: Counts 11, 12, 15, 16 (rape), 13, 14, 17 (assault), 18 (human trafficking)</u>**

Complainant 7 (hereinafter "C7") was contacted by police in March 2025 and later provided a formal account of her testimony to law enforcement in a video-recorded interview. ECF No. 68-1 at 92. Based on her detailed and explicit testimony, and corroborating evidence thereof, the United Kingdom has brought four (4) charges of rape, three (3) charges of assault and one (1) count of human trafficking relative to C7.

According to C7, she met the Tate brothers at a nightclub in England when she was 20 years old, and she exchanged phone numbers with A. TATE. They met the following day for breakfast and began seeing each other regularly. According to C7, A. TATE led her to believe that they were in an exclusive relationship. C7 describes herself as young and naïve at the time. *Id*. at 92.

The relationship was marked by violence. A. TATE, who C7 described as having a "dominant personality," became violent towards her, both sexually and non-sexually, verbally and physically. *Id*. On at least one occasion, A. TATE held a samurai sword to C7's throat and forced her to do housework, such as his ironing. A. TATE also filmed himself making threats and played

the videos back to C7. A. TATE shouted abuse at her, including calling C7 a "stupid bitch" or "stupid hoe." *Id*. at 92–93.

1. Facts Supporting Count 11 (rape) and Count 13 (assault)

C7 detailed incidents of physical abuse and rape during her year-long relationship with A. TATE, including periods of strangulation during intercourse whereby C7 lost consciousness and convulsed. For example, on an occasion between November 2011 and October 2012, C7 recalled that A. TATE strangled her until she lost consciousness and continued to have sexual intercourse with her while she was unconscious. *Id*. at 94. This rape is charged in Count 11, and the accompanying assault by choking to the point of losing consciousness is charged in Count 13.

2. Facts Supporting Count 12 (rape) and Count 14 (assault)

C7 recalls four or five additional sexual encounters between November 2011 and October 2012 during which A. TATE put his entire bodyweight on her, grabbed her throat, and strangled her until she fell unconscious and was convulsing. A. TATE continued having sex with C7 while she was unconscious and continued when she regained consciousness. *Id*. at 94-96. These additional rapes are charged in Count 12, and the accompanying physical assaults by strangulation causing a loss of consciousness are charged in Count 14.

C7 has provided U.K. law enforcement with photographs corroborating her connection with A. TATE and his predilection for strangling women, including a photograph of C7 in bed with A. TATE and a photograph of herself with a hand around her throat that C7 stated was the hand of A. TATE. *Id* at 101.

3. Facts Supporting Counts 15 (rape), 16 (rape), 17 (assault)

The relationship between A. TATE and C7 ended when C7 learned that A. TATE was seeing someone else. Eventually C7 moved on and got married. According to C7, A. TATE

continued to send her occasional emails, including an email saying that he wanted to rape her. C7 deleted the email, as she did not want her husband to see it. *Id*. at 93-94.

Email correspondence was provided to law enforcement, which corroborates C7's account. The emails show that A. TATE contacted C7 in 2013, 2014, 2016 and 2017. In 2013, he asked how she was and asked her to accompany him on a business trip to Kosice, Slovakia; he said she would spend three nights clubbing. She refused. In 2014, he asked for C7's phone number; she refused. He emailed her again in 2014 asking her to be a cam girl on his webcam platform. He told her that fully-clothed girls made £700–£1000 per week. She refused. Later in 2014, he unsuccessfully tried again to obtain her phone number and to persuade her to do webcam work. This time, he said she would earn £1500–£2000 per week. *Id*. at 101. He emailed her again in 2016 and 2017. *Id*. at 102.

In April 2017, C7 had what she described as a "*lapse in judgment*" and responded to an email from A. TATE. *Id*. at 97. She agreed to meet him in England where she was living at the time. According to C7, they visited hotels and restaurants in the area. Invoices confirm that A. TATE stayed at hotels and ate at restaurants near C7's hometown in April 2017. *Id*.

On one occasion, C7 and A. TATE checked into a hotel room. According to C7, as soon as they walked into the room, A. TATE grabbed C7 by the throat, threw her on the bed face down and vaginally penetrated her whilst choking her. C7 lost consciousness. C7 recalled that A. TATE was "probably" still having sexual intercourse with her when she regained consciousness. *Id*. The vaginal rape is charged in Count 15; the accompanying assault by choking causing a loss of consciousness is charged in Count 17.

Following the vaginal rape in which she lost consciousness, A. TATE forced C7 to perform oral sex on him, exerting such force on C7's head that she vomited. *Id*. The oral rape is charged in Count 16.

4. Facts Supporting Count 18 (human trafficking)[12]

After these assaults, A. TATE continued to contact C7 and, according to C7 "*love-bombed*" her, seeking fast-paced commitment. *Id*. at 94. A. TATE encouraged C7 to leave her husband and move in with him in Romania. According to C7, A. TATE told her that she would not have to do webcam work, though she could if she wanted to earn money. If she did the webcam work, she was told that she would keep 80% of her earnings, and A. TATE would keep 20% to cover overhead. *Id*. at 99.

Emails between C7 and A. TATE from this time period were provided to law enforcement and corroborate C7's account. For example, in April 2017, A. TATE emailed C7 prior to her leaving for Romania. He wrote that she did not need to do webcam work in Romania if she did not want to, that "*daily life would be perfect*," she was his "*Number 1*," and he felt excited at the prospect of them being around each other. *Id*. at 102. C7's email response demonstrates that she was unsure about the prospect of going to Romania. *Id.*

Ultimately, C7 agreed to travel to Romania, and A. TATE booked her flight and, along with T. Tate and another female, picked her up at the airport upon arrival in Romania in June 2017. Records provided by C7 confirm her flights to and from Romania. *Id*. at 99. She was taken to a house where there were four or five other young females staying. There were webcams set up in

---

[12] A. TATE and T. Tate are jointly charged with trafficking C7; this offense is charged as Count 18 against T. Tate.

the rooms, and each room was made to look like a bedroom. Despite A. TATE's previous statements, C7 was quickly set up to work on webcams, often for twelve hours a day. Others in the house, including T. Tate, would control the chat function on the webcam broadcast and would accept payment for sex acts for C7 to carry out on camera irrespective of C7's agreement. *Id*.

According to C7, A. TATE also used violence and death threats against C7 and other females in the house in Romania in order to maintain control over them. This included strangling, tripping, slapping and leaving C7 on the floor unconscious and throwing her in the pool. Her movements were restricted and controlled by the Tate brothers, and she feared for her personal safety. C7 would sometimes sleep in a studio room in order to avoid sharing a room with A. TATE, who would demand sex from C7. *Id*. at 100.

C7 reported experiencing a complete disregard for her autonomy and her consent to carry out sexual acts on camera. For example, C7 was clear that she did not want to do any anal sexual activity, but T. Tate and others controlling the webchat would accept payment for C7 to carry out anal sex acts – including inserting sex toys in her anus. She also describes having to "*fuck a bed knob for an hour*," and says that it felt like "sexual slavery." *Id*. at 99. She was only allowed to keep 20% of her earnings and had to pay her own living expenses. *Id*. at 99-100. After approximately three months, C7 left Romania. She booked a flight and waited until A. TATE was out before she ran to an apartment and created an elaborate lie about her mother being in the hospital in the United Kingdom. *Id*. at 100.

Bank records confirm that C7 received four payments totaling only £2,711.01 from T. Tate during the approximate 3-month period when C7 was in Romania working for A. TATE and T. Tate. *Id*. at 102. A further payment scheduled to take place on September 8, 2017, for £128.18 was cancelled, and C7 did not receive the money. *Id*. at 95.

**E. <u>Complainant 5: Counts 19, 20 (rape); Count 21 (human trafficking)</u>**

Complainant 5 (hereinafter "C5") was contacted by police in February 2025. Her account of at least two incidences of rape and sexual violence over the course of approximately one year (April 2015-March 2016), as well as A. TATE's recruitment and resulting transportation and prostitution of her in Romania, is memorialized in a video recorded interview. ECF No. 68-1 at 102-104.

According to C5, she was contacted by A. TATE on social media when she was 20 or 21 years old. A. TATE and C5 met at a cocktail bar in England soon thereafter and began dating. Throughout their ostensible relationship, A. TATE strangled, slapped, and hit C5 within sexual and non-sexual settings. As further outlined below, C5 alleges multiple incidents of physical and sexual abuse, including allegations of rape soon after they met. C5 told police that, at the time, she was unaware that it was rape if you told someone to stop during sexual intercourse and they continued. *Id*. at 103.

1. <u>Facts Supporting Count 19 (rape)</u>

According to C5, not long after they started dating, A. TATE took C5 to his apartment in England. T. Tate was also present at the apartment, and the three started drinking. C5 became very drunk and recalls wanting to have sex with A. TATE, as she perceived him as her boyfriend. According to C5, this would have been the first time they had sex, and the sex began as entirely consensual. *Id*. at 104.

However, without C5's consent, A. TATE started to become rough, hitting and slapping C5 on her face and body. C5 told A. TATE that she did not like it. A. TATE responded by grabbing her head, pulling it back and hitting her again. He then turned her over and hit her buttocks, leaving red marks that were visible the following day. A. TATE then flipped C5 over

again and put his hands around her neck, strangling her until she could not breathe. She was scared and remembered trying to get his hands off her neck (which she indicated by clawing at her neck). A. TATE stopped strangling her, grabbed her hands and pinned them down until he ejaculated. C5 told authorities she wanted A. TATE to stop, but she did not tell him to stop and "just let it happen." She was too scared to sleep that night. *Id*. at 104–105.

C5 recalled sustaining big red marks like bruising all over her body, including on her legs and buttocks as a result of the encounter. A. TATE and C5 had not discussed or agreed to strangulation or hitting. While C5 initially consented to vaginal sexual intercourse with A. TATE, she did not consent to being slapped, hit or choked. *Id*. at 105.

2. Facts Supporting Count 20 (rape)

Following the first incident of alleged rape, C5 stopped seeing A. TATE. However, he continued to contact her in a way that, like C7, C5 described as "love bombing"– sending her messages on Instagram and by text telling her he loved her and wanted to be with her. *Id*. Some weeks later, A. TATE and C5 met at a hotel bar in London. During the evening, A. TATE told C5 that he owned a webcam agency and had girls that worked for him as prostitutes. He claimed it was legal. *Id*. He attempted to recruit C5, who says that she was vulnerable at the time. A. TATE told her that she could earn £2,000 per week for doing nothing, and that it was easy money just talking to people online. C5 reluctantly agreed, and A. TATE set up C5's account with *ModelStars* and showed her how it worked. However, after a few minutes in the chat room, someone recognized C5, and, because of this, C5 was clear that it was not something she wanted to do. *Id*. at 106.

A. TATE continued to contact C5, telling her he loved her and that he wanted to help her financially. He showed her a photograph of a woman who worked for him (and with whom he

was sleeping) and told C5 she could earn double what the woman earned. C5 was upset over the photograph. *Id.*

Approximately one month later, A. TATE and C5 met at a hotel in London. He reassured her that he was not sleeping with the woman in the photograph and that he loved her, wanted to be with her and wanted her to go to Romania with him. *Id.* A. TATE and C5 began having consensual sexual intercourse. However, C5 was thinking of the woman in the photograph and no longer wanted to have sex. She vividly recalled telling A. TATE to stop and attempted to push him off of her. He did not stop. Instead, A. TATE pinned down C5's hands and continued penetrating her. She laid there until he finished. She recalled feeling sore and uncomfortable afterwards. *Id.* at 107.

3. Facts Supporting Count 21 (human trafficking)[13]

C5 did not speak to A. TATE for approximately a month after the second alleged incident of sexual violence. However, A. TATE continued to contact C5 across different platforms and from different numbers with "love bomb" messages, telling C5 he loved her and wanted her back. A. TATE asked C5 to come to Romania on the pretense of spending time together romantically on holiday. *Id.* C5 eventually agreed based on A. TATE's promises.

A. TATE booked and paid for C5's flight to Romania. C5 was met at the airport by T. Tate and another female who took her to the apartment. On arrival, A. TATE took possession of C5's passport under the pretense that he needed it to book flights for the two of them to go on holiday. *Id.* at 108-110.

---

[13] A. TATE and T. Tate are jointly charged with this count of trafficking C5; this offense is charged as Count 15 against T. Tate.

That night, they all consumed alcohol in a hot tub, and A. TATE then told the females to get "to work," and he accompanied them into a room. *Id*. at 108. C5 was told to stay with T. Tate in the other room. *Id*. T. Tate was working on his laptop on the webcam platform when he asked C5 to try webcamming; C5 refused, telling T. Tate that she had already told A. TATE that she was not participating. T. Tate told C5 that she was going to have to do it and that all she had to do was sit there. She sat there, fully clothed, while T. Tate typed to the men online. He then told her to pretend that she was typing. She did not type convincingly, which she said annoyed T. Tate. He then told her that a man wanted her to take her top off. C5 refused. *Id*. at 108–109.

T. Tate then left the room, and A. TATE entered. A. TATE pinned C5 against the wall and put his hand around her neck, telling her that she must do what T. Tate told her, "*you do what the captain says. You fucking do what he says*." *Id*. at 109. C5 was scared and got back on the bed and removed her top, becoming visibly distressed and crying. Because of this, they stopped. *Id*.

That night, she recalled being afraid when A. TATE came into the bedroom where she was sleeping. Though she says she did not want to have intercourse with him, she just laid there and let him do it, which U.K. authorities assert demonstrates the level of control that A. TATE had over C5 by this time. *Id*.

The following night (C5's second night in Romania), A. TATE told the females to "get to work." *Id*. C5 refused and told him that she was not there to work. A. TATE threatened her and told her to get ready, which she did because, by this point, C5 was "utterly terrified" of him. *Id*. He told her that she was going to be in the room with two other women. A. TATE was in the same room typing on the laptop, and there were people logged into the chatroom watching them. A. TATE then instructed them all to perform oral sex on each other. They did as they were instructed, including C5. *Id*.

After, C5 vomited in the bathroom and spent the night in the bathroom with the door locked. C5 told A. TATE that she did not want to be there anymore. He told her that she was not allowed to leave (he still had her passport). At this point, C5 realized that he did not love her and only wanted to make money off of her. A. TATE only agreed to allow C5 to leave when she told A. TATE that her family knew she was there in Romania with him. A. TATE persisted in trying to convince her to stay and threatened to kill her and her family if she told anyone about what occurred in Romania. *Id*. at 110.

Police have obtained a screen recording of Facebook messages between C5 and A. TATE from October 2015, November 2015, and June 2016, where A. TATE said that he is a "pimp" and tried to recruit C5 to work for him, telling her "*You don't have to do shit but sit there and talk*," "*Nothing else*" and "*I guarantee u 2k a week and free place to live*." *Id*. at 110-111. They also recovered the photograph C5 said A. TATE sent to her. On November 20, 2015, A. TATE sent a photograph of a female to C5 stating, "*sits at a computer gets 5K a week*" and "*plus she gets fucked by me. Dream life obviously*;" and "*You would make double that*." *Id*. at 111.

**F. <u>Complainant 6: Count 22 (rape); Count 23 (human trafficking)</u>**

Complainant 6 (hereinafter "C6") was contacted by the police in January 2025, and her account of rape and trafficking at the hands of A. TATE is preserved in a video-recorded interview. ECF No. 68-1 at 111. C6's statement details one count of rape and one count of human trafficking.

1. <u>Facts Supporting Count 22 (rape)</u>

C6 met A. TATE through a dating app when she was 21 years old.[14] A. TATE purported to engage in a romantic relationship with C6 while she was in a vulnerable state, experiencing

[14] This was the same dating app that A. TATE used to meet C3. ECF No. 68-1 at 84.

family difficulties, the end of a difficult romantic relationship and feeling isolated from friends. C6 described the sexual relationship between A. TATE and C6 during that time as "always very violent" and "very aggressive." *Id*. at 112-113. C6 recalls that while the intercourse was initially consensual, A. TATE engaged in violent behavior that was never consensual. During intercourse, A. TATE would grab C6 by the head from behind and push her face into the bed making her unable to breathe. C6 would attempt to lift her head up, but A. TATE would continue to push her face back down onto the bed. C6 never consented to suffocation during sexual intercourse. ECF No. 68-1 at 112-113. The multiple vaginal rapes of C6, made nonconsensual by TATE's suffocation of C6, are charged as a single count—Count 22.

2. Facts Supporting Count 23 (human trafficking)[15]

In addition to the sexual violence, A. TATE recruited C6 to work as a cam girl in Romania by telling her that she would be his girlfriend and that she could make money from doing the webcam work without taking her clothes off. C6 traveled to Romania on September 2, 2016; she did not pay for her flight but does not know who did.[16] *Id*. at 114.

On arrival in Romania, T. TATE and another female met her at the airport and took her to the house. *Id*. When C6 arrived at the house in Romania, her passport was taken from her and locked away. *Id*. A. TATE showed her around the house on her first day, and within 24 hours of arriving in Romania, C6 was made to perform naked on webcams. She often worked a minimum

---

[15] A. TATE and T. Tate are jointly charged with this count of trafficking C5; this offense is charged as Count 16 against T. Tate.

[16] Bank records from this time show transactions for C6's bank account occurring on September 2, 2016, at the departing airport in England and then thereafter in Romania until she returned to the United Kingdom on March 17, 2017, corroborating her account that she was there at this time. ECF No. 68-1 at 118.

of nine hour per day doing webcam sex work. Others controlled the webchat and accepted payments for sex acts regardless of her agreement, including masturbation and engaging in digital anal penetration of other females. She was also required to produce bespoke pornographic videos for the Tate brothers' subscribers, including a bespoke video depicting herself urinating in the shower. *Id*. at 115–116.

C6 told authorities that, while in Romania, A. TATE orally raped her and committed non-sexual violent acts towards her, including on one occasion where he grabbed her by the throat, lifted her off the floor, and threatened to kill her for smoking. *Id*. at 116–117. C6 fled Romania back to the United Kingdom, on March 17, 2017, under the auspice of attending a funeral. When she booked the flight, she was forced to purchase a return flight to Romania. Once she returned to the United Kingdom, she told A. TATE from the safety of the United Kingdom that she was not returning to Romania. A. TATE suggested she continue to work with the webcam business from a flat in Luton. She agreed to the proposal only so that she could (safely) return to Romania to collect her belongings.[17] She did return to Romania and retrieved her belongings, and after leaving Romania for the second time, C6 did not undertake further webcam work for A. TATE and blocked the Tate brothers in her phone and on all social media. Screenshots from C6's phone confirm that the Tate brothers were blocked in her contact lists and on social media. *Id.*

According to evidence obtained by the United Kingdom, C6 worked a total of 1,248 hours online between September 2016 and March 2017, generating approximately £93,530.62, of which she was given a little more than a quarter. *Id*.

[17] Flight records also corroborate this account. ECF No. 68-1 at 119.

**G. <u>Charges Related to Pornographic Images: Counts 24, 25, 27-29 (distribution) Counts 31-37 (making); Counts 39-42 (possession)</u>**

The United Kingdom has charged and the United States is seeking certification on five (5) counts of distributing indecent images of a child, seven (7) counts of making indecent images of a child, and four (4) counts of possession of extreme pornographic images against A. TATE.[18] ECF No. 68-1 at 120. These charges arise from forensic examinations of three devices U.K. authorities seized from A. TATE's home and person in 2015, pursuant to court process and his arrest on July 18, 2015, on a matter that does not pertain to the charges sought for extradition. *Id.*

While in custody on the other matter, authorities seized a white iPhone from A. TATE's person, referred to as Exhibit AT01, and two additional devices from the dining room table of A. TATE's residence: a yellow-black Samsung mobile phone, referred to as PKB02, and a laptop, referred to as Exhibit SJB1. U.K. specialists examined the contents of these three devices and discovered 285 images that have been classified as indecent and unlawful under U.K. law. *Id.* at 120-122.

1. <u>Attribution Evidence</u>

The United Kingdom's extradition request sets out attribution evidence for all three of the devices, including that A. TATE provided the passcode for the white iPhone (Exhibit AT01) to law enforcement at the time of his arrest; he said the password was "andy v," which successfully unlocked the device. *Id.* at 126. In addition, the phone number associated with Exhibit AT01 (ending in 8271) was included in an email A. TATE (from emoryatate@gmail.com) sent to the female minor portrayed in the indecent images described below. The same number ending in 8271

---

[18] As reflected *supra* footnote 4, the United States is not seeking certification from this Court on two of the United Kingdom's charges for distributing indecent images of a child and one of their charges for making indecent images of a child.

was stored in C2's phone as "Andrew Tate." *Id*. In messages recovered from a WhatsApp Chat group stored on Exhibit AT01, in which A. TATE purportedly distributed indecent images of the female minor, the sender is referred to as "Andrew" by other participants in the chat. *Id*.

With respect to the second phone, Exhibit PKB02, A. TATE's email address (emoryatate@gmail.com) was logged into the device when police examined it. The device also contained images of A. TATE, including A. TATE and a girl performing sexual acts, and at least 1,337 WhatsApp messages to the minor female portrayed in the charged photographs wherein the user referred to himself as Andrew Tate. *Id*. at 127-129. Exhibit PKB02 also contained a series of email exchanges between the minor female and A. TATE, as well as with the minor female's parents, addressed to "Andrew" at emoryatate@gmail.com. *Id*. at 129.

With respect to the laptop, Exhibit SJB1, subscriber details from Apple for the serial number of the laptop confirmed that the device was registered to "Emory Tate," using the same emoryatate@gmail.com email address,[19] as well as A. TATE's mailing address in Luton. *Id*. at 130. Examination of the device showed that it accessed various WiFi networks that, when cross referenced with A. TATE's financial records, indicate that A. TATE took the device with him when he traveled. *Id*. at 130-131. The device's web history revealed that it was used to visit various My Free Cams pages, where A. TATE conducted his sex webcam business. *Id*. at 131.

On June 21, 2016, A. TATE used the email account associated with all three devices to lodge a complaint with the Independent Police Complaints Commission. In his complaint, A. TATE wrote, "*I was arrested for something I did not do over 1.5 years ago. At the time* ***my mobile phone and laptop were confiscated from me***." *Id*. at 126 (emphasis added). He also described

---

[19] A Dropbox account was installed on SJB1 that was signed into using the email address emoryatate@gmail.com.

videos from the phone that were published in the media as ones that "*…ONLY existed on the phone which was confiscated from me*." *Id*.

Despite these admissions, in an interview under caution conducted by U.K. authorities on August 12, 2016, A. TATE told police that he could not recall which device seized by police was his personal mobile telephone. He told police that the phone seized from his person was not, in fact, his own device. He said that, at the time of his arrest, he had simply picked up a device from within his house and that the telephone taken from him was that device rather than his personal mobile phone.[20] *Id*. at 124-125.

2. Overview of the Unlawful Images

An appropriately trained U.K. law enforcement officer examined the contents of the three devices and categorized 285 images as indecent and unlawful images, as follows:

- 66 Category A images depicting penetrative sexual activity, sadism, or bestiality, involving a child;
- 26 Category B images showing non-penetrative sexual activity involving a child;
- 76 Category C images of other indecent images not covered by Category A or B, such as sexually suggestive poses or nudity without active sexual acts; and
- 117 Extreme images depicting either adult images of a serious violent nature (actual or realistic) produced for the purpose of sexual arousal or sexual images involving penetration of or by animals with adults.

*Id*. at 121-22, 176. The 168 images classified as Category A, B, and C images depict the same female minor, whose identity is known to the United Kingdom and whose passport confirms that

[20] A. TATE also admitted to being part of WhatsApp chat groups with large numbers of participants that shared messages and media and argued that the images may have been shared in the chat and automatically saved to the devices. ECF No. 68-1 at 125.

she was under the age of 18 throughout the relevant period and when the devices containing the unlawful images were seized from A. TATE and his home on July 18, 2015. *Id.* at 122-23.

Messages recovered from A. TATE's devices demonstrate his knowledge that the female subject of the indecent images charges was a minor at the time he made and/or distributed the indecent images and while she was working for A. TATE in his sex webcam business. *Id*. at 123-124. For example, during an exchange with the minor about her father wanting her to return home, A. TATE asked the minor, "*what will he do if I tell him your (sic) not coming [home]*", and the minor replied, "*Fly his ass his with police*" "*start a court case*" "*I don't know he's crazy*". *Id*. at 123. A. TATE replied, "*Well then we have a problem legally Ur not old enough to do this*," and later stated, "*If he wants to bring direct heat on me it'll be easy and I could get in legal trouble cause ur (sic) 17*" and "*So it's not that simple*." *Id*. at 123-124.

On the same day, A. TATE and T. Tate discussed how to deal with the "problem." A. TATE wrote to T. Tate, "*Im thinking what is best reply to him*," and "*They'll ask [the female child] for id and she will havr to say that she doednt have any and her dads lying to try and get her back*." He also wrote, "*She doednt look 17 at least*," to which T. Tate replied, "*Exactly*." *Id*. at 124.

The United Kingdom provided detailed descriptions for each of the images and/or videos either distributed, made or possessed for the purpose of showing that they are in fact of a criminally indecent nature. For ease of reference, these image descriptions, the counts to which they relate and the device on which they were recovered, are contained in the attached chart at Exhibit A.

3. <u>Facts Supporting Counts 24, 25, 27-29 (distribution of indecent images of a minor</u>)

For the five (5) distribution counts, the United Kingdom explains the manner and means by which the images of the minor female are distributed, detailing the messages sent from A.

TATE, using phone number ending in 8271 from device AT01 (white iPhone), to the receiver of each image:

(1) On June 1, 2015, immediately prior to sending the Category A image as charged in Count 24, which depicted the minor female lying on her back with her breasts and vagina exposed, while penetrating her vagina with her fingers, A. TATE wrote to the recipient "*I got a girl in […]*," and "*Does anything I say*." *Id*. at 133-134. Immediately after sending the Category A image charged in Count 24, A. TATE wrote to the recipient, "*Told her I'd dump her if she didn't fist herself So now she keeps sending me vids trying*," and "*she won't give up 6 vids so far*." ECF No. 68-1 at 134.

(2) On June 3, 2015, immediately prior to sending the Category A image as charged in Count 25, which showed the minor female lying on her side with her buttocks facing the camera and her vagina exposed; she then penetrated her vagina with her fingers and then proceeded to place all five fingers and a portion of her hand into her vagina; she changed positions and continued to push her hand deeper inside her vagina, *id*. at 135, A. TATE wrote to the recipient that "*I got a girl who works for me there who's in love with me*," "*Begging for me to come and see her but I'm always abroad Bla Bla*," and "*She has a client who keeps offer [sic] her a grant to fist herself so I said. Learn to fist yourself so you can take a grand a week off that punk and I'll come*." *Id*. at 135. Immediately after sending the Category A image charged in Count 25, A. TATE wrote to the recipient, "*And she did. That's true love*," and "*So better go see her for a few days*." *Id*. The recipient replied, "*lol sounds like a good girl*." *Id*.

(3) On June 14, 2015, immediately prior to sending the Category A image as charged in Count 27, which showed the minor female lying on her side with her buttocks facing the camera and her vagina exposed; she then penetrated her vagina with her fingers and then proceeded to

place all five fingers and a portion of her hand into her vagina; she changed positions and continued to push her hand deeper inside her vagina, A. TATE wrote to the recipient, "*I told [...] I'd dump her if she didn't learn to fist herself*." *Id*. at 137. Three days later, on June 17, 2015, A. TATE and the recipient further discussed the female child and her videos, in which A. TATE sent a screenshot image of two payments of $1,000.00 received into his PayPal account on June 15, 2015, followed by "*And he gave 2000 dollars*" "*To watch her do it*." *Id*. at 137-138. The recipient replied, "*make her work*," "*What a ledge*" and "*Fighting is for peasants*." *Id*. at 138. A. TATE wrote, "*Saggy pussy but ass still tight she can fist all day I want my money!*" to which the recipient replied, "*Get it hoe*" and "*We'll trained*." *Id.*

(4) On June 19, 2015, immediately prior to sending the Category A image as charged in Count 28, which depicted the minor female penetrating her vagina with a finger, A. TATE first sent a regular image of the minor female to a WhatsApp group titled "*Plot*," writing, "*This girl [...] is super obsessed with me*" "*works on webcam and loves me*," to which a recipient responds, "*Fuck Andrew!!!*" "*She's Perfect*" and "*Andrew show us the way*," to which A. TATE replied, "*Lemme show you*." *Id*. at 139. A. TATE then shared a screenshot of messages between himself and the minor female wherein the minor wrote, "*Does it make you smile daddy*," to which A. TATE replied, "*I'll smile when your fist is inside*." *Id*. The minor female responded, "*Can't put it deeper*," to which A. TATE replied, "*You can and you will*," and "*Put it up to your wrist*." After sharing this exchange with the WhatsApp group "*Plot*," a recipient wrote, "*No way! Your actually a living legend*." *Id*. at 140

(5) Also on June 19, 2015, as part of the same WhatsApp group exchange above, A. TATE sent the Category A image charged in Count 29, which showed the minor female lying on her side with her buttocks facing the camera and her vagina exposed; she then penetrated her vagina with

her fingers and then proceeded to place all five fingers and a portion of her hand into her vagina; she changed positions and continued to push her hand deeper inside her vagina, A. TATE wrote "*And finally she learnt how*," "*cause I said I won't talk to her till she can do it*." *Id*. at 140-141. The recipients reply, among other things: "*Andrew you're the man loooool*," and A. TATE replied, "*Hahaha I got Tristan beat I have loads of storys [sic] like this*." *Id*.

4. Facts Supporting Counts 31-37 (making indecent images of a child)

In relation to the charges of making indecent images of children, the United Kingdom provides that the relevant images as charged in Counts 31-37 were stored on devices attributable to A. TATE. *Id.* at 142-46. As a result of its investigation, the United Kingdom has inferred that A. TATE took an action that caused the images to exist on that particular device; to produce it by his actions, or to bring it about. *Id.* at 142-43. The images depicted in Counts 31-37 are as follows:

- Count 31: 36 Category A images and videos appearing on device AT01 (white iPhone), including depiction of the minor's exposed genitals and anus as the minor penetrates her anus with her hand;

- Count 32: 13 Category B images and videos appearing on device AT01 (white iPhone), including depiction of the minor having non-penetrative intimate contact with an adult female while both participants are on a bed with the child wearing lingerie and her breasts exposed;

- Count 33: 41 Category C images appearing on device AT01 (white iPhone), including depiction of the minor lying on a bed with her genitals exposed and displayed to the camera;

- Count 34: 3 Category B images appearing on device PKB02 (yellow-black Samsung phone), including depiction of the minor naked with her fingers on her exposed genitals, potentially including an object inserted in her vagina;

- Count 35: 17 Category C images appearing on device PKB02 (yellow-black Samsung phone), including depiction of the minor with her upper body exposed with one hand resting on her exposed breast;

- Count 36: 30 Category A images appearing on device SJB1 (laptop), including depiction of the minor naked and holding an object inserted into her vagina; and

- Count 37: 10 Category B images and videos appearing on device SJB1 (laptop), including depiction of the minor wearing lingerie and kissing while A. TATE is seated on a bed, speaking into a camera. The video also includes an adult female whose breasts are exposed leaning across A. TATE and kissing the minor.

For ease of reference, the relevant information for each of the above-listed charges is contained in the attached chart at Exhibit A.

5. Facts Supporting Counts 39-42 (possession of extreme pornographic images)

With respect to the charges of possession of extreme pornographic images as described and charged in Counts 39-42, the United Kingdom explains that there is evidence that the relevant images were stored on the devices attributable to A. TATE. ECF No. 68-1 at 147-50. As described further in Exhibit A, the images at issue in Counts 39 and 40 were found on device SJB1 (laptop) and each depicted a person performing an act of intercourse with a live animal—an eel and a horse, respectively. The two images underlying the charges in Counts 41 and 41 were found on device PKB02 (yellow-black Samsung phone) and depicted individuals violently mutilating their genitalia. The United Kingdom has provided additional details about the content of these images in its extradition request. *See* ECF 68-1 at 148-50.

## APPLICABLE LAW

### I. THE ROLE OF THE JUDGE IN EXTRADITION PROCEEDINGS

"The power to extradite derives from the President's power to conduct foreign affairs." *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828 (11th Cir. 1993) (citing U.S. Const. art. II, § 2, cl. 2). Thus, extradition is primarily an executive responsibility. Nevertheless, the Executive delegates "an independent review function" to the judiciary, as defined by the extradition statute. *Id.* So the judicial officer presiding over an extradition hearing does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a

special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted).

Pursuant to Section 3184, the extradition court holds a hearing to consider the evidence of criminality presented by the foreign country and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If any evidence is offered by the fugitive, the judge rules on its admissibility. Once the record is complete, the judge should make written findings of fact and conclusions of law as to each of the elements for certification. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). If the judge finds that the evidence is sufficient, he or she "shall certify [his or her findings] . . . to the Secretary of State." *Id.*[21] The Secretary of State, and not the Court, ultimately decides whether to surrender the fugitive. 18 U.S.C. § 3186.

## II. PROCEDURES DURING THE EXTRADITION HEARING

### A. An extradition hearing is not a criminal proceeding.

An extradition proceeding "is not a criminal proceeding," *Martin*, 993 F.2d at 828, and "[t]he magistrate does not inquire into the guilt or innocence of the accused," *Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004) (internal quotation marks and citation omitted); *see also*, *e.g.*, *Benson v. McMahon*, 127 U.S. 457, 463 (1888) ("[T]he proceeding before the [extradition judge] is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him . . . ."); *Arias v. Warden*, 928 F.3d 1281,

[21] If the extradition court certifies the matter to the Secretary of State, it must commit the fugitive to the custody of the United States Marshal to await further determination by the Secretary regarding surrender to the representatives of the requesting state. *See* 18 U.S.C. § 3184 (following certification, the judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made").

1286 (11th Cir. 2019) ("A United States court dealing with an extradition request for an accused is obliged to resist any temptation to judge the guilt or innocence of the accused." (internal quotation marks and citation omitted)). A fugitive's guilt or innocence is determined by a foreign court through "a trial according to the modes established in the country where the crime was committed[.]" *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *see Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008) ("Determining the ultimate guilt of the accused, therefore, is a function committed to the justice system of the requesting country."). Accordingly, in an extradition proceeding, the government must show only "probable cause that the fugitive is guilty." *Kastnerova*, 365 F.3d at 987 (internal quotation marks omitted); *see also*, *e.g.*, *Collins v. Loisel*, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

**B. Usual constitutional rights and criminal procedures do not apply.**

"By design, the procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation." *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011) (internal quotation marks and citation omitted). Given the unique and limited nature of extradition proceedings, and the United States' international obligations under extradition treaties, limited procedural and evidentiary rules apply to extradition hearings. By their express terms, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include … the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to … miscellaneous proceedings such as extradition or rendition.").

Hearsay evidence is admissible at an extradition hearing and may sustain a determination that the fugitive is extraditable. *See, e.g.*, *Collins*, 259 U.S. at 317 ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate . . . ."); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005) (probable cause determination based on an unsworn bill of indictment); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *4 (S.D. Fla. May 28, 2015) ("A certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government.").

The circumscribed nature of extradition proceedings also limits the fugitive's opportunity to challenge the evidence introduced against him. "Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) (internal quotation marks, citation, and emphasis omitted); *see also, e.g.*, *Collins*, 259 U.S. at 315-17; *Castro Bobadilla*, 826 F. Supp. at 1433. As such, "[t]estimony that merely gives the opposite version of the facts does not destroy the [probability] of guilt and is therefore inadmissible." *Martinelli*, 2017 WL 3776953, at *9 (internal quotation marks omitted). This allowance of "explanatory evidence" and prohibition on "contradictory evidence" is rooted in the fact that an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986). A contrary rule might compel the "demanding government to produce all its evidence …

both directing and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (citation omitted). The admission of such explanatory evidence is largely within the discretion of the Court. *E.g.*, *Matter of Extradition of Ben-Tov*, 2006 WL 8463565, at *2 (S.D. Fla. Feb. 27, 2006); *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) (citing *Collins*, 259 U.S. at 315-17).

Additionally, the fugitive is not entitled to certain rights normally attendant criminal proceedings in the United States. Because extradition hearings "are not to be converted into a dress rehearsal trial," a fugitive has no right to discovery in extradition proceedings. *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) (upholding denial of discovery); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976) (same). Relatedly, an extradition hearing is not the time to weigh affirmative defenses to the charges. *See, e.g.*, *Shapiro*, 478 F.2d at 900-01 (explaining that a judicial officer may properly exclude "evidence of alibi," "facts contradicting the demanding country's proof," or proof of a defense); *see also Charlton v. Kelly*, 229 U.S. 447, 462 (1913); *Collins*, 259 U.S. at 316-17. "And an extraditee is also not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses." *See Martinelli*, 2017 WL 3776953, at *9 (citing *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993)); *see also, e.g.*, *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003). Such issues, which require factual or credibility determinations, are for the courts in the requesting country to resolve.

Moreover, the fugitive's constitutional rights are limited. For example, the fugitive has no right to cross-examine a witness who might testify, *Skaftouros*, 667 F.3d at 155 n.16; there is no right for the fugitive to confront his accusers, *id.* (citing *Bingham*, 241 U.S. at 517; there is no right to a speedy extradition, *Martin*, 993 F.2d at 829; and the Fourth Amendment's exclusionary rule is not applicable, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980).

### C. <u>Extradition hearings rely on written submissions, not live testimony.</u>

A certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information that the foreign government requesting extradition has provided. *See, e.g.*, *Afanasjev*, 418 F.3d at 1164; *cf. Collins*, 259 U.S. at 317 (noting that "unsworn statements of absent witnesses may be acted upon" even if such statements would ordinarily be prohibited). Indeed, extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Treaty governs the certification of documents introduced during an extradition hearing. Article 9 of the Treaty, as amended, provides that documents bearing "the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization." Here, the United Kingdom has complied with the Treaty's requirements for authentication by submitting documents that bear the certificate or seal of the U.K. Home Office. Thus, the documents provided by the United Kingdom are admissible in these proceedings.

### D. <u>The rule of non-inquiry: the Executive considers all matters other than sufficiency.</u>

In extradition proceedings, the rule of non-inquiry "precludes courts from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request . . . [Courts] have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch." *Arias*, 928 F.3d at 1295. In other words, a judicial officer reviews only the sufficiency of the evidence, *see* 18 U.S.C.

§ 3184, and the Court is "bound by the existence of an extradition treaty to assume that the trial" in the requesting state "will be fair," *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911); *Martinelli*, 2017 WL 3776953, at *28-29. All other matters fall within the ambit of the Executive's power to conduct foreign affairs. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. I.N.S.*, 107 F.3d 191, 195 n.7 (3d Cir. 1997); *see also Hurtado v. U.S. Atty. Gen.*, 401 F. App'x 453, 456 (11th Cir. 2010). The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the receiving country. *See Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act … performed through the Secretary of State" within the Executive's prerogative. *See In re Kaine*, 55 U.S. 103, 110 (1852); *Martin*, 993 F.2d at 828.

## III. THE REQUIREMENTS FOR CERTIFICATION

At the extradition hearing, a court's review is limited to determining whether: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the applicable treaty covers the crimes for which extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause as to each charge for which extradition is sought. *E.g.*, *Shaw*, 2015 WL 3442022, at *5 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *see also, e.g.*, *Martinelli*, 2017 WL 3776953, at *10. Each of these five requirements is satisfied; the Court, therefore, should issue a certification to the Secretary of State.

**A. <u>The Court is authorized to conduct the extradition hearing.</u>**

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State[.]" 18 U.S.C. § 3184. The extradition statute therefore expressly permits a magistrate judge to render a certification, and this District's local rules expressly authorize magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184." *See* Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida, Rule 1(a)(3). Thus, the Court is authorized to preside over the extradition proceedings.

**B. <u>The Court has jurisdiction over A. TATE.</u>**

A court has jurisdiction over a fugitive found within its jurisdictional boundaries. *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction … issue his warrant for the apprehension of the person so charged."). When the Court's provisional arrest warrant was executed, A. TATE was in Miami, Florida, which is in the Southern District of Florida. Thus, the Court has jurisdiction over A. TATE.

**C. <u>The Treaty is in full force and effect.</u>**

Extradition is appropriate when a treaty or convention is in full force and effect between the requesting state and the United States. 18 U.S.C. § 3184; *see also Kastnerova*, 365 F.3d 980, 987 (11th Cir. 2004) (dismissing habeas petition challenging certification of extradition, because, among other reasons, district court did not err in determining extradition treaty to be valid).

Here, an Attorney Adviser in the Office of the Legal Adviser for the Department of State submitted a declaration attesting that the Treaty is in full force and effect between the United States and the United Kingdom. *See* ECF No. 68-1 at 1, ¶ 2. When determining whether a treaty is in

full force and effect, a court defers to the determination of the Department of State. *See Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Charlton*, 229 U.S. at 468; *Arias*, 928 F.3d at 1288 ("[C]ourts *must* defer to the determination of the executive branch in deciding whether an extradition treaty remains in force." (emphasis in original, internal quotation marks omitted)). Moreover, the Treaty itself prescribes termination procedures that have not occurred. Treaty at Art. 22.

**D. <u>The Treaty covers the crimes for which the United Kingdom seeks extradition.</u>**

An extradition treaty creates an obligation for the United States to surrender fugitives under the circumstances the treaty specifies. Here, the Treaty provides for the extradition of "persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses." ECF No. 68-1 at 13 (Treaty, Art. 1). The Treaty further states, in relevant part, that "an offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty." *Id.* at Art. 2(1).[22] Also, an offense is extraditable regardless of whether (a) "the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology;" or (b) "the offense is one for which United States federal law requires the showing of such matters as interstate transportation…such matters being jurisdictional only." *Id.* at Art. 2(3).

In assessing whether the Treaty covers the offenses for which the United Kingdom seeks extradition and the State Department has authorized to proceed, the Court should examine the description of criminal conduct that the United Kingdom has provided and determine whether that

---

[22] Art. 2(5) of the Treaty permits extradition for an offense punishable by less than one year's deprivation of liberty, provided that the other requirements for extradition are met, and that extradition has been granted for at least one extraditable offense. ECF No. 68-1 at 13.

conduct, if it had been committed in the United States, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Wright v. Henkel*, 190 U.S. 40, 60–61 (1903); *Arias*, 928 F.3d at 1292-93; *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000). This is commonly referred to as the dual criminality requirement.

A requesting country need not establish that its crimes (or the elements of the crimes) are identical to crimes in the United States. *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 217 (4th Cir. 2014) (collecting cases). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312. Thus, the fact that the foreign offense may be broader than its U.S. analogue, or vice versa, does not defeat dual criminality. *See Arias*, 928 F.3d at 1293 (citing *Man-Seok Choe v. Torres*, 525 F.3d 733, 738 (9th Cir. 2008)); *see also, e.g.*, *id.* ("Dual criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours." (internal quotation marks and citation omitted)); *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged.").

In fulfilling its function under Section 3184, the Court should construe liberally the applicable extradition treaty to effectuate its purpose, namely the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 293, 303 (1933). Because extradition treaties should be "interpreted with a view to fulfil[l] our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court "must approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla.

1981); *cf. Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) ("The point of an extradition treaty after all is to facilitate extradition[.]").

To assist the court in its dual criminality analysis, the United States has composed a chart, attached here as Exhibit B, containing for each charge: 1) the U.K. count number; 2) the U.K. statute; 3) the maximum U.K. penalty; 4) a description of the basic facts underlying each charged offense; 5) the U.S. and/or Florida statute(s) that would apply to the criminal conduct as alleged;[23] and 6) the maximum U.S. and/or Florida penalty or penalties. As demonstrated therein, all of the offenses for which the United States seeks certification of extradition are dually criminal and thus extraditable offenses under the Treaty.

**E. The United Kingdom's submission establishes probable cause that A. TATE committed the charged offenses.**

The domestic probable cause standard governs whether the foreign country's evidence is "sufficient to sustain the charge," as required under Section 3184. *See, e.g.*, *Kastnerova*, 365 F.3d at 987. To certify the evidence to the Secretary of State, the Court must conclude that probable cause exists to believe that the crimes charged by the United Kingdom were committed and that the person before the Court committed them. *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *Sindona v. Grant*, 619 F.2d 167, 175 (2d Cir. 1980); *Castro Bobadilla*, 826 F. Supp. at 1432. Probable cause exists where it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The Court does not evaluate guilt or innocence, nor does it

[23] Exhibit B does not include each and every possible U.S. federal or Florida state statute that might apply to the underlying conduct.

attempt to determine whether the evidence is sufficient to prove criminality beyond a reasonable doubt. *See Arias*, 928 F.3d at 1286; *Kastnerova*, 365 F.3d at 987.

As detailed above in the "U.K. Offenses" section, the authenticated U.K. submission puts forward evidence from which a person of ordinary prudence and caution could entertain a reasonable belief of A. TATE's guilt as to all offenses. Further analysis follows:

1. <u>Rape and Assault</u>

A. TATE is alleged to have committed ten counts of rape in violation of Section 1 of the U.K. Sexual Offences Act 2003, and seven counts of assault occasioning actual bodily harm in violation of Section 47 of the Offences Against the Person Act 1861. With respect to the rape charges, Section 1 the U.K.'s Sexual Offences Act 2003 provides that a person "(A) commits an offence of rape if (a) he intentionally penetrates the vagina, anus or mouth of another person (B) with his penis; (b) B does not consent to the penetration, and (c) A does not reasonably believe that B consents." Further, "[w]hether a belief is reasonable is to be determined having regard to all the circumstances, including any steps A has taken to ascertain whether B consents." *See* ECF No. 68-1 at 156-157. Under U.K. law, "penetration is a continuing act from entry to withdrawal so that it follows that consensual intercourse will become rape if the woman or man ceases to consent during the intercourse and the accused with the necessary mens rea continues the intercourse." *Id*. at 157. Section 74 of the Sexual Offences Act 2003 provides that "a person consents if he agrees by choice and has the freedom and capacity to make that choice." *Id*. at 158. Under Section 75, violence used immediately before or during the act gives rise to a presumption that the complainant did not consent and that the defendant lacked a reasonable basis to believe otherwise. *Id*. at 158–160.

With respect to assault occasioning bodily harm under Section 47 of the U.K.'s Offences Against the Person Act, "an assault is any act, and not a mere omission to act, by which a person intentionally or recklessly causes another to apprehend immediate and unlawful violence." *Id*. at 163. To be liable for assault occasioning bodily harm, the prosecution must prove the assault "occasioned," or caused, the bodily harm. "Bodily harm" has its ordinary meaning and also includes a momentary loss of consciousness. *Id*. at 164. Under U.K. law, a person cannot consent to the infliction of actual bodily harm, unless it falls within a recognized exception, such as sport. *Id*. Accordingly, where sexual activity involves the intentional infliction of actual bodily harm, including injury caused by choking, strangulation or other forms of rough sexual violence, consent does not provide a defense. *Id*. at 165.

The ten (10) charges of rape (Counts 3, 4, 8, 11, 12, 15, 16, 19, 20, 22) and seven (7) charges of assault (Counts 5, 6, 7, 9, 13, 14, 17) pending against A. TATE in the United Kingdom rest on highly detailed, firsthand accounts from five independent complainants, each memorialized in video-recorded statements to law enforcement and summarized above. Standing alone, these comprehensive victim statements are sufficient to establish probable cause for the charged offenses. *See, e.g., United States v. Martinelli*, 454 F.3d 1300, 1306-07 (11th Cir. 2006) (holding that firsthand testimony from victim-witnesses can establish probable cause); *see also United States v. Golden*, 545 F. App'x 920, 921 (11th Cir. 2013) (upholding a search warrant based on uncorroborated testimony from a minor victim); Fla. Stat. § 794.022(1) (providing that victim

testimony need not be corroborated in prosecutions for specified offenses, including rape and human trafficking).[24]

While the highly detailed victim testimony can alone be found sufficient to support probable cause, the United Kingdom's request for extradition does not rely on victim testimony alone. It sets forth substantial independent corroboration for each complainant, including communications in which A. TATE incriminates himself, disclosures to friends and family, and contemporaneous witness observations of injuries and physical marks allegedly inflicted by him. For four of the five complainants who were later trafficked by A. TATE, the request further details evidence corroborating their accounts of commercial sexual exploitation, including recruitment communications with A. TATE, travel records, and banking records. This evidence provides powerful indicia of reliability that reinforces and independently supports the alleged victims' accounts of rape and assault.

The complainants' accounts, given independently over a span of years, reveal a remarkably consistent pattern. Each describes the same core dynamic: the rapid establishment of control through intimidation, domination, and violence. The similarities are neither isolated nor superficial. Across multiple victims, A. TATE allegedly employed the same methods to test boundaries, assert power, and condition compliance—conduct that appears closely linked to his recruitment of women to work as "cam girls," as four of the complainants ultimately did.[25]

---

[24] The Background section above contains a detailed account of the key facts and evidence in support of probable cause for each count. For a streamlined review of the facts and evidence underlying each count, please refer to Exhibit B, Dual Criminality Chart.

[25] C2, who was older than the others when she met A. TATE under the auspices of recruiting her to train other girls, seemingly "failed" the test by cutting all ties to A. TATE after he raped her, whereas many other victims who "passed" endured months if not years of sexual violence at the hands of A. TATE.

The alleged violence itself followed a similarly consistent pattern. The complainants repeatedly described choking, strangulation, or the intentional restriction of breathing during sexual encounters. Several reported being forced to tell A. TATE they loved him in effort to stop him. Multiple complainants lost consciousness during the assaults. Under U.K. law, such violence gives rise to a presumption that the complainant did not consent and that the defendant lacked a reasonable basis to believe otherwise. *See* Doc 68-1 at 158-160.

Viewed separately, each complainant's testimony sufficiently establishes probable cause for the corresponding charges. Viewed together, the accounts form a compelling and mutually reinforcing body of evidence, one that is further strengthened by independent corroboration. With or without that corroborating evidence, the record amply supports a finding of probable cause that A. TATE committed the charged offenses of rape and assault.

2. Human Trafficking and Controlling Prostitution for Gain

The United Kingdom alleges that four of the five victims of rape and assault discussed above were also victims of human trafficking or prostitution for gain by A. TATE for which he is charged in five (5) counts of human trafficking (Counts 1, 2, 18, 21, 23) and one (1) count of prostitution for gain (Count 10), in violation of Sections 2 and 3 of the Modern Slavery Act. With the addition of C1,[26] the United Kingdom has identified five victims who were allegedly exploited through the same overarching scheme. Four victims (C1, C5, C6, and C7) were recruited or enticed to travel to Romania for commercial sexual exploitation, while C3 was recruited to perform

[26] C1 is also an alleged victim of rape and assault, but only at the hands of A. TATE's brother, business partner, and co-conspirator, Tristan Tate.

commercial sexual services in England under A. TATE's direction, resulting in the charge that he controlled her prostitution for gain.

Under U.K. law, a person violates Section 2(1) of the Modern Slavery Act 2015 if they "arrange[] or facilitate[] the travel of another person ("V") with a view toward V being exploited." ECF No. 68-1 at 166. Under Section 3 of the Act, a person is "exploited" under Section 2(1) if, for example, "something is done to or in respect of the person- which involves the commission of an offense under… Part 1 of the Sexual Offences Act 2003." *Id*. at 167-168. Part 1 of the Sexual Offences Act 2003 includes, but is not limited to, sexual offences against adults and children and controlling prostitution for gain. *Id*. at 169. The offense of controlling prostitution for gain is defined as "intentionally control[ing] any of the activities of another person relating to that person's prostitution[27] in any part of the world… for or in the expectation of gain for himself or a third person." *Id*. at 170. A person is also "exploited" under the meaning of Section 2(1) of the Modern Slavery Act 2015 if the person is subjected to "force, threats or deception designed to induce him or her- (a) to provide services of any kind…" *Id*. at 168-169.

The evidentiary support for the human trafficking and controlling prostitution allegations is substantial. The United Kingdom relies not only on the detailed accounts of the complainants themselves, but also on communications documenting recruitment efforts, promises of earnings, and efforts to persuade women to work for the operation; travel records corroborating the victims'

---

[27] Prostitution involves the provision of "sexual services" to another person in return for payment or a promise of payment. "Sexual services" is not statutorily defined, but "sexual" is defined in Section 78 of the Sexual Offence Act 2003, which provides that "penetration, touching or any other activity is sexual if a reasonable person would consider that-(a) whatever its circumstances or any person's purposes in relation to it, it is because of its nature sexual, or (b) because of its nature it may be sexual and because of its circumstances or the purpose of any person in relation to it (or both) it is sexual." *Id*. at 171–172.

movements and dates of transportation; financial records reflecting payments made to victims allegedly in exchange for their commercial sex work;[28] and other contemporaneous documentary evidence corroborating the existence and operation of the enterprise. For example, the request includes evidence concerning A. TATE's sexual exploitation of a minor female whom he claimed worked for him, further corroborating the broader exploitation scheme described by the adult complainants.

Notably, the complainants' accounts contain recurring details that naturally reinforce one another. Multiple women describe being recruited through romantic promises (C3, C5, C6 and C7), transported to Romania at the Tates' arrangement and/or expense (C1,[29] C5, C7 and likely C6), pressured to engage in increasingly explicit sexual performances and finding themselves unable to exercise the autonomy they had been promised (C1, C6 and C7). More than one complainant reported having her passport retained after arrival (C5 and C6). Others described restrictions on their freedom of movement, fear of retaliation if they left, or the need to beg, fabricate emergencies, or otherwise devise means of escape before being allowed to depart. One complainant ultimately fled only after concocting a false family emergency (C7); another repeatedly begged to be permitted to leave (C1); still another was told she could not leave after expressing a desire to return home and only secured her release after invoking concern from her family members (C5); and another reported leaving Romania under the guise of attending a funeral (C6). These recurring circumstances permit a reasonable inference that the alleged exploitation was not accidental or ad hoc but reflected a deliberate method of operation.

---

[28]*See* footnote 24, *supra.*

[29] The Tate brothers arranged for C1 to travel more than once to Romania for purposes of online prostitution and is the subject of two separate counts as a result (Counts 1 and 2).

In sum, each complainant's account and corroborating evidence viewed individually clears the probable cause threshold with considerable room to spare, as the required standard is a hurdle, not a high jump. Taken together, the evidence reveals a coherent and highly consistent pattern in which vulnerable women were recruited through promises of romance and economic opportunity, transported or directed into commercial sexual services, subjected to varying forms of control and coercion and violence, and exploited for the financial benefit of A. TATE and his associates. The complainants' mutually reinforcing accounts, together with the documentary corroboration of travel records and payments, decisively crosses the finish line in establishing probable cause for the human trafficking and controlling prostitution charges.

3. Making or Distributing Indecent Images of Children

For the five distribution counts (Counts 24, 25, 27, 28, 29), the United Kingdom explains in great detail the manner and means by which the images of the minor female are distributed, setting forth the messages sent from A. TATE, using phone number ending in 8271 from device AT01 (a device that is clearly attributable to A. TATE, *see supra* pages 30-32) to the receiver of each image. *See infra* pages 33-36. From the context of the messages, it is obvious who the sender is: A. TATE.

It is also clear who persuaded or enticed the minor female to produce the indecent videos and images at issue in Counts 31-37. Like the images A. TATE is charged with distributing, the images he is charged with making were found on devices attributable to A. TATE and contain explicit content involving the same minor female. The documented text exchanges between A. TATE and others, *see supra* pages 33-36, establish that A. TATE has a documented history of directing this specific minor female to perform certain sexual acts on camera and provide the images to him. Moreover, some of the images A. TATE is accused of making are strikingly similar

to those he charged with distributing. *Compare* Counts 24, 25, 27-29 (depicting the minor female inserting all or a portion of her hand in her vagina, *with* Count 31 (depicting the same minor female penetrating her anus with her hand). Additionally, it is notable that A. TATE is physically present in at least one of the images that he is accused of making (Count 37).[30] Accordingly, the United Kingdom provide sufficient evidence to warrant A. TATE going to trial in that country on these charges.

4. Possession of Extreme Pornographic Images

For the four counts related to the possession of extreme pornographic images (Counts 39-42), the United Kingdom provided detailed information about its investigation and how the devices on which the images were found can be attributed to A. TATE. *See supra* pages 30-32; ECF No. 68-1 at 148-50. As the United Kingdom explained in its extradition request, "the presence of [the] images on devices under his control provides evidence of his possession of them." ECF No. 68-1 at 147. Moreover, any reasonable person could find that the images, which depict bestiality and violent genital mutilation, are "extreme" images, in that they are "grossly offensive, disgusting, or of an obscene character," particularly because some of them depict acts that "threaten a person's life," "results, or is likely to result, in serious injury to a person's anus, breasts or genitals," or involve a sexual act "with an animal." *See* ECF No. 68-1 at 148-50, 178-79. Accordingly, the Court should conclude that the record contains sufficient evidence warranting certification of extraditability on these counts.

---

[30] While the United States is not seeking certification of extradition on Count 30, A. TATE is also physically present in the image at issue in that count. *See* ECF No. 68-1 at 141-42.

**Conclusion**

For the foregoing reasons, the United States requests that the Court determine that the submission on behalf of the United Kingdom is sufficient to sustain the charges under the provisions of the applicable Treaty and certify the extradition of A. TATE for the charges sought to the Secretary of State for possible surrender to the United Kingdom.

Dated: October 26, 2026

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: *<u>/s/ Alejandra L. López</u>*
ALEJANDRA L. LÓPEZ
Assistant United States Attorney
Fla. Bar No. 37132
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9241
Email: Alejandra.Lopez@usdoj.gov

By: *<u>/s/ Abbie D. Waxman</u>*
ABBIE D. WAXMAN
Assistant United States Attorney
Fla. Bar No. 109315
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9240
Email: Abbie.Waxman@usdoj.gov

A. TYSEN DUVA
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

By: *<u>/s/ Kerry A. Monaco</u>*
KERRY A. MONACO
Associate Director
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503560
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 616-4798
Email: Kerry.Monaco2@usdoj.gov

By: *<u>/s/ Rachel M. Yasser</u>*
RACHEL M. YASSER
Trial Attorney
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503561
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 674-5702
Email: Rachel.Yasser2@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 26, 2026, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF, which caused the same to be served on Howard Srebnick, Esquire, Jackie Perczek, Esquire, Thomas Maniotis, Esquire and Joseph McBride, Esquire, counsel for the Defendant.

*/s/ Abbie D. Waxman*
Abbie D. Waxman
Assistant United States Attorney